



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

### RSA UNION BUILDING

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410

BOB RILEY
GOVERNOR

JOHN M. HOUSTON
COMMISSIONER

April 25, 2007

## BY FACSIMILE AND
## OVERNIGHT MAIL

Ollie Croom, Investigator
U. S. Equal Employment Opportunity Commission
Birmingham District Office - 420
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL  35205

RE:     **EEOC Charge No. 420-2007-01385**
          **Charging Party:  Winifred Blackledge**

Dear Ms. Croom:

In response to the request for a statement of our position with respect to the issues contained in the above charge, the Department of Mental Health and Mental Retardation (DMH/MR) denies the Charging Party's allegations of discrimination and retaliation and submits the following information:

On the Charge of Discrimination form signed by the Charging Party, the boxes for race, color, and retaliation are marked as the cause of discrimination; however, the Charging Party only alleges retaliation-based discrimination and refers to her most recent Performance Appraisal as an example.  Therefore, this response will provide the race of the individuals named, but it will only address the Charging Party's allegation of retaliation-based discrimination.

The DMH/MR agrees with the Charging Party's statements that she filed a Charge of Discrimination with the EEOC in 2004 and subsequently filed a lawsuit.  However, the DMH/MR denies that the Charging Party is being retaliated against for filing the EEOC Charge and lawsuit.  The DMH/MR also denies that the Charging Party was given ". . . a completely false and adverse performance appraisal . . ." and that she was ". . . adversely affected . . ."

The DMH/MR is a state agency that provides mental illness, mental retardation, and substance abuse services throughout Alabama, which includes operating seven residential treatment facilities for individuals with mental illness, one residential treatment facility for individuals with mental retardation, and five regional community services offices located throughout Alabama.  Attached as **Exhibit A** is a copy of an Organizational Chart dated January 10, 2005, which shows the offices under the various divisions in the Central Office of the

DEFENDANT'S
EXHIBIT
10

Ollie Croom
Page 2
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

DMH/MR in Montgomery, Alabama.  The one facility operated by the DMH/MR for individuals with mental retardation and the five regional community services offices, including the Region III Community Services Office in which the Charging Party works, are under the Division of Mental Retardation (MR).  Eranell McIntosh-Wilson (African-American) is listed on this chart as the Associate Commissioner for the Division of Mental Retardation (MR); however, she became a Special Advisor to the Commissioner effective April 18, 2007.

A copy of the Organizational Chart for the Division of MR dated May 7, 2004, is attached as **Exhibit B**.  Under Ms. Wilson is the Office of Community Programs, which is directed by Fordyce Mitchel (Caucasian).  The regional community services offices are under the Office of Community Programs, and they are responsible for coordinating, developing, and monitoring services, and finding placement in the community for individuals with mental retardation.

Employment information about the Charging Party is as follows:  The Charging Party (African-American) was employed by the DMH/MR on March 23, 1987, as a Habilitation Team Leader Trainee at the Albert P. Brewer Developmental Center (Brewer), which was a residential facility for individuals with mental retardation under the Division of MR that was formerly operated by the DMH/MR in Mobile, Alabama.  The Charging Party was promoted to the classification of Mental Health Social Worker II (SW II) on March 26, 1988, at the Brewer Center.  She remains in this same classification; however, the Brewer Center closed effective March 1, 2004.  The Charging Party transferred to the Region III Community Services Office between 1988 and 1989 and currently still works in this office, which is located in Daphne, Alabama.

## APPRAISAL PROCESS

Before discussing the Charging Party's supervisory chain of command and her Employee Performance Appraisals, it will be helpful to explain the performance appraisal system, including how the Performance Appraisal Score impacts an employee's salary, and the state agency, State Personnel Department (State Personnel), that developed the system.

State Personnel is a department separate from the DMH/MR.  Pursuant to state law, State Personnel was established to administer an employment system that assures an equal employment opportunity for individuals to compete for jobs within state service.  State Personnel is authorized and responsible for various functions, including administering and maintaining a classification and pay plan.  The classification plan is a grouping of positions that are organized into separate categories involving similar duties and responsibilities.  The pay plan is a schedule of the salary rates for each classification that usually contains 18 steps.  After successfully completing a six-month probationary period, an employee is eligible for an increase of up to two-steps.  The employee is then eligible for a maximum of a two-step raise every twelve months until he/she reaches the top of the salary range.

Ollie Croom
Page 3
April 25, 2007
Re: Charge No. 420-2007-01385; Charging Party: Winifred Blackledge

        The performance appraisal system developed by State Personnel is utilized by state
agencies to evaluate an individual's job performance during his/her employment. Performance
appraisal is a continuous process of management that encompasses communicating, monitoring,
and providing feedback as performance occurs and at the end of the appraisal year. Appraising
an employee's performance includes both informal and formal meetings and discussions with the
employee about the strong areas of performance and to review progress in areas of weaknesses
or complex/non-routine responsibilities. The employee's immediate supervisor is responsible for
conducting the various phases of the appraisal process, including rating the employee's
performance, and is therefore considered the rating supervisor. The immediate supervisor of the
rating supervisor is the reviewing supervisor.

        The formal sessions for a permanent employee consist of three phases during a 12-month
period of time as follows: Preappraisal, Midappraisal, and final Appraisal. Written
documentation is completed for each of these phases, and it is mandatory that they are signed by
the employee. The Preappraisal phase is used to outline and discuss the employee's
responsibilities and expected results prior to the beginning of the appraisal year. Modifications
may be made on the Preappraisal anytime during the year as the job changes. During the
Midappraisal phase (around the six-month interval time), the employee's strengths, weaknesses,
corrective action plan, and the fully competent areas of performance are discussed and
documented. The final Appraisal phase is considered the end result of the appraisal process, at
which time the supervisor rates the employee's performance. In appraising performance, the
supervisor should evaluate the employee's work habits and responsibilities in a fair and objective
manner to accurately reflect what has occurred during the rating period. (In her Charge, the
Charging Party refers to her most recent performance appraisal. She is referring to the Employee
Performance Appraisal (final Appraisal form) on which an employee's performance is rated,
compliance or noncompliance for work habits is indicated, and disciplinary actions, if any, are
documented.)

        On the Employee Performance Appraisal, the rating supervisor assigns a numerical
rating, which corresponds to the level of performance by the employee, for each of his/her
responsibilities. The Responsibility Score is calculated by adding together the ratings for each of
the responsibilities performed by the employee. After the Responsibility Score has been
calculated, the Disciplinary Score, if any, is subtracted from it to derive the Performance
Appraisal Score. The Performance Appraisal Score on the Employee Performance Appraisal
impacts whether or not an employee, who is eligible for an annual raise, receives an increase and
the amount of that increase.

        Prior to the final Appraisal session with the employee, the rating supervisor should
discuss the proposed ratings/score with the reviewing supervisor so that they will have an
opportunity to discuss the ratings and Performance Appraisal Score. The employee is required to
sign the appraisal, but only to indicate that it was reviewed and discussed with the rating
supervisor. The employee signature does not necessarily denote agreement with the score. An
employee may rebut his/her appraisal by attaching comments to the Employee Performance

Ollie Croom
Page 4
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

Appraisal.  The reviewing supervisor should investigate situations in which an employee refuses to sign the appraisal or when an employee attaches comments to the form.

The Employee Appraisal Score will fall into one of five categories.  The numerical range and State Personnel's definition for each category, as well as the amount of the increase an employee, who is eligible for a raise, will receive for a score in the category, is as follows.

| Numerical Range | Level of Performance | Amount of Increase |
|---|---|---|
| 6.6 or Below | Does Not Meet Standards | None |

The employee's overall job performance consistently failed to meet the job requirements, which may mean that work is not performed timely, or is not of sufficient quantity or quality, or too much instruction was required for someone in this position.

| | | |
|---|---|---|
| 6.7 - 16.6 | Partially Meets Standards | None |

The employee's overall job performance was below the fully competent level and too much supervision was required in a position where the employee should have been working independently.

| | | |
|---|---|---|
| 16.7 - 26.6 | Meets Standards | One-step |

The employee's overall performance was in a fully competent manner, as he/she was hired to do, and the expected results were met.  The employee correctly performed the job in a timely manner with only necessary supervision.

| | | |
|---|---|---|
| 26.7 - 36.6 | Exceeds Standards | Two-steps |

The employee's overall job performance was frequently above the fully competent level and more complex tasks may have been completed with less supervision.

| | | |
|---|---|---|
| 36.7 - 40 | Consistently Exceeds Standards | Two-steps |

The employee's overall job performance was consistently above the expected levels and the employee may have completed the most complex assignments without supervision.

Ollie Croom
Page 5
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

## THE CHARGING PARTY'S RATING CHAIN

As to the Charging Party's supervisory chain of command, Susan Stuardi (Caucasian), Community Services Specialist V (CSS V), was the Community Services Director of Region III and the Charging Party's immediate (rating) supervisor at the time the Charging Party filed a Charge of Discrimination with the EEOC in June, 2004.  Ms. Stuardi retired effective August 1, 2004, and Jerryln London (African-American), who held the position of Community Services Specialist IV (CSS IV) in the Region III Community Services Office, became Acting Director. Ms. London was promoted to the classification of Community Services Director (CSS V) on December 25, 2004.  At the time Ms. London became the Acting Director, and subsequently became the Director, there were ten other employees who worked for the Region III Community Services Office, including the Charging Party.  Ms. London was their immediate (rating) supervisor, and Mr. Mitchel, as Ms. London's immediate supervisor, was their reviewing supervisor.

Effective March 27, 2006, Ms. London assigned the duty of supervising three of the employees in the Region III Community Services Office, including the Charging Party, to Kendra Butler (Caucasian), Community Services Specialist IV (CSS IV).  Therefore, at this point in time, Ms. Butler became the immediate (rating) supervisor of these three employees, and Ms. London, as Ms. Butler's immediate supervisor, became their reviewing supervisor.

## DMH/MR'S SPECIFIC RESPONSES TO THE
## CHARGING PARTY'S RETALIATION CLAIMS

Ms. London assigned the above supervisory duties to Ms. Butler after receiving a telephone call from Ms. Wilson (Associate Commissioner for the Division of MR) informing her that the Charging Party had made some complaints against Ms. London.  Attached as **Exhibit C** is a copy of the Charging Party's letter dated March 21, 2006, to Ms. Wilson complaining about Ms. London.  In her letter, the Charging Party specifically complains about two situations as follows:  (1) The Charging Party's request for Sick Leave during the time that Spring Conference was scheduled; and (2) Ms. London lowering and then raising the Charging Party's Performance Appraisal Score during a meeting on December 20, 2005.  Information and documentation regarding the situations in the Charging Party's letter is provided below:

1.  The Spring Conference is a statewide conference about issues relating to services provided to individuals with mental retardation, which is sponsored by the DMH/MR Division of MR and coordinated by the Region III Community Services Office.  The 2006 Spring Conference was scheduled for Monday through Wednesday, April 17-19, 2006.  Around March 9, 2006, the Charging Party requested 24 hours of Sick Leave for the three days of the Spring Conference.  She informed Ms. London that she needed to be off from work to receive medical treatment (knee injections) to alleviate knee pain. Because the dates conflicted with the Spring Conference and the requested Sick Leave was for a scheduled medical treatment, Ms. London asked the Charging Party to

Ollie Croom
Page 6
April 25, 2007
Re: Charge No. 420-2007-01385; Charging Party: Winifred Blackledge

reschedule her appointment for knee injections to a different date. Ms. London also told the Charging Party that her assistance was needed at the registration desk during the Spring Conference because another employee had been scheduled weeks before to be off at this time. Several discussions about this leave request were held between Ms. London and the Charging Party, at which time Ms. London informed the Charging Party that a doctor's statement should be submitted if her medical treatment could not be rescheduled. The Charging Party provided a doctor's statement and Ms. London approved her Sick Leave Request for Monday, April 17, 2006. The following correspondence regarding this situation is provided as **Exhibit D**:

    a.    Memorandum dated 3/27/06 from Ms. London to the Charging Party;

    b.    Leave Request from the Charging Party for 24 hours of sick leave from 4/17-19/06;

    c.    Memorandum dated 4/12/06 from the Charging Party to Ms. London;

    d.    Memorandum dated 4/12/06 from Ms. London to the Charging Party, with a Leave Request for 4/17/06 attached;

    e.    Doctor's statement dated 3/13/06 from The Orthopaedic Group for the Charging Party;

    f.    E-mail dated 4/12/06 from Ms. London to Ms. Wilson, Mr. Mitchel, and Mr. Ervin.

2.    For either the appraisal period of 1/1/04-1/1/05 or 1/1/05-1/1/06, Ms. London did initially rate the Charging Party's performance for some of her responsibilities with a score lower than the scores for the previous appraisal period. However, after a discussion with the Charging Party, Ms. London made the determination to increase the rating for these responsibilities. The Appraisal with the higher ratings was submitted as the Charging Party's Employee Performance Appraisal. Ms. London did not keep a copy of the Appraisal with the lower scores, and she does not remember for which period the Appraisal was changed. According to her recollection of this situation, Ms. London thinks that she initially lowered some of the ratings from 3 (Exceeds Standards) to 2 (Meets Standards), but the Charging Party's Performance Appraisal Score remained in the category of Exceeds Standards.

Information about the Charging Party's last four Employee Performance Appraisals is provided below, and a copy is attached as indicated. Please note that any attachments to an Appraisal are included as part of the exhibit. Following this information is a discussion of the Appraisals.

Ollie Croom
Page 7
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

| APPRAISAL PERIOD | APPRAISAL SCORE/CATEGORY | RATING SUPERVISOR | REVIEWING SUPERVISOR | EXHIBIT |
|---|---|---|---|---|
| 1/1/03-1/1/04 | 36.2/Exceeds Standards | Susan Stuardi | Fordyce Mitchel | **E** |
| 1/1/04-1/1/05 | 36.3/Exceeds Standards | Jerrlyn London | Fordyce Mitchel | **F** |
| 1/1/05-1/1/06 | 35.7/Exceeds Standards | Jerrlyn London | Fordyce Mitchel | **G** |
| 1/1/06-1/1/07 | 25.7/Meets Standards | Kendra Butler | Jerrlyn London | **H** * |

*Attached to this appraisal are three memorandums that are referred to and discussed below.

As noted above, Ms. Stuardi was the Charging Party's immediate and rating supervisor for the period of 1/1/03 to 1/1/04, and the Charging Party's Performance Appraisal Score for this period was in the category of Exceeds Standards.  During the period of 1/1/04-1/1/05, Ms. Stuardi supervised the Charging Party until her retirement was effective August 1, 2004, at which time Ms. London took over this duty.  Ms. London continued to evaluate the Charging Party's performance in a manner similar to that of Ms. Stuardi, which resulted in the Charging Party's Performance Appraisal Score being in the category of Exceeds Standards for the period of 1/1/04-1/1/05.  Ms. London also gave the Charging Party a Performance Appraisal Score in the category of Exceeds Standards for the appraisal period of 1/1/05-1/1/06.

Effective March 27, 2006, Ms. Butler began supervising and evaluating the Charging Party's performance.  The Charging Party's Performance Appraisal Score on the Employee Performance Appraisal for the period of 1/1/06-1/1/07 was in the category of Meets Standards. This is presumably the Employee Performance Appraisal which the Charge Party refers to in her Charge as being ". . . completely false and adverse . . ."  However, the DMH/MR denies this allegation.  Ms. Butler assigned a numerical rating to each of the Charging Party's responsibilities based on her observations, monitorings, and documentation of the Charging Party's performance during the appraisal period.  As to the category of Meets Standards, State Personnel's definition means that the Charging Party consistently performed her responsibilities at a fully satisfactory level.  In addition, please note that before Ms. Butler held the final Appraisal session with the Charging Party, she discussed the proposed ratings/score with Ms. London, who is the reviewing supervisor, and Ms. London agreed with the evaluation of Charging Party's job performance.   A copy of Ms. Butler's handwritten notes about the Charging Party's work habits and job performance from May 30, 2006, to October 16, 2006, is attached as **Exhibit I**.  (Please note that other written documentation about the Charging Party's work habits and job performance will be referred to later in this response and will also be attached as exhibits.)

During the final Appraisal session on January 4, 2007, the Charging Party expressed to Ms. Butler her dissatisfaction with her score and refused to sign the Employee Performance

Ollie Croom
Page 8
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

Appraisal.  Ms. Butler explained that, as indicated on the form, the employee's signature is mandatory and does not mean that the employee agrees with the score.  Ms. Butler also informed the Charging Party that disciplinary action is to be taken with an employee who refuses to sign the appraisal form; however, the Charging Party continued to refuse to sign the appraisal form.  Ms. Butler followed up on their meeting by writing the Charging Party in a memorandum dated January 4, 2007.  In this memorandum, Ms. Butler again informs the Charging Party that her signature is mandatory on the Employee Performance Appraisal.  Ms. Butler also states that she will continue to attempt to contact State Personnel regarding the Charging Party's questions about an employee's score being lower than the previous year.  (See **Exhibit J.**)

Ms. Butler informs the Charging Party in a memorandum dated January 5, 2007, that she contacted Sandra Speakman (Caucasian), Assistant Attorney General and Deputy Legal Counsel for State Personnel, who stated that State Personnel does not have a policy about an employee's appraisal score being lower than the previous appraisal period.  Ms. Speakman further indicated that an employee's rating is based on his/her job performance during the appraisal period.  (See **Exhibit K.**)

The Charging Party informed Ms. Butler in a memorandum dated January 9, 2007, that she was providing her with a six-page document to be attached to her Employee Performance Appraisal.  In this document, the Charging Party alleges that Ms. Butler never informed her that there were problems with her job performance or work habits, even during her Midappraisal session, and she discusses each of her responsibilities.  (The information from the Charging Party is included as one of the attachments to her Employee Performance Appraisal for the period of 1/1/6-1/1/07, which is attached to this response as Exhibit H.)  This response will later address the Charging Party's allegation that prior to the final Appraisal Ms. Butler had not discussed with her any performance problems.  However, at this point in this response, the series of events following the Charging Party's memorandum dated January 9, 2007, will be described, as well as the other memorandums attached to her Employee Performance Appraisal for the period of 1/1/06-1/1/07.

As previously indicated, Ms. Butler consulted with Ms. London prior to the final Appraisal session and Ms. London agreed with the evaluation of the Charging Party's performance during this appraisal period.  After receiving the Charging Party's comments about her appraisal score, Ms. Butler then discussed them with Ms. London, and they worked together on the response dated January 12, 2007, which was signed by Ms. Butler.  In the response to the Charging Party, Ms. Butler discusses the fact that an employee's signature is mandatory on the Employee Performance Appraisal, and she addresses each of the Charging Party's responsibilities.  Ms. Butler also explains that she did not find any justification for the ratings to be increased on the Charging Party's Employee Performance Appraisal.  The memorandum dated January 12, 2007, from Ms. Butler is also included as an attachment to the Appraisal that is part of Exhibit H.

Ollie Croom
Page 9
April 25, 2007
Re: Charge No. 420-2007-01385; Charging Party: Winifred Blackledge

      Ms. Butler again met with the Charging Party on January 12, 2007, to discuss the Employee Performance Appraisal for 1/1/06-1/1/07 and the Preappraisal for the period of 1/1/07-1/1/08. During this meeting, Ms. Butler gave the Charging Party a copy of the memorandum dated January 12, 2007, that was written in response to the Charging Party's comments to her final Appraisal. (Ms. Butler's memorandum and the Charging Party's comments are attached as part of Exhibit H.) The Charging Party again refused to sign her Employee Performance Appraisal and another meeting was scheduled for January 16, 2007. Ms. Butler documented the meeting with the Charging Party on January 12, 2007, in a memorandum with the same date, which is attached as **Exhibit L**. The Preappraisal for the period of 1/1/07-1/1/08, which was signed by the Charging Party, is attached as **Exhibit M**. A meeting between the Charging Party and Ms. Butler was held on January 16, 2007, and the Charging Party signed her Employee Performance Appraisal.

      Around this same period of time, the Charging Party contacted Joan Owens (Caucasian), Personnel Specialist III, in the Bureau of Human Resources in the Central Office of the DMH/MR in Montgomery, Alabama, about her Employee Performance Appraisal. Ms. Owens informed the Charging Party that the employee's signature on the appraisal form is mandatory; that discipline is to be taken with an employee who refuses to sign the form; and discipline is to continue if refusal continues.

      In a memorandum dated January 16, 2007, the same date she signed her Employee Performance Appraisal, the Charging Party wrote Henry Ervin (African-American), Director of the Bureau of Human Resources Management in the Central Office of the DMH/MR, to complain about her Appraisal score. Mr. Ervin did not respond to the Charging Party's memorandum since Ms. Owens, who works in his office, had already communicated with the Charging Party and Ms. London, as reviewing supervisor, had been involved in the appraisal process, including the investigation of the Charging Party's complaints, and agreed with the evaluation of the Charging Party's job performance. (The Charging Party's memorandum to Mr. Ervin is also attached to the Appraisal for the period of 1/1/06-1/1/07, which is Exhibit H of this response.)

      In addition to the above communications, the Charging Party forwarded to this writer the following documents by facsimile, which are attached as **Exhibit N**: (1) Fax Cover Sheet dated January 16, 2007, from the Charging Party to this writer; (2) Memorandum dated January 16, 2007, from the Charging Party to Henry Ervin complaining that she was required to take 15 minutes of Annual Leave; (3) Memorandum dated January 16, 2007, from the Charging Party to Henry Ervin complaining about her Performance Appraisal Score; and (4) Memorandum dated January 12, 2007, from Ms. Butler to the Charging Party, in which she responded to the comments made by the Charging Party about her Employee Performance Appraisal. (These last two memorandums are also attached to the Charging Party's appraisal, which is included with this response as Exhibit H.) Because the Charging Party is represented by an attorney in a lawsuit filed against the DMH/MR, this writer responded to her facsimile by informing her attorney of the information sent to this office.

Ollie Croom
Page 10
April 25, 2007
Re: Charge No. 420-2007-01385; Charging Party: Winifred Blackledge


     To return to the Charging Party's allegation in the comments attached to her final Appraisal for the period of 1/1/06-1/1/07 that Ms. Butler had not discussed with her any problems with her job performance or work habits (Exhibit H), the DMH/MR denies this statement. Ms. Butler noted on the Charging Party's Midappraisal, which was signed on July 26, 2006, that the Charging Party needed to improve in accepting changes in her job responsibilities. Ms. Butler also indicated that the plan of correction was for the Charging Party to review her monitoring assignments. A copy of the Charging Party's Employee Performance Midappraisal for the period of 1/1/06 to 1/1/07 is on the second page of the Preappraisal for this same period of time. Attached to the Midappraisal are the Charging Party's comments about her Midappraisal. **(See Exhibit O.)**

     In addition, Ms. Butler communicated on numerous occasions, both in writing and during informal meetings/discussions, with the Charging Party throughout the appraisal period about various issues and problems, including the Charging Party not completing the duties associated with her primary responsibility of monitoring group homes. A copy of various written communications during the period of 1/1/06-1/1/07 is attached as indicated:

     **Exhibit P:**    Correspondence regarding the staff members of the Region III Community Services Office signing in and out on time sheets, as follows:

          (1)    E-mail dated April 21, 2006, from Ms. Butler to the Charging Party;

          (2)    Memorandum dated April 26, 2006, from the Charging Party to Ms. Butler;

          (3)    E-mail dated April 27, 2006, from Ms. London to various staff members;

          (Please note that in a memorandum dated 10/22/04, Ms. London wrote to all staff members that they were required to sign in and out on the Time Sheets and she attached a copy of the DMH/MR Policy No. 60-42, Absenteeism, which was in effect at that time. Ms. London's memorandum of 10/22/04 and attached policy, as well as the current version of that policy are also attached as part of this exhibit.)

     **Exhibit Q:**    Correspondence regarding monitoring assignments, as follows:

          (1)    Memorandum dated June 16, 2006, from the Charging Party to Butler;

Ollie Croom
Page 11
April 25, 2007
Re: Charge No. 420-2007-01385; Charging Party: Winifred Blackledge

      (2)      Memorandum dated June 19, 2006, from Ms. Butler to the Charging Party;

      (3)      E-mail dated August 29, 2006, from Ms. Butler to the Charging Party;

**Exhibit R:**      Correspondence regarding the use of flex and compensatory time by the staff members of the Region III Community Services Office, as follows:

      (1)      Memorandum dated September 19, 2006, from Ms. Butler to the Charging Party;

      (2)      Memorandum dated September 19, 2006, from the Charging Party to Ms. Butler;

      (3)      Handwritten Note dated October 16, 2006, from Ms. Butler to Ms. London, with the following attachments:

            (a)      Fax Cover Sheet dated October 16, 2006, from the Charging Party to Ms. Butler;

            (b)      Memorandum dated October 13, 2006, from the Charging Party to Ms. Butler;

      (4)      Memorandum dated October 19, 2006, from Ms. Butler to the Charging Party;

(Please note that flex time is an adjustment within a work day to accommodate a monitoring visit to a group home outside of regular business hours. Compensatory Time is explained in DMH/MR Policy No. 60-56, Compensatory Time, which is attached as **Exhibit S**.)

**Exhibit T:**      Correspondence regarding the Charging Party leaving work early, as follows:

      (1)      Typewritten note dated January 4, 2007, from Ms. London;

      (2)      Memorandum dated January 4, 2007, from Ms. Butler to the Charging Party;

      (3)      Memorandum dated January 12, 2007, from the Charging Party to Henry Ervin;

Ollie Croom
Page 12
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

(4)     Leave Request for January 4, 2007, for the Charging Party, which
was signed by Ms. Butler;

## NO ADVERSE IMPACT

An explanation was provided earlier in this response about how the Performance Appraisal Score impacts whether or not an eligible employee receives an annual raise and the amount of that raise.  It was further explained that an employee is only eligible for an annual increase until he/she tops out of the pay range for his/her classification.  As this relates to the Charging Party, the annual salary for her classification of Mental Health Social Worker II is Pay Grade 70, which begins on Step 1 at $30,888.00 and ends on Step 18 at $46,788.00.  The Charging Party reached the top of her pay range at Step 18 on March 1, 1999, which means that she has **not** been eligible for an annual raise since that date.  (Please note that she has received cost-of-living increases as approved by the Legislature for state employees.)  Therefore, the Charging Party's Performance Appraisal Score on her Employee Performance Appraisal does **not** affect her salary.

For your information, the following DMH/MR policies are attached as indicated below:

1.     DMH/MR Policy No. 60-20, Equal Employment Opportunity (**Exhibit U**)

2.     DMH/MR Policy No. 60-40, Progressive Discipline (**Exhibit V**)

3.     DMH/MR Policy No. 60-60, Sick Leave (**Exhibit W**)

4.     DMH/MR Policy No. 60-64, Annual Leave (**Exhibit X**)

## CONCLUSION

In conclusion, the DMH/MR again denies that the Charging Party was recently ". . . given a completely false and adverse performance appraisal."  As previously explained, Ms. Butler, the rating supervisor, had numerous informal meetings and discussions with the Charging Party throughout the appraisal period of 1/1/06-1/1/07 regarding various issues with her job performance and work habits.  Based on her observations, monitorings, and documentation during the appraisal period, Ms. Butler evaluated the Charging Party's performance, and she rated her accordingly.  Ms. Butler consulted with Ms. London, the reviewing supervisor, in preparation for the final Appraisal session with the Charging Party, and Ms. London agreed with Ms. Butler's evaluation of the Charging Party's job performance.  Ms. London also reviewed the Charging Party's comments about her appraisal score and assisted Ms. Butler with the response to the Charging Party.  Therefore, Ms. London has been involved throughout this process and agrees with the evaluation of the Charging Party's job performance.

Ollie Croom
Page 13
April 25, 2007
Re:  Charge No. 420-2007-01385; Charging Party:  Winifred Blackledge

        The DMH/MR also denies that the Charging Party was ". . . adversely affected . . ." by
her Performance Appraisal Score ". . . as my salary is directly related to performance appraisals."
The Charging Party's salary is not affected by her Performance Appraisal Score, as she has not
been eligible for an annual raise since she reached the top of her pay range in 1999.

        As previously stated, the DMH/MR provides the above information in response to the
Charging Party's allegations of retaliation.  Because of the vague and conclusory nature of the
statements made by the Charging Party in her Charge of Discrimination, the DMH/MR is unable
to address her allegations of discrimination based on race and color other than its previous
responses to her original Charge (No. 130-2004-03106).  Otherwise, those allegations are denied.

        If you have any questions or need additional information, please contact Kathy
Thompson at (334) 353-9007.

                                Sincerely,

                                Courtney W. Tarver
                                Deputy Attorney General and Counsel
                                Bureau of Legal Services

Attachments

pc:    Eranell McIntosh-Wilson
        Henry Ervin
        Jerryln London
        Kendra Butler

# EXHIBIT

# A

**Alabama**
**Department of Mental Health Mental Retardation**

Approved: _[signature]_
Date:

GOVERNOR
Bob Riley

MENTAL HEALTH/MENTAL
RETARDATION ADVISORY
BOARD OF TRUSTEES

DEVELOPMENTAL
DISABILITIES COUNCIL
Elmyra Jones

Commissioner
Kathy E. Sawyer

Deputy Commissioner
(Vacant)

Executive Assistant
John Houston

Administrative
Assistant VII
Beth Sievers

Administrative
Assistant III
Leah Martin

Management
Steering Advisory
Committee

Advocacy
Advisory Board

Office of Legislative
Affairs and Constituent
Affairs
Jane Davis

Office of Children's
Services
Steve LaFreniere

Office of Policy and
Planning
Anne Evans

Bureau of Advocacy
Services
G. Allen Fortson

Bureau of Finance
Kathleen Brantley,
Acting CFO

Bureau of Legal
Services
Courtney Tarver

Bureau of Special
Investigations
Richard Koerner

Office of Public
Information
Dr. John Ziegler

Associate Commissioner
Division of Administration
Otha R. Dillihay, Sr

Executive Assistant/
Advisory Attorney
June Lynn

Bureau of Human
Resources
Henry Ervin

Office of Pre-
Admission Screening
Kathy McPherson

Bureau of Data
Management
Dan Evans

Office of Staff
Development
Commie Carter

Office of Certification
Robert Cunningham

Office of Contracts
Catheryn Townsend

Division of Mental Illness
Acting Associate Commissioner
Charles Day, Acting

Executive Assistant
Charles Day, JD

Office of Consumer
Relations
Mike Autrey

Office of Performance
Improvement
Danielle Rowe, DPA

Office of Community
Programs
Molly Brooms

Director of MI Facilities
Paul Bisbee, PhD

Office of Deaf Services
Steve Hamerdinger

Division of Mental Retardation
Associate Commissioner
Eranell McIntosh Wilson

Executive Assistant/
Fiscal Officer
Joey Kreuzer

Office of Quality
Enhancement
Jeffery Williams

Director of MR
Facilities
Judith Johnston

Office of Certification
Alison Terry, RN

Office of Community
Programs
Fordyce Mitchel

Office of Psychological Services
& Behavioral Services
Dr. Susan Ford

Substance Abuse Services Division
Associate Commissioner
J. Kent Hunt

Executive Assistant
Sarah H. Harkless

Office of Performance
Improvement
Kathy Seifried

Office of Contracts &
Grants
(Vacant)

Methadone Authority
(Vacant)

Office of Certification
Robert Wynn

Office of Research,
Evaluation, and
Information
Joe Drop

Office of Prevention
Services
Stephanie McCladdie

EXHIBIT

B



Alabama
Department of Mental Health/Mental Retardation
Division of Mental Retardation

Approved:
Date:

**Commissioner**
Kathy E. Sawyer

**Division of Mental Retardation**
Associate Commissioner
Eranell McIntosh-Wilson

**Executive Assistant/ Fiscal Officer**
Joey Kreauter

**MH Administrative Assistant**
Shirley Hicks

**Clerical Support**
Joann Bennett, Melanie Williams, Tonya Hardy, Marti Evans

**Office of Psychological & Behavioral Services**
Susan Ford, PhD

**Comprehensive Support Services - North**
(Vacant)

**Comprehensive Support Services - Central**
Marc Williams, Ph.D., BCBA

**Comprehensive Support Services - South**
David Zuskind

**Director of MR Facilities**
Judith Johnston

**Partlow Center**
Levi Harris, Ph.D.

**Office of Consumer Empowerment**
Joe Meadours

**Administrative Assistant**
Anthony Baskin

**Asst to CS Director**
Daphne Rosillis

**Region I Community Services**
LaGreta Ratliff

**Region II-E Community Services**
Barbara Brunson

**Region II-W Community Services**
Willodean Ash

**Region III Community Services**
Susan Stuard

**Region IV Community Services**
Mike Martin

**Office of Community Programs**
Fordyce Mitchell

**Case Management & Waiver Services**
Sherry Robertson

**Support Coordinator**
Jewel Pitts

**Data Entry - Waiver Services**
Madonna Moores

**Early Intervention Coordinator**
Alice Widgeon

**Assistant Fiscal Officer**
Neddie Dunnivan

**Account Clerk**
Penni Parker

**Office of Quality Enhancement**
Jeffery Williams

**Region I**
Don Jones

**Region II-E QE**
Clyde Williams

**Region II-W QE**
Audrey McShan

**Region III QE**
Mickey Groggel

**Region IV QE**
Connie Batiste

**Contract Management (Community)**
Reuel Huffman

**Office of Certification**
Alison Terry, RN

**Certification Community Programs**

**Region I Certification**
Brice Martin & Lisa Griffin

**Region II-E Certification**
Lori Hemby

**Region II-W Certification**
Randi Coleman

**Region III Certification**
Beth Rogers & Jane Johnston

**Region IV Certification**
Zane Welch

# EXHIBIT

# C

March 21, 2006



Ms. Eranell McIntosh-Wilson
Associate Commissioner
Department of Mental Health
And Mental Retardation
100 Union Street
Montgomery, Alabama 36130

Dear Ms. McIntosh-Wilson:

I am addressing this letter to you because we were informed in a recent staff meeting that
you were the Acting Director of Community Services while Fordyce Mitchel was
working on the Harmony Project. The purpose of this letter is to report that I am a victim
of harassment and retaliation and to request that the Department of Mental Health and
Mental Retardation (DMH/MR) administrators take immediate steps to correct this
situation. I do not make this accusation lightly. I want you to know immediately that I am
not a disgruntled employee. I am a dedicated employee of 19 years and take my job
seriously. I have tried not to write this letter. However, I feel that I have no other recourse
at this time.

There is such a disparity of treatment in the manner in which my supervisor, Jerryln
London treats me as compared to the manner in which she treats other employees that I
am becoming more emotionally distressed everyday. The harassment and retaliation is
subtle, systematic, and intended to cause me unnecessary tension and stress. The
harassment and retaliation has to end now. I have a problem with being singled out and
harassed for things that are commonplace occurrences in Region III Community Services.
I do not know the reasons for the harassment and retaliation.

I first would like to provide to you details of two of the most troubling incidents: On
March 8, 2006, I verbally informed Ms. London that I would not be attending Spring
Conference due to having medical treatment to alleviate pain and inflammation in my
knee. Ms. London gave me a verbal okay to not attend Spring Conference.
On March 9, 2006, Ms. London called and left a voice mail message saying, "I called to
see if you were going to Spring Conference, I can't recall whether you said you were
going to be out because of your knee, send me a e-mail." I called Ms. London back and
left her a message saying, "As I informed you earlier, I will not be going to Spring
Conference due to the medical treatment I am receiving for my knee." On March 10,
2006, Ms. London left a message on my voicemail saying, "I really need your help with
registration, if you can't come the other two days, this is fine, right now I have you
helping Lori with registration, if you can't come, I need you to bring a doctor's
statement." I called her back and told her, "I will not be able to go."

Page Two
Ms. Wilson
Harassment and Retaliation
Winifred Blackledge
March 21, 2006

I asked Ms. London when did we start bringing doctor's statements and she informed me "this was not out of the ordinary." If what Ms. London said about bringing a doctor's statement "was not out of the ordinary" was true for the employees in Region III Community Services, I would not have a problem. However, requiring a doctor's statement from any employee is very much out of the ordinary for Region III Community Services employees. Not since I been an employee in Community Services has anyone brought or been asked for a doctor's statement. On March 13, 2006, I was checking my e-mails and pulled a copy of an e-mail Ms. London sent to Jeff Williams informing Mr. Williams that I would not be attending Spring Conference and she would see if she could find someone else to help with registration. After receiving Ms. London's e-mail to Mr. Williams I assumed the incident was closed and submitted my leave slip.
On March 16, 2006, I received another called from Ms. London saying that "she really needed me to be at Spring Conference and if I could not come I would need to bring a doctor's statement because I would be out for 3 consecutive days. Ms. London further went on to inform me that I would have to file for family medical leave due to being out for three consecutive days. I told Ms. London I believed that an employee had to file family medical leave when an employee was out for more than three consecutive days and she replied, "I need to check the policy." Since Ms. London was making a major issue out of me not going to Spring Conference and needing me to help with registration, after I spoke to Ms. London, I spoke to Donna Buckley explaining my situation and that Ms. London needed someone to assist with registration. Ms. Buckley said, "she informed Ms. London and Beth Rodgers that she would assist with Spring Conference wherever she was needed and that she would do registration." After my conversation with Ms. Buckley I attempted to call Ms. London and got her voicemail. I left a message on Ms. London's voicemail informing her that Ms. Buckley volunteered to do registration at Spring Conference. Ms. London called me back and said, "I appreciate you finding someone but Donna may have another assignment." "I don't have the assignments in front of me but I will check with Beth Rodgers, but I need everyone's help and if you are not going to attend you will need to bring a doctor's statement."

This is not about Spring Conference. This is just a way to harass me. I think is was very unprofessional for Ms. London to lead me to think initially that it was ok for me not to attend Spring Conference and then say that she had forgotten. People have always attended or not attended Spring Conference as desired. There have always been enough people to handle registration. People from other community agencies as well as other people in other divisions in DMH/MR have worked registration. There are 20 people in our building who can help with registration. People generally perform multiple tasks during Spring Conference.

Page Three
Ms. Wilson
Harassment and Retaliation
Winifred Blackledge
March 21, 2006

If there is a shortage of people to work registration and Ms. London as she said needed everyone's help, I ask you, why did Ms. London give the person that does registration permission to be on annual leave during Spring Conference?

By Ms. London's actions she is also insinuating that I am lying about my medical treatment. I am only trying to avoid having a third surgery on my knee and get relief from my constant pain.

The second troubling incident was the attempt to lower my appraisal score without any cause during my annual employee evaluation on December 20, 2005. Prior to my annual evaluation, I had the 6 months pre-appraisal. Ms. London, during my pre-appraisal evaluation said my job performance was fine and there were no problems. When I pointed out to Ms. London that she had never discussed any problems with me and the policy stated that she could not lower my score without provocation and must inform me of my deficits, she said, "I will have to check the policy." After checking the policy, she raised the score. Since that were no mention of problems with my work and there have been no complaints about my work to this day, I feel her actions were clearly retaliatory. I have always performed my job responsibilities with care and accuracy. I take it very personally when my job performance is belittled.

There have been other incidents where I have been singled out, such as when my door is ajar (not closed, ajar), although there are other employees that have their doors ajar or completely closed most days, including the secretary. I was unaware that having your door ajar or closed was a violation of any policy. Ms. London also informed me that I was leaving 15 minutes early. I often come in early and have no idea what occasion/occasions she was talking about. Employees come in late regularly (this includes Ms. London) and not a word is said to the employees. Yes, I am aware of the 8: 00 a. m. to 4:30 p. m. work hours but if it does not apply to all employees, including Ms. London and Ms. London's friends, than it should not apply to anyone.

Ms. London seems to have hidden agendas. I don't know if they are personal or directed by the Department of DMH/MR but I have had enough. I am apprehensive and dread coming to work because I don't know what type of harassment or retaliation I may receive from Ms. London.

Page Four
Ms. Wilson
Harassment and Retaliation
Winifred Blackledge
March 21, 2006

Ms. London shows partiality to her friends, does not know DMH/MR policies and makes the rules up as she goes along. I have attempted to stay in my office, do my job and avoid the pettiness but this doesn't work. I could go on about the lax atmosphere but I truly don't care what the other employees do. I simply want the harassment and retaliation to stop. I simply want to be treated in a fair manner. I simply want to be treated as a professional and be allowed to do my job to the best of my ability. I hope that we can resolve this problem without my having to pursue further avenues.

Sincerely,

Winifred A. Blackledge

Winifred A. Blackledge

P. C. John Houston
          Commissioner, Department of Mental Health and Mental Retardation

          Josh Wilson
                Wiggins, Childs, Quinn & Pantazis

# EXHIBIT

# D

# MEMORANDUM

DATE:      3/27/06

TO:        Winifred Blackledge

FROM:      *Jerryln London* (signature)
           Jerryln London

RE:        Leave Request

The expectation of Region III staff is that we all work to ensure the success of the Spring Conference. I am returning your request for sick leave for 4/17-18/06 unapproved. As we have discussed on at least three occasions, I need your assistance at the registration table for the Spring Conference. Registration will be opened on Monday, 4/17/06. I am requesting that if you need to pursue medical treatment/appointments that you do so at another time. If you cannot re-schedule your medical treatment/appointment please submit a statement from your physician. Monitoring and moderator services will be covered on 4/18/06, Tuesday and 4/19/06 Wednesday. If you need to be off those days the leave can be approved with a doctor's statement.

PC: Fordyce Mitchel
    Eranell McIntosh-Wilson
    Henry Ervin

FORM P6
Revised 7/2003

**STATE OF ALABAMA**
**DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION**

Original: Timekeeper
Yellow:   Supervisor
Pink:     Employee

SECTION/UNIT _____    CHECK ONE: ☐ LEAVE REQUEST    ☐ LEAVE EARNED

SOCIAL SECURITY NUMBER

NAME (First, Middle, Last)

WiniFred Blackledge

| | Month | Day | Year | Hour | A.M. | P.M. | Month | Day | Year | Hour | A.M. | P.M. | TOTAL HOURS | MIN | LEAVE TYPE | APPROVAL/ DISAPPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **LEAVE STARTS** | | | | | | **LEAVE ENDS** | | | | | | | | | |
| 1 | 4 | 17 | 06 | | 8:00 | | 4 | 19 | 06 | | | 3:30 | 24 | | | |
| 2 | | | | | 7:00 | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | |

| LEAVE TYPES REQUESTED (Use Symbol in leave type or write leave type) | | | | |
|---|---|---|---|---|
| V – Annual | F - FMLA | H - Holiday | PD – Personal Leave Day | S - Sick |
| CT – Compensatory Time | J - Jury | L - L.W.O.P. | M - Military | |

| LEAVE TYPES EARNED (Use Symbol in leave type or write leave type) | |
|---|---|
| HE – Holiday Earned | NR – Non-Regular |
| CE – Comp Time Earned | Hours Earned |

Explanation/Comments/Purpose: _____

| Employee | Date | Supervisor | Date |
|---|---|---|---|
| Winifred Blackledge | 3/14/06 | Jerrilyn L. Linton | 3/ |

**MEMORANDUM:**

Date: April 12, 2006

To: Jerrlyn London

From: Winifred Blackledge

Re: Doctor's Statement

Attached find a doctor's statement indicating I will be receiving medical treatment on April 17, 2006 in an attempt to relieve chronic pain of the knee. I still feel that I am being singled out while other employees are allowed to go on vacation, choose if they will attend or what days they will attend. These employees are being allowed to choose their attendance and do not have medical problems that are adversely effecting their health. However, I have a medical problem and requested to be off on sick leave and in your letter dated March 27, 2006 you demanded that I attend Spring Conference even to the extent that you ordered me to change my medical schedule. However, other employees have not been asked to change their vacation or simply attend against their will. I find it very suspicious that I am the only person being asked to attend Spring Conference all three days.

Again, since I have been in Community Services no employee has been required to bring a doctor's statement. I assume that this is a new policy and all employees will be required to bring a doctor's statement when they are out on sick leave. If not you and the department are most differently singling me out. I feel that this is a retaliatory act by not just you but the department's administrators. I will be attending Spring Conference on April 18, 2006 and April 19, 2006. As I usually do at all the Spring Conferences I have attended (by the way I have not missed any Spring Conferences that employees have been allowed to attend in the eighteen years I have been in Community Services), I will provide my experience and assistance. I am having problems with my knee to the extent that it is causing me pain to stand or walk. Please be advised I will hold the Department of Mental Health And Mental Retardation liable should I injury my knee in anyway at Spring Conference.

Attachment: Leave Slip for approval 4/17/06
            Doctor's statement

P. C. Commissioner John Houston
        Associate Commissioner Eranell McIntosh-Wilson
        Fordyce Mitchel
        Henry Ervin
        Josh Wilson

# **MEMORANDUM**

DATE:        4/12/06

TO:          Winifred Blackledge

FROM:        Jerlyn London

RE:          Doctor's Statement

Upon my return to work from a meeting at approximately 1:15 pm, I found an envelope with a memo attached from you stating that you had a doctor's statement attached regarding medical treatment on 4/17/06. A leave slip for 4/17/06 was attached <u>but not a doctor's statement</u>. I have a witness that no doctor's statement was attached or enclosed in the envelope.

The person that will be on annual leave during the Spring Conference requested and was approved between 4-6 months ago if not longer. The person's absence will have us one person short and that is why your presence is necessary to adequately staff the registration table.

Until I receive your doctor's statement your request for leave is unapproved.

PC:     Eranell McIntosh-Wilson
        Fordyce Mitchel
        Henry Ervin
        Kendra Butler



SECTION/UNIT

DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION

CHECK ONE:    ☐ LEAVE REQUEST    ☐ LEAVE EARNED

Original: Timekeeper
Yellow: Supervisor
Pink: Employee

SOCIAL SECURITY NUMBER

NAME (First, Middle, Last)

Winifred Blackledge

**LEAVE STARTS**

| | Month | Day | Year | Hour | A.M. | P.M. |
|---|---|---|---|---|---|---|
| 1 | 4 | 11 | 06 | | 7:00 | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |

**LEAVE ENDS**

| Month | Day | Year | Hour | A.M. | P.M. | TOTAL HOURS | | LEAVE TYPE | APPROVAL/ DISAPPROVAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | HOURS | MIN | | |
| | | | | | 3:30 | | | | |

UNAPPROVED  4/12/06

**LEAVE TYPES REQUESTED** (Use Symbol in leave type or write leave type)

V - Annual
CT – Compensatory Time

F - FMLA
J - Jury

H - Holiday
L - L.W.O.P.

PD – Personal Leave Day
M - Military

S - Sick

**LEAVE TYPES EARNED** (Use Symbol in leave type or write leave type)

HE – Holiday Earned
CE – Comp Time Earned

NR – Non-Regular
Hours Earned

Explanation/Comments/Purpose:

Employee _____    Date 4/12/06

Supervisor _____    Date

Mar. 13 2006 11:04AM    NURSE STATION CD    No.0537  P.171

## THE ORTHOPAEDIC GROUP, P.C.

6144 Airport Blvd. • P.O. Box 85144 • Mobile, AL 36689-6144
(251) 476-5800 • (800) 242-1348 • www.THEORTHOGROUP.COM

### CLINIC LOCATIONS:

6144 Airport Boulevard • Mobile, AL
1720 Springhill Avenue, Suite 100 • Mobile, AL
1711 North McGregor Street • Foley, AL
Monroe County Hospital • U.S. Highway 21 South • Monroeville, AL
878 Mill Street • Luverne, MS

Bert F. Taylor, M.D.
Eugene C. Dyas, IV, M.D.
William I. Pace, III, M.D.
Robert B. McGinley, M.D.
Guy L. Rutledge, III, M.D.
Harry A. Luscher, Jr., M.D.
Milton A. Wallace, Jr., M.D.

Ben H. Hinson, M.D.
James L. Wert, III, M.D.
Stephen D. Core, M.D.
I. F. McGowin, III, M.D.
J. Michael Crawley, M.D.
Thomas M. Barbour, III, M.D.
Tobi K. Villacan, M.D.

William J. Boss, M.D.
Benny P. Petrikin, III, M.D.
William I. Park, IV, M.D.
L. Dean Mason, II, M.D.
Jeffrey M. Conrad, M.D.
Chris T. Nichols, M.D.

NAME: _Winford Blackledge_

Pt scheduled for
knee injections on
4/11/06 to alleviate
knee pain.

DATE: _3/13/06_

[signature]

TOG-70206

## London, Jerryln

**From:**    London, Jerryln
**Sent:**    Wednesday, April 12, 2006 2:51 PM
**To:**      London, Jerryln; McIntosh-Wilson, Eranell; Mitchel, Fordyce; Ervin, Henry
**Subject:** RE: Reponse to W. Blackledge Update

I took the memo to Winifred that emailed to you earlier today. I informed Winifred that the doctor's statement was not attached. Her response was "Oh, did you want a copy of that". My response was "Winifred, (I pointed to the memo she sent.) you stated the statement was attached". Winfred responded with "Let me get my keys. It's in the car. Winifred did provide a doctor's statement for 4/17/06.
Jerryln

---

**From:** London, Jerryln
**Sent:** Wednesday, April 12, 2006 1:36 PM
**To:** McIntosh-Wilson, Eranell; Mitchel, Fordyce; Ervin, Henry
**Subject:** Reponse to W. Blackledge

I don't know whether or not you have received the memo from Winifred dated 4/12/06. I did not receive the doctor's statement as indicated in her memo.
Jerryln

4/12/2006

# EXHIBIT

# E

Form 13
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number
of Steps

Employee Name: WINIFRED A BLACKLEDGE

Social Security Number: _____

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 309E/BREWER DEV CTR

Classification: M H SOCIAL WORKER II

Class Code: W2000

Period Covered From: 01/01/2003    To: 01/01/2004

Annual Raise Effective: MARCH 2004

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN. _____-____-_____ | | SSN_____-____-_____ |
| *Signature* | *Signature* | *Signature* |
| 12-19-03 | 12-19-03 | |
| Date | Date | Date |
| _____ | _____ | _____ |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

36.2 ___ — ___ 0 ___ = ___ 36.2 ___

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☐ | ☐ |
| Punctuality | ☐ | ☐ |
| Cooperation with Coworkers | ☐ | ☐ |
| Compliance with Rules | ☐ | ☐ |

*RESPONSIBILITIES:* List a ~~bbre~~ ted version of the employee's re ~~sibil~~ s below as documented on and discussed during the Preappraisal. R ~~rd~~ the appropriate rating in t ~~e ox f~~ ach responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

---

*Responsibility* | *Rating*
---|---

1. Provides technical assistance and consultations to residential providers in the region … `3`

2. Coordinates the monitoring of contracted residential facilities and individuals … `4`

3. Assists with the development of residential resources and placement of individuals… `4`

4. Composes clinical documents, reports and correspondence on individuals, programs … `4`

5. Coordinates liaison activities with nursing homes including OBRA screenings and … `3`

6. Serves as case manager of a select group of individuals in order to facilitate community… `4`

7. Updates data and completes special projects related to the operation of community … `4`

8. Serves as RCS staff on call on a rotating basis in order to address questions or problem… `3`

9. _____

10. _____

---

**RESPONSIBILITY SCORE:**

| 29 | ÷ | 8 | = | 3.62 | x | 10 | = | 36.2 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

---

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

---

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

EXHIBIT



F

*Corrected Copy*

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

☐ Number of Steps

Employee Name: WINIFRED A BLACKLEDGE                 Social Security Number: _____

Agency: 061/MENTAL HEALTH & RETARDATION             Division: 313E/CENTRAL OFF MR COMM PRO

Classification: M H SOCIAL WORKER II                 Class Code: H2000

Period Covered From: 01/01/2004    To: 01/01/2005    Annual Raise Effective: (MARCH 2005)

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.    *Dec. III*

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ___-__-____ | | X SSN ___-__-____ |
| *[signature]* | *[signature]* | X *[signature]* |
| Signature | Signature | X Signature |
| Date 12/17/04 | Date 12/17/04 | Date 12/21/2004 |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

36.3    36.25                    0                  =        36.3    36.25

Responsibility Score          Disciplinary Score              Performance Appraisal Score

---

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☐ | ☐ |
| Punctuality | ☐ | ☐ |
| Cooperation with Coworkers | ☐ | ☐ |
| Compliance with Rules | ☐ | ☐ |

*SP 1-13-05*

**RESPONSIBILITIES:** Listed below are the stated verbal or documented employee's responsibilities agreed on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility* *Rating*

and case management JPC 12/17 by

1. Provides technical assistance and consultations to residential providers in the region … | 4

2. Coordinates the monitoring of contracted residential facilities and individuals … | 4

3. Assists with the development of residential resources and placement of individuals… | 4

4. Composes clinical documents, reports and correspondence on individuals, programs … | 4

5. Coordinates liaison activities with nursing homes including OBRA screenings and … | 3

6. Serves as case manager of a select group of individuals in order to facilitate community… | 4

7. Updates data and completes special projects related to the operation of community … | 3

8. Serves as RCS staff on call on a rotating basis in order to address questions or problem… | 3

9. _____ | 

10. _____ | 

**RESPONSIBILITY SCORE:**

$$\underline{29} \div \underline{8} = \underline{3.625} \times 10 = \underline{36.3}\ \boxed{36.25}\ \ 33$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action. _none_

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: __0__

# EXHIBIT

# G

**Form 13**
**Revised (06/2005)**

**EMPLO _E_ PERFORMANCE _APPRAISAL_**
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: <u>WINIFRED A BLACKLEDGE</u>

Agency: <u>061/MENTAL HEALTH & RETARDATION</u>

Classification: <u>M H SOCIAL WORKER II</u>

Period Covered From: <u>01/01/2005</u> To: <u>01/01/2006</u>

Social Security Number:

Division: <u>313E/CENTRAL OFF MR COMM PRO</u>

Class Code: <u>W2000</u> Position #: <u>8823006</u>

Annual Raise Effective: <u>MARCH 2006</u>

**_APPRAISAL SIGNATURES:_** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN | | SSN |
| *Jerrelyn L Linden* | *Winifred Blackledge* | *Jordyn Mitchel* |
| Rater Signature | Employee Signature | Reviewer Signature |
| 12/21/05 | 12/21/05 | 1/9/2006 |
| Date | Date | Date |
| | | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**_PERFORMANCE APPRAISAL SCORE:_** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

<u>35.7</u>    -    <u>0</u>    =    <u>35.7</u>
Responsibility Score      Disciplinary Score      Performance Appraisal Score

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

**_WORK HABITS:_** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | _____ | ✓ | _____ |
| Punctuality | _____ | ✓ | _____ |
| Cooperation with Coworkers | _____ | ✓ | _____ |
| Compliance with Rules | _____ | ✓ | _____ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal.   Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| Provides technical assistance and consultations to residential providers in the region ... | 3 |
| Coordinates the monitoring of contracted residential facilities and individuals ... | 4 |
| Assists with the development of residential resources and placement of individuals ... | 4 |
| Composes clinical documents, reports and correspondence on individuals, programs ... | 4 |
| Provides service coordination as case manager of a select group of individuals in order to... | 4 |
| Updates data and completes special projects related to the operation of community ... | 3 |
| Serves as RCS staff on call on a rotating basis in order to address questions or problem... | 3 |
| | |
| | |
| 0. | |

**RESPONSIBILITY SCORE:**

| 25 | ÷ | 7 | = | 3.57 | × | 10 | = | 35.7 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:**   Any disciplinary action taken with the employee during this appraisal period is to be documented below.  Provide the number of disciplinary actions and steps taken with the employee during the appraisal year.  If no disciplinary action has been taken, a "0" should be marked in each block provided.  Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| _____ | _____ | _____ | _____ |

**DISCIPLINARY SCORE:**   This section should include the use of the discipline steps of reprimand, suspension, and demotion only.  The Disciplinary Score does not include scores for counseling and warnings.  To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period.  If the most severe step was one or more reprimands, the Disciplinary Score will be 7.  If the most severe step was one or more suspensions, the Disciplinary Score will be 17.  If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24.  Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**    _____



# EXHIBIT

# H

*I Do not Agree with Scoring See (3) Attachments.*
*Winifred Blackledge 1/16/07*

**Form 13**
**Revised (01/2006)**

## EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
#### Personnel Department

Employee Name: <u>WINIFRED A BLACKLEDGE</u>

Agency: <u>061/MENTAL HEALTH & RETARDATION</u>

Classification: <u>M H SOCIAL WORKER II</u>

Period Covered From: <u>01/01/2006</u> To: <u>01/01/2007</u>

Social Security Number: _____  *3*

Division: <u>313E/CENTRAL OFF MR COMM PRO</u>

Class Code: <u>W2000</u> Position #: <u>08823006</u>

Annual Raise Effective: <u>MARCH 2007</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN  XXX- XX- _____ | SSN  XXX- XX- ___ | SSN  XXX- XX- ___ |
| *Kendra Butler* | *Winifred G. Blackledge* | *Jerril R. Linton* |
| Rater Signature | Employee Signature | Reviewer Signature |
| *Kendra Butler* | | *Jerrylnn R. Linton* |
| Rater Printed Name | | Reviewer Printed Name |
| 1/4/07 | 1/16/07 | 1/16/17 |
| Date | Date | Date |
| *KB* | *WGB* | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

<u>   25.7   </u>  -  <u>   0   </u>  =  <u>   25.7   </u>
Responsibility Score  —  Disciplinary Score  =  Performance Appraisal Score

---

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ____ | ✓ | _____ |
| Punctuality | ____ | ✓ | _____ |
| Cooperation with Coworkers | ____ | ✓ | _____ |
| Compliance with Rules | ____ | ✓ | _____ |

**RESPONSIBILITIES:** List an abb. .ated version of the employee's responsi....ies below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility** — **Rating**

Coordinates community services staff monitoring of residential facilities, maintains monitoring data base, monitoring of contracted residential facilities & individual in the service delivery system in order to address quality life issues. — 3

Provides technical assistance & consultations to day & residential providers in order to address quality of life issues & standards compliance. — 2

Development of resources, finding community placements, working with the placement process for individuals in order to promote living in the least restrictive setting & institutional diversion — 2

Serves as liaison between the regional community services office and the 310 case managers and provides technical assistance with standards compliance. — 2

Review Medicaid Redetermination forms and completes Medicaid Waiver forms as needed. — 3

Serves as case manager of a select group of individuals in order to facilitate community living. — 3

Composes clinical documents, reports and corresponding on individuals, programs, issues for use in client services and program enhancement. — 3

[blank box]

[blank box]

[blank box]

**RESPONSIBILITY SCORE:**

| 18 | ÷ | 7 | = | 2.57  2.6 KB  ¹¹/4/07 | × 10 | = | 25.7 |
|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____0_____

MEMORANDUM:

January 9, 2007

To: Kendra Butler

From: Winifred Blackledge *WB*

Re: Attachment to Performance Appraisal

Please find an attachment to the Performance Appraisal completed by you on January 4, 2007. As you indicated in your memorandum dated January 4, 2007 it is mandatory that I sign.

Let me know when you want me to sign.

P. c. Copy to Personnel File
    John Houston, Commissioner
    Eranell McIntosh-Wilson, Associate Commissioner
    Fordyce Mithcel, Director of Community Services
    Josh Wilson, Wiggins, Childs, Quinn & Pantazis

ATTACHMENT TO PERFORMANCE APPRAISAL
DATED JANUARRY 4, 2007
WINIFRED A. BLACKLEDGE

I am providing an attachment to my January 4, 2007 Performance Appraisal because my supervisor, Kendra Butler significantly reduced my score. I am signing the performance appraisal under duress and the treat of disciplinary action as indicated in a memorandum dated January 4, 2007 and given to me by Ms. Butler on January 8, 2007 at 8:30 a. m.

During my mid year PreAppraisal, which I signed July 26, 2006 and July 27, 2007 there were no concerns expressed by Ms. Butler regarding the manner in which I performed my responsibilities. At no time has Ms. Butler indicated that I was not performing my duties as well as the preceding year. I expected Ms. Butler to inform me if she felt the level of my job performance had dropped (10) points and to give me an opportunity to improve before lowering my score.

Ms. Butler stated in the Performance Appraisal meeting that I pride myself on working independently. It is common practice for Region III Community Services staff to be expected to be able to work independently and to be able to assess situations and make recommendations for improvement. At no time did Ms. Butler inform me that she viewed working independently as an undesirable trait. I disagree adamantly to being penalized for one of my strongest qualities, being able to work independently, making recommendations to improve what was and still is a poorly met objective of Region III Community Services (staff monitoring of community homes). Ms. Butler informed me during the performance appraisal meeting that I did not communicate with her regarding what I was doing. I was providing and informing Ms. Butler in writing of my schedule and she was signing the schedules. I discontinued this practice when Ms. Butler told me she did not require me to provide her a schedule. Common practice in Regional III Community Services is to indicate your whereabouts on the sign –in sheet that I proceed to do after Ms. Butler informed me that she was not requiring a written schedule. When I submitted my last schedule on September 19, 2006, Ms. Butler would not approve the schedule. Ms. Butler informed me that I could not earn compensatory time but had to flex my time. On September 19, 2006, I asked Ms. Butler to inform me in writing that I could not make compensatory time. Ms Butler responded back in writing on September 19, 2006 stating, "RCS staff can flex their hours to do monitoring visits rather than earn comp time." Ms. Butler gave me the submitted schedule back without approving the schedule along with her written response.  I am aware of the departmental policy on compensatory time but I am unaware of a departmental policy on flexing time.  Thus, I requested further information from Ms. Butler regarding whether the department has a flex policy. Ms. Butler has not provided me the policy or told me where I could find the policy. If employees are being told that they can flex. Their time. Employees need to have policies to follow on flexing time.

Page 2 of 6
Winifred Blackledge
Attachment to Performance
Appraisal Dated
January 4, 2007

During my mid year PreAppraisal, signed July 26, 2006 and July 27, 2006 was the time for Ms. Butler as my supervisor to inform me if she had any concerns about my job performance in all the job responsibilities areas she reduced my scores. Also, doing the PreAppraisal at no time did Ms. Butler inform me that she had concerns about my job performance to the extent that she would even consider reducing my scores. Further, there is no documentation from any source including community care providers that I was performing my responsibilities poorly. Ms. Butler should have ensured that I had written documentation making me aware of any concerns she had with my job performance. In addition, Ms. Butler should have given written objective suggestions on improving my job performance if she felt there was a need in the areas where she reduced my scores. However, Ms. Butler has treated me unprofessionally and attempted to penalize me for making recommendations to improve the quality of monitoring done by Region III Community Services staff. I view the lowing of my score on the performance appraisal as retaliatory by Ms. Butler due to her personal reasons. I merely handled the situation as has been expected of me for the past 20 years. I recommended a method that would improve the quality of monitoring. Once Ms. Butler did not agree with my recommendations, I performed the task as she instructed.

Throughout my career with the Department of Mental Health and Mental Retardation I have never taken my job responsibilities, PreAppraisals, Performance Appraisals lightly. Below I am giving my reasons on why I disagree with Ms. Butler's scoring:

Responsibility Number One: Monitoring responsibilities: Ms. Butler mentioned in the Performance Appraisal meeting that she had several discussions with me on the expansion of the monitoring assignment given to me by her in April, 2006. Ms. Butler mentioned that I needed to be "more accepting of expansion of job responsibilities on my pre-appraisal dated by me July 26, 2006 and July 27, 2005. I disagreed with Ms. Butler's statement on the PreAppraisal and did an attachment to the PreAppraisal dated July 26, 2006 that was submitted to my personnel file. Again as discussed in my pre-appraisal attachment, I was voicing my professional recommendations and providing Ms. Butler with pertinent information that I thought was needed. Are we no longer concerned with improving the effectiveness of Community Services Functions? Obviously, my complying with the assignment and assuming the majority of homes to be monitored, developing a new monitoring assignment checklist (which I implemented the fiscal year beginning October, 2007), maintaining the monitoring database, and keeping Ms. Butler and Ms. Jerryln London, Director of Community Services aware of what homes were and were not being monitored by staff has not been enough to maintain previous year score of 4 for this responsibility.

Page 3 of 6
Winifred Blackledge
Attachment to Performance
Appraisal dated January 4, 2007

After Ms. Butler stated that I "needed to be more accepting of expansion of job responsibilities" (which I disagreed with her statement). I begin to show even more an effort to increase my monitoring and to comply with the assignments. It is my opinion that this score should have remained a four. Ms. Butler had no further concerns or complaints regarding how I was doing with this assignment.

Responsibility Number Two: I have for years have been one of the primary staff to provide technical assistance to community care providers, prior to site visits and after site visits (if there are community care providers placed on provisional by the Certification Team). Ms. Butler was well aware of the fact that Ms. London has instructed RCS staff to provide technical assistance only when requested by the care provider. As requested by the community providers assigned to me, I provided whatever assistance was required. I have been there when needed for as long as needed and my providers avoided provisional status or were removed from provision. Not one time has Ms. Butler ever discussed any problems or concerns regarding the manner in which I provided technical assistance. Ms. Butler informed me in the evaluation meeting that she was aware that I was providing technical assistance to the smaller agencies. What justification is there to lower my score when neither Ms. Butler nor the providers have a problem? It is my opinion that number two should have remained scored a three.

Responsibility Number Three: I have consistently for years performed the responsibility of resource development and placement. This is the duty of a classification higher than mine. I have extensive experience in this area. Ms. Butler was fully aware that Ms. London assigned me from November, 2005 through February, 2006 to work with the 310 Board case mangers to ensure that that they were moving individuals off the waiting list during the absence of their supervisor. The waiting list is a primary job responsibility assigned to Ms. Butler who has a higher classification than mine. I worked very effectively with the Mobile Mental Health 310 Board case managers. This responsibility consisted of numerous discussions/meetings with the case managers on developing resources, assessing individuals for appropriate community placements and services. Ms. Butler and Ms. London were in some of these meetings. I kept Ms. Butler informed verbally and in writing on what I was doing with this assignment. I was also assigned by Ms. Butler to assess developing resources for potential new community homes/care providers. This involved written assessments of the potential homes/ care providers. These written assessments were given to Ms. Butler. Ms. Butler knows that the aforementioned assignments in this paragraph are crucial to development of resources and placement. Neither Ms. Butler nor Ms. London voiced any concerns with the manner in which I handled this assignment. I think my score should have remained a 4.

Page 4 of 6
Winifred Blackledge
Attachment to Performance
Appraisal Dated
January 4, 2007

Responsibility Number Four: I have served as the liaison person for the 310 case managers. Serving in this capacity I have provided technical assistance for standard compliance. I review case managers' quarterly reports and billing, followed-up with the 310 case manager supervisors to report my findings and recommendations and ensured any necessary actions are taken. Ms. Butler has never discussed in detail her expectation of me with regards to this assignment. I am not even sure if Ms. Butler was aware of what responsibilities I had related to this assignment. Again, I ask, what was Ms. Butler's justification for giving me a low score of two? There have been no complaints or concerns expressed by the 310 Boards.

Responsibility Number five: I disagreed with Ms. Butler's score of three. I was one of the staff assigned to review re-determinations and have always done this review in a timely manner. Ms. Butler is fully aware if the reviews of re-determinations are not done in a timely manner, the care providers medicaid funding could be in jeopardy. I was the person assigned to review and submit all the re-determinations from our region when Rebecca Green left in December, 2005. I assumed this assignment starting January, 2006 to April 3, 2006 and worked professionally and effectively with Sherry Robinson out of Central Office. All re-determinations were reviewed and submitted in a timely manner. I trained the new employee, Jean Long, who was hired to do this assignment. I assisted Ms. Long with filing at least 3 months of re-determinations/other medicaid paper work because Ms. Long was at least 3 months behind in filing paperwork that she had reviewed. I kept Ms. Butler informed in writing on the progress of assisting Ms. Long with her job responsibility. Ms. Butler did not voice any problems or concerns with my performance of this responsibility (which was not my responsibility to that extent). However, I assisted Ms. Long with the filing as best I could even though I had an injury at that time. I should have received a score of 4 in this area.

Responsibility Number 6: I have extensive experience in case management and as assigned cases I have always done this job effectively. Ms. Butler assigned me a case where she informed me that the individual's responsible relative had taken legal actions to receive appropriate services. Would this case have been given to an inexperience Region III Community Services employee with no or very limited case management experience? Was the case given to the 310 Board Case Managers to follow? I have handled this case effectively and kept Ms. Butler informed verbally and in writing of what I was doing with this case.

Page 5 of 6
Winifred Blackledge
Attachment to Performance
Appraisal Dated
January 4, 2007

I did the Medicaid Waiver Forms for the individual to begin to receive funding from the Medicaid Waiver and continue to provide case management for this case. It took an experience case manger to establish a rapport with the responsible relative and to diffuse any further legal actions. What problems occurred that prompted Ms. Butler to lower this score from 4 to 3? This score should have remained a 4. I handled this case efficiently and effectively.

I believe lowering my Performance Appraisal was really about causing me as much stress as possible. I believe the agenda of my supervisors were to punish me for voicing my complaints about being harassed and treated unfairly. I believe Mrs. Butler and Mrs. London have conspired to discredit me professionally. I believe Mrs. Butler harbors resentment because I voiced my opinion concerning the amount of compensatory time she has earned over the past several years to avoid using her annual leave. I think this was the real reason why I was told on September 19, 2006 that I could not make compensatory time. Why would Ms. Butler initially tell me that I could not make compensatory time without giving me a reason while other employees were claiming compensatory time? I was required to work past my work hours and had found a workable solution with trying to do my job responsibility. I am not entitled to compensatory time if I obtain prior approval from the supervisor? I believe that I am being punished for protesting the discriminatory manner in which DMH/MR has treated me. I believe Ms. London harbors resentment because in an effort to seek relief from constant harassment I lodged a complaint against her. I come to work, do my job, try and stay out of everyone's way and still I am forced to work in a hostile environment. There should be some recourse for the employee whose job performance and creditability has been attacked due to personal reasons.

As Mrs. Butler does not know why she lower my evaluation, and in her memorandum dated January 4, 2007 requested that I document why it should at least remain the same, I have written this justification. What policy states that an employee must justify not having their evaluation score lower when the supervisor has not documentation, rhyme or reason?

Page 6 of 6
Attachment to Performance
Appraisal Dated
January 4, 2007


I have never had a Performance Appraisal below exceeds standards.  I have never
performed my duties below exceeds standards.  I am requesting that justification for
lowering my evaluation be presented, and as I know none exists **today,** I am requesting
that my score be raised at least to the level of last year.


Sincerely,

Winifred A. Blackledge                    Date: Attachment submitted: 1/9/07

P. C. Copy to Personnel File
       John Houston, Commissioner
       Eranell McIntosh-Wilson, Associate Commissioner
       Fordyce Mitchel, Director of Community Services
       Josh Wilson, Wiggins, Childs, Quinn & Pantazis

Memorandum

To:    Winifred Blackledge

From:  Kendra Butler    *Kendra Butler*

Date:  January 12, 2007

Re:    Attachment to Performance
       Appraisal Dated January 4, 2007

We met on January 4, 2007 to do your Employee Performance Appraisal. You chose not to sign your Employee Performance Appraisal as you were not in agreement with the scoring. You were advised that the employee signature is mandatory as stated in the section Appraisal Signatures on the Employee Performance Appraisal form. It further states that an employee's signature "denotes supervisor and employee discussion and receipt of form. Employee signature does not denote agreement." Section 36-26-27.1 of the Code of Alabama states the reasons for employee signatures being mandatory. It also addresses the disciplinary issue. This information was included in a January 4, 2007, memo given to you on Monday, January 8, 2007, as you were on sick leave and not at work on Friday, January 5, 2007.

Responsibility Number One: Monitoring responsibilities: You are the designated Monitoring Coordinator for Region III and as such, the majority of the homes in the region are assigned to you to monitor as part of your responsibility. You are also responsible for maintaining the monitoring database, generating reports, etc. You and I met on several occasions to make sure that all of the group homes to be monitored were listed and to discuss the number of group homes assigned to RCS staff. I have not observed nor received any information or documentation that your score should reflect consistently exceeds standard.

Responsibility Number Two: Provides technical assistance to community providers: You provided technical assistance to a small number of providers. Technical assistance should be offered to all providers. Technical assistance is provided or not provided depending upon the community provider's response. There is not justification for the rating exceeds standards.

Responsibility Number Three: Resource development: Performing assigned tasks does not indicate that your work performance exceeds standards or consistently exceeds standards.

Page 2
Winfred Blackledge
Attachment to Performance
Appraisal Dated January 4, 2007

Responsibility Number Four: RCS liaison to work with 310 case managers: Meetings were held with case managers of two 310 boards. There are four 310 boards in Region 3. Your job performance is not indicative of exceeds standards or consistently exceeds standards.

Responsibility Number Five: Medicaid Waivers/Redeterminations: The period that RCS staff reviewed waiver documents was not limited to January 1, 2006-April 3, 2006. RCS staff reviewed waiver documents to ensure accuracy and continuous and effective services. RCS staff assisted in filing the waiver packets. There is no indication that your work exceeds standards or consistently exceeds standards.

Responsibility Number Six: Case Management: You referenced the one case for which you are case manager. RCS was asked to handle the case by Central Office. The local 310 Board in the county where the consumer resides does not provide case management for children. Initially, you and I worked on the case together to ensure that the consumer received the services she needed and to see that the new Plan of Care form was completed correctly. Being an experienced worker does not equate consistently exceeds standards.

I do not harbor any resentment against you. When you voiced your opinion that you did not agree with the scoring you received, you were offered the opportunity to present documentation justifying higher ratings on your appraisal form. Your Attachment to Performance Appraisal dated January 4, 2007, does not provide justification to amend your performance appraisal. Your performance appraisal reflects your performance over the past year.

Pc Personnel File
    Ms. Eranell McIntosh-Wilson
    Fordyce Mitchell
    Courtney Tarver

MEMORNADUM

To: Henry Ervin
DMH/MR Personnel

From: Winifred Blackledge

Date: January 16, 2007

Re: Kendra Butler's Response To My Attachment
To Performance Appraisal Dated
January 4, 2007

It appears to me that Ms. butler is determined to lower my Performance Appraisal score. Since Ms. Butler cannot tell me why, I am requesting an explanation from personnel. Ms. Butler has missed the entire reason for my compliant. I am not asking to have my Performance Appraisal score raised any higher than it was last year. I am asking what did I not do with regards to my job performance to warrant the lowing of my score ten points?

I find it difficult to believe, as I am being told, there does not have to be a reason to lower an employer's Performance Appraisal score. Submitting an attachment does not change the score. This coming March, 2007 I would have worked 20 years for the department. My work philosophy has always been to do the best job I could in an efficiently and professionally manner. If Ms. Butler, prior to my Performance Appraisal evaluation had discussed what she though were deficits in my job performance, I most definitely would have worked to improve them.

I am annoyed that Ms. Butler is allowed, as I have been told to lower my score from Exceeds Standards to Meet Standards. I am requesting the policies & procedures for lowering an employee Performance Appraisal from personnel if any exist. There is no current employee whose Performance Appraisal score is 25 or has been lower drastically as my Performance Appraisal was lowered.

With regards to Ms. Butler's attachment dated January 12, 2007 in response to my attachment dated January 4, 2007, the information in Ms. Butler's attachment is inaccurate. Responsibility number one: I have monitored the majority of the homes as I was assigned. I gave Ms. Butler a written schedule, which she approved with her signature until she informed me that a schedule was not required. Ms. Butler states she has not observed or received any information or documentation that reflects consistently exceeds standards, which was my previous score. Ms. Butler has not received any information at all. Ms. Butler does not review the monitoring reports or accompany me on any monitoring visits. Ms. Butler has not said or produce any documentation, which would determine what my performance was on any monitoring visits. Further, my monitoring responsibility is not about just monitoring homes. I have to maintain a database of homes visited and which staff did the visits. I implemented a monitoring checklist tracking home visits by staff that has to be maintained. I coordinate and assigned staff to monitor homes and update the staff monitoring assignment form as needed. I follow-up on any concerns I may have found on monitoring visits with the appropriate care providers and Community Services staff as needed. I red flagged other staff follow-up and follow-up with staff as needed. What did Ms. Butler use to determine my score should have been lowered?

Page 2 of 4
Henry Ervin
Second Attachment to Winifred Blackledge's
Performance Appraisal
Dated January 4, 2007

Responsibility Number Two: Ms. Butler has not indicated she had any information regarding the effectiveness of my technical assistance visits. What did she use to lower my score?

Responsibility Number Three: I worked with case management on the waiting list. I assessed two potential care providers assigned to me by Ms. Butler. Although these were short-term assignments, I performed the assignments well. Ms. Butler did not complain or make any comments on my job performance regarding these assignments. What documentation did she use to lower my score?

Responsibility Number Four: Ms. Butler was in error as to the number of 310 case management Boards I worked with. Is Ms. Butler in possession of any complaints from the 310 Board Case managers with regard to my job performance? Ms. Butler is unaware of what transpired during my visits with the 310 Board Case Managers. Ms. Butler and I never had any detailed discussion regarding this responsibility would involve or informed me what her expectations were for this responsibility. What documentation did she use to lower my score?

Responsibility Number 5: Yes, all RCS staff including me for years reviewed the re-determination Medicaid Waiver forms/packets. However, from January 1, 2007 to April 3, 2007, I completely processed all Medicaid Waiver forms/packets along with my other job responsibilities. I was punitively assigned to file forms along with another employee who had filed a complaint to assist the person hired to do this responsibility. I had no problem assisting the new employee hired to do this responsibility as I had assume the entire responsibility of the re-determination/Medicaid Waiver process prior to the new employee being hired which consisted of: reviewing, correcting, copying, mailing, processing the Medicaid audit. I am sure it is apparent that my responsibilities were different from the normal responsibility of Community Services staff in the past that only reviewed the Medicaid Waiver forms/packets prior to me being assigned all the responsibilities for the re-determination/Medicaid waiver process. What documentation was used to lower my score?

Responsibility Number Six: Is it my fault that there was only one case management assignment. What documentation was used to lower my score?

The fact remains that throughout the past year Ms. Butler has not advised me of one complaint she had with my work performance. After I asked for justification for lowering my score she could not provide justification. The only response I have received is a response to my attachment dated January 4, 2006.

It is misleading when Ms. Butler refers to my desire to raise my Performance Appraisal score. I am asking why it was lowered without justification and that the score remain the same as the last year Performance Appraisal score. I am not asking for anything that I don't deserve.

Page 3 of 4
Henry Ervin
Second Attachment to Winifred Blackledge's
Performance Appraisal dated
January 4, 2007

If Ms. Butler required more communication than has been required for the last 20 years, Ms. butler should have informed me what type of communication she desired. As a new supervisor she should have most definitely conveyed her expectations. Ms. Butler is very aware of the procedures with regards to performing tasks in Region III Community Services. It is not normal practice for employees to report everything that they do with their job responsibilities to the supervisor. It is normal practice and an expectation for employees to be able to work independently.

Simply attaching a statement does not change the fact that my score was lowered 10 points. Thus far, no one has told me what is the appeal process when an employee score is lowered. I have asked personnel if such a process exist and told there were no policies and procedures for appeal and to do an attachment.

Ms. Butler's commented that she does harbor resentment against me. I contend that she does harbor resentment. It is very obvious that she has no justification other than her personal agenda for lowering my Performance Appraisal score. If she had reasons or justification why didn't she discuss it with me prior to my Performance Appraisal evaluation and given me an opportunity to correct her concerns before she lowered the score? It was Ms. Butler's attention not to allow me to improve whatever her complaints were and it was her attention to not allow me to appeal the lowering of my score. Ms. Butler and I can discuss the lowering of my Performance Appraisal score forever. I have no further desire to discuss with Ms. Butler the lowering of my Performance appraisal score.

I will be signing the Performance Appraisal under duress. However, I want my feelings about the lowering of the Performance Appraisal understood. Ms. Butler lowered my score without prior discussion with me regarding any concerns about my job performance and given me the opportunity to improve any concerns. I want to appeal the score. I find Ms. Butler's actions hostile, punitive and retaliatory.

I have talked to personnel, sent personnel information regarding my concerns with Ms. Butler's lowering of my Performance Appraisal score. How can a supervisor be allowed to arbitrarily lower an employee's Performance Appraisal score without given the employee a chance to improve any concerns that a supervisor may have? I find it punitive that personnel or Ms. Butler have not informed me of what the appeal process is and insist that none exists.

Page 4 of 4
Henry Ervin
Second Attachment to Winifred Blackledge's
Performance Appraisal dated
January 4, 2007

Again, I will be signing any Performance Appraisal score lower than last year under duress and
to avoid further disciplinary action as indicated in Ms. Butler's memorandum dated
January 4, 2007. I feel at this point any further discussion regarding the appeal process should be
directed to my attorney: Mr. Josh Wilson, Wiggins, Childs, Quinn & Pantazis, P. C., Three
hundred one-nineteenth Street North, Birmingham, AI 35203, 205-314-0566.

Sincerely,

Winifred A. Blackledge

P. C. Personnel File
    John Houston, Commissioner
    Eranell McIntosh-Wilson, Associate Commissioner
    Fordyce Mitchel, Director of Community Services
    Kendra Butler, Community Services
    Courtney Tarver, DMH/MR Legal Division
    Josh Wilson, Wiggins, Childs, Quinn & Pantazis

# EXHIBIT

I

5/30/06

Monitoring Visits

9:30 am — Winifred Blackledge & I met to discuss
monitoring visit assignments based on
1/06/06 list of revised monitoring assignments
I used to list assignments by
worker (current) and their proposed
assignments based on information
& workload. At the time of the meeting,
Winifred informed me that I had
the wrong lists (1/6/06) because on the list
according to her the (correct) list,
didn't reflect Jennifer London, RCS
Director, as having any or many
group homes to monitor as she (Winifred)
had picked up a number of them.
We discussed some reassignments — Cathy
Smith to take medical issue group
homes. Donna Buckley to assume
responsibility in monitoring Rachael House (VOI)
and possibly possibly the Thompson
House (VOA), and reduction of homes
for Steve Lloyd and myself. (Winifred
asked why the reduction for us —
workload responsibilities). I asked
Winifred to check the lists and
come up w/a corrected one w/assign-
ments to be reviewed on June
9. She is also to make sure

we have all of the homes listed with indications of whether they are independent or subcontract w/another agency.

At the June 9th meeting, we will review the number of homes assigned to workers. Winfred's primary responsibility is the monitoring of group homes and ~~collecting~~ reviewing monitoring visit reports, and entering data into the data base.

*Kendra Butler*

5/30/06    I called Winfred and requested
11:45am   a copy of the "correct" monitoring
          visit list she referenced at
          the meeting this morning. She
          stated she'd have to look for it
          as she wasn't sure she had it
          or had erased it.

*Kendra Butler*

5/30/06    Winfred informed me that she
12:00pm   couldn't find the list I requested;
          the one other than 4/06/06. She said she
          "must have erased it or something."

6/09/06

10:00 am Meeting w/ Winifred

1. Discussed assignments
   a. rationale noted on memo dated 6/09/06
   b. ~~revision~~ asked that # be decreased for
      Cathy, Steve & myself - they were
      increased for Cathy (16) & Steve (11) in
      comparison to 1/6/06 list
   c. per Winifred she discussed assignment - # -
      w/ Donna & Yolanda as they have a larger #
      of homes to monitor ~~Report~~ reportedly they
      are comfortable w/the # assigned to
      them
   d. Winifred has requested consideration of
      group discussion re: assignments
   e. data, list, assignments

2. 6/09/06 assignment sheet revisions
   a. add 4 homes to list
      Petway - Southern Oaks & Vista Ridge
      Cahaba - McDonald St.
      LT - Williams Mary to replace Pineview Lane
   b. ? Look a Jean being assigned Maxine Hills home
      or was IL Jerryhn London

3. responsibilities of Monitoring Coord
    when assigned responsibility
    Susan Steardi was RCS Director
    ↳ coordination of monitoring
    of group homes, data base entries
    ↳ completion of monitoring forms
    Mentioned it didn't entail being
    responsible for larger # of homes
    to monitor
        Knows things change


4. Form 40
    Winifred questioned whether or
    not monitoring was on everyone's
    Form 40.
    Suggested if it wasn't maybe it
    should be

6/14/06 Meeting scheduled w/ Winifred
9:30 am meeting was scheduled
to look at monitoring assignment
revisions since last meeting
6/9/06

9:35 am I called & left message re: meeting
9:45 am I called her again & asked
about meeting. Her response
was that she had a memo
for me. A few minutes later
she brought me a memo dated
6/16/06 (pg 1) and June 14, 2006
on pages 2-4.

6/16/06 Memo from Winifred
Pg.1      re: Monitoring Assessments


1st meeting referenced was May 30th difficult
stated that late hours would be ~~different~~
as she has a business; usually works
6 days + she's involved with her
church
    - Job w/DMH/MR is responsibility (primary)
    - can adjust hours
    - look @ working flex hours
    - look @ homes where consumers
      are home earlier in afternoon

p.2. dated   - Winifred was given a proposal for
6/14/06        assignments after I reviewed 1/6/06
               first
           5 reasons were listed as to assignments
           were made
        ? need for 2nd paragraph to be included
           in 6/9/06 memo re: revised monitoring
           assessments
        # for Steve & Cathy ↑ after asking her to
        reduce # or keep @ this @ no more than
        11

pg. 3
6/14/06

- Concern should be for her own job responsibilities not others
- monitoring, in some homes, can occur during "regular" work hours as consumers are in the home -
- school age children get home around 3 or earlier depending on provider
- during summer can find (may) @ home later in am

Being a "coordinator" (monitoring children's coordinator) means that that ind. has primary task/responsibility for that area

reference to responsibilities; her understanding of them dates back to when initially assigned by Susan Stuardi, former LCS Director

- Amended hours/days would they vary? from Frequency?

*job to accept job responsibility w/o need to do events*

6/14/06 cont'd - ? why others had reduction
in # of homes per my directive -
· stated that she didn't see herself
as having primary
- wants to work an amended
to include working in Mobile
1-2 days

not receptive
to change

wants "fairness"

questions reason for change job responsibilities
it took meetings (  ) and memos(  )
to arrive @ point where the coord. had
a higher # of homes to monitoring as
it's a <u>major</u> job responsibility

6/19/06 my response per memo

statement that m assignments left to
the discretion of supervisor

began 5/30/06 - 6/30/06 final assignments
made

I did initial review of list prior to 5/30/06
as me gave me a copy of the assign-
ments by home not worker; number
- RQS job is primary responsibility
- flexibility needed
- acceptance of changes in assignments
- not being overly concerned about assignm
- questioning fairness

Describe area(s) that needs improvement
of responsibilities and/or work habits

*looking for policy*

- needs to be more accepting of
  new job responsibilities
  expansion of job
  responsibilities

- when discussed ↑ monitoring responsibilities
  as monitoring coord. gave reason
  it'd be difficult as she had a
  business she did in the evening ud?

4/26/06
- questions if she's being singled
  out and treated w/ disparity

- monitoring ↑ for coord.
    meetings scheduled
    6/8 memo - w/ assignments/rationale
    6/14 9:30 scheduled mtg. - contacted

not the case - these outcomes when before 9:45 am had 4 pg memo
brought to me - states that
addtl monitoring responsibilities
would require consistently working overt

    5/30 - met to discuss revision of
    1/6/06 current monitoring assignments
        & current work responsibilities


↳ asks question seeking justification
  for changes, ie ↑ caseload for monitoring

6/19/06  Winifred arrived @ work and signed in @ 7:20 am. Regular work hours 7:00am-3:30 pm. No reason given for arriving @ 7:20pm. At 7:50 am, I took Winifred the written response to her 6/16/06 /6/14/06 (pg. 2-4) 4 pg. memo re: monitoring assignments. She was sitting @ her desk reading the newspaper.

6/20/06  7:15 am Winifred gave me the 6/19/06 revised monitoring assignment list to review which I did. I arrived at a total different than hers re: the total # of group homes. We met @ 8:15am to go over the difference in numbers and found errors in assignments. Winifred was given the list to revise again re: number assignments. After we met, I contacted Winifred per phone (left a voice message) & requested that she increase her number of group homes to monitor as well as Yolanda's & B look at decreasing Donna's and Yolanda's. The assignment was originally requested to be finalized and submitted to me by 12 Noon. I stopped by Winifred's office between 12:20 and 12:25 pm. She wasn't there. When I returned to my office at 1:00pm the list was in the holder on my door. I reviewed the list for corrections & numbers. Winifred & I met again to go over the numbers. Approval was given for the list to be distributed to RA staff responsible for monitoring group homes.

10/13/06

8:30 am  Discussion w/Winifred Shelledge re: 10/5/06 flexing of time due to car problems. States she went out monitoring that afternoon. Reiterated she can earn comp time or flextime. Mentioned to her to bring things to me in person rather than sliding things under my door. She does this even when I'm in the building. She stated she doesn't mean to be "nit picky"

Plan: Check monitoring report for 10/5/06 monitoring visit for/by her.

Addendum: 10/13/06 I apologized for oversight for monitoring on 10/5/06. She posted monitoring but not location - which is not always done by others either.

10/16/06.

The attached fax was sent by Winifred Blackledge from her home.

approx. 6:10am: She called in early this morning stating she had a headache; that she was going back to bed. She stated she may possibly be in later.

approx. 9:45am: Winifred called to state she was not coming in due to headache. She stated she had something confidential she wanted to fax me and requested the fax number for the break room. I gave it to her, 621-4795.

I was by the fax machine waiting for the fax to come in.

Kendra Butler.