# EXHIBIT

# J



DEFENDANT'S
EXHIBIT
10 - 2

# MEMORANDUM

TO:      Winifred Blackledge

FROM:   Kendra Butler *KB*

DATE:   January 4, 2007

RE:      Employee Performance Appraisal,
         Employee Performance Pre-appraisal


We met this afternoon to do your Employee Performance Appraisal and Employee
Performance Pre-appraisal. After reviewing the appraisal form, you stated that you were
not in agreement with the ratings for the responsibility statements; you felt that some of the
ratings should be higher than meets standard or exceeds standards. You also expressed
concern that your responsibility score is lower than in the past.

As I explained to you, I do not have documentation to support changing the ratings.
You were asked to provide documentation/justification to support changing the ratings for
the stated responsibilities. You asked for time to review the appraisal and pre-appraisal
forms.

You refused to sign both the Employee Performance Appraisal and Employee Performance
Pre-appraisal forms after it was reviewed with you that your signature signifies only
discussion and receipt of the aforementioned forms. You refused to sign the forms knowing
that signatures are mandatory. "Section 36-26-27.1 of the Code of Alabama requires
employees to have had prior knowledge of any documentation used in the disciplinary
process. For this reason, it is imperative that the employee sign the performance appraisal
form. As noted on the form this signature does not denote agreement, but merely
acknowledgement that the form has been discussed with the employee. Should an employee
refuse to sign, the supervisor should issue a direct order to do so with the clear
understanding by the employee that disciplinary action will occur if the direct order is not
obeyed. If refusal continues, discipline continues."

I have not been able to get the answer from Personnel to your question regarding the
scoring. I will continue to try to get an answer.


Pc Jerryln London



EXHIBIT

K

# MEMORANDUM

**To:**    Winifred Blackledge

**From:** Kendra Butler *KB*
       Supervisor

**Date:**  January 5, 2007

**Re:**    Evaluation

We met on January 4, 2007 to do your Employee Performance Appraisal. After you reviewed your rating, you stated you thought that your rating could not be lower than the previous one unless you had been counseled. You asked that I check to see if there is a policy stating this.

I spoke with Sandy Speakman, Deputy Legal Counsel, with the State Personnel Office today. She stated that there is not a policy stating that an employee's rating cannot be lower than in the past unless counseling has occurred. The rating is based on the employee's work performance during the appraisal period.

I hope this addresses your concern. If you have further questions, please let me know.

Pc Jerryln London

# EXHIBIT



# L

# MEMORNADUM

To:    Winfred Blackledge

From:  Kendra Butler

Date:  January 12, 2007

Re:    Performance Appraisal


We met today at approximately 12:17 p.m. to go over your appraisal.  We went over the Employee Performance Pre-appraisal form which reflects the changes you requested and we both signed off on it.

As we were discussing your Employee Performance Appraisal, I gave you a copy of my response to your attachment dated January 4, 2007.  After reading it, you stated that you did not agree with my response and stated you'd like to make a phone call. You returned to my office at approximately at 12:30 p.m. stating that you would like time to respond to my response stating that you did not know I would make comments (to be included be included with your performance appraisal).  My response was "Winifred, I have the same rights as you do."  The Performance Evaluation was not signed.

You asked if we could meet on Monday.  Since it is a state holiday, we agreed to meet on Tuesday, January 16.




Pc Personnel File
    Ms. Eranell McIntosh-Wilson
    Fordyce Mitchel
    Courtney Tarver

# EXHIBIT

# M

**Form 13P**
**Revised (01/2006)**

## EMPLOYEE PERFORMANCE *PREAPPRAISAL*
### STATE OF ALABAMA
**Personnel Department**

Employee Name: <u>WINIFRED A BLACKLEDGE</u>

Agency: <u>061/MENTAL HEALTH & RETARDATION</u>

Classification: <u>M H SOCIAL WORKER II</u>

Period Covered From: <u>01/01/2007</u> To: <u>01/01/2008</u>

Social Security Number: 

Division: <u>313E/CENTRAL OFF MR COMM PRO</u>

Class Code: <u>W2000</u>

Position Number: <u>08823006</u>

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1. Coordinates community services staff monitoring of residential facilities, maintains monitoring database, provide monitoring reports of contracted residential facilities and individuals in the service delivery system in order to address quality of life issues. *Does monitoring of community based homes.* KB 1/12/07 WB 1/12/07

2. Provides technical assistance and consultations to day and residential providers in the region in order to address quality of life issues and standards compliance. Provides written feedback to providers. KB 1/12/07 WB 1/12/07

3. Assists families in the development of resources, finding community placements, working with the placement process for individuals in order to promote living in the least restrictive settings and institutional diversion.

4. Serves as liaison between the Regional Community Services office and the 310 case managers and provides technical assistance with standards compliance.

5. Serves as case manager for select group of individuals in order to facilitate community living. Reviews Plan of Care and quarterly narratives.

KB 1/12/07 types WB 1/12/07
6. Composes clinical documents, reports and correspondence on individuals, programs, issues for use in client services and program enhancement.

**WORK HABITS:**  Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee.  For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

|  |  |
|---|---|
| _____ | Attendance |
| _____ | Punctuality |
| _____ | Cooperation with Coworkers |
| _____ | Compliance with Rules |

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _1|4|07 1st mtg   1|12|07 2nd mtg_

Employee Signature: (denotes discussion and receipt of form, not agreement) _Winfred G. Blackledge_

Rater Signature: (denotes discussion and employee receipt of form) _Kendra Butler_

Reviewer Signature: _Gerrida L. Sinclair_

---

## EMPLOYEE PERFORMANCE MIDAPPRAISAL

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

_____

_____

_____

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period.  Document any actions taken or the corrective action plan that was developed to improve the areas of weakness.  If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period.  Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session.  If there is no documentation in the first two areas, this section should be completed.

_____

_____

_____

A Midappraisal session has been held on this date and performance has been discussed:_____

Employee Signature:_____    Initial if comments attached:_____

Rater Signature:_____    Initial if comments attached:_____

Reviewer Signature:_____    Initial if comments attached:_____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee.  Signatures are mandatory.  Employee signature does not denote agreement but discussion of the form and rater comments.  Comments may be attached.  The person attaching comments must initial in the appropriate space.)

# EXHIBIT

# N

# FAX COVER

Date: January 16, 2007

To: Courtney Tarver

From: Winifred Blackledge

Pages including fax cover: Nine

Fax Number:

Comments: Audit request, Second attachment to Performance Appraisal, Kendra Butler's Response to First Attachment, January 4, 2007.

MEMORANDUM

To: Henry Ervin
  DMH/MR Personnel

From: Winifred Blackledge

January 16, 2007

Re: Audit

As you are aware, your office or State Personnel advised Ms. Kendra Butler,
I am  not sure which, to deduct 15 minutes from my annual leave based upon false
statements by Jerryln London and Ms. Butler regarding me leaving work 15 minutes
early on January 4, 2007.

Again, I want to be sure that it is noted Ms. Butler made no mention of checking the
parking lot until I had reported that I checked the time Ms. London was returning to
work and I was leaving work. I habitually do no leave early since Ms. London alleged
in a memo on October 13, 2005 that I was not working am 8 hour day.  I have
attempted to avoid given Ms. London an opportunity to hares me about leaving early or
not signing in and out.

As I have said before it is only l that Ms. London harass about leaving early and not
working an 8-hour day. Other employees can leave throughout the day, which requires
15 minutes or more to get coffee, go grocery shopping, clothes shopping and whatever
they wish. I find it strange that Ms. London and Ms. Butler will lie about me leaving
early on January 4, 2007 as they have participated in this behavior. Employees will
probably not tell truth about these common practices but at this point I have no reason
to not to tell the truth.  No other employee has been questioned or forced to take leave if
they leave early or do not work an 8-hour day as Ms. London mentioned in her memo to
me on October 13, 2005.

However, since 15 minutes is very important to everyone, I am requesting an impartial
audit of the sign in sheets and I am asking to be compensated for every minute l worked
over 8 hours for the last five years.

I am sure personnel can see the significance of my request. Fifteen minutes is equally
important to me as it is to the State of Alabama.

Page 2 of 2
Henry Ervin From
Winifred Blackledge
Audit Request
January 16, 2007

The leaving 15 minutes as indicated in Ms. London's memorandum dated
January 4, 2007, are false statements by Ms. London and Ms. Butler and is simply
harressment and retaliation.  **Thus, I am requesting the audit.**

    P. C. Personnel File

    **John Houston, Commissioner**
    **Eranell McIntosh-Wilson, Associate Commissioner**
    **Fordyce Mitchel, Director of Community Services**
    **Josh Wilson, Wiggins, Childs, Quinn & Pantazis**

MEMORNADUM

To:  Henry Ervin
DMH/MR Personnel

From: Winifred Blackledge

Date: January 16, 2007

Re: Kendra Butler's Response To My Attachment
To Performance Appraisal Dated
January 4, 2007

It appears to me that Ms. butler is determined to lower my Performance Appraisal score. Since Ms. Butler cannot tell me why, I am requesting an explanation from personnel. Ms. Butler has missed the entire reason for my compliant.  I am not asking to have my Performance Appraisal score raised any higher than it was last year. I am asking what did I not do with regards to my job performance to warrant the lowing of my score ten points?

I find it difficult to believe, as I am being told, there does not have to be a reason to lower an employer's Performance Appraisal score. Submitting an attachment does not change the score. This coming March, 2007 I would have worked 20 years for the department. My work philosophy has always been to do the best job I could in an efficiently and professionally manner. If Ms. Butler, prior to my Performance Appraisal evaluation had discussed what she though were deficits in my job performance, I most definitely would have worked to improve them.

 I am annoyed that Ms. Butler is allowed, as I have been told to lower my score from Exceeds Standards to Meet Standards. I am requesting the policies & procedures for lowering an employee Performance Appraisal from personnel if any exist. There is no current employee whose Performance Appraisal score is 25 or has been lower drastically as my Performance Appraisal was lowered.

With regards to Ms. Butler's attachment dated January 12, 2007 in response to my attachment dated January 4, 2007, the information in Ms. Butler's attachment is inaccurate. Responsibility number one: I have monitored the majority of the homes as I was assigned. I gave Ms. Butler a written schedule, which she approved with her signature until she informed me that a schedule was not required. Ms. Butler states she has not observed or received any information or documentation that reflects consistently exceeds standards, which was my previous score. Ms. Butler has not received any information at all. Ms. Butler does not review the monitoring reports or accompany me on any monitoring visits. Ms. Butler has not said or produce any documentation, which would determine what my performance was on any monitoring visits. Further, my monitoring responsibility is not about just monitoring homes. I have to maintain a database of homes visited and which staff did the visits. I implemented a monitoring checklist tracking home visits by staff that has to be maintained. I coordinate and assigned staff to monitor homes and update the staff monitoring assignment form as needed. I follow-up on any concerns I may have found on monitoring visits with the appropriate care providers and Community Services staff as needed. I red flagged other staff follow-up and follow-up with staff as needed. What did Ms. Butler use to determine my score should have been lowered?

Page 2 of 4
Henry Ervin
Second Attachment to Winifred Blackledge's
Performance Appraisal
Dated January 4, 2007

Responsibility Number Two: Ms. Butler has not indicated she had any information regarding the effectiveness of my technical assistance visits. What did she use to lower my score?

Responsibility Number Three: I worked with case management on the waiting list. I assessed two potential care providers assigned to me by Ms. Butler. Although these were short-term assignments, I performed the assignments well. Ms. Butler did not complain or make any comments on my job performance regarding these assignments. What documentation did she use to lower my score?

Responsibility Number Four: Ms. Butler was in error as to the number of 310 case management Boards I worked with. Is Ms. Butler in possession of any complaints from the 310 Board Case managers with regard to my job performance? Ms. Butler is unaware of what transpired during my visits with the 310 Board Case Managers. Ms. Butler and I never had any detailed discussion regarding this responsibility would involve or informed me what her expectations were for this responsibility. What documentation did she use to lower my score?

Responsibility Number 5: Yes, all RCS staff including me for years reviewed the re-determination Medicaid Waiver forms/packets. However, from January 1, 2007 to April 3, 2007, I completely processed all Medicaid Waiver forms/packets along with my other job responsibilities. I was punitively assigned to file forms along with another employee who had filed a complaint to assist the person hired to do this responsibility. I had no problem assisting the new employee hired to do this responsibility as I had assume the entire responsibility of the re-determination/Medicaid Waiver process prior to the new employee being hired which consisted of: reviewing, correcting, copying, mailing, processing the Medicaid audit. I am sure it is apparent that my responsibilities were different from the normal responsibility of Community Services staff in the past that only reviewed the Medicaid Waiver forms/packets prior to me being assigned all the responsibilities for the re-determination/Medicaid waiver process. What documentation was used to lower my score?

Responsibility Number Six: Is it my fault that there was only one case management assignment. What documentation was used to lower my score?

The fact remains that throughout the past year Ms. Butler has not advised me of one complaint she had with my work performance. After I asked for justification for lowering my score she could not provide justification. The only response I have received is a response to my attachment dated January 4, 2006.

It is misleading when Ms. Butler refers to my desire to raise my Performance Appraisal score. I am asking why it was lowered without justification and that the score remain the same as the last year Performance Appraisal score. I am not asking for anything that I don't deserve.

Page 3 of 4
Henry Ervin
Second Attachment to Winifred Blackledge's
Performance Appraisal dated
January 4, 2007

If Ms. Butler required more communication than has been required for the last 20 years, Ms. butler should have informed me what type of communication she desired. As a new supervisor she should have most definitely conveyed her expectations. Ms. Butler is very aware of the procedures with regards to performing tasks in Region III Community Services. It is not normal practice for employees to report everything that they do with their job responsibilities to the supervisor. It is normal practice and an expectation for employees to be able to work independently.

Simply attaching a statement does not change the fact that my score was lowered 10 points. Thus far, no one has told me what is the appeal process when an employee score is lowered. I have asked personnel if such a process exist and told there were no policies and procedures for appeal and to do an attachment.

Ms. Butler's commented that she does harbor resentment against me. I contend that she does harbor resentment. It is very obvious that she has no justification other than her personal agenda for lowering my Performance Appraisal score. If she had reasons or justification why didn't she discuss it with me prior to my Performance Appraisal evaluation and given me an opportunity to correct her concerns before she lowered my score? It was Ms. Butler's attention not to allow me to improve whatever her complaints were and it was her attention to not allow me to appeal the lowering of my score. Ms. Butler and I can discuss the lowering of my Performance Appraisal score forever. I have no further desire to discuss with Ms. Butler the lowering of my Performance appraisal score.

I will be signing the Performance Appraisal under duress. However, I want my feelings about the lowering of the Performance Appraisal understood. Ms. Butler lowered my score without prior discussion with me regarding any concerns about my job performance and given me the opportunity to improve any concerns. I want to appeal the score. I find Ms. Butler's actions hostile, punitive and retaliatory.

I have talked to personnel, sent personnel information regarding my concerns with Ms. Butler's lowering of my Performance Appraisal score. How can a supervisor be allowed to arbitrarily lower an employee's Performance Appraisal score without given the employee a chance to improve any concerns that a supervisor may have? I find it punitive that personnel or Ms. Butler have not informed me of what the appeal process is and insist that none exists.

Page 4 of 4
Henry Ervin
Second Attachment to Winifred Blackledge's
Performance Appraisal dated
January 4, 2007

Again, I will be signing any Performance Appraisal score lower than last year under duress and to avoid further disciplinary action as indicated in Ms. Butler's memorandum dated January 4, 2007. I feel at this point any further discussion regarding the appeal process should be directed to my attorney: Mr. Josh Wilson, Wiggins, Childs, Quinn & Pantazis, P. C., Three hundred one-nineteenth Street North, Birmingham, Al 35203, 205-314-0566.

Sincerely,

Winifred A. Blackledge

P. C. Personnel File
    John Houston, Commissioner
    Eranell McIntosh-Wilson, Associate Commissioner
    Fordyce Mitchel, Director of Community Services
    Kendra Butler, Community Services
    Courtney Tarver, DMH/MR Legal Division
    Josh Wilson, Wiggins, Childs, Quinn & Pantazis

Memorandum

To:     Winifred Blackledge

From: Kendra Butler

Date:   January 12, 2007

Re:     Attachment to Performance
        Appraisal Dated January 4, 2007

We met on January 4, 2007 to do your Employee Performance Appraisal. You chose not to sign your Employee Performance Appraisal as you were not in agreement with the scoring. You were advised that the employee signature is mandatory as stated in the section Appraisal Signatures on the Employee Performance Appraisal form. It further states that an employee's signature "denotes supervisor and employee discussion and receipt of form. Employee signature does not denote agreement." Section 36-26-27.1 of the Code of Alabama states the reasons for employee signatures being mandatory. It also addresses the disciplinary issue. This information was included in a January 4, 2007, memo given to you on Monday, January 8, 2007, as you were on sick leave and not at work on Friday, January 5, 2007.

Responsibility Number One: Monitoring responsibilities: You are the designated Monitoring Coordinator for Region III and as such, the majority of the homes in the region are assigned to you to monitor as part of your responsibility. You are also responsible for maintaining the monitoring database, generating reports, etc. You and I met on several occasions to make sure that all of the group homes to be monitored were listed and to discuss the number of group homes assigned to RCS staff. I have not observed nor received any information or documentation that your score should reflect consistently exceeds standard.

Responsibility Number Two: Provides technical assistance to community providers: You provided technical assistance to a small number of providers. Technical assistance should be offered to all providers. Technical assistance is provided or not provided depending upon the community provider's response. There is not justification for the rating exceeds standards.

Responsibility Number Three: Resource development: Performing assigned tasks does not indicate that your work performance exceeds standards or consistently exceeds standards.

Page 2
Winfred Blackledge
Attachment to Performance
Appraisal Dated January 4, 2007

Responsibility Number Four: RCS liaison to work with 310 case managers: Meetings
were held with case managers of two 310 boards. There are four 310 boards in Region 3.
Your job performance is not indicative of exceeds standards or consistently exceeds
standards.

Responsibility Number Five: Medicaid Waivers/Redeterminations: The period that RCS
staff reviewed waiver documents was not limited to January 1, 2006-April 3, 2006. RCS
staff reviewed waiver documents to ensure accuracy and continuous and effective
services. RCS staff assisted in filing the waiver packets. There is no indication that
your work exceeds standards or consistently exceeds standards.

Responsibility Number Six: Case Management: You referenced the one case for which
you are case manager. RCS was asked to handle the case by Central Office. The local
310 Board in the county where the consumer resides does not provide case management
for children. Initially, you and I worked on the case together to ensure that the consumer
received the services she needed and to see that the new Plan of Care form was
completed correctly. Being an experienced worker does not equate consistently exceeds
standards.

I do not harbor any resentment against you. When you voiced your opinion that you did
not agree with the scoring you received, you were offered the opportunity to present
documentation justifying higher ratings on your appraisal form. Your Attachment to
Performance Appraisal dated January 4, 2007, does not provide justification to amend
your performance appraisal. Your performance appraisal reflects your performance over
the past year.


Pc Personnel File
    Ms. Eranell McIntosh-Wilson
    Fordyce Mitchell
    Courtney Tarver

# EXHIBIT



O

**Form 13P**                   EMPLO‿‿ PERFORMANCE *PREAPPRA‿ ‿L*
**Revised (06/2005)**              STATE OF ALABAMA
                        **Personnel Department**

Employee Name: <u>WINIFRED A BLACKLEDGE</u>            Social Security Number _____

Agency: <u>061/MENTAL HEALTH & RETARDATION</u>       Division: <u>313E/CENTRAL OFF MR COMM PRO</u>

Classification: <u>M H SOCIAL WORKER II</u>           Class Code: <u>W2000</u>

Period Covered From: <u>01/01/2006</u> To: <u>01/01/2007</u>     Position Number: <u>08823006</u>

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1.  Coordinates community services staff monitoring of residential facilities, maintains monitoring database, monitoring of contracted residential facilities and individuals in the service delivery system in order to address quality of life issues.

2.  Provides technical assistance and consultations to day and residential providers in region in order to address quality of life issues and standards compliance.

3.  Development of resources, finding community placements, working with the placement process for individuals in order to promote living in the least restrictive settings and institution diversion.

4.  Serves as liaison between the Regional Community Services office and the 310 case managers and provides technical assistance with standards compliance.

5.  Review Medicaid Redetermination forms and completes Medicaid Waiver Forms as needed.

6.  Serves as case manager of a select group of individuals in order to facilitate community living.

7.  Composes clinical documents, reports and correspondence on individuals, programs, issues for use in client services and program enhancement.

**WORK HABITS:** Provide a check if  e appropriate space to document that th  policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

| | |
|---|---|
| _____ | Attendance |
| _____ | Punctuality |
| _____ | Cooperation with Coworkers |
| _____ | Compliance with Rules |

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _*Dec 20, 2005*_

Employee Signature: (denotes discussion and receipt of form, not agreement) _____

Rater Signature: (denotes discussion and employee receipt of form) _*Jerrita L. Linda JRL 12/2/05*_

Reviewer Signature: _*Winifred Blockledge 12/30/05*_        *Hatchel*

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.
*Winifred completes her job responsibilities*
*7/26/WB she's comfortable with.*

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.
*Winifred needs to be more acceptant of expansion of job responsibilities (existing) and/or new job responsibilities assigned. Review documentations of*
*( increased monitoring assignment ( deletion of follow up items )*

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____

_____

A Midappraisal session has been held on this date and performance has been discussed: _*7/26/06*_

Employee Signature: _*Winifred Blockledge*_        Initial if comments attached: _*WB 7/26/06*_

Rater Signature: _*Kendra Butler*_        Initial if comments attached: _____

Reviewer Signature: _*Jerrita L. Linda*_        Initial if comments attached: _*7/26/06 JRL*_   *No comments*

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

ATTACHMENT TO EMPLOYEE PERFORMANCE PREAPPRAISAL
DISCUSSION DATED 7/26/06

Date: 7/26/06:

To: Kendra Butler:
Supervisor

From: Winifred A. Blackledge
Winifred A. Blackledge


I think you totally missed the point of my discussion regarding the recent assignment given by you where I have the majority of the homes to monitor. I can take constructive criticism but I disagree with your comments in the section for area of improvement. As discussed with you and Jerrlyn London, the point was not that I did not want to accept expanded monitoring responsibilities but as I informed you and Ms. London, the point was that working after hours was going to cause me undue hardship and <u>severe detriment</u> with personal obligations.

I have discussed with you and Ms. London on numerous occasions that I have personal obligations after work that interferes with me working after hours. Further, Ms. London told staff in a staff meeting that we were not allowed to work flex time. I have had numerous conversations with Ms. London and never did she mention that she expected me to have the majority of the residential homes to monitor. Ms London as well has never told me that I was not performing my duties effectively. Ms. London in January, 2006 gave me the residential homes that were assigned to her and at that time it still was not my understanding that I had the majority of the homes. Thus, at no time was there any discussion with Ms. London that I would have the majority of the homes and because of a lack of discussion; the monitoring assignment form did not reflect that I had the majority of the homes. Ms. London has asked me on numerous occasions to give her the current staff monitoring assignments and data base showing what staff were doing and again at no time did she discuss that I needed to take the majority of the homes or that she had concerns about what I was doing with my monitoring assignment .I have reported to Ms. London numerous times especially in staff meetings that staff were not doing their monitoring assignments and there has been no consequences given to staff for not doing their monitoring assignments.

Ms. London the first part of the year requested that I do an updated Form 40 and this was an opportunity to discuss with me any concerns and inform me that I had the majority of the homes to monitor. If this was Ms. London's requirement she should have ensured that this was reflected on the Form 40.

ATTACHMENT TO EMPLOYEE PERFORMANCE
PREAPPRAISAL DISCUSSION DATED 7/26/06

PAGE TWO
WINIFRED A. BLACKLEDGE

To perform these duties require alterations to my work hours which should have also been reflected on my Form 40 if Ms. London was requiring me to do the majority of the monitoring.

On April 11, 2206, you asked the staff you supervise to put in writing their perspective of their job responsibilities. It was not my perspective that I was to do the monitoring of the majority of the homes. At the time I gave you my perspective there was no discussion from you about me during the majority of the homes.

Both you and Ms. London confused an effort to find a workable solution to the monitoring situation as my not accepting a job assignment. Once the issue was resolved and I was told that I could flex and it was not detrimental to my personal obligations, I gave you my monitoring schedule with dates reflecting what homes I would be monitoring. I as well informed you in my memo that I would be giving you a consistent schedule of my monitoring which I will continue to do

As a 19 year employee I can take constructive criticism. I always work hard with my assignments. I am comfortable with any assignment given as long as it does not interfere with after working hours obligations. My perspective is that your comment was not constructive criticism but punitive for expressing my opinions and trying to come up with a workable solution that would not be detrimental to me.

Communication in Community Services needs to improve drastically. Working procedures needs to be followed more closely. Work assignments need to be put in writing to avoid exactly what happened in reassigning me the majority of the homes to monitor. When a Form 40 is updated as a Form 40 should be updated anytime assignments are changed, the supervisor should ensure that their expectations are reflected. You ask me for my perspective. My perspective was I was not to monitor the majority of the homes. It should have been quickly pointed out to me at that time what you expected when I gave you my perspective in writing. I will always do my very best with any assignments that I am given. I will always make suggestions to improve the effectiveness of my job performance. I hope that we can avoid any future miscommunication and work mutually in the best interest of people we serve.

# EXHIBIT

# P

## Butler, Kendra

| | |
|---|---|
| **From:** | Butler, Kendra |
| **Sent:** | Friday, April 21, 2006 2:16 PM |
| **To:** | Blackledge, Winifred |
| **Subject:** | Signing In/Out |

Winifred,

Please remember that it is policy for RCS staff to sign in and out on the time sheets located in Shirley's office. Jerryln has reminded staff about this in several RCS staff meetings. You signed in on the time sheet this morning.  However, you did not sign out (note the time) when you left to do the technical assistance visit at Mrs. Paula Hill's.  Please be consistent in signing in and out per policy.

*Kendra Butler*
*Region 3-DMR*
*Phone: 251-621-4790*
*Fax: 251-621-4798*

4/26/2006

**Memorandum:**

Date: April 26, 2006

To: Kendra Butler
Community Services

From: Winifred Blackledge
Community Services.

This is in response to your memo dated April 21, 2006 and your reply to my request for the RCS policy in question. On April 26, 2006 you informed me that there was no RCS policy regarding signing in and out and placing departure times on the sign in and out sheets During this same conversation you informed me that you were only aware of an attendance policy and it was the expectation for employees. If it is an expectation, why is it not an expectation for all employees as well as all employees under your supervision? I found it hard to believe that this is an expectation when employees have never consistently signed in and out let along put departure times in Region III Community Services.

I have no problems with my attendance and I don't abuse leave in any form or fashion. I find it to be extremely petty that after I had a detailed discussion with you and you were fully aware of where I was going and what my attentions were, I received such a memo. You were informed by me the morning of my technical assistance visit on April 21, 2006, that Mickey Groggel and I were doing a joint technical visit at Ms. Paula Hill, care provider. After I discussed in detail with you my intentions, I returned to my office to find a trivial memo because I did not indicate a departure time on the sign in and out sheet. It is not even common practice among Region III Community Services employees to tell their supervisor where they are going. I was attempting to work with you and went beyond what was expected and what is the usual practice and still I got singled out and treated disparately.

In my eighteen years of being in Community Services employees placing departure times on the sign in and out sheets has never been an issue and is still not consistently done by employees. I find it very suspicious that you will chose such a inconsequential issue to address at this time especially since you know where I was going an why I was going. I come to work on time, I do my job, and I go where I say I am going. Why were you checking the sign in sheet for a departure time? Are you implying that I did not go directly to Ms. Hill? It seems like you were looking for something to be able to single me out. There is all kind of leave abuse in this office that needs to be addressed but I was singled out and hounded for trying to do my job. I got single out for as you informed me a non-existing policy.

Page Two
Kendra Butler
Response to Memo
Dated April 21, 2006

Are you planning to continue the disparity of treatment that I have been recently subjected to by my previous supervisor, Jerryln London? In all my nineteen years with the Department of Mental Health and Mental Retardation, I have never had a problem with a supervisor. However, since I had to file a valid complaint, there is suddenly an issue and scrutiny of my every move. Have you been instructed to single me out? As I said I have been in Community Services eighteen years and at this point I know my job and do not need to be micro-managed.

As I discussed with you when I was informed that you would be my supervisor, I would like to have a good working relationship with you. However, if you continue just as the previous supervisor to single me out and to treat me with disparity, a good working relationship will be difficult.

I hope that we can end this right here and treat each other with respect. All that I am requesting is equality of treatment.

P. C. Josh Wilson

## Butler, Kendra

| | |
|---|---|
| **From:** | London, Jerryln |
| **Sent:** | Thursday, April 27, 2006 4:31 PM |
| **To:** | Thomas, Yolanda; Butler, Kendra; Buckley, Donna; Blackledge, Winifred; Smith, Cathrine; Lloyd, Steve; Leathers, Lori; Patterson, Shirley |
| **Subject:** | Sign In and Out |
| **Importance:** | High |

All staff must sign-in and out. Time cards will not be approved if the sign-in sheet and does not match the time cards. All staff are urged to strictly adhere to the policy.
Jerryln

STATE OF ALABAMA

## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION

MENTAL RETARDATION SERVICES
REGION III
7400 ROPER LANE
DAPHNE, ALABAMA 36526
PHONE: (251) 621-4760
FAX: (251) 621-4798

BOB RILEY
GOVERNOR



KATHY E. SAWYER
COMMISSIONER

## MEMORANDUM

DATE:       10/22/04

TO:         All Region 3 Staff

FROM:       *Jerryln R. London*
            Jerryln R. London

RE:         Sign-In and Absentee Policy

Mrs. McIntosh-Wilson has requested that <u>all</u> staff housed in the Regional offices sign in and out. The sign-in sheets are located in Shirley Patterson's office. Staff are required to sign in and out, call Shirley or her designee (person answering the phone) and ask that you be signed in/out if job responsibilities require you to be in the community. Staff should never give Shirley verbal instructions as they are exiting the building. Each staff is responsible for signing in and out. The affected staff are RCS, Support Team, QE, Certification and Advocates.

All staff are required to strictly adhere to policy 60-42, Absenteeism Policy. Copies of the policy were distributed on Friday, 10/22/04. A copy of the policy is attached. The policy is also available for review in the P&P manual located in Mrs. Patterson's office.

Please feel free to contact me or your immediate supervisor if you have any questions.

DMH/MR Policy 60-42

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:    60-42

SUBJECT:   Personnel/Payroll
TITLE:     Absenteeism

EFFECTIVE: 9/28/85        REVIEWED:              CHANGED:  8/6/2004

RESPONSIBLE
OFFICE:    Personnel

APPROVED:

## I.    POLICY:

Employees have a duty and obligation to be at work as scheduled.  Employees who have excessive absences will be subject to progressive discipline as specified.

## II.   DEFINITIONS:

1.    Scheduled leave is defined as any leave in which an employee makes a written request and receives approval from the appropriate supervisor on the appropriate form in advance of his/her absence.

2.    An occasion of absence is an absence for one hour or more or all of one (1) work day or consecutive work days without prior approval.  However, if the absence is approved under the Family and Medical Leave Act of 1993, (Policy 60-108) an occasion of absenteeism is not counted against the employee.

## III.  STANDARDS:

1.    Employees have a duty and obligation to notify the facility/supervisor before the start of a shift when they will be absent.

DMH/MR Policy 60-42

2.    An employee may be considered as having an attendance problem if he/she is absent without prior approval more than six (6) occasions within twelve (12) consecutive months.

3.    Supervisors will advise, instruct, and encourage employees regarding their responsibility to be at work prior to the seventh (7) occasion with documentation maintained in the supervisor's file.

4.    Unscheduled absences will subject the employee to progressive discipline as follows.

    a.    7th occasion within 12 consecutive months will result in the employee receiving a written warning by his/her supervisor. This warning will be placed in the employee's personnel file, but will not be reflected on the employee's appraisal.

    b.    The 8th occasion occurring within 12 consecutive months will result in the employee receiving a written reprimand by his/her supervisor. This reprimand will be placed in the employee's personnel file and will be reflected on the employee's appraisal.

    c.    The 9th occasion occurring within 12 consecutive months will result in the employee being suspended for one day. This action will be documented in the employee's personnel file and will be reflected on the employee's appraisal.

    d.    The 10th occasion occurring within 12 consecutive months will result in the employee being terminated.

5.    An occasion will no longer be counted against the employee once its anniversary date is reached.

6.    Employees who establish a pattern of absenteeism may be subject to appropriate disciplinary action.

7.    The Appointing Authority shall have the discretion in unusual circumstances based upon extenuating conditions and in situations where there are extreme verifiable emergencies to grant an exception regarding the implementation of progressive discipline or the counting of an occasion.

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:     60-42

SUBJECT:    Personnel/Payroll
TITLE:      Absenteeism

EFFECTIVE: 9/28/85     REVIEWED: 10/4/2006     CHANGED: 8/6/2004

RESPONSIBLE OFFICE:    Personnel

APPROVED:    *(signature)*

## I.    POLICY:

Employees have a duty and obligation to be at work as scheduled. Employees who have excessive absences will be subject to progressive discipline as specified.

## II.    DEFINITIONS:

1.    Scheduled leave is defined as any leave in which an employee makes a written request and receives approval from the appropriate supervisor on the appropriate form in advance of his/her absence.

2.    An occasion of absence is an absence for one hour or more or all of one (1) work day or consecutive work days without prior approval. However, if the absence is approved under the Family and Medical Leave Act of 1993, (Policy 60-108) an occasion of absenteeism is not counted against the employee.

## III.    STANDARDS:

1.    Employees have a duty and obligation to notify the facility/supervisor before the start of a shift when they will be absent.

2.    An employee may be considered as having an attendance problem if he/she is absent without prior approval more than six (6) occasions within twelve (12) consecutive months.

DMH/MR Policy 60-42

3.      Supervisors will advise, instruct, and encourage employees regarding their responsibility to be at work prior to the seventh (7) occasion with documentation maintained in the supervisor's file.

4.      Unscheduled absences will subject the employee to progressive discipline as follows.

    a.  7th occasion within 12 consecutive months will result in the employee receiving a written warning by his/her supervisor. This warning will be placed in the employee's personnel file, but will not be reflected on the employee's appraisal.

    b.  The 8th occasion occurring within 12 consecutive months will result in the employee receiving a written reprimand by his/her supervisor. This reprimand will be placed in the employee's personnel file and will be reflected on the employee's appraisal.

    c.  The 9th occasion occurring within 12 consecutive months will result in the employee being suspended for one day. This action will be documented in the employee's personnel file and will be reflected on the employee's appraisal.

    d.  The 10th occasion occurring within 12 consecutive months will result in the employee being terminated.

5.      An occasion will no longer be counted against the employee once its anniversary date is reached.

6.      Employees who establish a pattern of absenteeism may be subject to appropriate disciplinary action.

7.      The Appointing Authority shall have the discretion in unusual circumstances based upon extenuating conditions and in situations where there are extreme verifiable emergencies to grant an exception regarding the implementation of progressive discipline or the counting of an occasion.

# EXHIBIT

# Q

## MEMORANDUM:

Date: June 16, 2006

To: Kendra Butler

From: Winifred Blackledge
Monitoring Coordinator

As you are aware on two occasions we have discussed the staff monitoring assignments. In our first meeting you presented a proposal to me and informed me that you wanted me to pick up more of the monitoring assignments from the following individuals whose monitoring assignments are being reduced due their job responsibilities: Steve Lloyd, Cathy Smith and yourself. I would have to consistently work overtime in order to do what you proposed. I informed you during our first meeting that this was going to be a problem for me due to the fact that I cannot work overtime on a consistent basis due to personal obligations. I have as well in past conversations Jerryln London informed her that I would have a problem working after hours due to personal obligations. I also informed you in the meeting that I had made an error in the last staff monitoring assignments given to staff dated January 6, 2006. During the first part of the year, Jerryln London assigned her homes to me. The staff monitoring assignment should have reflected that I had all of Jerryln London's homes except the Williams' home located on Lantern Court. Cathy Smith was assigned the Lantern Court home. Below is what should have been reflected on the staff monitoring assignments dated January 6, 2006:

| Winifed : | 29 |
|-----------|-----|
| Cathy     | 11 |
| Steve     | 13 |
| Yolanda   | 18 |
| Donna     | 16 |
| Kendra    | 20 |

Page Two
Kendra Butler
**Response to Monitoring Assignments**
Request
June 14, 2006

**As you know you proposed the following based upon the errors made on the last
staff monitoring assignments dated January 6, 2006 (errors are in the process of
being corrected):**

| | |
|---|---|
| Winifred | 28 |
| Donna | 4 and to pick up some more homes |
| Kendra | 7 |
| Jerrlyn | 2 |
| Steve | 7 |
| Cathy | 11 |
| Yolanda | 18 |
| Jean | 14 |

**On June 9, 2006, I met with you and gave you the new staff monitoring assignments
I thought would be possible workable. I stress possible workable because as I have
informed you as well as Jerrlyn London both in person and in staff meetings that
staff were not consistently monitoring. I as well informed you that I had discussed
my proposal with Yolanda and Donna, the two other main people that will have the
highest assignments. I detected after telling you that I had discussed the assignments
with Yolanda and Donna that you had concerns if these individuals were in
agreement with their assignments. I am curious to know why you were that concern
if one or both of these individuals would be concern with their assignments? I have
given to Jerrlyn London as she has requested at least two or three times the
database information indicating what staff was doing with regards to monitoring
assignments. There is staff that is only averaging two to five homes a year if that
much.**

**In my June 9, 2006 letter I informed you how I had derived at my recommendations
for monitoring assignments. I have given you a copy of this letter. Below were my
assignment recommendations;**

| | |
|---|---|
| Donna | 19 |
| Cathy | 17 |
| Jean | 13 |
| Kendra | 10 |
| Steve | 14 |
| Winifred | 19 |
| Yolanda | 19 |

Page Three
Kendra Butler
Response to Monitoring Assignments
Request
June 14, 2006


On June 9, 2006 we met on my proposal and you insisted that you, Cathy and Steve be reduced based upon responsibilities. I am not aware that any new responsibilities have been added to these staff including you that should make a major impact on reducing monitoring assignments. Especially since monitoring occurs primarily before working hours and after working hours. You also informed me that I was the primary person responsible for monitoring the homes. I informed you that this was not the understanding that I had and informed you of my understanding: to maintain the database, to coordinate assignments, to red flag any problems/concerns, to get back with staff to ensure the problems/ concerns have been corrected and to do a reasonable amount of assigned homes.

Based upon your proposal and request for me to take most of the assigned homes, below would be the assigned count for staff:

| | |
|---|---|
| Winifred | 19 + 16 = 35 (if I pick up the 16 from you, Steve and Cathy) |
| Donna | 19 (based upon our last conversation you did not indicate you wanted Donna to receive more) |
| Yolanda | 18 |
| Jean | 13 |
| Steve | 7 |
| Cathy | 11 |
| Kendra | 7 |

We also have to allow consideration for any possible new homes and as we discussed RFI is expected to open at least two to three homes in the near future? Are you proposing as well that I take the new RFI homes?

I don't mind taken on a few extra homes but what you are proposing is not fair and is not realistically manageable for me to do. Monitoring as we discussed in our meeting on June 9, 2006 is a mandate by the department. In order for this region to at least attempt to address this mandate the staff assignments have to be reasonable and fair, especially since all staff will have to do monitoring before coming to work and after working hours. If you are adamant that I keep the 35 homes, I will do the best that I can but I am also requesting that my work hours be adjusted accordingly to attempt to address my having the highest homes to monitor. The adjustment of the work hours would be done based upon the days that I can work an amended work schedule. The amended work schedule will include working in Mobile once or twice a week and not reporting to Daphne. The database is presently showing that I am doing the most monitoring of homes now.

Page Four
Kendra Butler
Response to Monitoring Assignments
Request
June 14, 2006


I can not guarantee that I can always do the amended work schedule all the time
due to personal obligations but as I have always done since being in Community
Services I will do my best.  The other option would be to look at fairly doing the
monitoring assignments in a more equitable manner.

Please provide in writing your response to this memo. I would like to finalized staff
assignments as soon as possible.

MEMORANDUM:

TO:    Winifred Blackledge

FROM:    *Kendra Butler*
         Kendra Butler

DATE:    June 19, 2006

RE:    Monitoring Assignments

This memo is in response to your four page memo dated June 16, 2006/June 14, 2006. As monitoring coordinator, your responsibilities include coordinating monitoring assignments, database entry, and having the primary responsibility of monitoring group homes. We discussed this on June 9, 2006. At that time, you brought to my attention your understanding of what your monitoring coordinator responsibilities were as initially assigned by Susan Stuardi, former RCS Director. Times change and your monitoring of additional homes was discussed per phone with Jerryln London on July 15, 2005. Your responsibility for monitoring group homes is being expanded, again. Monitoring assignments are left to the discretion of the supervisor.

You indicated that you will have 35 homes based on the most recent proposal. That averages out to less than 7 monitoring visits a month for a six-month period. Flex hours can be worked when doing monitoring visits. The need for flex hours should mirror the number of homes monitored.

Your responsibilities include maintaining the monitoring database, coordinating monitoring assignments, red flagging any problems/concerns, following up with staff and/or provider, as appropriate, to ensure that problems/concerns have been addressed in a timely manner. Additionally, as monitoring coordinator you are expected to assume responsibility for monitoring more homes than other staff. You may not be limited to the responsibilities as described. Additional responsibilities may change, be added or deleted as needs change.

Please submit a monitoring assignment document to me by 12:00 p.m. Tuesday, June 20, 2006, for review. It should reflect the addition of the homes we discussed. Please double check the number of homes assigned to Jean as I come up with 14 homes in Baldwin County, not 13. Also, an approval line is to be added to the monitoring assignment memo.

## Butler, Kendra

**From:** Butler, Kendra
**Sent:** Tuesday, August 29, 2006 8:40 AM
**To:** Blackledge, Winifred
**Cc:** London, Jerryln
**Subject:** Monitoring Visiits Report-8/28/2006

Winifred,

Thank you for the report.  In reviewing the report, there appears to be a number of pages missing.  There does not appear to be a complete listing of MARC homes as the homes you visited on 8/28/06 are not reflected in the report.  On page 4 the names of the MARC homes you visited in January and early August are not listed.  On page 7, the dates listed for your visit to the Graham's homes is listed as 06.  The Petways have two homes on Emerald Drive.  Is it possible to distinguish between East and West, if still applicable?

Winifred, in your memo you listed Cahaba 9th Street as needing to be listed in the data base.  Cahaba subcontracts with Mrs. Linda Gilford who runs the home as the Horizon Home which is listed on page 2 of the data base under Kiddie Kastle Inc.  My last visit to the home was 7/19/06.  Mrs. Gilford's August 4 memo addresses the three recommendations addressed in the monitoring report.

Please give me a copy of a revised report when it is done.  Thank you.

*Kendra Butler*
*Region 3 DMH/MR*
*Phone 251-621-4790*
*Fax 251-621-4795*

PRIVACY AND CONFIDENTIALITY WARNING

This E-mail may contain Protected Health Information, Individually Identifiable Health Information and other information which is protected by law. The information is intended only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any review, disclosure/re-disclosure, copying, storing, distributing or the taking of action in reliance on the content of this E-mail and any attachments thereto, is strictly prohibited. If you have received this E-mail in error, please notify the sender immediately and destroy the contents of this E-mail and its attachments by deleting any and all electronic copies and any and all hard copies regardless of where they are maintained or stored.

# EXHIBIT

# R

Memorandum:

Date:   September 19, 2006

To:     Winifred Blackedge

From:   Kendra Butler *KB*

Re:     Monitoring Visit Schedule

This is in response to your tentative schedule for monitoring visits dated today.  RCS staff can flex their hours to do monitoring visits rather than earn comp time.  This may involve doing an early morning visit and leaving the office earlier than one's normal work schedule. For example, your normal work hours are 7:00 a.m. - 3:30 p.m.  If you do a 6:00 a.m. visit on your way to the office, you could leave at 2:30 p.m.  You may opt to do a late afternoon or evening monitoring visit and come in later in the morning to accommodate your work day.

Memorandum:

Date: September 19, 2006

To: Kendra Butler

From: Winifred Blackledge

Re: Flexing Time for Monitoring Visits

This is in response to your memo dated September 19, 2006 regarding flexing time for monitoring visits and the return of my memo informing you of my schedule and request for earning comp time (unapproved). We had a discussion this morning when I provided you my schedule for monitoring and request for approval of comp time for September 19, 2006. You informed me that I had to flex my time.

Please provide me the policies for an employees flexing time and earning comp time. Please as well provide me with any new guidelines related to monitoring. I would like to have the aforementioned requested information or a written response if possible by September 20, 2006.

10/16/06

Jenylu,

Winifred called @ approximately 9:45 am to state she is not coming in due to continuing headache. She said she had something confidential to send me and asked for the fax number in the break room which I gave her. The attached is what she sent me.

Kendra

# Fax Cover Sheet
# Winifred A. Blackledge

| Send to: Kendra Butler | From: Winifred Blackledge |
|---|---|
| Attention: | Date: 10/16/06 |
| Office Location: | Office Location: |
| Fax Number: 621-4795 | Phone Number: |

❑ Urgent
❑ Reply ASAP
❑ Please comment
❑ Please Review
❑ For your Information

Total pages, including cover: 3

**Comments:**

| Regarding Flex Time, Comp Time and Communication |
|---|

Memorandum:

Date: October 13, 2006

To: Kendra Butler

From: Winifred Blackledge WB
Re: Flex Time, Compensatory Time (Comp) and Communication
Page One of Two

You called me by phone on October 13, 2006 and asked me how I flex my time on October 5, 2006 as reflected on the day I had car trouble. You were not in the office the whole day on October 5, 2006. I left a message with Lori Leathers that I would be in after seeing about my car. During our conversation, I informed you I made up the time that afternoon by monitoring and reflected this on the sign in and out sheet. You than told me I had reflected it on the time sheet and it was an oversight by you. Recently, you have been questioning my flexing and comp time. You informed me on September 19, 2006 that I could not make comp time and had to flex. I asked you why I had to flex while other employees were earning comp time (including you) and asked that you put in writing our conversation that I could not make comp time. You wrote me a memo on September 19, 2006 saying that I can flex. I wrote you back asking for the flex and comp time polices and up until this date I have not received these policies. You gave me my written schedule back where I had informed you what I was doing and my request for prior approval for comp time back to me unapproved. You keep mentioning that I am not putting the times for flexing or earning comp time on the sign in sheet. I asked you if other employees were putting times on the sign in and out when they flexed or earned comp time and you paused during the conversation when I asked you this question. I know for a fact that it is not a common practice for employees to put on the sign in and out sheet times for flexing and earning comp time. You again on October 13, 2006 you mentioned that I could either flex or make comp time based on what was workable for me. I keep asking you what is that you want for me. I have tried to show you that I am doing my job. When I provide you a written schedule of what I am doing and to obtain prior approval for earning comp time you had a problem with what I was doing. When I have told you verbally what I am doing you have a problem. When I put what I am doing on the sign in and out sheet you have a problem with what I am doing. I don't know what else to do.

Again, during our conversation I asked you what you wanted from me, especially after you said I was informing you of what I was doing. I have attempted to work with you. Since June, 2006 when I was assigned the bulk of the monitoring, I have given you written schedules of what I was doing and you approved by schedules and prior approval for comp time. On September 19, 2006, I gave you a written schedule and a request for prior approval to earn comp time and you told me I had to flex and could not make comp time.

Page Two
Kendra Butler
Flex Time, Compensatory Time, Communication
10/13/06

I am confused why for months you approved my comp time and than all of the sudden you told me I had to flex my time. If you had a problem with me earning comp time, as the supervisor you should had told me immediately and not months after you had been approving my comp time. I was doing what was workable and I think following DMH/MR policy on compensatory time. I know of no employees in this office that gives their supervisor a detail written schedule of what they are doing and to obtain prior written approval for comp or flex time. You said that I was not communicating with you and gave the example of me leaving a note to Shirley Patterson when I could not find my time card on October 13, 2006 and said I should have come to you. What I did was not out of the ordinary for an employee in this office.

When I looked in the area where the time cards were kept I saw where another employee had left a note to Ms. Patterson. Ms. Patterson is the timekeeper; it is a common practice for employees to leave notes for Ms. Patterson or to communicate with Ms. Patterson if there is a question regarding time sheets and time cards. You also mentioned that I put things under your door and admitted that your door may be closed while you are in the office. I have put memorandums under your door if your door was closed and I heard you on the phone or if you were out of your office. However, putting things or memorandums under doors is a common practice among employees including the supervisors.

I disagree with you totally about not communicating with you. This is one of the reasons, I have communicated with you in writing to avoid just what you are saying about me not communicating with you and to attempt to show you I am doing my job. Nothing I do seems to satisfy you. With or with out the supervisors approval in this office it is common practice for employees do as they please, come and go as they please.

You are being very unreasonable. Whatever I have done in an attempt to exhibit doing my job has been scrutinized by you. If you would stop nix picking and micromanaging you could see that I am trying to do my job and have communicated with you. You are requiring me to do things that other employees do not have to do. I have to wonder what is the purpose of the nix picking and micromanagement. I don't have a problem following any requests or policies if all employees effective are following the requests and polices. I am just asking for fairness.

P. C.   Joan Owens, DMH/MR Personnel (Copy For Personnel File)
         Josh Wilson, Wiggins, Childs, Quinn & Pantazis

MEMORANDUM:

TO:      Winifred Blackledge

FROM: *Kendra Butler*
         Kendra Butler

DATE:  October 19, 2006

RE:      Follow-Up to Memorandum Received

This memo is in response to your two page memo dated October 13, 2006 RE: Flex Time, Comp Time and Communication

As stated in my memorandum to you dated June 19, 2006 I informed you that flex hours can be worked when doing monitoring visits. The need for flex hours should mirror the number of homes monitored. Compensatory Time requires prior approval of the supervisor. Comp time is at the discretion of the supervisor. Please review Policy #60-56 in the DMH/MR Manual which is located in the Regional Secretary's office. I at no time required or asked you to submit a written schedule outlining what you are doing. This is not normal procedure in our office, yet you chose to do this on your own, and continue to do so, on your own. All staff, including you, is required to indicate on the sign-in/sign-out sheet their whereabouts, time in/out, and the leave granted or approved. Please complete leave slips requesting to earn comp time, in advance, for my approval.

I am not aware of any employee working for the department who does as they please and comes and goes as they please; therefore, I am not in a position to say what others are doing and/or not doing. We all have job responsibilities to perform in this department. Some job/area of responsibilities are unique given the nature of what is required and the area of expertise, for instance your area as monitoring coordinator. As monitoring coordinator you are expected to assume responsibility for monitoring more homes than other staff. My expectations of you are the same expectations I have of others and that is for you do your job, do it well and to conduct yourself in a professional manner at all times.

If you ever feel that you are treated unfairly, please continue to feel free to come to me so that we can resolve the issue(s) in question.

# EXHIBIT

# S

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:    60-56

SUBJECT:    Personnel/Payroll
TITLE:        Compensatory Time

EFFECTIVE: 4/4/88        REVIEWED:        CHANGED:  10/06/06

RESPONSIBLE OFFICE:    Division of Administration/Personnel

APPROVED:

## I.    POLICY:

In accordance with the provisions of the Fair Labor Standard Acts (FLSA) and State Personnel's policy, the Department of Mental Health and Mental Retardation will use compensatory time rather than overtime pay to compensate all employees except those "direct care employees" and others on the "Cash Overtime and Compensatory Time Eligibility List" specifically approved for cash overtime payment by State Personnel Board.

## II.    DEFINITIONS

1.    A **standard employee** as defined in the state payroll\personnel computer system is a full-time employee who is scheduled to work 8 hours daily from Monday through Friday and scheduled off days are Saturday and Sunday.

2.    A **non-standard employee** as defined in the state payroll\personnel computer system is a full-time employee who is not scheduled to work 8 hours daily from Monday through Friday and scheduled off days may not be Saturday and Sunday.

3.    The Cash Overtime and Compensatory Time Eligibility List is a comprehensive list of all the job titles in the department showing the eligibility for compensatory time or cash overtime and the accumulation rate in accordance with the provisions of the Fair Labor Standard Acts.

DMH/MR Policy 60-56

### III.    STANDARDS:

1.   Compensatory time will be permitted when job duties cannot be reasonably performed within the employee's regular scheduled shift. Prior approved leave slip must be obtained by the employee from the supervisor before working beyond their assigned schedule/shift.

2.   The Cash Overtime and Compensatory Time Eligibility List will be referenced in determining the amount of compensatory time to accumulate when an employee works in excess of their normal daily work schedule/hours.

3.   Compensatory Time must be documented (accumulation and usage) on a departmental leave slip (currently, Form P6). A formal record of the compensatory time will be maintained as part of the employee's individual leave record and will be audited to assure compliance with this policy.

4.   Compensatory Time must be used within (60) days of the date earned or the compensatory time will be forfeited. Manpower needs may dictate the need for an exception. Such exceptions must be approved, in writing, by the appointing authority

5.   Compensatory Time may be accumulated or used to ensure full time non-standard employees receive 1/24th of annual salary under the semi-monthly payment system.

6.   Accumulated compensatory time shall be used before annual leave. This shall not be interpreted to require the loss of accumulated annual leave.

7.   Employee will receive pay for compensatory time accumulation that cannot be used because of:
   a)   coverage consideration after one year or
   b)   accumulated hours exceed maximum accumulation of 240 hours (480 hours for law enforcement officers) at any time.

   Approval for payment of compensatory time must be made by the State Personnel Director, following approval by the appointing authority. The payment will be made at the employee's regular rate of pay.

8.   Upon separation from employment or transfer to another state department an employee that is non-exempt from FLSA provisions is entitled to payment for positive balance of accumulated compensatory time. An employee that is exempt from FLSA provision is not entitled to payment for positive balance of accumulated compensatory time upon separation from employment or transfer

DMH/MR Policy 60-56

to another state department.  Negative compensatory time balance must be deducted from the employee's final pay check to prevent overpayment.

IV.    **REFERENCES:**

DMH/MR Policy 60-50

# EXHIBIT

# T

On January 4, 2007, I observed Winifred Blackledge backing out of her parking space at 3:15 PM. I was returning from a late lunch. I was on a liquid diet on 1/4/07 for a colonoscopy scheduled for 1/5/07. I specifically did not have lunch with my co-workers to prevent agony and temptation to eat. I went to the bank and upon my return I observed Ms. Blackledge leaving for the day.

I later learned that Ms. Blackledge signed out at 3:30 PM.

*Jerryln L London* 1/10/07
Jerryln R. London

Memorandum

TO:     Winifred Blackledge

FROM:   Kendra Butler  *KB*

DATE:   January 4, 2007

RE:     Leaving Early

You left work at approximately 3:15 p.m. on this date. Ms. Jerryln London, RCS Director, observed you backing out to leave, as she was returning to the office. You indicated in the "Time Out" block on the Region III Community Services Sign In/Out Sheet that you left at 3:30 p.m. The only other documentation in your sign in/out area was the time you signed in this morning which was 7:05 a.m.

Pc Jerryln London

January 12, 2007

MEMORANDUM:

To: Henry Ervin
     DMH/MR Personnel

From: Winifred Blackledge
Regional Community Services


At approximately 9: 30 a. m. Ms. Kendra Butler called me into her office and advised me that Personnel had informed her that I had to take 15 minutes of leave where Jerrlyn London lied and said that I left 15 minutes early on January 4, 2007. When I told Ms. Butler that I did not leave early, Ms. Butler informed me that she stayed late and went out and did not see my car. I find it very suspicious that Ms. Butler did not mentioned this prior to my statement in writing to you on January 8, 2006 where I said Ms. London lied about me leaving early on Janaury 4, 2007. It appears very clear to me that Ms. London and Ms. Butler have conspired to give validity to Ms. London's statement.  Both Ms. London and Ms. Butler are in conclusion and are lying.

I still see Ms. Butler's and Ms. London's actions as harassment and retaliation. I did not leave early, thus, I am not voluntarily given leave.


P. c. John Houston, Commissioner
     Eranell-McIntosh Wilson, Associate Commissioner
     Fordyce Mitchel, Director of Community Services
     Josh Wilson, Wiggins, Childs, Quinn

FORM P6
Revised 7/2000

STATE OF ALABAMA
DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION

CHECK ONE: ☒ LEAVE REQUEST

☐ LEAVE EARNED

Original: Timekeeper
Yellow: Supervisor
Pink: Employee

DEPT/UNIT

SOCIAL SECURITY NUMBER

NAME (First, Middle, Last)

Winifred Blackledge

| | | LEAVE STARTS | | | | | LEAVE ENDS | | | | | TOTAL HOURS | | APPROVAL/ DISAPPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month | Day | Year | Hour | A.M. | P.M. | Month | Day | Year | Hour | A.M. | P.M. | | |
| | | | | | | | | | | | | | HOURS | MIN |
| 1 | 01 | 04 | 07 | 3:15 | | X | 01 | 04 | 07 | 3:30 | X | | | 15 |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |

| CHECK TYPE LEAVE REQUESTED | |
|---|---|
| ☒ ANNUAL | ☐ L.W.O.P. |
| ☐ COMPENSATORY | ☐ PERSONAL LEAVE DAY |
| ☐ COURT | ☐ MILITARY |
| ☐ FMLA | ☐ SICK |
| ☐ HOLIDAY | |

| CHECK TYPE LEAVE EARNED |
|---|
| ☐ HOLIDAY EARNED |
| ☐ COMP EARNED |
| ☐ NON-REGULAR HOURS EARNED |

Explanation/Comments/Purpose: Winifred was entered leaving the parking lot
at 3:15 pm by Mr. Wrigley Kendrick. PBM Director. MR. Kendrick refused
to permit her in the parking lot for the two extra stile she would
to sign leave slip as requested.

_____ Employee _____ Date

_Winifred Blackledge_ Supervisor 1/16/07 Date

EXHIBIT

U

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:     60-20

SUBJECT:    Personnel
TITLE:      Equal Employment Opportunity

EFFECTIVE: 4/4/88          REVIEWED: 8/7/2002          CHANGED: 1/19/07

RESPONSIBLE OFFICE:    Division of Administration/Personnel

APPROVED:    *[signature]*

## I.    POLICY:

The Alabama Department of Mental Health/Mental Retardation will recruit, employ, promote, remunerate, and conduct all personnel administrative practices without regard to race, religion, national origin, color, age, gender, or disability, except where sex or physical ability constitute a bona fide occupational qualification.

## II.    STANDARDS:

1.    The Department will maintain and implement an internal Affirmative Action Plan.

# EXHIBIT

# V

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:    60-40

SUBJECT:    Personnel/Payroll
TITLE:    Progressive Discipline

EFFECTIVE: 4/4/88        REVIEWED: 9/7/05        CHANGED: 8/16/03

RESPONSIBLE OFFICE:    Personnel

APPROVED:    *John Houston*

## I.  POLICY:

The Department of Mental Health and Mental Retardation shall use Progressive Discipline as a management tool.

## II.  DEFINITIONS:

1. Disciplinary Action is action taken with an employee who fails to act in good faith, commits an act of non-compliance, or commits an act not in keeping with DMH/MR standards of conduct or accountability in which a warning, reprimand, suspension, or termination process is applied.

2. Progressive Discipline: is a series of sequential disciplinary steps, corrective in nature, taken to provide employees the opportunity to improve on job performance and/or comply with departmental policies, rules, and regulations.

## III.  STANDARDS:

1. Disciplinary steps shall generally be progressive to ensure that the employee has the opportunity to correct his or her performance or behavior.  The sequence of steps is as follows:

    a.  Oral or Verbal counseling or coaching - a cooperative attempt with the employee in determining and correcting a problem.  This step involves written documentation of the discussion or session with the employee outlining a problem area, including development and implementation of a corrective action plan.  Documentation is maintained by the supervisor, but not in the employee personnel file, nor copy provided to the employee.

b.  Written Warning - formal notification with written documentation of an unacceptable behavior maintained in the employee's formal personnel file and documented on the Employee Performance Appraisal at the end of the appraisal year. Notice of a warning is provided to the employee in writing. Although documented, disciplinary points are not deducted under the "disciplinary score" on the Employee Performance Appraisal.

c.  Written Reprimand - a more serious approach to discipline which includes written documentation placed in the employee personnel files, including documentation on the Employee Performance Appraisal at the end of the employee's appraisal year. Notice of a reprimand is provided to the employee in writing. One or more reprimands result in seven (7) points being deducted in the disciplinary section affecting the outcome of the final annual appraisal score.

d.  Suspension - a severe and extremely serious step involving due process, usually resulting in the loss of work and pay for a specified number of hours or days. Written notification is provided to the employee, as well as maintained in the personnel file. A suspension is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. One or more suspensions result in seventeen (17) points being deducted in the disciplinary section affecting the outcome of the final annual appraisal score.

e.  Termination – a documented involuntary personnel action applied by the appointing authority based on a serious violation(s) or repeated violation(s) of departmental rules or policies, or uncorrected conduct preceded by due process procedure.

2.  Progressive discipline shall be applied in the order as specified above. However, it is recognized that depending upon the nature of the infraction, a more severe disciplinary action or step may be warranted upon a first offense. Any step or steps of the disciplinary process may be passed over based on investigation and/or analysis of the situation.

## IV.  REFERENCES:

1.  "Positive Discipline" training manual – The State of Alabama Personnel Department Training Division

2.  State of Alabama Performance Appraisal Manual, The State of Alabama Personnel Department Training Division

3.  State Personnel Board Rules

# EXHIBIT

# W

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:    60-60

SUBJECT:    Personnel/Payroll
TITLE:    Sick Leave

EFFECTIVE: 4/4/88        REVIEWED:  12/4/02        CHANGED:  6/2/06

RESPONSIBLE OFFICE:    Division of Administration/Personnel

APPROVED:    *Joe Houston*

## I.    POLICY:

Employees in permanent positions, including provisional and temporary appointees, shall earn sick leave with pay on the basis of semi-monthly pay periods and in accordance with the Rules of the State Personnel Board.  Temporary employees who are paid on a semi-monthly basis may accrue sick leave as authorized by their Appointing Authority.  Contractors do not earn sick leave.

## II.    DEFINITIONS

1.    Provisional appointee – an employee employed for not more than 156 actual work days when there is no appropriate employment register to use for regular appointment.  Upon the establishment of the appropriate employment register, the provisional status ceases, and an employee is hired from the employment register based on ranking.

2.    Temporary employee – an employee employed for not more than 104 actual work days regardless of the employee's ranking on an employment register.

3.    Sick leave - the absence from duty of an employee because of:
    a.    illness/medical appointments;
    b.    bodily injury incurred in or outside the line of duty;
    c.    attendance upon members of the immediate family (spouse, children, grandchildren, parents or grandparents, sister or brother, father/mother/son and daughter-in-law) whose illness requires the care of the employee;
    d.    death in the immediate family.

DMHMR Policy 60-60

### III.    STANDARDS

1.    Four hours and 20 minutes of sick leave is accumulated semi-monthly regardless of the years of service for a full time employee. A Part-time employee accumulates a prorated amount.

2.    Employees accrue sick leave at the end of the pay period if the employee is in pay status 80% of their work schedule.

3.    Sick leave usage will be in 15 minutes increment as approved by the employee's supervisor on a department leave request form (currently, Form 6).

4.    No more than 1200 hours of accumulated sick leave can be carried over beyond the end of the calendar year.

5.    Upon retirement from state service or death, an employee is paid for 50% the actual amount of sick leave accumulated up to 50% of 1200 hours.

6.    The appointing authority, within his/her sole discretion, may grant sick leave usage upon receiving a written request/justification from the employee for non-immediate family members if an unusually strong personal tie exists.

# EXHIBIT



# X

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:    60-64

SUBJECT:    Personnel/Payroll
TITLE:        Annual Leave

EFFECTIVE: 4/7/89        REVIEWED: 12/4/02        CHANGED:  6/2/06

RESPONSIBLE OFFICE:    Division of Administration/Personnel

APPROVED:    *Joe Houston*

## I.    POLICY:

Employees in permanent positions, including provisional appointees, shall earn annual leave (vacation) with pay on the basis of semi-monthly pay periods and in accordance with the Rules of the State Personnel Board.  Temporary employees and contractors do not earn annual leave.

## II.    DEFINITIONS

1.    Provisional appointee - an employee employed for not more than 156 actual work days when there is no appropriate employment register to use for regular appointment.  Upon the establishment of the appropriate employment register, the provisional status ceases, and an employee is hired from the employment register based on ranking.

2.    Temporary employee – an employee employed for not more than 104 actual work days regardless of the employee's ranking on an employment register.

## II.    STANDARDS

1.    The amount of Annual leave is accumulated according to the schedule established by the Rules of the State Personnel Board 670-X-13-.20 based on the total years of state service. A part time employee accumulates a prorated amount.

2.    Employees accrue annual leave at the end of the pay period if the employee is in pay status 80% of their work schedule.

DMHMR Policy 60-64

3.    Annual leave usage will be in 15 minute increments as approved by the
      employee's supervisor on a department leave request form (currently Form 6).

4.    No more than 480 hours of accumulated annual leave can be carried over
      beyond the end of the calendar year.

5.    Upon separation from state service, an employee is paid for the actual amount
      of annual leave accumulated up to 480 hours.

*pc: LD*

# STATE OF ALABAMA
# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
## Bureau of Legal Services
## Telephone (334) 242-3038
## Fax (334) 242-0924

### FACSIMILE TRANSMITTAL SHEET

DATE: _4/25/07_          TIME: _11:25 am._

TO: _Ollie Croom, EEOC_

FAX NO.: _205-212-2105_

FROM: _Kathy Thompson_

RE: _Position Statement_

PAGES: _14_          (including cover sheet)

REMARKS:

Per our conversation yesterday, I am attaching our response to the Charge filed by Winifred Blackledge (420-2007-01385). The exhibits will be placed in the overnight mail so you should receive them tomorrow.

Please call me if you have any questions or need additional info.

The communication which follows this Cover Sheet is forwarded and intended only for use by the designated recipient. It may contain privileged or otherwise confidential information not subject to disclosure under the State or Federal Law. If the person or entity reading the communication is not the intended recipient, you are notified that any publication, copying or distribution of the information or message is unauthorized and prohibited. If you have received the communication in error, please contact this agency immediately and return the original message to us at the address shown above. The recipient of this information is required to destroy this information after its stated need has been fulfilled. Thank you.

** TX STATUS REPORT ** AS OF APR 25 2007 11:40 PAGE.01

LEGAL DIVISION

| | DATE | TIME | TO/FROM | MODE | MIN/SEC | PGS | CMD# | STATUS |
|---|---|---|---|---|---|---|---|---|
| 01 | 04/25 | 11:35 | +2052122105 | EC--S | 05'40" | 014 | 098 | OK |

STATE OF ALABAMA
DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
Bureau of Legal Services
Telephone (334) 242-3038
Fax (334) 242-0924

## FACSIMILE TRANSMITTAL SHEET

DATE: 4/25/07 TIME: 11:25 am.

TO: Ollie Croom, EEOC

FAX NO.: 205-212-2105

FROM: Kathy Thompson

RE: Position Statement

PAGES: 14 (including cover sheet)

REMARKS:

Per our conversation yesterday, I am attaching our response to the Charge filed by Winifred Blackledge (420-2007-01385). The exhibits will be placed in the overnight mail so you should receive them tomorrow.

Please call me if you have any questions or need additional info.

The communication which follows this Cover Sheet is forwarded and intended only for use by the designated recipient. It may contain privileged or otherwise confidential information not subject to disclosure under the State or Federal Law. If the person or entity reading the communication is not the intended recipient, you are notified that any publication, copying or distribution of the information or message is unauthorized and prohibited. If you have received the communication in error, please contact this agency immediately and return the original message to us at the address shown above. The recipient of this information is required to destroy this information after its stated need has been fulfilled. Thank you.

# STATE OF ALABAMA
# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
## Bureau of Legal Services
## Telephone (334) 242-3038
## Fax (334) 242-0924

### FACSIMILE TRANSMITTAL SHEET

DATE: 3/8/07                    TIME: 2:30 pm

TO: Ollie Croom, EEOC Investigator

FAX NO.: 205-212-2105

FROM: Kathy Thompson

RE: Attached Letter

PAGES: 2            (including cover sheet)

REMARKS:

Per our conversation, here is a copy of my letter to Deirdre Rivers regarding our response being submitted by 3/19/07.

Please call me if you have any further questions.

My direct line is 334-353-5007.

Kathy

The communication which follows this Cover Sheet is forwarded and intended only for use by the designated recipient. It may contain privileged or otherwise confidential information not subject to disclosure under the State or Federal Law. If the person or entity reading the communication is not the intended recipient, you are notified that any publication, copying or distribution of the information or message is unauthorized and prohibited. If you have received the communication in error, please contact this agency immediately and return the original message to us at the address shown above. The recipient of this information is required to destroy this information after its stated need has been fulfilled. Thank you.

# STATE OF ALABAMA
## DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
### Bureau of Legal Services
### Telephone (334) 242-3038
### Fax (334) 242-0924

## FACSIMILE TRANSMITTAL SHEET

DATE: _3/8/07_    TIME: _2:30 pm_

TO: _Ollie Croom, EEOC Investigator_

FAX NO.: _205-212-2105_

FROM: _Kathy Thompson_

RE: _Attached Letter_

PAGES: _2_ (including cover sheet)

REMARKS:

Per our conversation, here is a copy of
my letter to Deirdre Rivers regarding
our response being submitted by 3/19/07.

Please call me if you have any
further questions.

My direct line is 334-353-5007.

Kathy

The communication which follows this Cover Sheet is forwarded and intended only for use by the designated
recipient. It may contain privileged or otherwise confidential information not subject to disclosure under the State or
Federal Law. If the person or entity reading the communication is not the intended recipient, you are notified that
any publication, copying or distribution of the information or message is unauthorized and prohibited. If you have
received the communication in error, please contact this agency immediately and return the original message to us
at the address shown above. The recipient of this information is required to destroy this information after its stated
need has been fulfilled. Thank you.

---

| DATE TIME | TO/FROM | MODE | MIN/SEC | PGS | CMD# | STATUS |
|---|---|---|---|---|---|---|
| 23 03/08 14:38 +2052152105 | | EC--S | 00'41" | 002 | 200 | 152 | OK |

LEGAL DIVISION

** TX STATUS REPORT **    AS OF MAR 08 2007 14:39    PAGE.01



STATE OF ALABAMA

**DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION**

**RSA UNION BUILDING**

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



JOHN M. HOUSTON
COMMISSIONER

BOB RILEY
GOVERNOR

February 2. 2007

Deirdre J. Rivers, ADR Assistant
U. S. Equal Employment Opportunity Commission
Birmingham District Office – 420
Ridge Park Place
1130 22nd Street South
Birmingham, AL  35205

          **RE:**    **Charging Party:  Winnifred Blackledge
                    Charge No:  420-2007-01385**

Dear Ms. Rivers:

    This letter is to inform you that the Bureau of Legal Services represents the Department of Mental Health and Mental Retardation (DMH/MR) in the above referenced Charge.  I will be the primary contact person responsible for initially gathering the information and investigating this Charge; therefore, please forward all future correspondence and other writings to my attention at the above address in order that we may promptly comply with any request.

    The DMH/MR intends to submit a statement of position to the allegations in this Charge; however, we will not be able to respond by February 25, 2007.  We plan to submit our response to your office by March 19, 2007.

    If you have any questions or need further information, please contact me at the above address or at telephone number (334) 242-3038.

                Sincerely,

                *Kathy Thompson*

                Kathy Thompson
                Bureau of Legal Services



### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Birmingham District Office

Ridge Park Place
1130 22nd Street, South, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Courtney Taraver. General Counsel
Alabama Department of Mental Health & Mental Retardation
P.O. Box 301410
Montgomery, AL 36130

Reference:    Charge Number: 420 2007 01385
Winifred Blackledge v. Alabama State Department of Mental Health & Mental Retardation

Dear Counsel, Tarver:

The above-referenced charge of discrimination is assigned to me for investigation. If you wish to contact me, my office hours are Monday through Thursday 8:00 a.m. to 4:00 p.m. My telephone number is 205/212-2140. If you call and do not speak with me, please leave a message and allow me two business days to return your call.

Please note that **anytime prior to the conclusion of the investigation of this charge, we can engage in the negotiated settlement process to resolve the allegations of this charge.** Please contact me if you wish to engage in the negotiated settlement process.

Sincerely,

_2/26/07_
Date

_Ollie Croom_
Ollie Croom
Investigator



STATE OF ALABAMA

**DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION**

**RSA UNION BUILDING**

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



JOHN M. HOUSTON
COMMISSIONER

BOB RILEY
GOVERNOR

February 2. 2007


Deirdre J. Rivers, ADR Assistant
U. S. Equal Employment Opportunity Commission
Birmingham District Office – 420
Ridge Park Place
1130 22nd Street South
Birmingham, AL  35205

**RE:    Charging Party:  Winnifred Blackledge
Charge No:  420-2007-01385**

Dear Ms. Rivers:

This letter is to inform you that the Bureau of Legal Services represents the Department of Mental Health and Mental Retardation (DMH/MR) in the above referenced Charge.  I will be the primary contact person responsible for initially gathering the information and investigating this Charge; therefore, please forward all future correspondence and other writings to my attention at the above address in order that we may promptly comply with any request.

The DMH/MR intends to submit a statement of position to the allegations in this Charge; however, we will not be able to respond by February 25, 2007.  We plan to submit our response to your office by March 19, 2007.

If you have any questions or need further information, please contact me at the above address or at telephone number (334) 242-3038.

Sincerely,

*Kathy Thompson*

Kathy Thompson
Bureau of Legal Services