CONFIDENTIAL

Alabama Department of Mental Health/ Mental Retardation

# Special Personnel Task Force
# Report to the Commissioner

A Special Personnel Task Force was established on February 6, 2003, by the

Commissioner to address DMH/MR staffing standards for administrative support sections

of each state-operated facility.  The Task Force members consist of Henry Ervin, Chair,

Judith Johnston, Joey Kreauter, Ross Hart, Tamara Pharrams, Steve Spier, Paul Bisbee,

Bart Gaston, and David Bennett.  This group has diligently worked to provide the

following report based on the assigned tasks.

1.  **Review and certify accuracy of staffing deficiencies and overages by facility and**
    **further by classification/position.**

The staffing deficiencies and overages were reviewed and modified as necessary by the

task force members in an effort to certify the accuracy of the numbers.  The resulting

spreadsheet is attached that details the deficiencies and overages in administrative/

support staff, as per the charge of the task force, at the state-operated facilities

2.  **Establish and apply uniform staffing standards for all administrative,**
    **management, and non-direct care professional positions.**

The Task Force reviewed and standardized the facility personnel sections identified by

the Commissioner which include:

- ▪ Director's Office

- ▪ Fiscal Office

- ▪ Data Management Office

- ▪ Personnel Office

- ▪ Human Resources Development Office.

CONFIDENTIAL

-1-



PLAINTIFF'S
EXHIBIT

DEFENDANT'S
EXHIBIT

3532

CONFIDENTIAL

For purposes of this project, the census and staffing numbers used to figure ratios are identified at the end of the spreadsheet (see attached).

The differences in two of the five standardized sections are justified as follows:

Director's Office:  Division of Mental Illness Only

- Admissions Coordinator and staff

  Due to the numbers of admissions and discharges in the mental illness facilities, there is a need for an Admissions Coordinator.  In the developmental centers, the admissions are few and the responsibility is subsumed by the other staff in this section.  Therefore, there is no need for a separate admissions officer/staff for the mental retardation facilities.

- Risk Manager

  This position is required for JCAHO compliance for the mental illness facilities.  The responsibilities for risk management in the developmental centers are subsumed under the Office of Quality Enhancement.

Fiscal Office:

- Division of Mental Retardation

  For developmental centers of less than 150 beds, it was determined by a study of functions done by Mr. Ray Walker that the fiscal offices at the developmental centers required, at least, four staff to maintain the separation of functions to comply with recognized accounting practices.  The ratio of 1.5 fiscal staff per 100 beds provides sufficient staffing in larger facilities to conduct the business functions required for a relatively stable population.

CONFIDENTIAL
-2-

3533

CONFIDENTIAL

- Division of Mental Illness

   There is such a large patient turnover in the mental illness facilities, that it takes more staff to perform the functions of patient eligibility, billing, patient accounts, patient payroll, and insurance, etc. This is the reason for the rations for both large and small mental illness facilities to be greater than the developmental centers. The Division of Mental Illness did reduce its ratio from the current standards for facilities larger than 150 beds (from 4 FTE's per 100 beds to 3 FTE's per 100 beds).

3. **Upon completion of staffing plan, conduct a review and analysis of each facility's EBO plan, identifying the number of positions funded by classification by each facility.**

   Upon certification of the accuracy of the facility deficiencies and overages, these positions will be compared to the budgeted positions as indicated on the EBO 9 form. This analysis will help further refine and clarify staffing standards in the administrative support areas.

4. **Develop system-wide recommendations for adjustments in staffing to include**

   a. **methods to fill identified vacancies**

   b. **methods to reduce overage staff, and**

   c. **costs associated with both.**


   Methods to fill identified vacancies must be done according to State Personnel Rules and Department of Mental Health policies. Strategies to utilize include

3534

CONFIDENTIAL

1. Identify overages, merit and exempt, in the same classifications at other facilities.

   Offer employee transfers.

2. Identify classification with the same qualifications. Offer employee transfers.


Methods to reduce overage staff must also be done according to State Personnel rules and

DMH/MR policies and are as follows.

1. Monitor the attrition rate.

2. When a vacancy in the same classification occurs at other facilities, offer to transfer

   the employee with the lowest retention score in that classification.

3. When a vacancy occurs in a classification with the same qualifications, offer to

   transfer the employee to that vacancy.

4. Offer the employee the opportunity to test for a mental health worker position.

5. Lay-off employees beginning with those with the lowest retention score in the

   affected classification.

3535



ANO MENTAL RETARDATION
REGION III - RCS
16   LAKE RD. SO. BLDG 109
MOBILE ALABAMA 36608-4001
PHONE (251) 448-4769   621-1425
FAX (251) 461-5869



KATHY F. SAWYER
COMMISSIONER

*Exhibit 9*

MEMO

4 – 5 – 2004

TO:  WINIFRED BLACKLEDGE
     MH SOCIAL WORKER II

FR.  SUSAN STUARDI
     DIR. RCS III

RE:  COMPLAINT FILED 12/15/03

In response to your complaint filed 12/15/03, I requested a desk audit of your position by the DMH/MR Personnel Department  The purpose of this audit was to determine whether there was justification and possibility of reallocating your position to a CSS III or a MH Specialist II. The findings of that audit are as follows.

The Community Service Specialist series is the correct classification reflecting the nature and kind of work you perform.  No positions are open at this time

The Community Service Specialist III must have administrative responsibilities in addition to the duties you outlined in your form 40.

The MH Specialist II series is not a current option in Regional staffing plans.

As other positions for which you do qualify become available, you are encouraged to apply for those openings.

We do appreciate your efforts in providing follow up services for individuals outplaced from developmental centers and the coordination of residential monitoring. Reallocation is not an option at this time so you are encouraged to keep on seeking positions for which you may apply within the Region and throughout the state system.

Cc E Wilson
   F Mitchel
   H Ervin



# ALABAMA

## CONSOLIDATION PLAN
### August 2003

**Kathy E. Sawyer**
**Commissioner**

**Bob Riley**
**Governor**



DEFENDANT'S
EXHIBIT
12
tabbies

OFFICE OF THE GOVERNOR

BOB RILEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

## STATE OF ALABAMA

August 15, 2003

Kathy E. Sawyer
Commissioner, Department of Mental Health
   and Mental Retardation
P.O. Box 301410
Montgomery, AL  36130-1410

Dear Commissioner Sawyer:

I have completed my review of your plan for consolidation and closure of mental health facilities, and have reviewed in detail the many comments and recommended alternatives submitted by many across the state. My tours of mental health facilities and community programs also proved most helpful in better understanding the type of programs and individuals to be affected by our decisions. After careful thought, I have decided consolidation and closure of mental health facilities is warranted.

Therefore, I am approving your plan of consolidation and closure with the modifications we discussed and ask that you proceed with its implementation. The additional measure that establishes Regional Crisis and Evaluation Centers will help to address many of the concerns and fears expressed by families and provide a critical safety net of specialized services around the state. In reaching a final decision, I was very deliberate in considering this difficult and complex matter affecting hundreds of Alabamians with very complex needs.

I appreciate the comprehensive approach of your plan and also the time and effort you devoted to every detail, i.e. meetings with families, alternative facility uses, employee assistance, etc. While I know our decision will be difficult for some, I am confident that it is the right decision and right time for these reforms.

Thank you and your staff again for your hard work and dedication to the citizens of this great state.

Sincerely,

BR/tr/pb

# Alabama Department of Mental Health/Mental Retardation

## *Table of Contents*

I.  Executive Summary ............................................................................... 2

II.  Division of Mental Illness ................................................................ 7
   A. Introduction ........................................................................... 7
   B. National Trends ................................................................... 10
   C. Consolidation Plan ............................................................. 11
   D. Consolidation Process and Timelines ............................... 17

III. Division of Mental Retardation ..................................................... 21
   A. Introduction ......................................................................... 21
   B. National Trends ................................................................... 25
   C. Consolidation Plan ............................................................. 26
   D. Consolidation Process and Timelines ............................... 28

IV. Impact of Plan ................................................................................ 32
   A. Financial Impact ................................................................. 32
     1. Division of Mental Illness Reconfiguration ................... 32
     2. Division of Mental Retardation Reconfiguration .......... 36
   B. Stakeholder Impact ............................................................. 39
     1. Consumers/Families ....................................................... 39
     2. Workforce ....................................................................... 41
     3. Community ...................................................................... 47

V.  Support ............................................................................................ 61

VI. Conclusion ...................................................................................... 62

VII.  Appendices
   A. Mental Illness Catchment Area Maps
   B. Task Forces Memberships

## Executive Summary

The Code of Alabama 1975 requires the Alabama Department of Mental Health and Mental Retardation to serve Alabama citizens in need of mental health and mental retardation services (Title 20, Chapter 50, Code of Ala. 1975). These services are provided through a multi-faceted service delivery system that includes 14 state operated in-patient facilities and over 100 locally contracted and certified community agencies. Over the past 30 years, Alabama's mental health and mental retardation system has been, primarily, directed by judicial oversight as a result of the Wyatt V. Stickney lawsuit. The Wyatt case, as it is more commonly known, was filed in the 1970's and has continued for over 30 years. During this era, standards of client care, treatment, and habilitation were established and implemented in all state operated in-patient facilities in Alabama, which also became the basis for many national accreditation and certification standards in the mental health and mental retardation fields. By the mid 1980's, the focus of the Wyatt case shifted from primarily that of institutional care to that of community-based treatment and care. As a result, for almost two decades now, the Alabama mental health and mental retardation system has been expanding its community-based system and moving thousands of individuals from institutional settings to more community integrated systems for care and treatment.

While this system of care and treatment has evolved into a more person-directed and community-centered model, resources of the system have been transferred and reallocated at a slower pace.  In this era of fiscal responsibility and accountability, it has become evident that the service delivery system of the Alabama Department of Mental Health and Mental Retardation must be realigned to be consistent with and responsive to a majority of stakeholder needs and desires, while offering services to as many people as possible.

The 1999 Supreme Court decision, <u>Olmstead v. LC</u>, further reinforced the need to realign resources.  The court ruled that it is a violation of the Americans with Disabilities Act to provide people with disabilities services only in institutions.  All states have begun to move in the direction of consolidating institutional services as described below.

Around the country trends of downsizing, consolidation and closure of state operated psychiatric hospitals have been noted.  According to a 2003 survey of states by the National Association of State Mental Health Program Directors, 44 states closed mental health facilities in the 1990's; two (2) states, Florida and Illinois, closed facilities in 2002; three (3) states, North Carolina, South Carolina, and New York, plan closures in 2003; and two (2) states, Kansas and North Carolina, in addition to Alabama, are considering mergers of state mental health

facilities this year. Twelve (12) other states plan to reduce some 920 beds in their state mental health facilities.

Similar national trends are noted in state-operated mental retardation/developmental disabilities centers. Five (5) states are currently in the process of closing one or more of their state-operated developmental centers according to the National Association of State Developmental Disabilities Directors.

The Consolidation Plan, as described in the following pages, remains true to the department's mission to maintain a comprehensive system of both in-patient and community-based services for those placed under the department's care. The Consolidation Plan also recognizes, and is guided by, the following general principles.

- No individuals will be denied services based on their individual needs as assessed by qualified mental health and mental retardation professionals.

- The level and quality of services received will not be compromised or reduced by this Consolidation Plan.

- Individuals and their families will be given reasonable choices as to the most appropriate settings for the identified plan of care.

- Institutional care will continue to be offered for those who desire and need this level of care.

While there has already been organized opposition to this plan by families and employees affected by consolidation, it must be noted that the plan has received unanimous support and endorsements from all major state organizations associated with Alabama's mental health and mental retardation system. State organizations such as the Arc of Alabama, National Alliance for the Mentally Ill of Alabama, Mental Health Association of Alabama, Alabama Disabilities and Advocacy Program, People First, Alabama Council of Community Mental Health Boards, Alabama Association of Mental Retardation/ Developmental Disabilities Boards, Alabama Family Ties, Alabama Hospital Association, and others have submitted letters and mobilized their memberships in support of consolidation of Alabama's state facilities. Such broad and diverse support is unprecedented and further evidences the need and timeliness for realignment of the State's public mental health and mental retardation system.

The Department of Mental Health and Mental Retardation will remain committed to encouraging all Alabamians to embrace people with mental illness and mental retardation in the educational, social, and economic life of the community. To that end, this plan of consolidation will continue to offer the vision of achievement of personal goals and life experiences of the people the department serves while delivering to all the people of Alabama a mental health

and mental retardation system that is more fiscally and programmatically sound and responsive.

# Division of Mental Illness

## *Introduction*

The Division of Mental Illness is charged to provide appropriate care and treatment for individuals with severe mental illnesses such as schizophrenia and bipolar disorder (also referred to as manic-depression). Through the years, mental health professionals have realized that productivity and self-esteem are crucial elements in the recovery process. Services begin, and ideally should remain, in local communities, where an individual can maintain social activities, friendships, and meaningful work.

Primarily, people come in contact with the mental illness service system through local community mental health centers, or probate and juvenile courts. When the severity of a person's illness requires intensive treatment beyond the scope of services offered within the community, psychiatric hospital care is available on a short-term basis. This type care is often referred to as "acute care". There are four psychiatric hospitals (Bryce in Tuscaloosa, North Alabama Regional in Decatur, Searcy in Mt. Vernon, and Greil in Montgomery) that have acute care units (sometimes referred to as "admissions" units). Each hospital is assigned a geographical area (catchment) from which patients are admitted. There are currently 321 acute-care beds available within the state mental illness service

delivery system which represents a 30% decrease in the number of acute beds over a fourteen year period.

In some cases, longer term hospital care is necessary and provided, with the ultimate goal of the individual returning to their local community. This type of care is referred to as "extended-care". Three of the state hospitals (Bryce in Tuscaloosa, Searcy in Mt. Vernon, and Thomasville in Thomasville) provide this type of care and treatment. Catchment areas have also been established for the extended-care units to determine and manage the patient population. The Wyatt Settlement Agreement required that 300 of the then 669 extended-care beds be closed. Pursuant to the Agreement, there are currently 367 extended-care beds in the three (3) psychiatric hospitals listed above. The capacity to treat patients in extended-care has decreased 73% in the past fourteen (14) years.

The mental illness service delivery system also includes care and treatment to four (4) special populations: adolescents with severe emotional disturbances; acute geriatric; adults found by criminal courts to be "not guilty by reason of insanity" (NGRI) or in need of forensic evaluation to determine competency to stand trial or participate in their defense; and the elderly with severe mental illnesses and other health/medical conditions requiring basic nursing home care. Adolescents with severe mental illness are treated in a 40-bed adolescent unit at Bryce Hospital in Tuscaloosa. These adolescents also receive on-site educational

services by qualified, certified teachers.  The Mary Starke Harper Geriatric

Center, a 96-bed facility also located in Tuscaloosa, provides short-term mental

health care for people 65 years and older with acute psychiatric conditions.  The

Taylor Hardin Secure Medical Facility, a 114-bed facility located in Tuscaloosa,

is the state's primary forensic unit, as well as providing forensic evaluations,

acute, and long-term psychiatric care and treatment.  There are three (3)

psychiatric nursing homes (Claudette Box in Mt. Vernon, Alice Kidd in

Tuscaloosa, and S.D. Allen in Northport) operated by the department, all certified

by Medicaid as Intermediate Care Facilities.

     In addition to the aforementioned state in-patient facilities and services, the

Mental Illness Division serves over 98,000 individuals in community settings

throughout the state.  Community services represent the largest service component

of the Mental Illness Division (96%) compared to the 4,186 served in its state in-

patient facilities (4%).  Yet only 50% of the Mental Illness Division funds are

allocated to its community system as shown in the charts below.



**Division of Mental Illness People Served**

Hospital 4%

Community 96%

**Division of Mental Illness Budget Comparision**

Community 50%

Hospital 50%

### *National Trends*

The Alabama Consolidation Plan is comparable to those that have been implemented or are being considered in other states around the country. According to recent studies of public state mental health systems, the demand for psychiatric services is at an all time high and driven largely by the loss of private psychiatric hospital beds; inadequate Medicaid and Medicare reimbursements policies for psychiatric treatment; lack of mental health insurance parity, and increased knowledge and demand for services by consumers. The increased service demands compounded by drastic budget reductions have led states to cut services, reduce the number of individuals served, and close state facilities.

According the 2003 National Association of State Mental Health Program Directors Survey of States, the following states are reported to either have plans to close facilities, have closed facilities, or are in the process of merging facilities: Florida, Illinois, North Carolina, South Carolina, Kansas, and New York. Twelve (12) states report plans to reduce approximately 920 beds in FY03. Some 44 states closed psychiatric hospitals during the 1990's.

### *Consolidation Plan*

The Consolidation Plan for the Mental Illness Division will attempt to achieve

four (4) goals: First, increase the capacity for acute psychiatric care in Alabama

by expanding the number of admissions beds in acute care units of the

department's psychiatric hospitals. Second, realign the service catchment areas of

the state to more proportionately assign psychiatric hospital responsibility based

on the current identified needs for acute and extended care services. Third, reduce

and reconfigure psychiatric nursing home beds to address the remaining needs of

the population that cannot be cared for adequately in other community nursing

home settings. Fourth and finally, to better align extended care units with acute

care units and, likewise, reduce the operational costs of extended care units,

relocate and consolidate the long-term extended-care facility at Thomasville into

the administrative and program operations at Searcy Hospital.

The scope of the problem and resulting need for consolidation and

realignment of in-patient services within the Mental Illness Service Division are

driven by a number of factors described in the following paragraphs.

### *Admissions Bed Expansion*

In the past five years, Alabama has lost an estimated 432 private psychiatric

hospital beds. As these private hospitals decrease their capacity to serve

psychiatric patients on a short term basis, the demand on the state system of
psychiatric services has dramatically increased. The four acute units for adult
admissions (Bryce, Searcy, Greil, and North Alabama Regional) have been full for
several months, with the average daily census for patients in beds during FY02
being 93% of capacity. Bryce and North Alabama Regional averaged at, or
above, their capacity for the entire fiscal year (FY02) while Searcy has averaged
over capacity for the last six (6) months. The length-of-stay on the acute
(admissions) units has also increased due to the severity of the illnesses of patients
being committed. These problems are further compounded by the number of
individuals on waiting lists for Alabama's psychiatric hospitals. The waiting list
of committed patients for admission to the four acute units has averaged
approximately 25-30 people at any given time over the past six (6) months. In the
Survey of the States referenced earlier, 13 of 32 states report that psychiatric bed
closures in the private sector have increased demand for beds in state psychiatric
hospitals. Therefore, a modest increase in admission beds is necessary to
eliminate the waiting list and restore patient flow.

This plan will increase acute beds as follows:

- The addition of ten (10) acute beds at Searcy Psychiatric Hospital for a total of 95.
- The addition of twenty (20) acute beds at Bryce Psychiatric Hospital for a total of 116.

*Catchment Area Realignment*

Based on the planned expansion of the acute care (admissions) beds as described earlier, the catchment areas, i.e., geographic areas served by each psychiatric hospital, have been retooled to include adding a distinct extended-care catchment area for the Thomasville facility which will be relocated on the campus of Searcy Hospital. This realignment will provide a more balanced service catchment area for each psychiatric hospital, thus affording a more efficient patient flow in acute and extended-care beds throughout the state.

This plan proposes the acute care and extended catchment areas be realigned as follows.

| Facility | Acute Care (# of counties) | | Facility | Extended Care (# of counties) | |
|---|---|---|---|---|---|
| | Current | Proposed | | Current | Proposed |
| Bryce | 20 | 20 | Bryce | 46 | 34 |
| Searcy | 18 | 16 | Searcy | 21 | 16 |
| North Ala. Regional | 18 | 20 | Thomasville (located at Searcy) | 0 | 17 |
| Greil | 11 | 11 | | | |

Further, the reorganizing of the mental illness service catchment areas should relieve the "bottlenecking" of consumers that has occurred along the continuum of care and result in a better utilization of acute care beds. Maps of the current and proposed catchment areas are included in the appendices of this plan.

## *Reconfiguration of Psychiatric Nursing Homes*

With the success of the Wyatt settlement and the expanded opportunities for community living afforded elderly individuals through assisted-living facilities, real changes in the psychiatric nursing home system of the Mental Illness Division are now possible. Likewise, due to the success of the Dementia Education and Training Program (DETA) which has provided training to staff at community nursing homes throughout the state, local nursing homes are now better equipped and qualified to serve the elderly with mental illnesses. These improvements have led to noted decreases in the census and demand for the psychiatric nursing home beds as compared to earlier years. The following chart clearly depicts this trend.



* S.D. Allen, Northport
* Alice Kidd, Tuscaloosa

* Claudette Box, Mt. Vernon



Division of Mental Illness
Nursing Home Bed Capacity Trends

| Year | Bed Capacity |
|------|--------------|
| 1989 | 394 |
| 1995 | 496 |
| 2000 | 424 |
| 2003 | 178 |

Additionally, psychiatric nursing home care of the department is currently provided in single-structured facilities, independent of other state hospitals. These facilities are demanding more and more capital improvements with estimated capital repair needs in excess of $900,000. Since the Wyatt Settlement implementation has been successful in closing long-term care beds in the psychiatric hospitals, there are now unused wings at Bryce Hospital that can be utilized, at a lesser cost, for the consolidation of these psychiatric nursing home services.

This consolidation plan calls for the following to occur.

- Kidd Nursing Home (Tuscaloosa) will be downsized from 119 beds to 86 beds; and relocated to an unused wing at Bryce Hospital (Unit 1 North).

- Box Nursing Home (Mt. Vernon) will be closed and the 22 patients at Box will be offered opportunities at local nursing facilities or will be transferred to Kidd Psychiatric Nursing Home beds.

- Allen Nursing Home (Northport) will be closed, and the 37 patients will be offered opportunities at local nursing facilities or will be transferred to Kidd Psychiatric Nursing Home beds.

### *Relocation of the Thomasville Rehabilitation Center*

Currently, the Thomasville facility is the only psychiatric extended-care facility that is totally independent of other psychiatric hospital campuses. While its psycho-social rehabilitation model has been ideal for the current site, it can easily be replicated on the Searcy Hospital campus in the vacated Box facility. The relocation of Thomasville will not only better align acute care and extended care facilities in the state but will also yield considerable cost savings in operational and administrative costs.

The entire Thomasville facility will relocate to the vacated Box Nursing Facility at Searcy Hospital. The Thomasville facility located at Searcy Hospital will continue to provide extended-care services for the previously-mentioned proposed extended-care catchment area. Those people needing extended-care services from the Searcy catchment area will receive those services at Searcy Hospital.

### *Consolidation Process and Timelines*

#### *Nursing Homes*

The reconfiguration of the psychiatric nursing homes will begin immediately (August 2003) and will continue in phases over a six (6) month period as indicated below.

The relocation of Alice Kidd will be accomplished over a six (6) month period. The process will begin with a plan for necessary renovations at Unit 1 North, which include renovations of the bathrooms, installation of nurse call system and installation of a door lock system. Additionally, person-centered discharge plans will be developed for all current patients of the Kidd facility. For those individuals that are non-IMD, meaning they meet federal nursing home criteria but do not require mental health services, plans will be made for transfer to community nursing homes or other appropriate community facilities that the patients and their families choose. The remaining patients, who are IMD, will be relocated to the renovated wing at Unit 1 North. Currently, there are 15 IMD patients at Kidd and 99 non-IMD patients.

The closure of the Claudette Box Nursing Home in Mt. Vernon and the S.D. Allen Nursing Home in Northport will occur over a two (2) month period with the first step being to identify those patients who are categorized as IMD-only, as previously described. These patients will be transferred to Kidd

psychiatric nursing home beds. After person-centered discharge planning and meeting with families to discuss options, the remaining patients will be transferred to local community nursing homes or other appropriate community facilities.

### *Thomasville Relocation*

Again, this relocation phase will occur within a six (6) month time frame. Initially, services that Searcy Hospital will provide to the new Thomasville unit will be identified. These services could include food, housekeeping, lab, business, medical records, laundry, etc. Meetings will be held with families and staff to discuss all available options. This consolidation will be thoughtful, methodical, and with great care to the patients who are being moved. A personnel assistance office will be established to aid employees who may be displaced by offering access to other employment opportunities. Many of the staff will be offered employment at the new location in Mt. Vernon. After the new acute beds are opened at Searcy and the Box facility is closed, equipment and furniture from Thomasville will be moved. Then over an approximate two month period, patients will be moved, first to the second floor of the new facility, then to the first floor.

All patient transfers will occur gradually with extreme care being taken to ensure successful transition to the new living environment. A Patient Transition Task Force will be appointed to include representatives from, but not limited to,

the State's Medicaid agency, Public Health Department, Human Resources

Department, the Wyatt Plaintiff Class, and others deemed critical to the successful

implementation.

| Action | Facility |
|--------|----------|
| Finalize planning for necessary renovations at Bryce for Kidd relocation. | Bryce/Kidd |
| Complete renovations at Bryce. | Bryce |
| Get IMD-only list. | Box/Allen |
| Inventory equipment for move.. | Thomasville/Box |
| Develop specs for Medical Care Invitation-to-Bid. | Bryce |
| Identify Box positions to transfer to Poundstone Admissions Unit. | Box/Searcy |
| Meet with employees re:future of Box/establish onsite personnel assistance office. | Box |
| Identify Kidd non-IMD patients for outpatients. | Box/Kidd |
| Identify residents for community nursing home placement. | Box/Allen |
| Identify staff to transfer to the Admissions unit. | Box/Searcy |
| Identify staff to transfer to other MH positions in the Tuscaloosa area. | Allen |
| Inventory. | Box |
| Close Box and Allen. | Box/Allen |
| Conduct final inventory. | Box/Allen |
| Identify services for Searcy to provide for Thomasville. | Thomasville |
| Identify physical plant for Thomasville services at Box. | Thomasville/Box |
| Open Admissions beds (20). | Bryce |
| Open Admissions beds (10). | Searcy |
| Notify LTC-JCAHO of closures & return certificate. | Box/Allen |
| Move equipment & furniture. | Thomasville |
| Move patients to 2nd floor (Box). | Thomasville |
| Move patients to 1st floor (Box). | Thomasville |
| Move video cameras from Thomasville to Box. | Thomasville/Box |
| Conduct final inventory at Thomasville. | Thomasville |
| Relocate Kidd to Bryce. | Bryce/Kidd |
| Final cost report (due 90 days after closure). | Box/Allen |

### *Timeline for Consolidation*

The timeline for consolidation of mental illness facilities will begin immediately (August 2003). The following depicts the necessary sequence and projected timeframes to ensure an orderly transition.

The timeline for this consolidation is shown below.



Consolidation and reconfiguration of the psychiatric nursing homes will begin immediately (August 2003). Consolidation and relocation of the Thomasville facility will begin in October 2003.

# Division of Mental Retardation

## *Introduction*

Mental retardation is a life-long disability that affects many areas of an individual's life. It has been proven repeatedly that people with mental retardation can achieve levels of independence far beyond original expectations when given the appropriate care and training. Services provided to citizens with mental retardation through the Division of Mental Retardation will probably be needed from birth to death. The delivery of these services is accomplished either in a state-operated developmental center or in the local community.

Opening in 1921, Partlow in Tuscaloosa is the oldest developmental center in the state. Later three other developmental centers were established around the state, Wallace Center in Decatur (1970), Tarwater Center in Wetumpka (1976), and the Brewer Center first in Mobile (1984) and later in Daphne (2001). Each center is certified as an Intermediate Care Facility for Persons with Mental



Retardation by the Department of Public Health and receives federal Medicaid reimbursement for qualified residents. A myriad of services is offered to the people who live there, including medical, dental, dietary, pharmaceutical, social,

and psychological services provided by highly qualified staff. Recreational opportunities are also available.

In 1989, there were five (5) state-operated developmental centers serving 1,306 persons with mental retardation. In 1996, the census at the five (5) centers was 754. Upon implementation of the <u>Wyatt</u> Settlement Agreement in October 2000, there were four (4) developmental centers serving 632 individuals. As of August 8, 2003, the census at these four (4) developmental centers was 329 which exceeds the census target for the <u>Wyatt</u> Settlement Agreement of 332. The chart below depicts the trend of census reductions in the developmental centers.



To put this more in perspective, the census at the developmental centers has declined by 72% in fourteen years while the budget has shown only a 15% decrease. Although the number of state employees working in the centers has been reduced over time, there are fixed administrative and support functions that must be provided in each developmental center which has resulted in an inability to reduce the numbers of employees in a linear manner with the census reductions. The disparity in numbers of employees compared to current client census is further exacerbated by significant numbers of outplacements (327 as of August 8, 2003) from developmental centers over the past three (3) years of the Wyatt Settlement Agreement. Additionally, the cost of maintaining and repairing physical plants at facilities will require a significant investment of state funds on an ongoing basis.

As previously noted with the Mental Illness Division, the Mental Retardation Division also includes a community services component with more than 11,000 individuals funded in community-based programs and services. The community service component represents 97% of all served, yet, receives only 74% of the state's available funds, as noted in the following charts.



It should also be noted that these service population numbers do not include over 2,000 persons on waiting lists for mental retardation services, whom the state has not been able to serve, primarily due to a disproportionate share of the funds being expended in the State's development centers. According to FY03 budget data, approximately 26% of funds are being spent on only 3% of those served by the Mental Retardation Division.

## *National Trends*

Since 1960, 38 states, including Alabama, have closed one or more state-operated developmental centers or institutions, while eight (8) states and the District of Columbia do not currently operate any developmental centers – Alaska, Hawaii, Maine, New Hampshire, New Mexico, Rhode Island, Vermont, and West Virginia. Five (5) additional states, according the National Association of State Developmental Disabilities Services Directors are in the process of closing one or more state-operated developmental centers – Ohio, Wisconsin, Montana, California, and Massachusetts.

This trend is largely due to reduced census of state centers and increased demands and services in communities for persons with mental retardation. According to the 2002 University of Minnesota's publication, Residential Services for Persons with Developmental Disabilities:  Status and Trends through 2002, Alabama ranks 25th on a per capita for the numbers of individuals served in developmental centers.  Alabama serves 53.8 individuals in the community per 100,000 population as compared to the national average of 111.4 people served per 100,000.

### Consolidation Plan

The Consolidation Plan of the Mental Retardation Division will reduce the number of state operated developmental centers, more commonly referred to as institutions for persons with mental retardation, by more proportionately realigning the mental retardation system and its resources to the current and future needs of its target client population.

Three (3) developmental centers (Wallace, Brewer, & Tarwater) will be downsized to closure. The Partlow Center in Tuscaloosa will remain open for persons desiring their services to remain under the auspices of a state-operated program. The criteria for selecting Partlow as the remaining developmental center is based on several factors regarding physical plant, operating cost, and location. First, while Partlow is not centrally located, it is the most centrally located of all the developmental centers and its proximity to other departmental facilities is conducive to the sharing of support resources such as maintenance, housekeeping, business services, etc. Second, the large Partlow campus can adequately accommodate the consolidation of the other centers and provide consumers more independent freedom of movement, as well as excellent recreational opportunities. Third, with the exception of the Brewer Center at Daphne, Partlow has the newest residential buildings, having been either renovated or built between 1982 and 1989. Residential buildings at the other facilities were, by and large, built in the

1970's.  Capital repairs and improvements are estimated to be $885,395 at the

Wallace Center, $67,500 at Tarwater, $20,000 at Brewer and $270,000 at Partlow.

Fourth, Partlow currently has the lowest per diem costs among the four (4)

developmental centers at $135,875 per year per person, compared to $155,819 at

Tarwater, $194,311 at Brewer, and $240,590 at Wallace.

The projected census for Partlow after the completion of consolidation is

325 individuals at an annual cost per person of $123,173.  This census projection

makes the assumption that all individuals currently served in the other three (3)

developmental centers would choose and be relocated to the Partlow Center.

While the Mental Retardation Division's previous experience at facility

consolidation and closure indicates that a number of individuals and their families

will choose less expensive community-based care, the most expensive option is

used for the purposes of this consolidation plan.

Additionally, the Consolidation Plan for the Division of Mental Retardation

calls for the Regional Community Services Office to remain at each of the vacated

facilities – Wallace, Brewer, and Tarwater.  The offices will be expanded to

establish small non-residential crisis/evaluation centers.  These redesigned

regional community/crisis/evaluation centers will offer services such as medical

and dental that may not be available in many areas of the state.  Other services

that will be provided at these centers will include certification of community

homes and services as well as monitoring and oversight of those certified community homes and services.

### *Consolidation Process and Timelines*

The consolidation and closure of the three (3) developmental centers and the establishment of the crisis/evaluation centers will occur gradually over a six (6) month period beginning in October 2003. The establishment of the small crisis/evaluation centers will proceed along this same timeline.

Initially, the State Medicaid Department will be notified of the plans for consolidation and closure with requests for the approval of increased bed capacity at Partlow and assistance with the developmental of client transition and placement plans.

The safety of individuals and the quality of services continuing to be provided will be the guiding principles of the downsizing and moves of individuals to other locations. Care and consideration will be given to consumers and their families during all phases of the consolidation. Person-centered planning will occur with each individual at these three (3) centers to determine the individuals' needs, desires, and the supports that will be needed to achieve these plans. Special consideration will be given to those individuals who are medically fragile as determined by the interdisciplinary team and the individual's attending

physician. Transition plans will be developed for all individuals affected using a person-centered approach with special attention being given to the details necessary to afford each individual a successful and smooth transition to their new home.

A sincere effort will be made to offer choices before an individual moves from their current location, including community service options for needed care. Information will be shared on a one-to-one basis with families and consumers about possible alternative residential services.

After each individual plan is developed and dates targeted for moves, other closure plans will be finalized and implemented in a systematic manner as depicted in the chart below. Similar to the process of the Mental Illness Division, a Client Transition Task Force for the Mental Retardation Division will be appointed to include representatives from, but not limited to, the State's Medicaid agency, Public Health Department, Human Resources Department, the Wyatt Plaintiff Class, and others deemed critical to the successful implementation.

| Action | Facility |
|---|---|
| Establish facility work committees & develop plans for the following: <br> 1. Staff downsizing to closure plan <br> 2. Storage of client records <br> 3. Transfer/storage of state property | Wallace Center <br> Tarwater Center <br> Brewer Center |
| Identify Partlow staffing needs for 325 clients & the associated incremental numbers. | Partlow Center |

| Action | Facility |
|---|---|
| Implement staff reduction/ relocation plan. | Partlow Center<br>Wallace Center<br>Tarwater Center<br>Brewer Center |
| Conduct meetings with individuals and families. | Wallace Center<br>Tarwater Center<br>Brewer Center |
| Prepare residential cottages at Partlow. | Partlow Center |
| Notify relatives/guardian of projected move dates. | Wallace Center<br>Tarwater Center<br>Brewer Center |
| Move clients & staff to Partlow. | Wallace Center |
| Move clients & staff to Partlow. | Tarwater Center |
| Move clients & staff to Partlow. | Brewer Center |
| Move clients to the community from Wallace Center, the Tarwater Center, & the Brewer Center. | Wallace Center<br>Tarwater Center<br>Brewer Center |
| Transfer equipment to Partlow & other DMH/MR facilities. | Wallace Center<br>Tarwater Center<br>Brewer Center |
| Fiscal wrap-up at Wallace, Tarwater, & Brewer. | Wallace Center<br>Tarwater Center<br>Brewer Center |
| Establish & open small crisis/evaluation centers. | Wallace Center<br>Tarwater Center<br>Brewer Center |
| Vacate and secure centers. | Wallace Center<br>Tarwater Center<br>Brewer Center |

The consolidation and closure of the development centers will begin October 2003 and be completed by March 2004. The following depicts the necessary sequence and projected timeframes to ensure an orderly transition.

| Task | Month | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Medicaid approval to increase beds at Partlow. | ▓ | | | | | |
| Open Residential units at Partlow. | ▓▓ | | | | | |
| Hire/Transfer Additional Staff at Partlow | ▓▓▓▓▓▓ | | | | | |
| Move of Wallace clients. | ▓▓ | | | | | |
| Move of Tarwater clients. | | | ▓▓ | | | |
| Move of Brewer clients. | | | | | ▓▓ | |
| Open crisis/evaluation centers. | | ▓▓▓▓▓ | | | | |

# Impact of the Plan

## *Financial Impact*

### *Division of Mental Illness Reconfiguration*

It is projected that the increase in the number of acute beds can occur at no additional costs. The hospitals will outsource various medical functions and shift other costs to allow for this increase in acute bed capacity. The realignment of the catchments areas will, likewise, involve no increased costs.

The reconfiguration of the Psychiatric Nursing Homes will result in an anticipated budget decrease of 64% from a FY03 nursing home budget of $18,116,540 to a projected FY04 nursing home budget of $6,594,451. The total census is projected to be decreased by 52% from 178 as of August 2003 to 86 patients in FY04. The reduction in staff with this reconfiguration will be approximately 50% from 307 employees as of August 2003 to 152 in FY04.

With the consolidation of the Thomasville Rehabilitation Center into Searcy Hospital, a 34% reduction in budget should be realized from $7,239,219 in FY03 to a projected $4,802,523 in FY04. The workforce reduction should be approximately 25% from 130 employees as of August 2003 to 97 in FY04. This percentage may even be lower as attrition occurs in the Thomasville work force.

The cost savings is realized from the consolidation of various administrative functions and supports into the existing capacity at Searcy

Hospital. A detailed explanation of these cost savings results are provided in the following chart.

| Thomasville Cost Savings | |
|---|---|
| Salaries | $1,329,546 |
| Benefits | 411,161 |
| In-State Travel | 10,000 |
| Out-of-State Travel | 800 |
| Repairs/Maintenance | 20,000 |
| Rentals/Leases | 10,000 |
| Utilities/Communication | 90,000 |
| Professional Services | 103,000 |
| Supplies/Materials | 252,000 |
| Capital Cost Savings* | 252,000 |
| **SAVINGS** | **$2,476,507** |
| | |
| Savings | $2,476,507 |
| Separation Cost (Minus)** | (36,960) |
| Relocation Cost (Minus)*** | (2,851) |
| **TOTAL SAVINGS** | **$2,436,696** |

\* Represents costs of Thomasville capital repairs but does not include the approximate $500,000 capital repairs at Box already approved and contracted.

\*\* Based on an historical estimate that 40% of state employees would separate over and above the normal attrition rate.

\*\*\* Based on an historical estimate that 4.32% of employees will relocate to Searcy at $1,200 per employee.

The total cost savings from the consolidation efforts of the Division of Mental Illness should be around $13,958,785 which is a 55% decrease from FY03 to FY04.  The resulting decrease in staff is about 188 employees which is a 43% decline from the number employees as of August 2003.  These financial details of the Division of Mental Illness are depicted in the tables below.

*FY03 Annual Budget/Demographics*

| Facility | Location | Census as of 8/8/03 | Staff paid as of 8/8/03 | State Funding | Federal Funding | Total Funding |
|---|---|---|---|---|---|---|
| Allen | Northport | 37 | 71 | 1,862,888 | 2,538,658 | 4,401,546 |
| Kidd | Tuscaloosa | 119 | 136 | 1,703,095 | 6,221,579 | 7,924,674 |
| Box | Mt. Vernon | 22 | 100 | 651,333 | 5,138,987 | 5,790,320 |
| Thomasville | Thomasville | 72 | 130 | 6,784,971 | 454,248 | 7,239,219 |
| **TOTAL** | | **250** | **437** | **11,002,287** | **14,353,472** | **25,355,759** |

*Proposed FY04 Consolidation Budget/Demographics*

| Facility | Proposed Location | Projected Bed Capacity as of 10/1/03 | Projected Staff as of 10/1/03 | Projected State Funding | Projected Federal Funding | Projected Total Funding |
|---|---|---|---|---|---|---|
| Allen | Tuscaloosa (Harper) | 0 | 0 | 0 | 0 | 0 |
| Kidd | Tuscaloosa (Bryce) | 86 | 152 | 1,051,974 | 5,542,477 | 6,594,451 |
| *Box | | 0 | 0 | 0 | 0 | 0 |
| Thomasville | Mt. Vernon | 72 | 97 | 4,348,275 | 454,248 | 4,802,523 |
| TOTAL | | 158 | 249 | 5,400,249 | 5,996,725 | 11,396,974 |

*Difference*
*FY03Budget/Demographics and FY04 Proposed Budget/Demographics*

| Facility | Proposed Location | Projected Bed Capacity Difference | Projected Staff Difference | Projected State Funding Savings/ (Cost) | Projected Federal Funding Savings/ (Cost) | Projected Total Funding Savings/ (Cost) |
|---|---|---|---|---|---|---|
| Allen | | -37 | -71 | 1,862,888 | 2,538,658 | 4,401,546 |
| Kidd | Tuscaloosa (Bryce) | -33 | 16 | 651,121 | 679,102 | 1,330,223 |
| *Box | | -22 | -100 | 651,333 | 5,138,987 | 5,790,320 |
| Thomasville | Mt. Vernon | 0 | -33 | 2,436,696 | 0 | 2,436,696 |
| TOTAL Savings | | -92 | -188 | 5,602,038 | 8,356,747 | 13,958,785 |

Assumptions:
* This is contingent on 22 patients moving to community nursing homes.
- Consolidation will begin in FY03 with annualized savings to be realized in **FY04** in the amount of **$5,602,038** in state dollars and **$8,356,747** in federal dollars for a total savings of **$13,958,785**.

## *Division of Mental Retardation Reconfiguration*

The financial cost savings from consolidating the three developmental centers into one center (Partlow) will be realized over a two-year period. The first year, FY04, should see a savings of $14,844,181 from FY03, which is a 24% decrease. In the second year of consolidation, the savings should be around 30% of the FY03 budget. The staff will also be reconfigured gradually beginning with 1,072 employees as of 8/8/03, 1,072 employees on 10/1/03, and an ending number of 829 employees on 9/30/04. The workforce reduction is projected to be around 23% of the number of employees on August 8, 2003. It is also projected that many of these reductions will be accomplished through attrition.

The financial details of the Division of Mental Retardation consolidation are depicted in the tables below.

*FY03 Annual Budget/Demographics*

| Center | Location | Census as of 8/8/03 | Staff paid as of 8/8/03 | State Funding** | Federal Funding | Total Funding |
|--------|----------|--------------------:|------------------------:|----------------:|----------------:|--------------:|
| Partlow | Tuscaloosa | 154 | 487 | 9,036,590 | 14,150,463 | 23,187,053 |
| Wallace | Decatur | 51 | 232 | 5,227,873 | 10,996,557 | 16,224,430 |
| Brewer | Daphne | 59 | 180 | 2,886,700 | 7,924,371 | 10,811,071 |
| Tarwater | Wetumpka | 65 | 173 | 2,625,500 | 8,351,694 | 10,977,194 |
| **TOTAL** | | **329** | **1072** | **19,776,663** | **41,423,085** | **61,199,748** |

*Proposed FY04 Consolidation Budget/Demographics*

| Center | Location | Projected Census as of 10/1/03* | Projected Staff as of 10/1/03* | Projected State Funding** | Projected Federal Funding | Projected Total Funding |
|--------|----------|------|------|------|------|------|
| Partlow | Tuscaloosa | 154/325 | 487/808 | 10,925,937 | 22,903,140 | 33,829,077 |
| Wallace | Decatur | 51/0 | 232/0 | 1,126,790 | 3,289,399 | 4,416,189 |
| Brewer | Daphne | 59/0 | 180/0 | 1,495,036 | 3,281,767 | 4,776,803 |
| Tarwater | Wetumpka | 65/0 | 173/0 | 252,702 | 1,005,174 | 1,257,876 |
| Crisis Ctr | Decatur | | 7 | 314,814 | 377,060 | 691,874 |
| Crisis Ctr | Daphne | | 7 | 314,814 | 377,060 | 691,874 |
| Crisis Ctr | Wetumpka | | 7 | 314,814 | 377,060 | 691,874 |
| **TOTAL** | | **329/325** | **1072/829** | **14,744,907** | **31,610,660** | **46,355,567** |

*Difference*
*FY03Budget/Demographics and FY04 Proposed Budget/Demographics*
*Compares FY03 (as shown) to FY04 (end of year)*

| Center | Location | Projected Census Difference | Projected Staff Difference | Projected State Funding Savings/ (Cost) | Projected Federal Funding Savings/ (Cost) | Projected Total Funding Savings/ (Cost) |
|--------|----------|------|------|------|------|------|
| Partlow | Tuscaloosa | 171 | 321 | (1,889,347) | (8,752,677) | (10,642,024) |
| Wallace | Decatur | -51 | -232 | 4,101,083 | 7,707,158 | 11,808,241 |
| Brewer | Daphne | -59 | -180 | 1,391,664 | 4,642,604 | 6,034,268 |
| Tarwater | Wetumpka | -65 | -173 | 2,372,798 | 7,346,520 | 9,719,318 |
| Crisis Ctr | Decatur | | 7 | (314,814) | (377,060) | (691,874) |
| Crisis Ctr | Daphne | | 7 | (314,814) | (377,060) | (691,874) |
| Crisis Ctr | Wetumpka | | 7 | (314,814) | (377,060) | (691,874) |
| **TOTAL** | | **-4** | **-243** | **5,031,756** | **9,812,425** | **14,844,181** |

**Assumptions:**

\*    Census and Staff are as of the beginning of the year and the end of the year after the completion of consolidation.

\*\*    These costs are facility costs only. The community services offices & staff are not included.

- Consolidation occurs in phases during FY04.
- The FY04 Budget figures reflect both the costs for clients and employees during the entire year – before & after consolidation.
- Census and Staff are shown as of the beginning of the year and the end of the year after completion of consolidation. \*
- The **FY05** annualized savings is estimated to be **$5,772,899** in state dollars & **$12,849,673** in federal dollars for a total savings of **$18,622,572**.

*Summary of Cost Savings*

With the implementation of this consolidation plan, the department will realize a 33% savings from the FY03 budget regarding the nursing homes, Thomasville, and the developmental centers. In FY05 the savings are 38% of the FY03 budget. As previously stated, these projections are conservative and based on calculations done August 8, 2003. With the shift in focus from institutions to community programs, the savings realized from this plan will be reinvested in the community system to further enhance needed supports and services. The summary of the cost savings is shown below.

|  | FY04 compared to FY03 | | FY05 compared to FY03 | |
|---|---|---|---|---|
|  | State | Federal | State | Federal |
| Division of Mental Illness | 5,602,038 | 8,356,747 | 5,602,038 | 8,356,747 |
| Division of Mental Retardation | 5,031,756 | 9,812,425 | 5,772,899 | 12,849,673 |
| TOTAL | 10,633,794 | 18,169,172 | 11,374,937 | 21,206,420 |

The total savings for each year is as follows:

FY04          $28,802,966

FY05          $32,581,357

### *Stakeholder Impact*

#### *Consumers/Clients/Families*

With the realignment of the mental illness catchment areas, families with relatives receiving acute care services will have shorter distances to travel to visit their family members. The Thomasville Center will now serve a distinct catchment area rather than the whole state. Families from 17 counties will receive services at Thomasville rather than from all 67 counties of Alabama. Patients will continue to receive services at Kidd.

Many families of residents at the developmental centers are opposed to closure and have activated their stakeholder groups in an effort to solidify their opposition. Several groups have staged rallies at the State House seeking support for increased funding to keep the facilities operational. There will continue to be strong opposition from families and their local legislators. One major concern of families will be the perceived lack of a "safety-net" that the facilities provide if a community placement were to be jeopardized. Families are also concerned that there will be no one to assume the responsibility of caring for their disabled loved one when other family members are deceased. Assurances continue to be made to families that the institutional care will continue to be offered for those who need and desire this level of care, particularly if a community placement is at risk of failure. Also, the establishment of the crisis/evaluation centers should further

assure families that the same support services that were provided in the developmental centers will be available and easily accessible to their family member as needed.

### *Stakeholder Impact*

#### *Workforce Support*

#### Introduction

Workforce reductions have occurred throughout the past 30 years in the department. In the early Wyatt years, as the census at state facilities decreased, the workforce also decreased. Typically, the reduction in staff and census is not linear; rather the staff reductions take place incrementally over the ensuing years. With the successful implementation of the Wyatt Settlement, which will decrease the census at state facilities by at least 600 people, staff reductions would occur naturally. Since 1989, the staff at the mental illness facilities has decreased by 37%. Likewise, the staff at the developmental facilities has decreased by 51%, largely due to the closure of the Ireland Center.

To prepare for the staff reductions resulting from this plan, a Workforce Support Task Force was established to develop strategies to accommodate the needs of DMH/MR employees who could be adversely affected by the consolidation plan. The task force consisted of a diverse group of representatives from the following agencies: DMH/MR Personnel, Bryce Hospital Personnel, State Personnel, Searcy Hospital Personnel, Alabama Public Employees Association League (APEAL), Industrial Relations, State Employment Services, Alabama Public Employees Local Union #123; Employment Dispute Resolution

Services; DMH/MR Legal Bureau; ADECA Rapid Response.   This task force

was expected to establish innovative initiatives that will mitigate the negative

impact the consolidation plan will have on employees.

The consolidation/closure will affect three DMH/MR Nursing Homes, three

Developmental Centers and one Mental Illness facility.  Approximately 886

employees will experience the effects of the consolidation/closure plan as detailed

below.

| Facility | # of Employees as of August 2003 | # of Employees to be Immediately Absorbed without relocation | Employees to be Transferred/Relocated |
|---|---|---|---|
| Box | 100 | 99 | 1 |
| Allen | 71 | 71 | 0 |
| Wallace | 232 | 0 | 232 |
| Tarwater | 180 | 0 | 180 |
| Brewer | 173 | 0 | 173 |
| Thomasville | 130 | 0 | 130 |
| **TOTAL** | **886** | **170** | **716** |

There are 142 vacant positions (as of August 2003) within the department.

Approximately 289 additional positions will be needed at the Partlow

Developmental Center to accommodate the increase in clients that will be a result

of the consolidation.

In summary, there are

- **886 Positions/employees affected**
  -99 Positions/employees to be absorbed from Box by Searcy
  -71 Positions/employees to be absorbed from Allen by Kidd
- **716 Positions/employees to be transferred/relocated**

- 289   Additional positions (approximate) to be required at Partlow
  +21   Additional positions (approximate) to be required at the 3 Regional crisis/evaluation centers (7 employees per center)
  +142  DMH/MR current vacancies as of August 8, 2003
- **452  Total available DMH/MR positions to be available**
  + 209  Additional positions (approximate) required for alternative facility use (transition centers)
    53     Ireland
    30     Thomasville
    53     Tarwater
    73     Wallace

- **661   Total positions to be available**

## Workforce Support Plan

The Workforce Support Plan will be implemented immediately by forwarding a letter from the Commissioner to affected employees, state personnel and local newspapers, announcing the closure/consolidation of each facility. The Facility Directors of affected facilities will then issue letters to every employee. Each employee will be asked to complete and return a survey regarding their desires and availability for alternative employment options. The key to the successful implementation of this plan is empowering the employees to make choices about their future. All available options will be carefully and explicitly explained to each employee in order for the employee to make informed choices

regarding alternative employment. Each Personnel Office will open an Employee Assistance Office to discuss options and opportunities individually with each affected employee.

Interdepartmental transfers will occur adhering to all State Personnel rules and regulations and DMH/MR policies. Under the authority of the Commissioner of Mental Health, the Facility Director is delegated the responsibility to serve as the appointing authority. In order to facilitate interdepartmental transfers, State Personnel will calculate Transfer Scores for merit employees and the Facility Personnel Officer will calculate Transfer Scores for exempt employees at each affected facility. Transfer scores are calculated based on continuous years of departmental service and on previous performance evaluations. The transfer scores for merit employees will be the vehicle to secure vacant positions. The transfer scores for exempt employees will also serve as a vehicle to obtain employment at facilities where a vacancy may exist in the same classification.

Information Fairs will be conducted on-site at each affected facility. Representatives from the following groups will be available to discuss various employment or retirement options.

- State Personnel Department
- Alabama Employment Service

- Other agencies participating in the Retirement System. The task force identified one hundred seventy two (172) such agencies.
- Retirement Systems of Alabama
- Other Human Service Agencies such as community-based programs and private corporations

The ADECA "Rapid Response Team" will also be available to work with any staff to assist in locating employment. After the Information Fairs, facility personnel staff will conduct employee-counseling sessions to assess/identify viable options or offer alternative employment opportunities.

There may be an additional 209 job opportunities through the Department of Corrections and/or the Board of Pardons and Parole if the plan for alternative use of DMH/MR vacant facilities is approved. For those individuals interested in these positions, State Personnel will provide special testing sessions as appropriate. Transfers within the same classifications will also be offered to interested employees with approval of the appointing authorities.

During the actual closure process, appropriate temporary staff must be on-site to secure closed facilities and complete official closure functions, i.e., accounts payable, moving, and securing files, etc. Additionally, temporary staff may be necessary to maintain staffing levels as employees opt to take other employment options.

This Workforce Support Plan is fluid and will be ongoing. The department is committed to finding jobs for all employees affected by the consolidation/closure plan. Great care will be given to minimize the disruption in the lives of these employees who have shown untiring dedication to consumers served.

### *Stakeholder Impact*

#### *Community*

#### Introduction

Alternative uses for the physical plants are being explored to minimize adverse patient and community impact. The specifics of this plan have been developed with involvement from the Board of Pardons and Paroles, the Department of Corrections, the Sentencing Institute, the Sentencing Commission and the Alabama Department of Economic and Community Affairs. A coalition is being developed for long-term support and the development of a continuum of services. The coalition includes the Board of Pardons and Paroles, the Department of Corrections, the DMH/MR, the Department of Human Resources, the Department of Public Health, the Department of Industrial Relations, the Alabama College Systems, the Department of Rehabilitative Services, the Sentencing Commission, the Sentencing Institute, the Building Commission, the Alabama Department of Economic and Community Affairs and the Department of Children's Affairs.

"In the United States, the behavioral health system and the corrections system meet at a broad intersection where it's hard to know exactly where one system ends and the other begins." This quote was taken for the March 2003 issue

of <u>Behavioral Health Management</u>, which is devoted entirely to the subject of "Treatment vs. Jail". States around the country are struggling to define the roles of prisons and punishment versus behavioral healthcare organizations and treatment. The statistics that follow define the national problem that contributes to the struggle.

### Substance Abuse and the Prison System

- Of the $38 billion spent in the U.S. on prisons in 1996, more than $30 billion was spent on inmates who had a history of drug and alcohol violations, were high on drugs and/or alcohol at the time of their crime, or had committed their crime to get money to buy drugs.

- In 1995 it cost more than $5.2 billion to issue arrests and prosecute 1,436,000 impaired-driving cases.

- Most offenders who need addiction treatment do not receive it and are released untreated into the community, where they are likely to commit additional crimes.

- The Federal Bureau of Prisons estimates that 31% of its inmates suffer from addictions, but only 10% were treated in 1996.

- Between 1980 and 1996, the number of inmates in federal, state, and local prisons tripled, from 500,000 to 1.7 million.

- Drug and alcohol abuse and addiction are implicated in the incarceration of 80% - 1.4 million – of the 1.7 million men and women behind bars.

- Inmates who suffer from addictions are the most likely to be reincarcerated – again and again – and lengths of sentences increase for repeat offenders.

- The more prior convictions an individual has, the more likely he/she is a drug abuser.  In state prisons, 41% of first offenders have used drugs regularly, compared to 63% of inmates with two prior convictions and 81% of inmates with five of more prior convictions.

- State prison inmates with five or more prior convictions are three times likelier than first-time offenders to be regular crack users.

- Of individuals arrested for selling drugs, 81% test positive at the time of arrest, including 56% for cocaine and 13% for heroin.

- Of state parole and probation violators, 50% were under the influence of drugs, alcohol, or both when they committed their new offense.

Mental Illness and the Prison System

- Today, some 283,800 state and local inmates are identified as having a mental illness, representing 16% of the inmate population.

- Most inmates do not receive treatment.

- Half of mentally ill inmates report three or more prior incarcerations.

- One in every eight state prisoners is currently receiving some mental health therapy or counseling.

- Nearly 10% are receiving psychotropic medications. However, fewer than 2% are housed in a 24-hour mental health unit.

- Seventy-nine percent of those determined to be mentally ill receive mental health therapy or counseling services from a trained professional on a regular basis.

- There are nearly two million new jail admissions each year of people with mental illnesses – approximately 35,000 individuals per week.

- Seventy percent of jail inmates with mental illnesses are there for nonviolent offenses.

- At year-end 2001, 101,000 individuals with mental illnesses were inmates in local jails. Of these 63,000 had a severe mental illness (SMI).

- At year-end 2000, 201,000 individuals with mental illnesses were inmates in state (191,000) and federal (10,000) prisons. Of these, 132,000 had an SMI.

- At year-end 2000, 614,000 individuals with mental illnesses were on probation. Of these 315,000 had an SMI.

Alabama is not immune to the previously described difficulties as evidenced by the following statistics from the Alabama Sentencing Institute.

- Alabama's prison population has increased from 18,000 to 28,000 in the last ten years.

- The Department of Corrections General Fund budget increased from $140 million to $200.8 million in the last ten years.

- Alabama prisons currently operate at 203% of design capacity. Some facilities operate at 300 to 400 % of design capacity.

- The Department of Corrections has a shortage of 208 Correctional Officers. Additionally, 214 more vacancies have been created as a result of the activation of members of the National Guard.

- In 2002, over 77% of prison admissions were for drug, alcohol, or property offenses.

- The Department of Corrections reports that 5,445 inmates (or 19% of the total inmate population) currently receive mental health services. Of those, 1,895 are seriously mentally ill, 1,006 are at risk of harming themselves, and 2,544 have a history of mental illness.

- The Department of Corrections estimates that approximately 70 inmates are identified as having mental retardation.

- The Department of Corrections reports that 22,687 inmates (or 81% of the total inmate population) are identified for substance abuse treatment. Of those, 2,306 have completed the in-prison substance abuse treatment,

12,744 are participating in treatment and 7,637 are on the waiting list for treatment.

### Trends – National

All states are frustrated with the problems related to the appropriate mix of treatment and punishment and the needed resources for both. Efforts are currently being targeted to provide more appropriate alternatives to incarceration including sentencing reform, drug courts, mental health courts, community corrections and expansion of in-prison treatment. In addition, several states have taken legislative action to address their needs.

- According to Can't Make The Grade, a report published by the National Mental Health Association in 2003, twenty-four states reported the implementation of Pre-Booking Diversion Programs (Alabama does not have any Pre-Booking Programs). Pre-Booking Programs provide opportunities for people in police custody to receive mental health screenings. According to the Center on Crime, Communities and Culture, studies show that diversion of persons with mental illnesses accused of misdemeanor crimes into appropriate, community-based mental health treatment programs reduces recidivism and contributes to better long-term results for offenders.

- <u>Can't Make The Grade</u> also reports that Alabama is among sixteen states reporting the creation of "some mental health courts". Mental health courts hear cases involving persons with mental illness who have been charged with non-violent crimes. These individuals are diverted from jail or prison to mental health treatment programs.

- On November 7, 2000, voters in California passed The Substance Abuse Crime Prevention Act (Proposition 36). This initiative allows first – and second-time, nonviolent, simple drug-possession offenders the opportunity to receive substance abuse treatment instead of incarceration. Through Proposition 36, $120 million has been allocated annually for five-and-a-half years to pay for treatment services. Through this effort approximately 25,000 nonviolent drug-possession offenders per year will be diverted into drug treatment instead of prison.

- Measure 62 – treatment instead of incarceration – was passed in Washington D.C. This measure will provide substance abuse treatment instead of conviction or imprisonment to eligible nonviolent defendants charged with illegal possession or use of drugs. Lawsuits have been filed by D.C. Mayor Anthony Williams and a February 10, 2003 injunction has prevented its implementation.

- Ohio's Issue 1 – treatment instead of incarceration – garnered only 33% of voter acceptance in the fall of 2002.

- In Idaho, House Bill 369, a tax increase, was signed into law on April 14, 2003. The law imposes a 2 percent surcharge on state liquor sales, to raise $1.5 million a year to fund the state's popular drug court and family court services programs.

- According to the Collaborative Justice Courts Advisory Committee: Progress Report, rehabilitating criminals by drug court rather than prison saves California an estimated $18 million a year and dramatically reduces recidivism. Drug courts are separate from Proposition 36 programs. The typical recidivism rate for drug-addicted criminals is about 80-85 percent, according to the Judicial Council, but only 12-17 percent of drug court participants relapsed.

- In Kansas Senate Bill 123, which would sentence some drug offenders to treatment instead of prison, was signed by Governor Kathleen Sebelius on April 21, 2003. Judges can place qualified offenders in community treatment programs, which could include faith-based programs. Treatment programs could cost $9 million per year. Currently, each prisoner costs the state about $20,000 per year to feed, clothe and house, whereas drug treatment programs would costs between $3,200 and $6,400 per year.

- Arizona and California are considering sending non-violent drug offenders to substance abuse programs rather than prison.

- In Washington, Governor Locke wants to implement a year early a law approved in 2002 that would shorten drug sentences and end post-release supervision of low-risk offenders.

- In Hawaii, former Governor Benjamin Cayetano signed a diversion bill in 2002 mandating that first-time offenders convicted of drug use or possession be sentenced to treatment with probation, not prison.

- New Mexico passed several sentencing reforms and expanded drug treatment programs in 2001 and 2002.

- The states of Arkansas, Maryland, Mississippi, Missouri, Oklahoma, and South Carolina are also considering diversion programs.

Alternative Community Uses Plan

DMH/MR recommends partnering with the Board of Pardons and Paroles and the Department of Corrections to address the problem of prison overcrowding especially in the area of inmates suffering from substance abuse, addiction, and other mental health disorders. Alabama has instituted several initiatives designed to divert non-violent offenders, expand community treatment to assist with parolees and probationers, expand in-prison treatment availability, develop working relationships with faith-based providers, expand the capacity of the Board of Pardons and Paroles, and create a sentencing reform package. However, these efforts have not kept up with the ever increasing numbers of inmates being sent to the Department of Corrections, the numbers of individuals violating parole or probation, or the numbers of incarcerated individuals who are in need of substance abuse or other mental health services.

The Board of Pardons and Paroles is proposing that Transition Centers be developed for operation in the physical plants vacated by the DMH/MR. This proposal seeks to establish four regional transition centers, operated by the Alabama Board of Pardons and Paroles. The purpose of these centers would be to establish meaningful punishment options – with a heavy emphasis on mental health treatment, substance abuse treatment and educational programs – in order to decrease the number of inmates entering the state prison system each year.

Additionally, and perhaps more importantly, by offering programs targeted at addressing the root causes of crime, it is expected that these centers could help reduce the number of offenders who commit new offenses and continue to place a heavy burden on the state's criminal justice system.

Presently, the probation and parole department is exploring the possibility of converting properties previously used by the Alabama Department of Mental Health and Mental Retardation into facilities that could offer a broad array of punishment options. Services would include options ranging from long-term (six month) residential mental health and substance abuse treatment beds, work release programs to job placement, and adult basic education classes. Plus, by renovating existing facilities, even the most intensive residential programs could be operated for about the same cost per offender as a prison bed without the need for the kind of huge capital outlays that would be required to fund new prison construction.

Possible DMH Sites for Transition Centers

as proposed by the Board of Pardons and Paroles

- **The Ireland Developmental Center (Tarrant)** could serve males from throughout the central third of the state. Its capacity as a Transition Center would be 400 beds with 53 employees. It could serve as a facility for inmates sentenced to DOC for Felony DUI.

- **The Thomasville Rehabilitation Center (Thomasville)** could be established as a long-term, full-time confinement substance abuse treatment facility and serve the entire state, or could serve males from throughout the southern third of the state. Its capacity as a Transition Center would be 150 beds with 30 employees.

- **The Tarwater Developmental Center (Wetumpka)** could serve women from throughout the state. Its capacity as a Transition Center would be 400 beds with 53 employees.

- **The Wallace Developmental Center (Decatur)** could serve males from throughout the northern third of the state. Its capacity as a Transition Center would be 600 beds with 73 employees.

*Since the probation and parole department is not subject to the same space requirements for clients as DMH/MR, it is estimated that these capacities could be easily doubled. However, actual capacity ratings will have to be determined by the State Building Commission prior to finalizing plans.*

This proposal would serve approximately 3,100 parolees and probationers at the four (4) centers per year, at an average cost of all four (4) facilities of $20 per day and create approximately 209 jobs. Because of the economies of scale, the costs would be less than $20 per day.

Benefits

- A valuable vacant physical plant in Tarrant will be reactivated to provide treatment, support services, and jobs.

- Community step-down programs will be created for parolees and probationers.

- Intermediate sanctions will be created for parole and probation violators as an alternative to reincarceration.

- New wrap-around services will be created for parolees and probationers that are proven to reduce recidivism.

- Approximately 209 employment opportunities will be created for some DMH/MR employees that are affected by consolidation.

- New programs will offer economic stabilization for the communities affected by consolidation.

- The numbers of inmates going into prison will be reduced.

- The Department of Corrections will get expanded physical plant capability.

- Substance abuse and other mental health services will be expanded for underserved criminal justice populations.

- Alabama will be eligible for technical assistance from the Substance Abuse and Mental Health Services Administration (SAMHSA), the Federal Bureau of Prisons, the Department of Justice, and other federal agencies

because of these innovative efforts to deal with a problem that plagues

every state.

## Support

Many stakeholder groups have expressed support for this consolidation plan.

Those organizations include, but are not limited to, the following.

- National Alliance for the Mentally Ill

- Mental Health Association of Alabama

- People First of Alabama

- Wyatt Plaintiff Counsel

- Alabama Disabilities and Advocacy Program

- Alabama Association of Mental Retardation/Developmental Disabilities

- Alabama Council of Community Mental Health Center Boards

- The Arc of Alabama

- Directions Council

- Alabama Family Ties

- Lighthouse Counseling Center

- MMH Group Choices

- Alabama Hospital Association

## Conclusion

The Consolidation Plan represents a comprehensive restructuring of Alabama's Mental Health and Mental Retardation in-patient system. The restructuring is needed and timely, but most importantly, responsive to the changing needs and demands of the state's system. The plan also gives considerable attention and sensitivity to the needs of the system's affected stakeholders – our clients and their families, our employees, and the communities in which these facilities exist.

While the Consolidation Plan represents significant change, it also represents the significant progress and success that the state has realized over the past decades. This change and progress, largely driven by federal court oversight (Wyatt), has now been recognized and incorporated in the strategic and long-range plans of the system. Thus, as the end of the three year Wyatt Settlement Agreement draws near, and the need for change and consolidation has been recognized, all stakeholders should be commended and applauded for yet another milestone.

## Current Acute-Care Treatment Catchment Areas



## Proposed Acute-Care Treatment Catchment Areas



# Old Extended-Care Treatment Catchment Areas



## New Extended-Care Treatment Catchment Areas



## *Workforce Support Task Force Membership*

Henry Ervin, Chair
DMH/MR Personnel Director

Marilyn Benson
DMH/MR Personnel

Jim Elliott
Bryce Hospital Personnel

Mike Mathis
Bryce Hospital Personnel

Lane Tolbert
Searcy Hospital Personnel

Tamara Pharrams
DMH/MR Legal

Jackie Graham
State Personnel

Martin Fisher
APPEAL

Carolyn Walker
Industrial Relations

Frank McEvoy
Union #123

Thomas McPherson
Employment Dispute Resolution
Consultant

Allen Friday
ADECA, Rapid Response

## *Alternative Community Uses Task Force Membership*

Kent Hunt, Chair
DMH/MR

John Houston
DMH/MR

Sarah Harkless
DMH/MR

William C. Segrest
Pardons and Parole

Cynthia Dillard
Pardons and Parole

Sharon Ziglar
Pardons and Parole

Andy Farquhar
Department of Corrections

Becki Goggins
Sentencing Institute

Rosa Davis
Sentencing Commission

Lynda Flynt
Sentencing Commission

Bill Johnson
ADECA