**FREEDOM COURT REPORTING**

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3               SOUTHERN DIVISION
4
5      CIVIL ACTION NUMBER   CV-2:06CV321-ID
6   WINIFRED BLACKLEDGE,
7        Plaintiff(s),
8   v.
9   ALABAMA DEPARTMENT OF MENTAL HEALTH
10  & RETARDATION; COMMISSIONER JOHN
11  HOUSTON in his Official capacity as
12  Commissioner of Alabama Department
13  of Mental Health & Mental
14  Retardation,
15
16       Defendant(s).
17
18         DEPOSITION TESTIMONY OF:
19              HENRY ERVIN
20  Commissioner:
21  Renny D. McNaughton
22  March 15, 2007
23  Mobile, Alabama

COPY

DEFENDANT'S EXHIBIT 13

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

**FREEDOM COURT REPORTING**

Page 74

1  BY MR. WILSON
2      Q    Okay. I'll mark this as
3  Plaintiff's Exhibit 91, five pages, Bates
4  stamped 3532 to 3536. Can you tell me what
5  these documents are?
6      A    Yes.
7      Q    What are they?
8      A    It's a task force that was set up
9  to review the staff and standards for the
10 department.
11     Q    For the entire department?
12     A    Yeah.
13     Q    Do you know why this task force
14 was set up? Specifically, can you be more
15 specific about why it was set up?
16     A    To establish guidelines for
17 staffing standards for each facility in each
18 region.
19     Q    Okay. And you were made the
20 chair of this task force?
21     A    Yes.
22     Q    Do you monitor every EEOC charge
23 that's filed against the department?

**FREEDOM COURT REPORTING**

1   IN THE UNITED STATE
2   FOR THE MIDDLE DIS
3       SOUTHERN
4
5   CIVIL ACTION NUMBE
6   WINIFRED BLACKLEDGE,
7       Plaintiff(s),
8   v.
9   ALABAMA DEPARTMENT OF MENTAL HEALTH
10  & RETARDATION; COMMISSIONER JOHN
11  HOUSTON in his Official capacity as
12  Commissioner of Alabama Department
13  of Mental Health & Mental
14  Retardation,
15
16      Defendant(s).
17
18      DEPOSITION TESTIMONY OF:
19          SUSAN STUARDI
20  Commissioner:
21  Renny D. McNaughton
22  March 14, 2007
23  Mobile, Alabama

*[Handwritten: 109-114, Exhibit B]*
*[Stamp: COPY]*
*[Stamp: DEFENDANT'S EXHIBIT 14]*

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

1    account the other things you discussed
2    earlier, such as education and experience?
3             MS. TARVER:  Object to the form.
4        A    Correct.  Yes.  This is just a
5    tally sheet from the interviews.
6        Q    But you said those things,
7    education, experience, should play a factor
8    also in the final decision to hire someone,
9    correct?
10       A    Yes.  Sure.
11       Q    Do you know if Ms. Groggel had
12   experience in the Community Services
13   Department?
14       A    That would not have been a
15   factor.  The experience that would have been
16   a factor would have been experience with the
17   tasks, the skill sets that were being looked
18   for in an employee, whether somebody came
19   from inside or outside or where they came
20   from, if they had certain skill sets that
21   were being considered.
22       Q    Even though the first category is
23   knowledge of Department of Mental Health,

FREEDOM COURT REPORTING

Page 110

1  Mental Retardation and Community Service
2  programs?
3      A    Yes.  They would not have had to
4  be employed in the Community Service section
5  to have a knowledge of what was going on in
6  the whole Community Service environment.
7  Just as somebody in Community Services would
8  have a really good working knowledge of what
9  went on in the facility, even if they
10 weren't employed by the facility.
11     Q    Is it fair to say that knowledge
12 of working in the Community Service would
13 help, though?
14     A    It might.  Having -- I guess,
15 whoever your employer is was not -- would
16 not be the critical factor.  Your knowledge
17 base about what's going on in a certain area
18 could be pretty extensive without actually
19 being employed in that section.  We were
20 pulling people from the facility to go out
21 and do a lot of tasks in the community.  We
22 were pulling facility staff to go out and do
23 assessments in the community, we were doing

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

1  consulting in the community, and doing a lot
2  of things, even though their employer was
3  the facility.  Does that help you
4  understand?
5       Q    Somewhat.
6       A    Okay.
7       Q    If you will, look at the first
8  page.
9       A    Okay.  Page 1.
10      Q    Some of these documents are cut
11 off.
12      A    Yeah.  These are not very clear
13 set in some cases, because you're missing
14 names and --
15      Q    But the first page there appears
16 to be an interview by one of the panelists
17 on Ms. Blackledge?
18      A    That's correct.
19      Q    Can you tell --
20      A    And you can't tell who.
21      Q    I was going to ask you if you can
22 tell if that was your handwriting?
23      A    No, I only know that's not mine.

1  Q    You know that's not yours?

2  A    I know that's not mine.

3        MS. TARVER: For the record,
4   while you're looking for that
5   since we went off to copy Exhibit
6   16, Ms. Blackledge has left the
7   room and is not present at this
8   time, until now. She just walked
9   in.

10 Q    Do you know what happened to the
11 CSS III position after Ms. Groggel was
12 promoted to the PQA position in April 2004?

13 A    No, not really.

14 Q    Did it just disappear?

15 A    I honestly don't know. It could
16 have been reannounced, could have been done
17 away with in favor of some other
18 classification. I don't know.

19 Q    You had mentioned earlier you
20 thought there were several candidates that
21 you thought were qualified for the job and
22 were outstanding candidates. Is
23 Ms. Blackledge included in that list for the

**FREEDOM COURT REPORTING**

Page 113

1  CSS III position?
2      A   For the CSS III position that was
3  announced at that time, I thought there were
4  probably three people ahead of her in terms
5  of people who met the specific criteria we
6  were looking for at that particular job.
7      Q   And who were those three?
8      A   That would have been Ms. Groggel
9  Ms. Allen and Ms. Chappell.  And there was
10 one that was also very close.  And the
11 differences between them are not great.
12     Q   Do you think -- so if you're
13 saying they're not great, you think
14 Ms. Blackledge could have done the job?
15     A   I think Ms. Blackledge would have
16 had to gain a lot more skills than what she
17 had at the time that the job was announced.
18     Q   Such as?
19     A   Such as the testing skills.  I
20 think the key thing for that position at
21 that time was dealing with the functional
22 assessment tools and all of that sort of
23 thing that were outlined in the job

FREEDOM COURT REPORTING

Page 114

1  announcement.  What they were really after
2  at that time was somebody who could take
3  over coordinating of the individual client
4  assessments and training other people to use
5  client assessments.
6        Q    And do you know if Mickey Groggel
7  had experience in testing?
8        A    Yes.
9        Q    She did?
10       A    Yes.
11       Q    But to be clear, you thought she
12 was a candidate who was qualified to do the
13 job, although, not the highest candidate, in
14 your opinion?
15       A    I think she could have learned to
16 do the job.
17       Q    Let me jump back to 2002 now.  Do
18 you remember a Planning Quality Assurance
19 position opening in 2002?
20       A    I'm sorry, I can't give you a
21 good answer on that.
22       Q    Would it refresh your memory if I
23 told you there was one that was open that