**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WINIFRED BLACKLEDGE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE No.: CV 2:06-CV-321-ID** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **MENTAL HEALTH & MENTAL** | ) | |
| **RETARDATION & COMMISSIONER** | ) | |
| **JOHN HOUSTON, in his Official** | ) | |
| **Capacity as Commissioner.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**COMES NOW**, Plaintiff, Winnifred Blackledge, through the undersigned counsel, and

responds to Defendants' Alabama Department of Mental Health and Mental Retardation and

Commissioner John Houston's Motions for Summary Judgment.

**I.    INTRODUCTION**

Plaintiff Winnifred Blackledge (hereinafter "Blackledge" or "Plaintiff"), an African-

American female, brings claims against the Alabama Department of Mental Health and Mental

Retardation (hereinafter "ADMHMR") and Commissioner John Houston ("Houston") in his official

capacity as Commissioner of ADMHMR, pursuant to Title VII and § 1981[1] for racial discrimination

---

[1]The analytical framework and proof requirements are the same for plaintiff's § 1981 and Title VII claims,
so the court does not address them separately. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.
1998); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n. 2 (11th Cir. 1994).

in the form of three job promotions: (1) Planning & Quality Assurance Specialist II Position ("PQA II") in 2002; (2) Community Services Specialist III Position (" CSS III") in 2003-2004; and another PQA II position in 2004. Plaintiff also brings Title VII and § 1981 retaliation claims related to the retaliation that she has been forced to endure in the form of increased job scrutiny, lowered performance evaluations, increased discipline and other adverse terms and conditions of employment since she filed her EEOC Charge and her Civil Complaint.

In each of the three job promotion decisions, a white employee initiated the opening of the position, a majority white interview panel used a subjective interview process to interview the candidates, and a white employee made the ultimate decision on who received the job[2]. It is undisputed that Blackledge was qualified for each of these positions, she applied for them through the proper channels, went through the interview process, but was denied the promotion because of her race. Defendant does not specifically articulate legitimate non-discriminatory reasons why white employees were selected rather than Plaintiff for the PQA II positions (2002 and 2004). Therefore, Plaintiff must survive summary judgment on these claims.

For the CSS III position, Defendant argues that a white employee, Mickey Groggel, was the better candidate and scored higher on the interview by four panelists. The interview panel was based on subjective criteria and was 75% white. The majority white interview panel scored the three white candidates the highest and the four black candidates the lowest. Furthermore, Groggel actually only scored better than Blackledge by the three white panelists. The only black panelist, Jerryln London,

---

[2]Although the ADMHMR indicates that Eranell McIntosh-Wilson played a role in opening positions and making the ultimate decision. McIntosh-Wilson was clear in her testimony that she was merely the "appointing authority" who merely "signed off" of the decision to open a job and who would ultimately fulfill the job. She did not play an actual roll in the decision-making process. (McInosh-Wilson Depo., pp. 16-18; 39-47; 53-64; 77-78)(Henry Ervin Depo. pp. 92:15-23).

scored Blackledge with a 30 compared to Groggel's score of 18. (Exh. U).

Furthermore, Blackledge had been employed by the ADMHMR for longer than Groggel and had worked in the Community Service Department for approximately 16-17 years, while Groggel had not worked in the Community Services Department at all.

More importantly, there is also evidence which could amount to direct evidence, but at the very least is highly circumstantial evidence creating a material question of fact, that Defendant refused to hire a black employee, specifically Plaintiff Blackledge, for the CSS III position. Each of the black employees who applied for the CSS III position in 2003 were automatically disqualified for the CSS III position even if they met all of the requirements. In fact, each of the black applicant's names are crossed out, despite the fact that several of them, including Plaintiff Blackledge, met the qualifications required for the job. (Plaintiff's Exh. H)[3]. Furthermore, Susan Stuardi, the white panelist, who was responsible for opening the position, was also on the interview panel, and made the final decision to hire Groggel over Blackledge. It is clear that this interview process was nothing more than process the Defendant went through because the ADMHMR was going to select a white candidate for this position no matter what.

Furthermore, there is clear evidence of preselection by the ADMHMR that relates to this CSS III position and the PQA II (2004) position in the form of a letter from Susan Stuardi (the white supervisor) who was in charge of the ultimate hiring decision regarding these positions. Within a month of the discriminatory decision to place Mickey Groggel in the CSS III position, Stuardi wanted to put Kathi Allen (another white employee) into the CSS III position and move Groggel out

---

[3]All Plaintiff's Exhibits are hereby marked hereinafter "Exh." and are attached to the Evidentiary Submission filed in connection with Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

of this position ("likely to be vacated") into a new position. (Exh. M). When Allen decided she did not want the position, Groggel still "vacated" the position and was promoted to the PQA II position within a few weeks. The CSS III position that Blackledge wanted and was qualified for, and which Stuardi had pushed for over a year to get open, "disappeared" when the white employee (Allen) decided she didn't want it.

Blackledge has also been retaliated against since she filing her complaints of discrimination. Prior to filing her EEOC Charge and Civil Complaint, Blackledge never had any problems regarding her work performance and was an exemplary employee. However, since she has filed these complaints, she has been forced to suffer intensified scrutiny, lowered performance appraisals which could affect her salary, unnecessary discipline, and other adverse terms and conditions of employment. Each of the decision-makers responsible for these conditions were aware that she had filed an EEOC Charge and a Civil Lawsuit.

## II.     NARRATIVE STATEMENT OF FACTS

### A.     BACKGROUND

Winnifred Blackledge obtained B.A. Bachelor's degree in History Education from Clark College (now Clark College Atlanta University) in 1980 and a Master's degree in Social Work from Florida State University in 1984. (Plaintiff's Exh. A; Winnifred Blackledge depo. pp. 12:7 - 13:9). She is a Master Licensed Degree Social Worker. (Blackledge depo. pp. 13:10-19).

She worked at Bell Chase State School for the mentally retarded in Louisiana and then became employed by the Alabama Department of Mental Health and Mental Retardation in approximately March 1987. (Blackledge depo. pp. 15 - 16:15). She was hired as a Mental Health Social Worker II and remains in this same position today. (Blackledge depo. pp. 16:16 - 17:15). She

began working at the Brewer Center and then later went to Region III Community Service Center. (Blackledge depo. pp. 18:2-13).

Blackledge's duties include providing technical assistance in the surrounding areas, monitoring community homes, being the monitoring coordinator, and consultation training and monitoring in order to facilitate compliance with minimum standards applicable to ADMHMR. (Blackledge depo. pp. 42:6-18)(Exh. XX). Blackledge is a good employee who worked without performance problems, without discipline problems, without attendance problems, without tardiness problems; and who worked hard at her assignments. (Plaintiff's Exh. B; Stuardi Depo. pp. 25:23 - 26:3; 117:22 - 118:16.). All of Blackledge's performance appraisals under Susan Stuardi, the Director of Region III Community Services, "exceeded expectations." (Staurdi Depo. pp. 147:19 - 149:16)(Susan Stuardi Depo. pp. 19:3-6)( Exhibits BBB; CCC; DDD, EEE, FFF, GGG).

### B.    Planning Quality Assurance Specialist II Position (PQA II) (2002)

In 2002, Blackledge was discriminated against when she applied for the Planning Quality Assurance Specialist II position that she was more qualified for and was passed over for by a white female, Daphne Rosalis. (Blackledge depo. pp. 47:18 – 48:11)[4]( Exhibit. J). Daphne Rosalis was appointed to this position on November 11, 2002 and she began work in this position on November 18, 2002. (Exh. L #5).[5]

Plaintiff had the required Master's Degree in Social Work that was part of the job

---

[4]Decision-makers should look to the interview, the employee's education and qualifications and work experience. (Ervin Depo. pp. 96:7 - 97:7).

[5]Therefore, pursuant to the four-year statute of limitations. Plaintiff's § 1981 claim for racial discrimination regarding this position is timely.

announcement; she had extensive experience in Community Services in the area of Technical Assistance and Monitoring; furthermore, Rosalis, the white female who received the position, had no experience in these areas.  (Blackledge depo. pp. 48:8 - 49:9)( Exhibit. J).  It is undisputed that Plaintiff was qualified for the position.  (Exh. VV ).  Blackledge was listed as a black female employee on the applicant list.  (Exh.  VV).

Blackledge had 15 years of Community Services experience at the time, she knew the Community providers, she knew the Community standards, had rapport with the Community providers, knew the missions of the Community providers, knew the strengths and weaknesses of the Community provides , and Rosalis knew none of these things.  (Blackledge depo. pp. 53:4-2). Rosalis personally told Blackledge that Rosalis had no experience in the area of Quality Assurance. (Blackledge depo. pp. 49:2-10).

Furthermore, after Rosalis was hired into this position, Blackledge was asked by Susan Stuardi, the Community Services Director, to train Rosalis.  (Exh. K)(Blackledge depo. pp. 50:10 -53:3)(Blackledge depo. 54:20-23).

The panel for this position consisted of: B.C. Farnhum (white); Marilyn Benson (black); Joe Meters (white); Alice Wigon (white); Jewel Pitts (black).  (Exh.  K).  B.C. Farnhum (white) made the decision to hire Daphne Rosalis (white).  ( Plaintiff's Exh. E; Eranell McIntosh-Wilson Depo. pp. 52:1 -53:10)(Exh. WW).  Rosalis also had a close relationship with B.C. Farnham, a white male, who created the PQA Division, was part of the interview committee, and helped Rosalis get the position.  (Blackledge depo. pp. 50:10 -53:3; 54:20-23).

### C.     Community Services Specialist III Position (CSS II)[6] (2003-2004)

In 2004, Blackledge was discriminated against when she applied for the Community Services Specialist II position that she was more qualified for, and was passed over for by a white female, Mildred "Mickey" Groggel.  (Blackledge Depo. pp. 55:24 - 56:13).

Groggel was preselected for this position, which is indicated in the letter from Susan Stuardi to Henry Ervin and Fordyce Mitchell.  (Blackledge Depo. pp. 78:4-14)(Exh. M).

The CSS III position was first opened on October 27, 2003.  (Exh. O).  Although Susan Stuardi had been attempting to open this position since approximately November 2002.  (Exh. Q)(Exh. P)(Exh. HHH).

Blackledge applied for this position on October 28, 2003.  (Exh. R).  Blackledge met the qualifications for this position.  (Stuardi Depo. pp. 57:18 – 58:10)(Exh. O).

Blackledge was informed on **December 15, 2003** that she was not awarded the position. (Exh. T).  Groggel was awarded the job in December 2003, but she was not actually placed into the CSS III position until **March 6, 2004**[7].  (Exh. S); ( Exhibit. L; #11)(Stuardi Depo. pp. 86:22 - 87:3).

Susan Stuardi (white) was responsible for opening this position.  (Eranell McIntosh-Wilson 59:1 -- 61:15; 64:1-3)(Stuardi Depo. pp. 34:1-7).  Susan Stuardi (white) was also on the panel for the opening of this position.  (Exh. U).  Susan Stuardi (white) was also ultimately responsible for

---

[6]It should also be noted that the CSS III position that Staurdi had been attempting to open for over a year was vacated after Groggel served in the position for less than a month.  (Exh. Q; Exh. P).  It is possible ADMHMR was placing Groggel in this position for the time being so she would be allowed to move up.  (Stuardi Depo. pp. 130:6 - 132:5).  In fact, Blackledge had expressed interest in the CSS III position and was qualified for it, but when Groggel vacated, Blackledge was not given the option to apply or take the position.  Also disturbing is that the CSS III position was offered to Kathin Allen, who was white, but no offered to Blackledge.  (Stuard Depo. 132:23 - 135:22).

[7]Therefore, pursuant to the four-year statute of limitations.  Plaintiff's Title VII claim and § 1981 claim for racial discrimination regarding this position is timely.

making the decision to hire Mickey Groggel for the CSS III position.  (Eranell McIntosh-Wilson depo. pp. 70:15-21; 79:2-5; 80:13-17)(Exh. F; Fordyce Mitchell Depo. pp. 36:4-9; 42:13 - 43:3).

Stuardi recalls Blackledge inquiring about promotions on several occasions, including the CSS III position. (Stuardi Depo. pp. 27:12-17)(Exh. V).

### 1.    Qualifications

Plaintiff was more qualified than Groggel for this position.  In fact, Groggel, the white female who received the position did not have any Community Services Experience.  (Blackledge Depo. pp. 56:7-13).  Mickey Groggel the white employee who received the CSSI III position had been employed by ADMHMR since in approximately 1988, therefore Blackledge had more experience overall with ADMHMR and Blackledge had worked in the Community Services Division for 16-17 years, while Groggel had no experience in the Community Services Division . (Exh. N)

In fact,  Blackledge was already performing the job duties of a CSS III at the time of this job announcement.  She had 16-17 years experience in the Community Services department; her focus was on personal planning, having experience with technical assistance, with skill acquisition, behavior management, and DMHMR community retardation standards.  (Blackledge depo. pp. 67:10 – 68:4)(Exh. XX).

Groggel's experience was in institutionalization, where it is very regulated and structured; Groggel and her staff looked to Blackledge and the CS staff to deinstitutionalize individuals and put them into the community; to make sure there was quality of care, to make sure the services were there.  (Blackledge Depo. p. 67:10 – 68:23).  In fact, Blackledge filed a complaint to prove that that

she was completing the job duties of a CSS III.  (Exh. WW)(Blackledge Depo. pp. 69:2-11)[8] (Exh. XX).  Blackledge also filed an internal complaint concerning her job duties as a CSS III.  (Stuardi Depo. pp. 121:1 - 123:15)(Exh. AAA).

The desk audit was completed by Ms. Benson and was done improperly or was at least incomplete.  (Blackledge depo. pp. 72:8 - 73:12)(Exh. G; Ervin Depo. pp.  59:8-21; 64:13 - 65:17; 67:8-10)(Exh. XX).  Blackledge explained in detail that the desk audit was improper and explained specifically how she performed the duties of a CSS III.  (Exh. XX).  As a result of this desk audit, the hearing officer recommended that guidelines be established for doing desk audits and another desk audit be done for Ms. Blackledge.  (Ervin Depo. pp. 71:1-10) Exh. YY).

### 2.    Racial Bias of Interview Panel Regarding CSS III Position

Stuardi lists the three most important things during the interview process are "experience, education, and the interview."  (Stuardi Depo. pp. 60:3 - 61:10).  Regarding experience, Blackledge clearly had more experience in the Community Services Division.  Both Groggel and Plaintiff met the educational requirements of a Masters Degree and the interview determination is clearly a subjective evaluation.  (Stuardi Depo. pp. 99:7-20)(Ervin Depo. pp. 98:3 - 99:16).

The interview panel was 75 % white : Joan Owens (white), Jerrlyn London (black), Susan Stuardi (White) and Hugh Wicks (White).  (Stuardi depo. pp. 64-65)(Exh. U).  Stuardi (white) made the ultimate decision to hire Mickey Groggel (white).  (McIntosh-Wilson depo. pp. 70:15-21; 79:2-5; 80:13-17)( Mitchell Depo. pp. 36:4-9; 42:13 - 43:3).

The people who applied were: (1) Celestine Chappell (white); (2) James Packer (black); (3)

---

[8]It took one year for Blackledge to get back the desk audit results.  The result was to go back and do another desk audit.  By that time Blackledge had filed an EEOC charge and decided to proceed through her EEOC charge and lawsuit.  (Blackledge Depo. pp. 93:22 – 94:20).

Kathi Allen (white); (4) Winnifred Blackledge (black); (5) Yolanda Thomas (black); (6) Donna Buckley (white); (7) Edwin Aikens (white); (8) Rebecca Aydelette (white); (9) Melissa Ezell (black); (10) Mildred "Mickey" Groggel (white); (11) Sheritta Williams (black); (12) Tina Nettles (black). (Exh. H).

Jerryln London, the only black on the interview panel graded Ms. Blackledge with a 30 and graded Mickey Groggel with an 18. (Exhibit U)(Exh. UU). London thought Blackledge had a better knowledge of community programs and DMH programs. (Plaintiff's Exh. C; Jerryln London Depo. pp. 27:8 - 28:1). London recalls being the only black employee on the interview panel. (London Depo. pp. 30:19-22).

In one document, there is evidence that any black applicant would not be considered for this position despite their qualifications. Next to all of the black applicant's names, including Plaintiff Winnifred Blackledge who met the educational requirements, is the term **"NO"**. (Exh. H)[9]. Susan Stuardi (white) hand wrote notes stating **"NO"** next to each of the black applicant's names. (Stuardi Depo. pp. 76:7 - 79:10)(Exh. H). The remaining black applicant's names were scratched out because they allegedly did not meet the requirements for a masters. (Exh. H).

During the interview selection process Stuardi (white) graded the three white candidates the highest and the four black candidates the lowest. (Stuardi Depo. pp. 99:21 - 100:3)(Exh. U). Clearly, there was subjective racial bias in the selection of the CSS III position.

### 3.    Preselection

The preselection of the CSS III and the PQA II (2004) positions are clearly set out in the

---

[9]Plaintiff states that this evidence could clearly meet the "Direct Evidence" standard and is at least circumstantial evidence of discrimination which creates a genuine issue of material fact sufficient to survive summary judgment.

letter from Susan Stuardi.  The letter dated February 20, 2004 indicates that the CSS III position that was awarded to Mickey Groggel was going to be vacated and if Kathi Allen, white female, wanted it, she could have it because Groggel was going to be pre-selected for the PQA II (2004) position. (Exh. M)(Blackledge Depo. pp. 78:9 - 79:9).  Groggel had not even been placed in the CSS III position at the time of this letter; therefore there is evidence to suggest that Groggel was selected for the CSS III position so she could be placed in the position for a short time until she could be selected to the new PQA II position, which Blackledge already qualified for.  (Exh. M)(Exh. S).  In fact, once Groggel was finally placed into the CSS III position on March 6, 2004, she only remained in the position for just over a month.  (Exh. S)(Exh. L, #11 #18).

Although this was a position Susan Stuardi had tried to get open for over a year, as soon as Grogge was placed in the position, she was promoted again to the PQA II position and when a white employee, Kathi Allen, decided she didn't want the CSS III position, the position disappeared.  (Exh. M; Exh. P; Exh. Q).

### D.     Planning Quality Assurance Specialist II Position (PQA II) (2004)

Again, Plaintiff applied for a PQA II position in 2004, however Plaintiff was discriminated against again when the position went to a white female, Mickey Groggel.  Plaintiff was racially discriminated against in regards to this position because Mickey Groggel was preselected for this position and the CSS III position and because of the racial bias of the interview selection. (Blackledge Depo. pp. 76:19 - 78:14)(Exh. M).  This was also a Community Services Department position and Groggel had only been in the Community Services Division for approximately one month (because of the CSS III promotion) and Blackledge still had 17 years experience in Community Services.  (Blackledge Depo. Pp. 67:10 – 68:4).

The position opened on April 2, 2004. (Exh. L)  Mickey Groggel was placed in this position on April 17, 2004[10].  (Exh. L, #18).  Blackledge and Groggel were the only two employees who applied for the PQA II position, which of course, was awarded to the white female, Mickey Groggel. (Stuardi Depo. pp. 88:19 - 89:3).

Even though the position was not opened until April 2004, Susan Stuardi was already discussing who was going to be placed in this position and other positions prior to the job opening in February 2004.  (Exh.  M).  Mickey Groggel was only placed in the CSS III position for a couple of weeks so they could open up a Quality Enhancement position for her and Kathi Allen, white, was given the chance to move into the CSS III position that should have been awarded to Plaintiff in the first place. (Blackledge Depo. pp. 76:19 - 78:14)(  Exhibit M).[11]

However, because Kathi Allen left ADMHMR, she did not take this position, Mickey Grogell was appointed to the PQA II position and the CSS III position, that Susan Staurdi had wanted to open for over a year was closed and no one was promoted into the position.  (Fordyce Mitchell Depo. pp. 38:16 - 39:21; 40:15 - 42:4).

The interview panel on this position also was 75 % white.  (Exh.  L, #17). Jeff Williams (white), Don Jones (white), Audrey McShan (black), and Joan Owens (white) were on the interview panel.  (Exh. L).

---

[10]Therefore, pursuant to the four-year statute of limitations.  Plaintiff's § 1981 claim for racial discrimination regarding this position is timely as the original Complaint was filed in this case on April 10, 2006. (See Doc. # 1).

[11]There is clear evidence of discrimination as Kathi Allen, white female, was going to be offered the CSS III position, without having to go through the interview process, even though it was clear that Blackledge wanted this position.  The CSS III position just disappeared after Groggel was only placed in the position for one month. When Allen decided she did not want this position, ADMHMR never even considered giving the position to Blackledge, a black female.

Joan Owens (white) graded the selections for this position. (Exh. L, #17). Susuan Stuardi (white) had of course already suggested that Mickey Groggel (white) was going to be placed in this position. (Exh. M).

### E.   Retaliation

On January 8, 2007, Blackledge filed a second EEOC charge for the retaliation taken against her after she filed her June 8, 2004 EEOC charge and specifically after she filed her Federal Civil Complaint, which was filed on April 10, 2006. (Exh. W)

Blackledge claims that she received a false and adverse performance appraisal, her salary was directly related to this performance appraisal, she suffered increased job scrutiny, discipline and other adverse terms and conditions of employment. (Exh. W)

Eranell McIntosh-Wilson, the Associate Commissioner for the Department of Mental Health and Mental Retardation, was aware that Blackledge had filed an EEOC complaint. (Eranell McIntosh-Wilson Depo. pp. 36:21 - 37:1). Fordyce Mitchell was as well. (Mitchell Depo. pp. 45:20-23). Jerryln London was aware that Blackledge filed an EEOC charge. (London Depo. pp. 33:18-23). Butler was aware that Blackledge had filed a grievance. (Exh. D; Butler Depo. pp. 29:2 - 31:3).

In her previous 17 years of employment, Plaintiff never had problems with her job performance or any performance evaluations. (Blackledge Depo. pp. 134:13 - 135:1). However, since Blackledge has filed her EEOC complaint and her federal lawsuit she has been singled out by members of management. (Blackledge Depo. pp. 107:6 – 108:14).

Plaintiff was singled out by Jerrylyn London because she had her door closed, despite the fact that London herself and other employees often worked with their doors closed. Her supervisors also

began to treat her different than other employees regarding hours worked.  She was forced to work the Spring Conference despite the fact she was recovering from knee surgery, while another employee was allowed to miss the Spring Conference for vacation.  (Blackledge Depo. pp. 138-146)(Exh. X).

Blackledge was also subjected to lowered performance evaluations.  (Blackledge Depo. pp. 149:1-10)( Exhibits Y, X, Z, AA, III).  During the 2004 year nothing was said to Blackledge about her job performance; but after she filed her EEOC complaint in June 2004, her next performance appraisal in January 2005 was lowered without the required prior counseling. (Blackledge Depo. pp. 157:16 – 158:20; 164:7-12)(Ervin Depo. pp. 86:11 - 88:16)[12] (Plaintiff 's Exhibit CC)(Exh. BB) (Exh. Z) (Exh. AA)(Exh. DD).

Jerrylyn London called Plaintiff into the performance appraisal meeting and said she had dropped her evaluation 7.7 points to 20 points.  (Exh. BB).  London called Blackledge back in her office later that afternoon and said she raised it to 34 points because Blackledge had informed her that she can't lower her appraisal without giving her some sort of prior counseling.  (Blackledge Depo. pp. 153:21 – 154:24).

London testified that once an performance appraisal score has been lowered, it may affect promotion opportunities in the future and may play a role in layoffs when looking at retention scores. (London Depo. pp. 50:11 56:4).

Blackledge stated: "I believe lowering my performance appraisal is really by causing as much

---

[12]ADMHMR policy states: "The supervisor should make a note as documented evidence of the conversation as documented evidence of the conversation, including violation, the date it occurred, the employee's name, what action will follow, and employee's comments.  The note of the verbal reprimand should be kept in supervisor's file, not in the Personnel file."

stress as possible. I believe that generally my supervisors were to punish me for voicing my complaints about being harassed and treated unfairly"; she complained specifically about the disparity in treatment she was receiving. (Blackledge Depo. pp. 184:7-21)(Exh. III).

Kendra Butler became Blackledge's direct supervisor in March 27, 2006. (Kendra Butler Depo. pp. 11:20 - 12:16)(Exh. EE). London thought she was being taken off as Blackledge's direct supervisor because Blackledge and Donna Buckley wanted a white supervisor. (London Depo. pp. 53:9 - 55:4). Butler has never had to give Blackledge any written discipline. (Butler Depo. pp. 14:20-23).

Blackledge attempted to have a good relationship with her supervisors. (Exh. HH) However, Blackledge was forced to sent in complaints because she was being singled out by her supervisors and suffering "disparity of treatment" since she had filed her EEOC Complaint. ( Exhibit. FF) (Exh. GG). Blackledge's next performance evaluation, a Pre-Appraisal, was completed July 26, 2006. (Exh. II). Blackledge complained about this Appraisal. (Exh. JJ) (Exh. KK). Blackledge felt she was having to sign the Appraisal under duress to avoid further disciplinary action. (Exh. JJ) Blackledge sent a letter to Henry Ervin explaining her concerns. (Exh. LL) Although London was supposed to document that Blackledge needed to improve her mid-winter appraisal, she did not. (Exh. MM); (Mitchel Depo. pp. 56:11 - 57:19).

On January 4, 2007 Kendra Butler again dropped Ms. Blackledge's 2006 performance appraisal from 36.3 points to 25.7 points. (Blackledge Depo. pp. 16:7:25 – 16:9:23) (Butler Depo. pp. 18:2-11); (Exh. NN). This was despite the fact that she had received no prior counseling as required by ADMHMR policy. (Blackledge Depo. pp. 170:3 – 171:2).

Blackledge requested and filed an attachment to this performance appraisal because Butler

would not change the score.  (Exh. JJ)(Blackledge Depo. pp. 172:2-11).  On January 12, 2007 Butler forced Blackledge to take fifteen (15) minutes off of her time because she had allegedly left early; however Blackledge denies that she left early.  (Blackledge Depo. pp. 176:6 - 178:4).

Blackledge has also had an issue with Butler making her use compensatory time, but had to use flex time. (Blackledge Depo. pp. 181:10 – 183:13).  Blackledge attempted to work with Butler on issues regarding flex time and comp. time.  (Butler Depo. pp. 53:2 - 54:4)(Exh.  OO).  Fordyce Mitchell, the Director of Mental Retardation Community Service programs, based his recommendations on what was told to him by Jerryln London; he did not conduct any other independent investigation other than discussing the issues with London.  (Mitchell Depo.  62:3 - 64:15).  Mitchell has never had any training regarding employment discrimination since he has been with the ADMHMR.  (Mitchell Depo. pp. 64:16-22).

Henry Ervin has only had one conversation with Ms. Wilson to make sure that no retaliation takes place; but he has not had any conversations with Ms. London or Ms. Butler and has not specifically told anyone to not retaliate against Blackledge.  (Ervin Depo. pp. 79:11-18).  This is despite the fact that Blackledge has sent him notice that she feels she is being discriminated against and harassed because of her previous complaints.  (Exh. PP) (Exh. LL)(Exh. HH)(Exh. FF).

Henry Ervin, the Director of Human Resources, and his office did not investigate or conduct interviews about Blackledge's EEOC charge from 2004.  (Henry Ervin depo. pp. 23:8-21).  He did not interview Susan Stuardi, Jerryln London, Fordyce Mitchell, or Eranell McInosh-Wilson.  (Ervin Depo. pp. 24:4-13).

F.    **Inadequate Policies of ADMHMR**

Defendant ADMHMR's anti-harassment policy does not specifically address retaliation and

nothing in the policy states retaliation is prohibited. (Exh. ZZ)(Ervin Depo. pp. 26:18 - 28:6).

Ervin thinks supervisors should be trained on employment discrimination matters. (Ervin Depo. pp. 37:15-20). However, Kendra Butler, Blackledge's supervisor, does not recall ever seeing any policies related to harassment and discrimination in the workplace. (Butler Depo. pp. 47:12-16). Butler is not even aware of what constitutes retaliation in the workplace. (Butler Depo. pp. 48:11 - 49:5).

The ADMHMR has an affirmative action plan. (Ervin Depo. pp. 39:8-23). However, statistically, less blacks are promoted to positions than whites in the ADMHMR. (Exh. QQ)(p's exh. 87)

### G.    EEOC Findings[13]

Plaintiff found out she was not awarded the CSS III position via letter dated December 15, 2004. Plaintiff signed her EEOC charge on June 8, 2004, which was marked filed by the EEOC on June 9, 2004. (Exh. T)(Exh. RR). Plaintiff did not receive this letter until a couple of days later. Regardless, Plaintiff's EEOC charge was timely (as determined by the EEOC) and as determined by being filed within 180 days of the discriminatory act.[14]

The EEOC conducted in investigation into Ms. Blackledge's charge of discrimination [related to the CSS III position] and found reasonable cause that Title VII had been violated. (Exh. SS). On July 1, 2005, the EEOC found that "Timeliness and all other requirements for coverage have been met." Furthermore, that:

---

[13]In this circuit, it is well established that EEOC determinations are generally admissible in bench trials. *Barfield v. Orange County*, 911 F.2d 644, 649 (11th Cir. 1990), cert. denied, 500 U.S. 954, 111 S.Ct. 2263, 114 L.Ed.2d 715 (1991); *Walker v. Nationsbank of Florida*, N.A., 53 F.3d 1548, 1554 (11th Cir. 1995).

[14]Furthermore, Mickey Groggel was not placed into the CSS III position until March 2004, therefore, the discriminatory act did not take place until March 2004.

"Respondent [ADMHMR] utilized a predominantly White interview panel and a subjective interview process which resulted in all of the White applicants ranked higher than all of the Black applicants. The investigation also revealed that Respondent pre-selected the successful White applicant who may not have met the stated job requirements. The investigation revealed that it is more likely than not the Respondent discriminated against Blacks as a class in pre-selection of the White applicant and the utilization of a predominantly White interview panel and subjected interview process. The investigation further revealed that Respondent violated the Commission's recordkeeping requirements by not preserving the applications of Black applicants and Applicant Assessment Forms used in the scoring and ranking of the applicants during the interview process. (29 C.F.R. 1602.31). ...

You are reminded that Federal Law prohibits retaliation against persons who have exercised their right to inquire or complaint about matters they believe they may violate the law.

(Exh. SS)

The EEOC attempted to Conciliate this charge, however, the EEOC was unable to complete a Conciliation Agreement with ADMHMR. (Exh. TT). Therefore, the charge was sent to the Department of Justice for another extended investigation and Plaintiff finally was issued a right to sue by the Department of Justice on March 22, 2006. (Exh. W).

## III. **LEGAL ANALYSIS**

### A. **SUMMARY JUDGMENT STANDARD**

The basic issue before the court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. If reasonable minds could differ on the inferences arising form undisputed facts, then a court should deny summary judgment.

"As the moving party, [the defendant] has the burden of showing the absence of a genuine

issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993).    The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"    *Hairston*, 9 F.3d at 919 (quoting *Anderson*, 477 U.S. at 255).

### B.    **DEFENDANTS' ARGUMENTS**

### I.    **PROPER TITLE VII DEFENDANT**

Because of sovereign immunity, it is possible that the Plaintiffs' § 1983 claim for money damages against Defendant Houston in his official capacity may not remain.  However, the § 1983 suit against Houston in his official capacity as an officer of the state remains because an officer of the state is not entitled to sovereign immunity for § 1983 suits for injunctive relief.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see *Edelman v. Jordan*, 415 U.S. 651, 664-71, 94 S.Ct. 1347, 1356-60, 39 L.Ed.2d 662 (1974)(when a plaintiff sues a state official for a violation of federal law, the court may enjoin the official's future conduct, but may not order the state to provide retroactive monetary relief); *Will,* 491 U.S. at 70 n. 10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)("Of course, a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"); *Lassiter v. Alabama A & M University*, 3 F.3d 1482, 1485 (11th Cir.

1993)("Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief."); see also *Cross v. Ala. State Dept. of Mental Health and Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995).

The Eleventh Amendment also does not bar monetary relief, including costs, ancillary to the prospective injunctive relief. *Graham*, 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18 (citing *Edelman*, 415 U.S. at 667-68, 94 S.Ct. at 1357-58). Thus, Plaintiff Blackledge's claims against Houston in his official capacity for prospective injunctive relief and costs associated with that relief. See *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 102-03, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984).

Therefore, the claims against Commissioner Houston must remain and Defendant's Motion for Summary Judgment regarding Houston must be denied.

## II.    FAILURE TO PROMOTE CLAIMS

### A.    TIMELINESS

#### 1.    The Plaintiff's Job Discrimination Claim are all timely Pursuant to § 1981.

Defendant incorrectly argues that the two PQA Specialist II positions were not administratively exhausted. However, both PQA II positions and the CSS III position are filed under § 1981 as well as Title VII.

In *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836 (2004) the Supreme Court of the United States held that a cause of action brought under 42 U.S.C. § 1981, as detailed in the Complaint, is governed by the federal "catch-all" four year statute of limitations. See also *Sanders v. City of Montgomery*, 319 F.Supp.2d 1296 (M.D. Ala. 2004).

Plaintiff's Complaint was filed April 10, 2006.  Daphne Rosalis was not awarded the PQA II (202) until November 18, 2002.  (Exh. L #5).[15]  Therefore, the PQA II claim was filed within four years of the discriminatory act.

For the CSS III position, Mickey Groggel was not awarded the position until March 6, 2004.  (Exh. L, #11).  Plaintiff filed her lawsuit on April 10, 2006.  Therefore, the CSS III claim was filed within four years of the discriminatory act.

For the PQA II (2004) position, Mickey Groggel was not awarded this position April 17, 2004  (Exh. L, #18).  Therefore, the PQA II claim was filed within four years (and two years) of the discriminatory act.

Therefore, all of Plaintiff's claims [PQA 2002, CSS III, PQA 2004 and retaliation claims] are clearly timely pursuant to § 1981.

Furthermore, Plaintiff is not required to exhaust any administrative remedies with the EEOC prior to suit for § 1981 claims. See *Caldwell v. Nat'l Brewing Co.*, 443 F.2d 1044, 1046 (5th Cir. 1971)[16](holding that a plaintiff alleging discriminatory employment practices with regard to race "has an independent remedy under § 1981 without respect to exhaustion under Title VII").

Defendant's arguments regarding timeliness and exhaustion of administrative remedies are plainly incorrect.  All of Plaintiff's claims are timely under § 1981 and the claims related to the CSS III position and the retaliation claims are timely pursuant to Title VII and § 1981.

## 2.      The CSS III EEOC Charge Was Timely Pursuant to Title VII

---

[15]Therefore, pursuant to the four-year statute of limitations.  Plaintiff's § 1981 claim for racial discrimination regarding this position is timely.

[16]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Defendant's argument regarding timeliness in inaccurate.  Plaintiff Blackledge did not receive notice that she had not received the position until after **December 15, 2003**[17] when she was mailed a letter stating she did not receive the CSS III position.  (Exh. T).  Blackledge filed her EEOC charge on June 9, 2004 (signed June 8, 2004).  This is clearly within 180 days of the first discriminatory act against Blackledge (regarding the CSS III position) and is clearly timely pursuant to Title VII.  See *Nelson v. United States Steel Corp.*, 709 F.2d 675, 677 (11th Cir. 1983)("[t]he 180 day time period begins to run only when the complainant first learns or should have learned of the alleged discrimination."); see e.g. *Delaware State Coll v. Ricks*, 449 U.S. 250, 257 (1980); *Brewer v. Alabama*, 111 F.Supp.2d 1197, 1204 (M.D. Ala. 2000)(the limitations period begins to run when an employee **received notice** of the alleged discriminatory act)(emphasis added).

Furthermore, the evidence is undisputed that Mickey Groggel was not placed into the CSS III position until **March 6, 2004**.  (Exh. L #11).  Therefore the actual last discriminatory act related to the CSS III position did not take place until Groggel was actually awarded the position on March 6 2004.  Clearly, June 9, 2004 is within 180 days of March 6, 2004.

Under either of these circumstances, Plaintiff's EEOC Charge was clearly filed within 180 days of the last discriminatory act and is timely under Title VII.

### B.    PLAINTIFF HAS SUFFICIENTLY ESTABLISHED FAILURE TO PROMOTE CLAIMS

It is undisputed that Plaintiff has clearly met her prima facie case for all three positions.  She is an African-American female who was qualified for each of the positions, applied for and went through the selection process, but was denied the positions, which went to white employees.

---

[17]In fact, although the letter is dated December 15, 2003, Plaintiff did not receive the letter until approximately December 17, 2003.

Plaintiff can also show pretext by the selection process, including the fact that she was qualified (had more experience and superiority in the relevant field); a majority white interview panel chose the white employees based on subjective criteria; white supervisors made the actual hiring decision; and there is evidence of preselection on the part of the supervisors.

In a failure to promote case, Plaintiff must establish the following elements for a prima facie case: 1) she belonged to a protected group; 2) she applied and was qualified[18] for a job for which her employer was seeking applications; 3) despite her qualifications, she was rejected for the position; and 4) after she was rejected, his employer kept the position open or filled it with a person who is not a member of plaintiff's protected group. See *Walker v. Morthan*, 158 F.3d 1177, 1193 (11th Cir. 1998) (explaining that plaintiffs need not introduce evidence of the relative qualifications of persons promoted instead of plaintiffs as part of a prima facie case for failure to promote); *Norrell v. Waste Away Group, Inc.,* 246 F.Supp.2d 1213, 1221 (M.D. Ala. 2003)(citing *Walker* for elements of prima facie promotion case); see *also Miller v. Bed, Bath & Beyond, Inc.*, 185 F.Supp.2d 1253, 1267 n. 13 (N.D. Ala. 2002)(nothng that according to *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 n. 7 (11th Cir. 1983) there is some 11th Circuit authority that the prima facie case requires the element that plaintiff prove that other employees with "equal or lesser qualifications" who were not members of the protected class were promoted, but according to *Walker*, the express holding of the Eleventh Circuit is that a plaintiff is not required to show, as part of her prima facie case, that her qualifications were equal or superior to that of the successful applicant); see also *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n. 8 (11th Cir. 2001); *LeBlanc v. TJX Cos.*, 214 F.Supp.2d 1319, 1329

---

[18]Plaintiff only needs to show that she satisfies the employer's objective qualifications.  *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005).

(S.D. Fla. 2002); *Mays v. Union Camp Corp.*, 114 F.Supp. 2d 1233, 1239 (M.D. Ala. 2000)(citing *Walker* and listing prima facie elements for failure to promote on the basis of race and explaining "relative qualifications are placed in the second stage of the *McDonnell Douglas* framework, not the prima facie stage.").

Plaintiff Blackledge met her prima facie case for all three of these positions and it was Defendants' burden to articulate some legitimate non-discriminatory reason why Plaintiff was not awarded these positions. Defendant failed to articulate any specific reasons for the two PQA II positions and only articulated a reason for the CSS III position.

## 1. The Planning and Quality Assurance II Positions (2002) & (2004)

In Defendant's Memorandum in Support of Their Motion for Summary Judgment, Defendant does not argue that Plaintiff cannot meet her prima facie case for these two positions and Defendant does not specifically address any legitimate, non-discriminatory reasons why Daphne Rosalis was promoted to the PQA II position in 2002 and why Mickey Groggel was promoted to the PQA II position in 2004. (See Doc. #27). Defendant merely addresses these claims based on Plaintiff's failure to exhaust administrative remedies under Title VII. As discussed above, Plaintiff has shown that: (1) Plaintiff is not required to exhaust administrative remedies under § 1981; (2) these claims are timely pursuant to § 1981; (3) Plaintiff has met her prima facie case on both of these claims pursuant to § 1981.

Plaintiff is not required to rebut an argument that the Defendant never makes in its Motion for Summary Judgment.[19] Defendant had an opportunity to argue that Plaintiff could not make her

---

[19]For Plaintiff's PQA II (2002) & (2004) positions, Defendant has failed to argue that Plaintiff cannot meet her prima facie case and Defendant has failed to articulate any specific legitimate reasons why other employees were selected over Plaintiff. Federal Courts are consistent in requiring that parties opposing summary judgment

prima face case and the opportunity to present a legitimate non-discriminatory why the respective white employees were chosen over Plaintiff, but Defendant failed to do so. Therefore, Plaintiff must survive summary judgment on both of these PQA II claims.

### 2.    CSS III Position (2003-2004)

As stated above, it is undisputed that Plaintiff has met her prima facie case regarding the CSS III position. She is a qualified black female who applied for an interviewed for the position, which was awarded to a black female.

Defendant only offers a legitimate non-discriminatory reason for the CSS III position by arguing that the position was awarded to Mickey Groggel because she had experience in educational testing than Plaintiff Blackledge. (Doc. #27, pp. 10). Plaintiff also argues that Groggel scored higher on the interview by four panelists.

Title VII and Section 1981 provides a remedy to those who can show they were discriminated against on the basis of their race by their employer with respect to a promotional decision. *Sledge v. Goodyear Dunlop Tires N. Am. Ltd.*, 275 F.3d 1014, 1018 (11th Cir. 2001); *Gaddis v. Russell Corp.*, 242 F.Supp.2d 1123, 1134-35 (M.D. Ala.), aff'd 88 Fed.Appx. 385 (11th Cir. 2003)).

### a.    PRETEXT

"In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima face case." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir.1993). "Accordingly, the grant of summary judgment, though appropriate when

---

shall be given a meaningful opportunity to rebut all grounds and all evidence advanced in support of a motion for summary judgment. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989)("When a party moves for summary judgment on ground A, his opponent is not required to respond on ground B -- a ground the movant might have presented but did not."); *see also, John Deere Co. v. American National Bank*, 809 F.2d 1190 (5th Cir. 1987)(reversing granting of summary judgment on ground not advanced by moving party since non-moving party did not have opportunity to respond.).

evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII [or §1981] cases in which the plaintiff has established a prima facie case because of the 'elusive factual question' of intentional discrimination." *Hairston*, 9 F.3d at 921 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). A plaintiff may show pretext using comparative evidence, statistical evidence or direct evidence of retaliation. *Miles v. M.N.C. Corp.,* 750 F.2d 867 (11th Cir. 1985).

In order to establish pretext, plaintiff is allowed to produce evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Pretext is established if a plaintiff can "demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538; see also *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp. 1273, 1281 (M.D. Ala. 2000)(citations omitted)("The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation."). If an "explanation is unworthy of credence" it is akin to "affirmative evidence of guilt." *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 147 (2000). A "[Title VII or §1981] plaintiff may defeat a motion for summary judgment by undermining the credibility of a defendant's explanation's for its actions." *Arrington v. Cobb County*, 139 F.3d 865, 875 (11th Cir. 1998).

Here Plaintiff has introduced numerous instances of why Defendant's articulated reasons for the selection of Mickey Groggel are pretext for the true reason, that racial bias motivated the selection decision.    **1.    Qualifications Evidence**

Qualifications evidence may suffice to show pretext. *Ash v. Tyson*, 546 U.S. 454 (2006)(citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 187-188 (1989)(indicating that a Plaintiff 'might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position'), superseded on other grounds by 42 U.S.C. 1981(b); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981). Furthermore, the holding that qualifications must "jump off the page to slap you in the face" for inferring pretext from superior qualifications is no longer applicable. *Ash*, 546 U.S. at 454 (dismissing language from *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004)).

Where qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext. *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 772 (11th Cir. 2005).

Furthermore, when an employer attempts to prove its case by stating that the person chosen for the position was far more qualified without rebutting the fact that the Plaintiff was qualified, "such a contention does not establish that [the plaintiff] was not qualified" and the Plaintiff has therefore met her prima face case. *Mays v. Union Camp Corp.*, 114 F.Supp. 2d at 1240. "Once a prima facie case is established, a presumption of unlawful discrimination is established." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

For the CSS III position, Blackledge offered substantial evidence she was more qualified that Groggel for this position. Both employees were qualified for the position because they both had the required masters degrees. However, Plaintiff separated herself in the fact that she had 16-17 years experience in the Community Services Division while Groggel had no experience in the Community

Services Division.  Plaintiff had more seniority than Groggel and Defendant has not articulated any problems Plaintiff ever had with respect to her job duties and performance of those duties. Defendant's only reason for selecting Groggel over Plaintiff is that Groggel did better on the subjective interview process which was graded by 3 white panelists and 1 black panelist.  The only black panelist scored Blackledge with 30 and scored Groggel with a 18.  (Exh. U).

Plaintiff has clearly presented a material question of fact whether she was more qualified for Groggel.  The question of who was more qualified is clearly a question for the jury, therefore Blackledge's CSS III claims must survive summary judgment.

## 2.    <u>Preselection of Mickey Groggel</u>

"Evidence of preselection operates to discredit the employer's proffered explanation for its employment decision."  *Dorrego v. Public Health Trust of Miami Dade Co.*, 293 F.Supp.2d 1274 (S.D. Fla. 2003)(quoting *Goosetree v. State of Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986).

As stated above in the Statement of Facts, Plaintiff has also presented substantial evidence and a jury question that the interview process was merely a formality and Mickey Groggel had been pre-selected for the CSS III position and the PQA II (2004) position.  (Exh. M).  The timing of this letter does not add up.  While Groggel was allegedly selected for this position in December 2003, Groggel was not placed in this position until March 6, 2004.  (Exh. L: #11).

Susan Stuardi, the white Director of Region III Community Services at the time had wanted to open the CSS III position since December 2002.  She was well aware that Blackledge was interested in this position as Blackledge had told her on several occasions and written a letter expressing her interest.  Blackledge had also already been performing the duties of a CSS III.  Stuardi also served on the interview panel and according to Eranell McIntosh-Wilson made the actual final

decision to appoint Groggel to this position.[20]  Then, within a month of the discriminatory decision to place Mickey Groggel in the CSS III position, Stuardi wanted to put Kathi Allen (another white employee) into the CSS III position and move Groggel out of this position ("likely to be vacated") into a new position.  (Exh. M).

When Allen decided she did not want the position, Groggel still "vacated" the position and was promoted to the PQA II position within a few weeks.  The CSS III position that Blackledge wanted and was qualified for, and which Stuardi had pushed for over a year to get open, "disappeared" when the white employee (Allen) decided she didn't want it.

Plaintiff has presented a material question of fact as to the real reason the CSS III position was awarded to a white employee, Groggel, who only remained in the position for a matter of weeks and then was promoted again, while the CSS III position was offered to another white employee, yet Blackledge who was qualified for the position was never considered.  There is sufficient evidence that Stuardi only considered white employees for these positions and pre-selected who she wanted without regard to a true and fair interview process.  Plaintiff has presented a material question of fact for the jury to determine whether ADMHMR pre-selected white employees for the CSS III and PQA II (2004) position.  Therefore Blackledge's CSS III (and PQA II claims) claims must survive summary judgment.

### 3.     The Decisions of the Interview Panel were based on Subjective Criteria.

Because both Groggel and Blackledge met initial qualifications regarding education and other

---

[20]Stuardi's notes crossing out black applicants despite the fact that they were qualified alone creates a material question of fact as to the real reason Groggel was selected for this position.  (Exh. H). The remaining evidence helps support this question of fact.

requirements, it is clear that Groggel was selected based on Susan Stuardi and the other white interview panelists preference for a white employee for the CSS III position.  The interview process was clearly based on these white employees subjective preference for a white employee.  See *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 644 (11th Cir. 1998)("subjective evaluations involving white supervisors provide a ready mechanism for discrimination.").

Courts must examine subjective reasons with higher scrutiny than objective reasons.  See *Carter*, 132 at 644 (rejecting subjective criteria that "are too subjective to allow for any meaningful comparison between" applicants and observing that such subjective criteria "cannot be relief upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chose for the promotion"); *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1010-11 (11th Cir. 1984)("[T]he nature of the defendant's selection process and of the reasons that he offers affects the weight of his burden.  Where the reasons that the employer offers for rejection are based purely on subjective factors, the defendant's burden is greater."); *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 798 (11th Cir. 1988)("[I]nformal, secretive and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria."); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir. 1985)("This circuit has frequently noted ... that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination.  This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another."); *Carter*, 132 F.3d at 644(it is reasonable to scrutinize strictly decisions that are based on subjective criteria which provide a ready mechanism for discrimination); *Lewis v. Smith*, 731 F.2d 1535, 1539 (11th Cir. 1984);  *Grano v. Dept. of Development of City of Columbus*, 699 F.2d 837 (6th Cir. 1983)("the legitimacy of the articulate reason for the employment

decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluation is subjective and the evaluators themselves are not members of the protected minority.").

Plaintiff has presented a material question of fact as to the legitimacy of the articulated reason given by Defendant for the selection of Mickey Groggel and Plaintiff's promotion claims must survive summary judgment.

### 4.     Direct Evidence & Pretext

As discussed throughout this brief, there is overwhelming circumstantial evidence pointing to the fact that ADMHMR wanted a white employee for the CSS III position. In fact, the document in which all of the black applicants (even those that met the educational requirements) is not only highly circumstantial evidence sufficient to establish Pretext, such evidence could be considered direct evidence of discrimination. (Exh. H).

Plaintiff therefore states that such evidence if considered circumstantial sufficiently creates a jury question as to the why all of the qualified black applicants, including Plaintiff Blackledge, were automatically disqualified to the CSS III position. However, if the evidence is considered the evidence would automatically rebut Defendant's articulated reason for the selection of Groggel. "In cases of discrimination proven by direct evidence, it is incorrect to rely on the *McDonnell Douglas*[21] test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas*, no such inference of discrimination is required in the case of direct evidence." *Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095, 1104 (11th Cir. 2001)(citing *Taylor v. Runyon*, 175 f.3d 861, 867 n.2 (11th Cir. 1999). The Middle District

---

[21] The *McDonnell Douglas* test is used in cases "based on circumstantial evidence."*Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095, 1103 (11th Cir. 2001).

of Alabama has specifically applied this application in *Lane v. Ogden Entertainment, Inc.*, 13 F.

Supp. 2d 1261 (M.D. Ala. 1998):

> The presentation of direct evidence is somewhat of a nuclear bomb at the summary judgment stage. Where the nonmovant presents direct evidence that, if believed by the jury, would be sufficient at trial, **summary judgment is not appropriate even where the movant presents conflicting evidence.**

*Lane*, 13 F.Supp.2d at 1273 (emphasis added)(*citing Merritt v. Dillard Paper Co.,* 120 F.3d 1181,

1189 (11th Cir.1997)).    Direct evidence of discrimination is evidence which reflects "a

discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of

by the employee." *Damon v. Fleming Supermarket, Inc.*, 196 F.3d 1354, 1358 (11th Cir.

1999)(citations omitted); *see also Standard v. ABEL Serv., Inc.,* 161 F.3d 1318, 1330 (11th Cir.

1998)(direct evidence of intentional discrimination is defined as "evidence, that establishes the

existence of discriminatory intent behind the employment decision without any inference or

presumption.")

Under either circumstance, Plaintiff has presented sufficient evidence to defeat summary

judgment on the CSS III promotion claim.

## C.    Plaintiff has also Presented Evidence of Disparate Impact[22]

Plaintiff has also produced evidence that the Defendant's policy of allowing a majority white

interview panel interview employees through a subjective interview process results in white

employees being selected for positions more often than black employees.

To establish a prima facie case of disparate impact, a plaintiff must show that "(1) there is

a significant statistical disparity among members of different racial groups; (2) there is a specific,

---

[22]The statistical evidence can also be used to establish pretext. A plaintiff may also establish *pretext* by using statistical evidence. *Miles v. M.N.C. Corp.,* 750 F.2d 867 (11th Cir. 1985).

facially neutral employment policy or practice; and (3) there is a casual nexus between the specific policy or practice and the statistical disparity." *Cooper v. S. Co.*, 390 F.3d 695, 724 (11th Cir. 2004).

Here there is evidence that there is a significant disparity in white applicant's being awarded jobs over black employees, especially compared to the number of black applicant's who apply. (Exh. QQ). In fact, the statistical disparity is clearly shown in he Court Report of Black Applicants (Exh. QQ):

| PERIOD | BLACKS APPOINTED | WHITES APPOINTED |
|---|---|---|
| January - June 2002 | 42% | 58% |
| July - December 2002 | 37% | 61% |
| July - December 2003 | 39% | 60% |
| January - June 2004 | 53% | 46% |
| July - December 2004 | 38% | 59% |
| January - June 2005 | 38% | 61% |
| July - December 2005 | 47% | 51% |
| January - June 2006 | 36% | 61% |

In each of these reports (counsel was unable to locate January - June 2003), other than January - June 2004, White applicants have been appointed at a much greater rate than Black applicants. Such statistical disparity is clearly evidence of a disparate impact and evidence of pretext.

Furthermore, that the policy of having a majority whit interview panel was in effect for all three positions Blackledge complains of (Exh. K)(Exh. U)(Exh. L). The result of this policy was that white employees were selected for each of these three positions, despite the fact that there equally qualified black candidates.

For the PQA II Position (2002), an interview panel of three whites, two blacks (60% white), with one white (100% white) making the ultimate decision decided to hire a white employee.

For the CSS III position, an interview panel of three whites and one black (75%), with one white (100% white) making the ultimate employment decision to hire a white employee.

For the PQA II Position (2004), an interview panel of three whites and one black (75 % white), with one white (100% white) making the ultimate decision decided to hire a white employee.


Clearly, Plaintiff Blackledge has presented a sufficient question of fact sufficient to survive summary judgment whether the Defendant's applicant interview assessment policy creates a disparate impact toward black employees.  Therefore, summary judgment should be denied for all three positions.

## III. PLAINTIFF HAS SUFFICIENTLY STATED A CLAIM FOR RETALIATION

### A. Prima Facie Case

To establish a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relation between the two events.  *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)[23];  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998). Summary judgment is ordinarily inappropriate once a prima facie case of retaliation has been

---

[23]The Eleventh Circuit "has recognized that §1981 includes a cause of action for retaliation...."  *Tucker v. Talladega City Schools*, 171 Fed.Appx. 289 (11th Cir. 2006); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 2001)(recognizing that §1981 retaliation claims are viable after the 1991 amendments to §1981). Furthermore, §1981 claims of employment discrimination are analyzed in the same manner as Title VII.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)(explicitly addressing a Title VII race discrimination claim with the understanding that the same analysis applied to both §1981 and Title VII).

established.  *Hairston*, 9 F.3d at 919-20.

It is undisputed that Plaintiff engaged in statutorily protected expression by filing an EEOC Charge, her Federal lawsuit, and numerous internal complaints.  Defendant's only argument regarding retaliation is that Plaintiff has not suffered an adverse employment action.  Defendant does not address wether there is a sufficient casual connection between her complaints and the adverse employment action, and does not articulate any legitimate reason for any actions taken against Blackledge. Therefore Plaintiff is not required to address these elements.

## B.    Adverse Employment Action

In *Wideman*, the Eleventh Circuit joined the majority of circuits and declared that the protection against retaliation provided for by Title VII "extends to adverse actions which fall short of ultimate employment decisions."  141 F.3d at 1456.  While the Court did note that the actions in question must reach "some threshold level of substantiality," it declined to delineate the exact boundaries of sufficiency.  Thus, a determination of whether certain behavior constitutes an adverse employment action must be made on a case-by-case basis.  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

The Eleventh Circuit has cautioned against limiting what counts as adverse, stating that it is "important that the threshold for what constitutes an adverse employment action not be elevated artificially, because an employer's action, to the extent that it is deemed not to rise to the level of an adverse employment action, is removed completely from any scrutiny for discrimination."  *Doe v. DeKalb County School District*, 145 F.3d 1441, 1453 n. 21 (11th Cir. 1998).  In *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1240 (11th Cir. 2001), the court sought to more explicitly define what counts as an adverse action, stating that "an employee must show a serious and material change

in the terms, conditions, or privileges of employment...as viewed by a reasonable person in the circumstances."

Adverse employment actions come in many shapes and sizes. As the Seventh Circuit has recognized, "the law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination" *Knox v. Indiana,* 93 F.3d 1327, 1334 (7th Cir. 1996); see *Fowler v. Sunrise Carpet Indus. Inc.*, 911 F.Supp. 1560, 1583 (N.D. Ga. 1996)(reprimands, even if removed from an employee's file can constitute an adverse employment action);

*Naia v. Deal*, 13 F.Supp. 2d 1369, 1381 (S.D. Ga. 1998)(a written reprimand is treatment that constitutes an adverse employment action). Heightened scrutiny has likewise been found to constitute an adverse employment action for purposes of a claim of retaliation. *Harrison v. Merto Gov. of Nashville*, 80 F.3d 1107 (6th Cir. 1996).

Here, Blackledge was forced to work in "an atmosphere in which [her] activities were scrutinized more carefully... and...the defendants took every opportunity to make [her] life as an employee unpleasant." *Harrison, 80* F.3d at 1119. Blackledge's supervisor have singled her out and forced to work in an environment where she constantly feels harassed and discriminated against as evidenced by her numerous notes and letters expressing her concerns. Despite her numerous complaints, Henry Ervin, Director of HR for ADMHMR, has done nothing to conduct an independent investigation into the retaliation taken against Blackledge.

Her work has been scrutinized intensely compared to her working conditions prior to her EEOC Charge and Civil Complaint. (See Exh. III). Indeed, surveillance is especially suspect "because its presence strongly suggests that subsequent discipline was for the purposes of

-36-

retaliation."  Schlei & Grossman, Employment Discrimination Law 559 (2d ed. 1983).

Here, Blackledge received an adverse performance appraisal and several forms of verbal discipline, both of which she had never encountered before filing her EEOC Charge, her federal lawsuit and her internal complaints.  In fact, as a 20 year employee of the ADMHMR, Plaintiff has been an exemplary employee who has always done a good job.  Defendant acknowledge that her performance has always met or exceeded expectations.  Plaintiff, as a long term employee who takes her job very seriously has been extremely hurt by her employer who has given her increased scrutiny and lower performance evaluations since she filed her good-faith complaints of harassment.  A reasonable person in her position would certainly consider any type of scrutiny and lowered evaluations a serious and material change to an employee's situation.

Even if none of the particular incidents, when viewed in isolation, amount to adverse employment action, when viewed as a whole, Blackledge's allegations do support a claim for retaliation.  In *Wideman* the court declined to analyze each incident by itself, stating instead that it was "enough to conclude, as we do, that the actions about which *Wideman* complains considered collectively are sufficient to constitute prohibited discrimination."  141 F.3d at 1456.

Relying on the *Wideman* approach considering the totality of the actions, Judge Hancock, writing for the court in *Johnson v. Stone Container*, 88 F.Supp. 2d 1295 (N.D. Ala. 2000) found that the plaintiff had suffered an adverse employment action where she received a written reprimand, **negative performance evaluation,** and one-day suspension with pay.  Clearly conduct Blackledge was subjected to constitutes adverse employment action.

Blackledge has presented a material question of fact as to whether the heightened scrutiny, lowered performance evaluations, which did not follow ADMHMR policies, constitute an adverse

employment action.

###### IV.    PLAINTIFF HAS SUFFICIENTLY ESTABLISHED 42 U.S.C. §§ 1981 and 1983 CLAIMS

Plaintiff has sufficiently established § 1981 racial discrimination promotion claims for the PQA II positions (2002 and 2004) and the CSS III position and for the retaliation she has suffered for the reasons stated above.  Plaintiff's § 1981,  through §1983, claims are brought against Defendant Houston in his official capacity as Commissioner of the ADMHMR and against the ADMHMR.  *Kentucky v. Graham*, 477 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985)("Official capacity suits ... 'represent only another way of pleading an action against an entity of which an officer is an agent.'")(citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035, n.55 (1978)).

Plaintiff is pursuing § 1981 job promotion and retaliation claims through the remedial provisions of §1983, as provided for under this Circuit's precedent, against defendant Houston  in his official capacity. *Butts v. County of Volusia,* 222 F.3d 891, 893 (11th Cir. 2000)(Recognizing that where a plaintiff seeks vindication of rights secured by § 1981 against a state actor, §1983 provides the exclusive remedy for obtaining relief); *Tucker v. Talladega City Schools*, 171 Fed. Appx. 289 (11th Cir. 2006) (recognizing that "any such claim must be brought under the remedial provisions of §1983"); *Collier v. The Clayton County Community Service*, 236 F.Supp.2d 1345 (N.D. Ga. 2002), when a plaintiff brings a § 1981 claim through § 1983, it simply "merges" into the §1983 claim); *Collier v. The Clayton County Community Service*, 236 F.Supp.2d 1345, 1369 (N.D. Ga. 2002); *Jones v. Sieglemen*, 2001 WL 1772159, at *2 (M.D. Ala. Dec. 26, 2001)(noting, "Title VII, § 1981, and § 1983 all prohibit an employer from discriminating against its employees on the basis of race."); *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 731-32 (1989); *Williams v. Alabama Dept. of*

*Transportation*, 2007 WL 1876372 (M.D. Ala., June 28, 2007)(J. DeMent)(plaintiff "brings his §

1981 claims against [the commissioner] in his official capacity and sues under 42 U.S.C. § 1983);

*Reynolds v. Alabama Dept. of Transportation*, 4 F.Supp.2s 1068, 1088 (M.D. Ala. 1998). Therefore,

there is nothing barring Plaintiff from bringing this lawsuit against Commissioner Houston in his

official capacity or ADMHMR for § 1981 violations.

　　　　Therefore, Plaintiff can maintain a § 1981 action through § 1983 and Defendant's Motion

for summary judgment as to the § 1981 claims should be denied for the reasons stated throughout

this Brief.

## **CONCLUSION**

　　　　Based upon the foregoing, it is clear that the Defendants' Motion for Summary Judgment

should be denied.  There are numerous factual issues involved which create a genuine issue of

material fact and should be determined by a jury.

　　　　　　　　　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　　　/s/ Joshua D. Wilson
　　　　　　　　　　　　　　　　　　Joshua D. Wilson
　　　　　　　　　　　　　　　　　　*Attorney for the Plaintiff*

**OF COUNSEL:**
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500

## CERTIFICATE OF SERVICE

I do hereby certify that I have filed a copy of the above and foregoing by filing the same with the EC/CMF system, which will provide notification to the following:

TROY KING
ATTORNEY GENERAL

COURTNEY W. TARVER
Deputy Attorney General and General Counsel
State of Alabama Department of
Mental Health and Mental Retardation
RSA Union Building
100 N. Union Street
P.O. Box 301410
Montgomery, Alabama 36130-1410
Phone: (334) 242-3038
Fax:   (334) 242-0924

This the ___1st___ Day of ___August___, 2007.

/s/ Joshua D. Wilson
Of Counsel