1        Q.    What's her husband's name?

2        A.    Johnnie.

3        Q.    Do any of the folks that you've named so

4    far, or have any of these folks before worked for

5    the Department of Mental Health?

6        A.    No.

7        Q.    Could you tell us a description of the

8    history of your education?

9        A.    Yes.  I have a Bachelor's degree in

10   History Education from Clark College.  It is now

11   Clark College Atlanta University.

12       Q.    Atlanta University?

13       A.    Yes.

14       Q.    Is that a B.A.?

15       A.    Yes.

16       Q.    When did you obtain that?

17       A.    1980.

18       Q.    Did you go to any school further than

19   that?

20       A.    Yes.

21       Q.    What else did you --

22       A.    I have a Master's degree from Florida

23   State University.

24       Q.    Which campus would that be?  Is there

25   only one?

1       A.    Tallahassee.

2       Q.    Tallahassee.  What year was that?

3       A.    1984.

4       Q.    Other than continuing education in your

5    field of work, have you had any other than formal

6    education?

7       A.    No.

8       Q.    And your master's was in what field?

9       A.    Social Work.

10      Q.    Are you licensed --

11      A.    Yes, I --

12      Q.    -- to do anything in the State of

13   Alabama?

14      A.    Yes, I am.

15      Q.    How many licenses do you hold?

16      A.    One.

17      Q.    What is that license?

18      A.    I'm a Master Licensed Degree Social

19   Worker.

20      Q.    Do you -- did you work prior to going to

21   college, to Clark College?

22      A.    Professionally?

23      Q.    Yes.

24      A.    No.

25      Q.    Unofficially, did you work before then?

1    Q.   Do you still have that license?

2    A.   Yes, I do. It's on inactive status.

3    Q.   When did it go onto inactive status?

4    A.   When I went to Florida State.

5    Q.   In 1984?

6    A.   Right. No. In 19, really '82.

7    Q.   '82. Since 1982, have you earned any

8    income commissions, fees of any sort from the

9    sale of real estate?

10   A.   No.

11   Q.   Is your master's license, social worker

12   license still in effect?

13   A.   Yes.

14   Q.   Has it been continuously in effect since

15   it was issued?

16   A.   Correct.

17   Q.   After obtaining your master's degree, did

18   you then become employed?

19   A.   Yes.

20   Q.   What year was that?

21   A.   That was in 1984.

22   Q.   Where did you work at that time?

23   A.   Belle Chasse State School.

24   Q.   In Florida?

25   A.   Louisiana. Belle Chasse, Louisiana,

1       right outside of New Orleans.

2              Q.   What kind of school was that?

3              A.   It was a school for the mentally

4       retarded, it was a developmental school.

5              Q.   How long did you work for Belle Chasse?

6              A.   Probably two years and three months.

7              Q.   When you left working at Belle Chasse

8       State School, where did you next work?

9              A.   For the Department.

10             Q.   When did you come to work for the

11      Department?  You're talking about the Department

12      of Mental Health?

13             A.   Correct.

14             Q.   Uh-huh.

15             A.   March 1987.

16             Q.   When you hired in to work for the

17      Department of Mental Health, what position did

18      you take?

19             A.   My working position or classification?

20             Q.   Classification.

21             A.   Mental Health Social Worker II.

22             Q.   Did you go immediately to Mental Health

23      Social Worker II?

24             A.   Correct.

25             Q.   You didn't begin as a Habilitation Team

1    Leader Trainee?

2         A.    That was my working classification.

3         Q.    But you said your -- I'm sorry.  How did

4    you say that, that you were a Mental Health

5    Social Worker II?

6         A.    Classification, yes.

7         Q.    They were both classifications, both of

8    those you said, the other one was working

9    classification?

10        A.    That was a working title, the

11   Habilitation Coordinator.

12        Q.    And you believe your official

13   classification when you came to work for the

14   Department was Mental Health Social Worker II?

15        A.    I believe it was, yes.

16        Q.    Do you have any documentation of that?

17        A.    No, I don't.  Personnel would have it.

18        Q.    Did your classification change while you

19   were at the Department of Mental Health?

20        A.    No.

21        Q.    Are you sure about that?

22        A.    That's why I was saying, you might want

23   to check with Personnel.

24        Q.    Well, when you came to work for the

25   Department --

1    A.    Uh-huh.

2    Q.    -- did you work for the Brewer Facility

3    itself?

4    A.    Yes, I did.

5    Q.    And is that distinguished from Region III

6    Community Service?

7    A.    Correct.

8    Q.    And you came in working for the Brewer

9    Center at first; is that correct?

10   A.    Correct.

11   Q.    And later you worked for Region III

12   Community Service?

13   A.    Correct.

14   Q.    Did your classification change when you

15   changed from --

16   A.    No.  It was a lateral move, I think.

17   Q.    Do you recall having, having been a

18   Habilitation Team Coordinator?

19   A.    Yes.  That was, I thought, my working

20   title.

21   Q.    So if you had a different classification,

22   you don't know about that; is that -- when you

23   first came to work for the Department?

24   A.    Correct.

25   Q.    When you came into the Department,

1    counsel regarding your complaints against the

2    Department of Mental Health?

3        A.    I think when EEOC asked for the

4    Department to mediate with me, and that was in

5    20004.

6        Q.    You were giving us a listing of your

7    duties and responsibilities with CMHMR.  You said

8    in approximately 1998 your duties changed, and

9    you listed those?

10        A.    Uh-huh.

11        Q.    Have they changed since that time?

12        A.    No.

13        Q.    So the duties that you listed earlier,

14    providing technical assistance in the area,

15    monitoring community homes and being the

16    monitoring coordinator, et cetera, are the same

17    ones that you perform today?

18        A.    Correct.

19        MR. WILSON:  Let me, I think there -- now

20        that I think of it, there is one document

21        that we had asked for that I don't believe

22        was provided that she would have.  If you

23        give me a minute, I'll find it.

24        MS. LUCK:  Yes.

25        MR. WILSON:  But that's the only one I

1          A.   And Susan Watson, yes.

2          Q.   What about Eleanor Talbert (phonetic)?

3          A.   Yes.

4          Q.   What about Lindsey Puckett?

5          A.   He was the facility director that was

6     over our division.

7          Q.   And has anyone else acted in a

8     supervisory role to you while you've been working

9     at the Department of Mental Health?

10          A.   No.

11          Q.   Your complaint alleges that you have

12     discriminated against on a racial basis?

13          A.   Yes.

14          Q.   And it doesn't allege that you've been

15     discriminated against on any other basis, does

16     it?

17          A.   Other than retaliation.

18          Q.   When did you first believe that you were

19     being discriminated against racially?

20          A.   In 2002.

21          Q.   And what was it that caused you to

22     believe you had been discriminated against?

23          A.   I applied for a position, which I thought

24     I was qualified for, and was passed over by a

25     white female.

1    Q.    Why did you believe that you were

2    discriminated against?

3    A.    I had the qualifications and I was more

4    qualified.

5    Q.    Who was the person who was given that

6    position?

7    A.    Daphne Rosalis.

8    Q.    And this was a Planning and Quality

9    Assurance position?

10    A.    Planning, Quality Assurance Specialist

11    II.

12    Q.    What is it -- why do you believe that you

13    were more qualified than Daphne Rosalis?

14    A.    First of all, I had the educational

15    experience.

16    Q.    Meaning what?

17    A.    I had a Master's degree in Social Work.

18    That was part of the requirement in the job

19    announcement.  The other thing is that based on

20    my extensive experience in Community Services, in

21    the area of Technical Assistance and Monitoring,

22    I felt that I was qualified, because in both of

23    those two areas, the focus is on quality of care

24    and trying to enhance the services of the

25    individuals that we serve.  Ms. Rosalis had no

49

1    experience in that area.  I saw the position --

2        Q.   I'm sorry.  She had no experience in the

3    area of Quality Assurance?

4        A.   Correct, or mental retardation.

5        Q.   And you know this?

6        A.   Yes.

7        Q.   What makes you think that?

8        A.   That she didn't?

9        Q.   Yes.

10       A.   Ms. Rosalis personally told me.

11       Q.   I'm going to show you what is Bate

12   stamped, and was provided to your attorney as

13   Document 0001 and 0002.

14       A.   Okay.

15       Q.   And tell me if you know what that is

16   (indicating).

17       A.   (Witness reviewing document.)  Yes, I've

18   seen that.

19       Q.   What is that?

20       A.   The job announcement for the position.

21       Q.   That you were just talking about?

22       A.   Correct.

23       Q.   And that's the one that Ms. Rosalis was

24   hired?

25       A.   Correct.

50

1          MS. LUCK:  Could we mark that, please, as

2      an exhibit?

3          (Exhibit No. 3 was marked for

4          identification.)

5  BY MS. LUCK CONTINUED:

6          Q.  I want to ask you on that announcement

7      what is the requirement for education?

8          A.  A Master's degree in Public Health,

9      Special Education, Social Work or Psychology.

10          Q.  Thank you.  What other reasons do you

11      have for stating that Ms. Rosalis was not as

12      qualified as you were?

13          A.  Well, let's go back to what I was doing,

14      okay, and give you a little historical

15      information.  This position in the division was

16      new to the Department's personal emphasis in this

17      area to the extent that they created a division.

18      Now what year that was, I think it might have been

19      2001, or whatever.

20          Q.  What division did they create?

21          A.  The Planning, Quality Assurance Division.

22      And the director was Brian Christopher Farnham?

23      (phonetic).

24          Q.  Would that be B.C. Farnham?

25          A.  Yes.

---

51

1      Q.    And that was in about, you think,

2    somewhere near 2002?

3      A.    Yeah, uh-huh.  And it was new to

4    everybody, okay, the expectations of what was

5    going to be done in this position.  I felt my

6    experience, Technical Assistance, working with

7    the care providers in meeting the standards in

8    ensuring quality of care made me qualified along

9    with the monitoring, because one of the purposes

10   of the monitoring was to go out there to ensure

11   that services were being provided and quality of

12   care was being provided.  And during my 15 years

13   experience in Community Services, that has always

14   where my emphasis has always been.

15          I saw this particular position move me

16   into a different level and being an asset with

17   those experiences in helping the care providers

18   to improve even better the quality of care by

19   helping them to do more effective quality

20   enhancement planning.  Ms. Rosalis had no

21   experience in this area or in Community Services.

22          Most of the individuals, and I can safely

23   say this, that was hired in this position at that

24   time, except in our region, came from the

25   Community Services offices.  So it must have been

52

1    some value for the Community Services staff to be

2    hired into these areas, into this area.

3            Now, after Ms. Rosalis was hired into

4    this position, I was asked by my supervisor then,

5    Susan Stuardi, who's also the director of

6    Community Services at that time, to train Ms.

7    Rosalis.  Now, I was good enough to train Ms.

8    Rosalis, but I was not qualified enough to be

9    hired into the position.

10           Also, it was a well-known fact that Ms.

11   Rosalis and B.C. Farnham were friends.  There was

12   not -- nothing secret about that friendship.  In

13   2004, Ms. Rosalis confirmed the long-term

14   friendship to me that she had with Mr. Farnham to

15   the extent that she told me they went to school

16   together, in Atlanta, worked together in North

17   Carolina, lived and worked together in New York.

18       Q.   So are you basing your claims that Ms.

19   Rosalis was not as qualified as you were on the

20   fact that she knew someone in the department --

21           **MR. WILSON:**  Object to the form.

22           **MS. LUCK:**  -- prior to being hired?

23           **MR. WILSON:**  Object to the form.  Is that

24   what you are telling me?

25       A.   Yes.  Not only that, she was not

53

1    qualified, but I was passed over and I was more

2    qualified by a white female.  I was discriminated

3    against.

4    **BY MS. LUCK CONTINUED:**

5    Q.  If Ms. Rosalis did have MR experience --

6    A.  Uh-huh.

7    Q.  -- and QA experience --

8    A.  Uh-huh.

9    Q.  -- do you still contend that you were

10   more qualified than she was?

11   A.  Yes, ma'am.

12   Q.  And why is that?

13   A.  I had 15 years of Community Services

14   experience.  In order to do this job more

15   effectively, I knew the Community providers, I

16   knew the Community standards, I had a rapport

17   with the Community providers, I knew the missions

18   of the Community providers, I knew the strengths

19   and weaknesses of the Community providers, Ms.

20   Rosalis knew none of that.

21   Q.  Do you know if there were others who --

22   hold on just one second.  Let me see.  Are you

23   familiar with the scoring sheet from the

24   interview in that position?  Have you seen this?

25   It's marked as 0021, page 0021.  It was provided

54

1    to your attorney.

2        A.   Let me see?

3        Q.   Let me have it marked first as Exhibit

4    No. 4.

5        (Exhibit No. 4 was marked for

6        identification.)

7            Have you seen that document before?

8            (Handing document to witness.)

9        A.   (Witness reviewing document.)  Yeah, I

10   think this is one.  Yeah, this is the one, yeah.

11   Yeah, I saw it.

12       Q.   Do you know what it is?

13       A.   I guess it was the scores based on your

14   interview.

15       Q.   Okay.  Can you tell from looking at

16   Exhibit No. 4 who interviewed the interviewees?

17   Who did the interviewing?

18       A.   I guess it's these several people on the

19   side here to the left (indicating).

20       Q.   And who are they?  Could you --

21       A.   B.C. Farnham,  Marilyn Benson, Joe --that

22   he spelled it -- pronounced it Medours - Alice

23   Widgeon, Jewel Pitts.

24       Q.   And how many people were interviewed?

25       A.   Okay.  There was one, two, four, five.

1    Q.    Who scored the highest in the interviews?

2    A.    Daphne Rosalis.

3    Q.    Who scored second highest in the

4    interviews?

5    A.    Yolanda Thomas.

6    Q.    And you see that there were several

7    interviewers who made those determinations?

8    A.    Correct.

9    Q.    Do you believe that any one of those

10    people racially discriminated against you?

11    A.    Yes, I do.

12    Q.    Which ones?

13    A.    All of them.

14    Q.    Other than your scores on the interview,

15    do you have any reason to believe that any of

16    these people discriminated against you racially?

17    A.    That's a no.

18    Q.    In your complaint you've alleged that

19    there was not one but several times that you

20    applied for a position that you did not get, and

21    you've alleged that that was racial

22    discrimination?

23    A.    Correct.

24    Q.    What was the second time that you applied

25    for a position that you did not get?

1      A.   The year or the position?

2      Q.   The position.

3      A.   Community Services Specialist II -- III,

4    I'm sorry.

5      Q.   And do you recall what year that was?

6      A.   2003.

7      Q.   On that occasion, do you believe that you

8    were racially discriminated against?

9      A.   Yes, ma'am.

10     Q.   In what way?

11     A.   I was the most qualified.  I was passed

12   over by a white female that had no Community

13   Services experience.

14     Q.   All right.

15   **MS. LUCK:**  I'd like to have this document

16   marked as Exhibit No. 5.

17     (Exhibit No. 5 was marked for

18     identification.)

19   **BY MS. LUCK CONTINUED:**

20     Q.   Ms. Blackledge, would you look at Exhibit

21   No. 5, please, and tell me if you recognize that

22   document?

23     A.   Yes.

24     Q.   What is that?

25     A.   Job announcement for the Community

1       A.    I'm pretty sure I had to.

2       Q.    Do you know who was in charge of the

3    facility when Dr. Harris was not there?

4       A.    I think sometimes Mickey Groggel.

5       Q.    Did you ever have to work with Mickey

6    Groggel?

7       A.    While she was in charge of the facility?

8       Q.    Yes.

9       A.    Not that I'm aware of.

10      Q.    You have alleged that because -- you've

11   alleged that, that you were racially

12   discriminated against because you didn't get the

13   CSS III position?

14      A.    Correct.

15      Q.    And what is your basis for that

16   allegation?

17      A.    I was doing the position.  This

18   announcement right here (indicating), I was doing

19   it, okay?  Under the title work, I was doing the

20   job.  I had 15 years experience in Community

21   Services.  Under the kind of work, it focused on

22   personal planning.  It focused on having

23   experience with technical assistance, with skill

24   acquisition, behavior management, DMHMR community

25   mental retardation standards.  Little did it

1    focus on having administrative experience.  Under

2    the kind of work, it did not focus on

3    administrative experience at all.  You did not

4    have to have administrative experience.

5              Now, let me say this:  Prior to coming to

6    Community Services, I was also doing some of this

7    that was under the kind of work as far as the job

8    responsibility.  As a habilitation treatment team

9    coordinator, I had to write skill acquisition

10   objectives, I had to write behavior management

11   plans.  So again, when coming to Community

12   Services, that was an asset.  Okay?  So I was

13   doing work required in the job announcement.

14             Ms. Groggel experience was in

15   institutionalization, okay, where it is very

16   regulated, very structured.  I was in Community

17   Services.  Ms. Groggel and her staff looked to

18   the Community Services staff to

19   deinstitutionalize these individuals and put them

20   out into the community.  The facility staff

21   looked to us to make sure that there was quality

22   of care, to make sure that the services were

23   there.  So I was doing the job.

24        Q.   May I see that a minute, Exhibit No. 5?

25        A.   Sure.  (Witness handing the document to

1    counsel).

2        Q.    Okay.  So you felt that you were doing

3    that job even though you didn't have that job,

4    right, you had a different classification?

5        A.    Yes, I was doing the job.

6        Q.    And in fact you felt that you were doing

7    the job so much so that you asked for a desk

8    audit, did you not?

9        A.    I filed an internal complaint and my

10    supervisor asked for the desk audit.  That would

11    have been Susan Stuardi.

12        Q.    And you had a desk audit, didn't you?

13        A.    Correct.

14        Q.    And what is a desk audit?

15        A.    From the little I know about the desk

16    audit, they look at basically what you are doing

17    and look at the classification to see whether or

18    not you would be more -- you would meet that

19    higher classification.

20        Q.    So in the desk audit that you had --

21        A.    Uh-huh.

22        Q.    -- individuals came and looked at what

23    you did on a regular basis in your work?

24        A.    No, they did not.

25        Q.    All right.  Let me put it this way.  In

72

1    A.   Most definitely.

2    Q.   And do you think that Ms. Benson

3   discriminated against you because you were black?

4    A.   I would like to elaborate, if I could?

5    Q.   Can you answer that question first?

6    A.   No, Ms. Benson was black.  No, I don't

7   think she did, no.

8    Q.   Why do you think she did that?  You said

9   that you don't think she came to a correct

10   conclusion.

11    A.   No, I don't.  And let me say this:  In

12   order for Ms. Benson to have come to a conclusion

13   in that desk audit, she would have had to have

14   scored that desk audit.  Ms. Benson did an

15   improper desk audit.  She did not even score the

16   desk audit.  And further, and I don't want to have

17   to bring it in, but in the hearing, because we had

18   a hearing after the desk audit, Ms. Benson said

19   her boss told her to do it like that.  So how can

20   you come to a conclusion about where I should be

21   when you didn't even score the desk audit.  And

22   not only that, Ms. Benson had incorrect

23   information in my desk audit.

24        Not only that, Ms. Benson interview with

25   me was probably ten minutes or so.  Not only that,

1    after I found out she did an improper desk audit,

2    I found out that Ms. Benson didn't even ask me for

3    a narrative of what I did.  Not only that, but Ms.

4    Stuardi -- because Ms. Benson did not even sign

5    the desk audit, by the way -- Ms. Stuardi wrote me

6    the memo responding for Ms. Benson.  Ms. Stuardi

7    as my director did not even correct the incorrect

8    information Ms. Benson had on the desk audit to

9    let me know that either Ms. Stuardi did not want

10   to correct it, or Ms. Stuardi -- or Ms. Benson did

11   not ask Ms. Stuardi for any information on my job

12   responsibility.

13       Q.   Okay.  Let me just stop you here and

14   get --

15       A.   Sure.

16       Q.   -- a few things cleared on the record.

17       A.   Uh-huh.

18       Q.   You said that Ms. Benson said that her

19   supervisor wanted her to do something.

20       A.   Wanted her to do the desk audit the way

21   that she did it.

22       Q.   Who was her supervisor?

23       A.   I would imagine her supervisor was Henry

24   Ervin.

25       Q.   And Henry Ervin, is he a white man or a

1     A.   Again, I was doing the job.

2     Q.   Anything else?

3     A.   I had --

4     Q.   Anything else?

5     A.   Yeah.  I had at that time 15 years of

6  experience in Community Services.

7     Q.   Okay.  You've told us that.

8     A.   Right.

9     Q.   Is there anything else that you haven't

10  told us about?

11     A.   No.

12     Q.   I may come back to this --

13     A.   Sure.

14     Q.   -- but I want to go sort of

15  systematically, if I can, to the next position

16  that you're claiming you were discriminated

17  against.

18     A.   Sure.

19     Q.   The next time that you say you were

20  discriminated against racially --

21     A.   Uh-huh.

22     Q.   -- was when you didn't -- once again did

23  not get a P&QA II position?

24     A.   Correct.

25     Q.   What year was that?

1      A.   2004.

2      Q.   And who received -- who was hired for

3   that position?

4      A.   Mickey Groggel.

5      Q.   Do you recall who interviewed for the

6   position?

7      A.   I think it was just me and Mickey

8   Groggel.

9      Q.   Do you recall whether that position was

10   announced just statewide, department-wide, or

11   just facility-wide?

12      A.   I don't know how it was announced.

13      Q.   When that position came open --

14      A.   Uh-huh.

15      Q.   -- Ms. Groggel had been working as a CSS

16   III, is that right, she had had that position?

17      A.   For a short time.  And let me say "for a

18   short time," I would say less than two months.

19      Q.   Do you have any reason that -- do you

20   have any reasons at all for thinking that you

21   were racially discriminated against because you

22   didn't get that position?

23      A.   May I refer back to this document

24   (indicating)?

25      Q.   Yes, you may.  You were --

1    A.    In this document, it clearly talks about

2    the preselection and did not have the domino

3    moves of individuals to positions.

4    Q.    Okay.  You believe that your Plaintiff's

5    Exhibit A shows something that you believe

6    indicates there was a preselection of

7    individuals?

8    A.    Correct.

9    Q.    And what positions are you alleging there

10   was a preselection for in this document

11   (indicating)?

12   A.    The Community Services Specialist III and

13   the Planning Quality Assurance II, both positions

14   Ms. Groggel got.

15   Q.    Do you want to elaborate -- I mean, why

16   you think that there was a preselection?

17   A.    It's in the memo.

18   Q.    What exactly tells you that?

19   A.    Do you want me to read the whole memo to

20   you?

21   Q.    Not necessarily, no.

22   A.    Ms. Stuardi talks about vacating the

23   Community Services Specialist III position and if

24   Kathi Allen wanted the Community Services

25   Specialist III position, then when Ms. Groggel

1    vacated that position for the Planning Quality

2    Assurance position that Kathi Allen could move

3    into that position.

4         Now, let me say this:  Both of those

5    individuals were white females.  I did not have a

6    fair opportunity at all to compete where I

7    qualified.  Two white females were selected, and

8    I was passed over by them and I qualified.  If

9    this doesn't say it, I don't know what does.

10        Q.    What is the date of that memo?

11        A.    February 2nd, 2004.

12        Q.    When do you recall that the Brewer Center

13   closed?

14        A.    Which one, because we had the Annex in

15   Daphne and the one --

16        Q.    That's a fair question.  All right.  When

17   it finally closed, the Daphne facility.

18        A.    It was April 2004.

19        Q.    Did a lot of people have to change their

20   jobs when the Brewer Center closed?

21        A.    I would imagine they did.

22        Q.    Well, do you recall seeing that, and

23   knowing it?

24        A.    Some people got laid off and some people

25   jobs got changed, yes.

107

1    the three positions.

2    **BY MS. LUCK CONTINUED:**

3        Q.    What about, you have no other complaints

4    of racial discrimination?

5        A.    No.

6        Q.    You have any other complaints about

7    hostile work environment because of racial

8    issues?

9        A.    I have a complaint with regard to hostile

10    racial environment retaliation, yes.

11        Q.    Okay.  I want to hear about all of that.

12    So let's start with the first one.  I mean, you

13    can go present and back in time or go to the very

14    first in time and forward, whichever you'd like

15    to do.

16        A.    Okay.  Let's go with the first one.

17        Q.    Okay.  The very first time --

18        A.    Uh-huh.

19        Q.    -- that you felt that you were in a

20    hostile environment at work because of a racial

21    problem.

22        A.    Did you say racial problem?

23        Q.    Yes, I did say racial problem.

24        A.    It was a hostile environment in

25    retaliation, and I felt like I was being singled

1    out.

2         Q.   Okay.  All right.  So retaliation --

3         A.   Uh-huh.

4         Q.   -- and singled out.

5         A.   Uh-huh.

6         Q.   And what was that retaliation do you

7    think for, you allege?

8         A.   Because I probably filed my -- I know

9    because a filed a discrimination suit, I think.

10        Q.   Because you filed an EEOC complaint; is

11   that what you're talking about?

12        A.   And the lawsuit, yes.

13        Q.   And lawsuit?

14        A.   Uh-huh.

15        Q.   Okay.  And I'm going to try to put some

16   dates to this so we understand what we're talking

17   about.

18        A.   Okay.

19        Q.   When did you file your EEOC complaint?

20        A.   June, maybe.  June '04.

21        Q.   About June of '04?

22        A.   Yeah.

23        Q.   And when did you file your lawsuit?

24        A.   April '06, I think.

25        Q.   Now just so that I don't miss anything, I

134

1       A.    Uh-huh, the Department administrators.

2       Q.    They're all individual people; is that

3    right?

4       A.    Uh-huh.

5       Q.    I mean, the Department doesn't --

6       A.    I'm talking about --

7       Q.    -- have a voice itself?

8       A.    Right.  The Department administrators,

9    yes, uh-huh.

10      Q.    So some person, if Jerrylyn London was

11   told something, she had to be told by a person?

12      A.    Right.

13      Q.    Now, what person or persons do you allege

14   told Jerrylyn London to treat you differently?

15      A.    I have no slightly idea.  I do know that

16   it started occurring after I filed my harassment

17   -- I mean, EEOC and lawsuit charges.  Let me say

18   this:  I have never, in the 20 years I've been

19   with the Department prior to filing my internal

20   complaint, EEOC complaint or lawsuit had any

21   problems with supervisors, no problems with my

22   job performance, and I don't appreciate nobody

23   taking my job performance lightly, because I

24   don't take it lightly.  And my evaluations up

25   until the time that I filed those complaints

1    speaks for themselves.

2         Q.   We have to go back a step.

3         A.   Yeah.

4         Q.   You have alleged here in this room

5    today --

6         A.   Right.

7         Q.   -- that somebody or some people --

8         A.   Uh-huh.

9         Q.   -- told Jerrylyn London to treat you

10   differently than other employees and you said

11   that's based on the fact that you had filed a

12   complaint?

13        A.   That's when it all started.

14        Q.   First of all, who are the people?

15        A.   I wish I could tell you.

16        Q.   So you don't know?

17        A.   Other than the Department administrators.

18   That might be a question you need to ask somebody

19   else.

20        Q.   Now, what basis do you have for saying

21   that someone told Jerrylyn London what to do that

22   triggered your --

23        A.   It's all because of my lawsuit.  Ma'am, I

24   didn't have any problems until after I filed my

25   lawsuit.

1      A.   One time saying that my door was closed,

2   indicating that I did not have enough work to do,

3   which wasn't a common practice in Community

4   Services for the staff to have their door closed.

5   And my door was not closed.  It was more ajar.  I

6   kept it kind of cracked, like, where I could see

7   what was going on outside, and hear what was

8   going on.

9      Q.   Okay.  And how was this brought to your

10   attention?

11      A.   Ms. London, I think, called me by the

12   phone and asked me basically what I was doing and

13   that my door was closed and that indicated to her

14   that I didn't have enough to do.  The second

15   incident --

16      Q.   Okay.  Excuse me.

17      A.   Sure.

18      Q.   Did you know that you were supposed to

19   leave your door open?

20      A.   I didn't know it was a requirement that

21   you had to leave your door open, because, like I

22   said, it wasn't a common practice.  I mean, a lot

23   of staff had their doors closed.  I wasn't the

24   only one.

25      Q.   When Ms. London brought it to your

---

1  attention --

2      A.  Yes.

3      Q.  -- that she didn't think it appropriate,

4  that your door was closed?

5      A.  Uh-huh.

6      Q.  If in fact that's what you're alleging?

7      A.  Uh-huh.

8      Q.  If that happened, why couldn't you simply

9  open the door?

10     A.  My door was never closed, ma'am.  It was

11 always open.  It was ajar.  That's how I kept my

12 door.  Now sometimes it did close, but I wasn't

13 the only staff in that building that closed their

14 door.

15     Q.  You felt that that rose to a level high

16 enough for you to complain --

17     A.  It started --

18     Q.  -- because she asked you --

19     A.  It started to.

20     Q.  Because she had asked you --

21     A.  It started to.

22     Q.  Excuse me.  But we'll have to do this one

23 at a time, because the court reporter's trying to

24 write it down.

25     A.  Okay.

Q.   Other than her recommendation that you keep your door open, what other singling out incidences that you have say that happened?

A.   Indicating that I didn't work an eight-hour day.

Q.   And how did she indicate that?

A.   Through her email.  Didn't give any specific dates and times, but she did indicate that.  And I, you know, after she indicated that, to try to avoid any more problems, I just moved my clock ahead 15 minutes and worked -- and was very conscientious about what, you know, I was doing and not trying to leave early.  I thought it to be strange though, because, you know, other staff were doing the same thing, including Ms. London, you know.  It was nothing for staff to -- if you want to get into not working an eight-hour day, it was nothing for staff to come in late and sign that they came in on time, it was nothing for staff to take two hour lunch breaks, it was nothing for staff to go grocery shopping, it was nothing for staff to go get their haircut, not taking leave, it was nothing for staff to leave early not taking leave.  I could run the whole gamut of what staff was doing, but I got singled

1      out for doing it.

2           Q.   And that's set out in this letter as

3      well?

4           A.   (Witness nods head.)

5           Q.   Is that the description you made at the

6      third page, if you want to look at it --

7           A.   Uh-huh.

8           Q.   -- near the bottom about leaving 15

9      minutes early?

10          A.   (Witness reviewing document.)  There

11     might have been two incidents.  But, yeah, 15

12     minutes early, yes, uh-huh, that was that

13     incident.  Not working an eight-hour-day --

14          Q.   Did you leave 15 minutes early at that

15     time --

16          A.   I don't recall doing that.

17          Q.   You don't recall?

18          A.   No.  But let me say this:  Also, I don't

19     recall doing it, but I was also a staff person

20     that was punctual with my time, and being a

21     morning person, it was nothing for me to get

22     there, you know, early either, but, you know, I

23     don't recall that.

24          Q.   Okay.  So what you're saying to me is

25     that there is one or two times --

142

1      A.   No.  No more than one or two times.

2      Q.   I'm sorry.  Let me ask my question.

3      A.   All right.

4      Q.   -- one or two times that Ms. London

5  suggested to you that you work the full day and

6  not leave early?

7      A.   Correct.

8      Q.   And you thought that rose to the level of

9  something that you should complain about and that

10  that was disparity of treatment?

11      A.   It was disparity of treatment, but I

12  didn't immediately, if you notice, write Ms.

13  Wilson.  It was an accumulation of things.

14      Q.   What other incidents did you complain

15  about in March of '06 when you believe you were

16  singled out by Ms. London?

17      A.   Spring conference.

18      Q.   What about spring conference?

19      A.   I had complications with my knee after

20  the knee surgery, and I was in a lot of pain, but

21  I'm not a person that likes to just take those

22  injections unless I have to.  So I was trying to

23  hold off on taking the injections, but it had got

24  to the point where it was affecting my ambulation

25  and mobility.  So I asked Ms. London could I be

1   off for spring conference, and the first day that

2   I asked her she told me, yes.  Okay.  And then the

3   next day she, I think either emailed me or called

4   me and said she couldn't recall whether or not I

5   was going to take off for spring conference due

6   to my knee.  And I think I called her back and

7   told her that I needed to receive the medical

8   treatment.

9           And then at that point, she told me that

10  she needed me to assist Lori Meadows (phonetic),

11  who was one of the people that was handling the

12  registration, and I did tell her that I needed to

13  be out for my knee, because I thought at that time

14  that if I could just get off of it, you know, and

15  take the medical treatment I could get myself

16  together.  And when she told me that, she told me

17  that if I didn't come to spring conference, that

18  I would have to bring a doctor's statement.  See,

19  I found that to be unusual, because since being

20  in Community Services I never have heard of any

21  employee that had to bring in a doctor's

22  statement.

23          So what I also did was, I asked another

24  employee to do the assignment for me, because,

25  you know, a lot of people knew I was having pain,

1    and she told me that she would do it, and I let

2    Ms. London know and she said something about she

3    had to check the assignment list, but if I wasn't

4    coming, you know, to bring the doctor's

5    statement.

6           I did bring the doctor's statement, and I

7    gave it to Ms. London, and I think she left to go

8    on vacation and she didn't sign my leave.  So I

9    was kind of left in a limbo as to that Friday

10   before spring conference what to do.

11          So I called Central Office and talked to

12   Mr. Mitchell, Fordyce Mitchell, who was the only

13   person I could get in touch with at the time, and

14   he called me back and I told Mr. Mitchell that I

15   had brought in the doctor's statement because I

16   needed medical treatment and I needed to be off

17   at least for that first day of the spring

18   conference.  And Mr. Mitchell's response was:

19   "You mean you brought in a doctor's statement and

20   she still didn't sign it, your leave?"  And I

21   said, "No, she didn't sign my leave."  And so

22   she -- he just thanked me for, you know, making

23   the phone call, because I told Mr. Mitchell that

24   I didn't want to get in any trouble or anything, I

25   wasn't trying to create any problems, I just

1    needed to have this medical treatment.

2         Now, let me say this, too.  I was very

3    conscientious about going to spring conference.

4    I can't even recall a time that I've missed

5    spring conference.

6         Q.  It comes every year?

7         A.  Every year.  The only time that I may

8    have missed spring conference was when the

9    supervisor did not approve for the staff to go,

10   but at any time during my 15 years or 20 years of

11   being in Community Services, I always attended

12   spring conference and assisted in spring

13   conference.

14        And I also found it strange that

15   Mrs. London wouldn't allow me to go when she

16   allowed the primary person, Shirley Patterson --

17   because Ms. London wanted me to assist with

18   registration, but she allowed the primary person,

19   Shirley Patterson, to go on vacation.  And like I

20   said, I had found a substitute and there was 20

21   other people in the building that could have

22   assisted that day with the registration.

23        Q.  Okay.  You said 20 other people?

24        A.  We had about 20 other people in the

25   building, including Community Services staff,

1    Advocacy, Planning and Quality Assurance people,

2    you know, everyone was housed together, but she

3    was adamant that I attend the spring conference.

4        Q.   Now, spring conference comes about once a

5    year?

6        A.   Correct.

7        Q.   And would you say it's an important event

8    in Community Services?

9        A.   Well, it's an important event, yes,

10   uh-huh.  We host it, yes, uh-huh.

11       Q.   And you host it for who?  For other --

12       A.   For the -- yeah, other regions and other

13   community providers, whoever wants to come, yeah,

14   uh-huh.

15       Q.   Did you try to schedule your medical

16   treatment for another day?

17       A.   Well, Ms. London did ask me to schedule

18   my medical treatment for another day, which I

19   found strange when I was in need of this medical

20   treatment.  She wanted me to reschedule a medical

21   treatment, which was a health issue, but she gave

22   the person that was over registration vacation.

23       Q.   The secretary?

24       A.   Yes, uh-huh.

25       Q.   So eventually, after -- if I'm not

1    Q.   And you said that there was a discrepancy

2   about your attending the spring conference.  Were

3   there any other incidences when you believe that

4   Ms. London singled you out?

5    A.   When she dropped my performance

6   appraisal.

7    Q.   What do you mean, she dropped your

8   performance appraisal?

9    A.   She dropped it from the previous year.  I

10   think it was about 7.7 points she dropped it.

11    Q.   I'm trying to get some papers.  Excuse me

12   just a second.

13    A.   Uh-huh.

14    Q.   And I want to show them to you.  All

15   right.

16        What I'd like to do is show these to you

17   in chronological order.

18    A.   Uh-huh.

19    Q.   I'm going to show you a three-page

20   document that is marked as Exhibit No. 20, and

21   it's Bate stamped 4055, 4056 and 4057.

22    (Exhibit No. 20 was marked for

23    identification.)

24    A.   Okay.

25    Q.   And ask you if you recognize what that

1    something?

2        Q.   Yes.

3        A.   And I don't know how you want to handle

4    this.  There was one that was done prior to this,

5    and if it needs to be -- it was one where it was

6    dropped drastically from this one.  You got it?

7    No, that's the year before, I think.  That's

8    where the corrections were made, uh-huh.  There's

9    two different ones.  Uh-huh.

10        How can I explain that?  I don't remember

11   all the numbers.  I think this was the year

12   before.

13       Q.   I don't think I have anything I haven't

14   shown you in that time period.  So let's see if

15   you can describe that for me, if you will?

16       A.   Okay.  I will.

17       Q.   Just one second here.

18       A.   Sure.

19       Q.   Let me try to understand.  This one that

20   we've marked Exhibit No. 22 covers the period of

21   January of '05 to January of '06, and that's

22   signed by Jerrylyn London?

23       A.   Uh-huh.  That was the last one Jerrylyn

24   did on me, I think.

25       MR. WILSON:  This was the year before

1     that we marked?

2     A.  That's the year before, yeah.

3     **BY MS. LUCK CONTINUED:**

4     Q.  Is this the one you're talking about?

5     A.  Huh-uh.  We're talking about this one

6     (indicating), the last one she did on me.

7     Q.  I'm sorry.  Are you talking about any of

8     the ones that are on this table in front of you as

9     far as what you're complaining about?

10     A.  This one (indicating).

11     Q.  Okay.

12     A.  But it's not all of it.  That's all I'm

13     saying to you.

14     Q.  Was there some more pages?

15     A.  Well --

16     Q.  What do you mean that's "not all of it"?

17     A.  Okay.  She --

18     Q.  I'm sorry.  When you say "this one," tell

19     the court reporter so we can get it on the record

20     which one you're talking about.

21     A.  Okay.  Exhibit No. 22.

22     Q.  Okay.  Exhibit No. 22, which is 2 pages?

23     A.  Okay.

24     Q.  And what about that as it relates to your

25     claim?

1    Bate stamped 3366 and 3367, and they are marked

2    as Exhibit No. 23, and ask you if you recognize

3    that document (indicating)?

4         (Exhibit No. 23 was marked for

5         identification.)

6    A.    Right.

7    Q.    Would you tell the Court what that is?

8    A.    That is the performance appraisal done

9    from the year January the 1st, 2004 to January

10   the 1st, 2005.

11   Q.    Now, is that the evaluation that you have

12   testified to being the score that you wanted your

13   new score raised up to, is that the one you're

14   comparing it to?

15   A.    That's correct, yes.

16   Q.    Yes.  In 2004 to 5, you received a

17   certain score?

18   A.    Uh-huh.

19   Q.    And you argued with Ms. London that you

20   felt you should have that same score --

21   A.    Uh-huh.

22   Q.    -- or higher the next year?

23   A.    I didn't say higher, but definitely the

24   same score.

25   Q.    Uh-huh.

---

**BAY AREA REPORTING**
**MOBILE, AL (251) 473-1016**

1       A.    Because, you know, during the pre-

2   appraisal nothing was said to me about my job

3   performance, and that was the time at the pre-

4   appraisal to say, Winifred, on job responsibility

5   111 you need to do that and to develop a plan with

6   me on how to improve that job performance area.

7       Q.    Now, what was the date of the -- do you

8   know what the date of Ms. London's appraisal was

9   that followed this Exhibit No. 23?

10      A.    It's this one (indicating).

11      Q.    Was that the next one?

12      A.    Yeah.

13      Q.    Is that the one you're complaining about?

14      MR. WILSON:  I think  -- I'm not trying

15  to interrupt, but are you saying there's a

16  pre-appraisal in between that?

17      A.    Yeah. There was another pre-appraisal

18  that she did at the same time when she dropped it

19  to 20-something, where she really drastically

20  dropped it.

21  BY MS. LUCK CONTINUED:

22      Q.    The same time as what?

23      A.    As this pre-appraisal evaluation time.

24      MS. LUCK:  I'm sorry. Can we go off the

25  record for just a minute?

1    Exhibit No. 23, what was your score?

2        A.   Thirty-six point three, which put me in

3    the "Exceeds Standards."

4        Q.   Same category -- I mean, general

5    category, "Exceeds Standards?

6        A.   Correct.

7        Q.   And do you believe that this constitutes

8    dropping your performance appraisal?  That's what

9    you would call it, dropping?

10       A.   Yes.  Without no justification, no

11   reason, nothing was said during the pre-

12   appraisal.

13       Q.   Well, what about all these meetings that

14   you had with Ms. London about your, you know,

15   attempts to get her to raise it back up again?

16   Did you have any discussions with her at that

17   time as to why she had rated you lower?

18       A.   Yes.  She told me that she had had a year

19   to evaluate me from the previous director, who

20   was Susan Stuardi.

21       Q.   Okay.  So the previous director gave you

22   the score that you were trying to get Ms. London

23   to give you?

24       A.   Not true, because she did the previous --

25   I don't want to confuse you anymore, but she did

1    2:00 to 2:30?

2         A.   Right.

3         Q.   How long were you in her office?

4         A.   Probably 15 or 20 minutes.

5         Q.   What did you discuss with her while you

6    were in there?

7         A.   She proceeded to show me the evaluation,

8    and I told her you dropped my evaluation

9    drastically.  And I said to her, like I told Ms.

10   London, you know, you haven't given me no prior

11   counseling, nothing -- and she had dropped my

12   evaluation in all job responsibilities, by the

13   way -- and you didn't tell me in the pre-

14   appraisal that you were having problems with any

15   of my job responsibilities, you know, to drop it.

16         And Ms. Butler's response was, well, you

17   know, she wasn't going to change it, but you can

18   do an attachment.  And -- but I didn't sign it.

19   And I told Ms. Butler I wanted to review it.  And

20   so, I left her office and I was trying to regroup

21   from what had happened, and so I sat there for a

22   little while and then I started to review it,

23   because I had told Ms. Butler that I would get

24   back with her.

25         I don't think me and Ms. Butler had any

1      more discussion that day on it, because I think

2      she told me to do an attachment.  And --

3          Q.   I'm going to show you something here.

4          A.   Sure, uh-huh.

5          Q.   Ms. Blackledge I'm going to show you

6      what's marked as Exhibit No. 26.

7          (Exhibit No. 26 was marked for

8          identification.)

9          A.   Uh-huh.

10         Q.   4038 is the Bate stamp.  Is that the

11     attachment that you are describing?

12         A.   Well, some of the pages are missing.  I

13     see page 2, but that is to Ms. Butler's pre-

14     appraisal, by the way.

15         Q.   So that's not it?

16         A.   No.

17         Q.   All right.  Let's see if we can find

18     them.  Ms. Blackledge, I'm going to show you what

19     is marked as Exhibit No. 27, and it's Bate

20     stamped 4004 and following through 4009.

21         (Exhibit No. 27 was marked for

22         identification.)

23         A.   Okay.

24         Q.   I ask you if you recognize that?

25         A.   Okay.  .(Witness reviewing document.)

1    Yes, I can explain that one, but you don't have

2    all of that.  Okay.  Yes, I do recognize it.

3         Q.    What is that?

4         A.    That's the attachment to the performance

5    appraisal Ms. Butler did, and that's Exhibit No.

6    27.

7         Q.    Okay.  After you had had a discussion

8    with Ms. Butler, she asked you to file an

9    attachment to your performance appraisal?

10        A.    Correct, because she wouldn't change the

11   score.

12        Q.    And Exhibit No. 27 is the attachment that

13   you prepared and gave to her to attach to your

14   performance appraisal; is that right?

15        A.    That was one of the attachments, yes.

16        Q.    Were there more?

17        A.    Yes.

18        Q.    What else did you attach?

19        A.    Okay.  I did, after that I did the --

20   well, we're going back to Ms. London.  I was

21   reviewing Ms. Butler's evaluation, and I, you

22   know, had enough that day, I said, "I got to go."

23   I was leaving out the door, and I saw Ms. London

24   driving in, and I went and got in my car.  But for

25   some reason, I guess because I had been singled

1    Q.   And that's not -- this letter --

2    A.   No, no.

3    Q.   -- right here (indicating)?

4    A.   We'll come back to that, if we can,

5    please?

6    Q.   Okay.

7    A.   So on January 12th, Ms. Butler called me

8    in and said that you got to take 15 minutes.  And

9    I said, "Well, why do I have to take 15 minutes?"

10   And she said, "Because you left early on January

11   the 4th."  And I said, "I didn't leave early."  I

12   said, "That's not the truth."  And she said,

13   "Well, you need to submit a leave slip."  And then

14   she said, "If you don't submit the leave slip,

15   well, then, Jerrylyn and I will submit the leave

16   slip."  And so I said, "Well, you know, let me

17   think about it."

18          I had to think about that one again, you

19   know.  So I came back and I wrote Ms. Butler a

20   memorandum saying that, you know, I didn't take

21   the 15 minutes and I wasn't going to voluntarily

22   take the 15 minutes because I didn't leave 15

23   minutes early.  That was when she and Ms. London

24   submitted the leave slip saying that I left 15

25   minutes early.

1      During the process of me discussing it

2  with Ms. Butler, she told me, "Well, you need to

3  submit this leave slip right now." I said,

4  "Right now," I said, "are the time cards due

5  right now?" And then she thought about it and she

6  said, "No, they're not due right now." I said,

7  "Well, give me time to think about it," because

8  she was trying to force me to sign this leave

9  slip.

10      And then when I told her I didn't do it,

11  then she said, "Well, you know, Winifred, I, I

12  stayed late that day." I said okay. And she

13  said, "I went to the door and I saw your car

14  gone." I said okay. So after I had that

15  conversation with Ms. Butler and I told her I

16  wasn't going to take the 15 minutes, you could

17  take the 15 minutes if you needed to, I again

18  submitted some memorandums up to the Central

19  Office administrators. And this is what I told

20  them, I said, you know, now, both of them are

21  lying on me, both of them are in cahoots, because

22  Kendra Butler was my supervisor, and if on

23  January the 1st -- I mean the 4th she saw me not

24  there, why as the supervisor did she not write

25  the memo or did not the memorandum come from both

1 of them, but as my supervisor, and she saw me, why

2 didn't she write the memorandum and then why wait

3 from January the 4th to January the 12th to tell

4 me, Oh, I saw where you left?

5   Q. Now, I want to show you this, Exhibit No.

6 28, and it's 4001 and 4002 --

7   A. Right.

8   Q. -- January 9th, 2007, letter to Mr. Henry

9 Ervin from yourself?

10   A. Okay.

11   Q. And are you saying that as of January

12 29th Ms. London hadn't said that you left early?

13   A. I'm lost with that one.

14   Q. I'm sorry.  As of the date that you wrote

15 that letter --

16   A. uh-huh.

17   Q. -- that is Exhibit No. 20 -- what is

18 that?

19   A. Number 28.

20   Q. -- Number 28?

21   A. Uh-huh.

22   Q. Did you believe that Ms. London said you

23 left early?

24   A. This exhibit has nothing to do with the

25 leaving 15 minutes early. This exhibit has to do

1         A.   Which page are you on?

2         Q.   The second page.  Let me point it to you.

3   Right about here (indicating).

4         A.   Uh-huh, uh-huh.

5         Q.   You said, at that time you said, "I view

6   the lowering of my score on the performance

7   appraisal as retaliatory by Ms. Butler due to her

8   personal reasons".

9         A.   Uh-huh.

10        Q.   What did you mean by that, what personal

11   reasons?

12        A.   Okay.  Well, then, we're going into the

13   retaliation by Ms. Butler.  I had one incident

14   where Ms. Butler told me that I couldn't make

15   compensatory time for working overtime on an

16   assignment that she was requiring me to work

17   overtime that was monitoring.  And from June to,

18   I think it was September the 19th, trying to stay

19   out of trouble, what I did with Ms. Butler,

20   because I was having so much problems with

21   supervisors, I was giving Ms. Butler a schedule

22   of my whereabouts, what I was doing throughout

23   the day, where I was going, requesting her to

24   approve compensatory time or flex time.

25        Then on September the 19th, when I went

1    in to give Ms. Butler my schedule and requesting

2    compensatory time, she told me you can't make

3    compensatory time and I had to flex.  So I said

4    why, you know, because, you know, everybody else,

5    you know, when they work overtime was making

6    compensatory time, and so I said, Could you put

7    that in writing, you know, that I can't make

8    compensatory time for working overtime, and she

9    later came back that day and said that I could

10   make compensatory time and flex time.

11          But what had happened, I knew what she

12   was trying to do, was saying that -- I didn't say

13   it, but I wrote again to the Central Office

14   administrators saying that I was told by Ms.

15   Butler -- Ms. Butler you told me verbally that I

16   could not make compensatory time.  Well, where

17   I'm coming from with this is, I think after Ms.

18   Butler told me this, it was discussions in the

19   office about Ms. Butler making compensatory time

20   among staff, among several of the staff, and I

21   was one that commented about her making weekly

22   compensatory time, and she had been doing it for

23   about three years.

24          And so, I don't -- I suspect highly --

25   and that last discussion I had with staff was a

1    week prior to Ms. Butler telling me that I

2    couldn't make compensatory time, because all the

3    staff was talking about it. And so -- and she

4    told me I couldn't make compensatory time, and

5    she kind of stopped making it herself, and then

6    she kind of started back making it. So I assume

7    that she, she got mad when I told the staff, you

8    know, I dare her to tell me not to make

9    compensatory time when she was requiring me to

10   work overtime when she's sitting there at her

11   desk making compensatory time on a weekly basis.

12   And I think she probably got kind of upset about

13   that.

14        Q.   Okay. And you say other staff were

15   standing around talking about this?

16        A.   Other staff were aware, too. There was a

17   big discussion in our office.

18        Q.   Who were involved in that discussion?

19        A.   Donna Buckley, Shirley Patterson, Yolanda

20   Thomas.

21        Q.   Is that the personal reason you were

22   referring to in your comment, saying that's why

23   Ms. Butler has retaliated against you?

24        A.   Yeah.

25        Q.   If you would look at page 4 of that same