FREEDOM COURT REPORTING

Page 27

1  almost four years ago, so I can't remember.
2      Q   Do you remember any specifics
3  about her interview?
4      A   No, not really.
5      Q   So we just have to rely on what
6  this document says?
7      A   Right, that's correct.
8      Q   I don't see one with the title --
9  with Winifred Blackledge's name at the top
10 that you signed.  It's probably in here, but
11 as we saw earlier, some of these are cut
12 off, and we don't have the full documents.
13 You graded her a 30.  Is it fair to say she
14 was a more qualified candidate than Mickey
15 Groggel for that position?
16     A   No.  It's fair for me to say
17 these questions, knowledge of community
18 programs and DMH programs, that I probably
19 thought Winifred probably had more knowledge
20 of the community programs.  And we were
21 working on persons in planning.  And so
22 based on what we were grading them on, I
23 thought that she had better knowledge for

that.

Q You thought she had better knowledge of the Community Service position that was opening?

A I don't know how to answer that. I don't know how to answer that. I guess it goes back to what the intended position was for. Now, if you're asking about these, and I don't know if these are CANed, because these are what you're grading on, I answered it the best I thought, based on the interview.

Q Well, do you remember receiving anything besides this when you were doing the interviews?

A There were questions.

Q Okay.

A These are -- I mean there are always questions that -- the candidate is asked the same question, I mean, so that no one has an edge over the others. So it's whether the person comes with 10 questions, 15 questions, 18 questions, but you ask the

FREEDOM COURT REPORTING

Page 30

```
1   position, Winifred didn't interview in
2   person, she did over the phone.  I don't
3   know if this was the case or not, so I
4   can't --
5        Q    I'll represent that wasn't the
6   case.
7        A    Okay.
8        Q    This was a live interview.
9        A    Okay.  Then I guess I must have
10  thought that.
11       Q    And you thought that she could do
12  the job that was open, correct?
13       A    I must have and -- but if it was
14  testing, if the position was testing, maybe
15  I didn't understand that, because I'm a
16  social worker, too, so was Winifred, and we
17  can't test.  Our license won't allow us to
18  test.
19       Q    I went over this earlier, but do
20  you recall that you were the only black
21  employee on the interview panel?
22       A    Yes.
23       Q    Do you know what happened to that
```

FREEDOM COURT REPORTING

Page 33

1  exactly. It was either one of the two: BC
2  Farnum or Jeff Williams.
3      Q    And is she employed with the
4  department?
5      A    Yes.
6      Q    What is her position now?
7      A    PQA II. I guess it's II. Don't
8  quote me on that.
9      Q    Is she still in Region III?
10     A    Yes. She is in Region III, and
11 her supervisor is still in Montgomery.
12     Q    Who is her supervisor now?
13     A    Jeff Williams.
14     Q    So you don't have a opportunity
15 to work with her?
16     A    We do work together on a lot of
17 things, but I don't supervisor her.
18     Q    Okay. Were you aware that
19 Winifred filed an EEOC charge against the
20 department in, I think, April 2004?
21     A    I don't know when I was aware,
22 but, yes, I'm aware that she filed a EEOC
23 charge.

```
 1              MR. TARVER:  Object to the form.
 2        A     No.  Adverse in what way?
 3        Q     Well, I mean, do you think it has
 4   an adverse effect on their employment
 5   record?
 6              MR. TARVER:  Same objection.
 7        A     I guess it depends on the person.
 8   If I were to get a lower score, then that
 9   would, for me, it would make me do better so
10   that I could get where I wanted to go.
11        Q     I guess my question is:  Once the
12   score has been lowered and it's put in your
13   record, and that may affect you later on for
14   possible promotions or if there was layoffs,
15   is that true?
16        A     I imagine when they do retention
17   scores, your score would play into that, as
18   a part of some other things.  That wouldn't
19   be the only thing they would look at.
20        Q     But plays some role in the
21   employment record?
22        A     Yes.
23        Q     And a low score has an adverse
```

FREEDOM COURT REPORTING

Page 51

```
 1    effect on your employment record?
 2         A    I've never been involved in
 3    layoffs, but I heard they look at your
 4    scores with your retention score.
 5         Q    So could you understand why
 6    Ms. Blackledge didn't want her score
 7    lowered?
 8         A    Yeah, I can understand why she
 9    wouldn't want it lowered.
10              (Whereupon Plaintiff's
11              Exhibit Number 37 was marked and
12              attached to the deposition.)
13    BY MR. WILSON:
14         Q    I'll mark this as Plaintiff's
15    Exhibit 37, which was Defendant's Exhibit
16    18.  Four pages of documents -- four pages
17    of a letter from Ms. Blackledge, directed
18    towards Ms. Wilson, with a copy towards John
19    Houston, the Commissioner, and myself.  Have
20    you seen this document before?
21         A    Yes, I have.  I am familiar with
22    this.
23         Q    You've seen that document?
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

Page 52

1    A   Yes.

2    Q   Do you know how you saw that
3 document?

4    A   How I saw it?

5    Q   Yeah. I mean, did someone give
6 that to you to review, because you're
7 mentioned in it?

8    A   Yeah. I'm sure I got it. Maybe
9 somebody from -- I don't know. Somebody --
10 yeah, I got it. I don't know who gave it to
11 me, but I'm sure I had it.

12    Q   Do you remember having any
13 discussions with Ms. Wilson or Ms. Ervin --
14 first of all, I will start with Ms. Wilson,
15 about Ms. Blackledge's claims of retaliation
16 and harassment? Do you understand my
17 question?

18    A   Have I had a conversation with
19 Ms. Wilson regarding her?

20    Q   Yeah.

21    A   I can't say that I have, and I
22 can't say that I haven't either.

23    Q   You don't recall one way or

```
 1    another?
 2         A    No, I don't.
 3         Q    What about with Mr. Ervin, same
 4    question?
 5         A    No, I don't remember.
 6         Q    Don't recall one way or another?
 7         A    No.  I shook my head, but no, one
 8    way or the other.
 9         Q    So the only thing that you recall
10    about being taken off of direct supervision
11    of Ms. Blackledge was that you discussed it
12    with him?
13         A    Right.  After -- after I received
14    this, and I don't remember if Ms. Wilson or
15    who, how I got it, Fordyce sent it to me,
16    whoever.  Then after this, then I decided,
17    like I previously testified, that obviously
18    they wanted a white supervisor.
19         Q    And that's what you thought?
20         A    Yes.
21         Q    Was that ever discussed at all
22    about that they wanted a white supervisor?
23         A    I discussed that when I asked
```

FREEDOM COURT REPORTING

Page 54

1  Fordyce and Ms. Wilson if they had a problem
2  with me letting Kendra supervise them.
3       Q    And you discussed about how you
4  thought they wanted a white supervisor?
5       A    I can't say a hundred percent I
6  said that, but that was in my mind, if I
7  didn't say that.
8       Q    I mean, do you remember them
9  responding to that in any way?
10      A    No, I'm not -- I don't.
11      Q    That was in your mind, and you
12 think you brought it up at least about --
13      A    Yeah, I could have.  That was
14 definitely in my mind.  I can't say I voiced
15 with a -- a hundred percent that I voiced
16 that to them.
17      Q    And maybe I'm not exactly clear.
18 Tell me why you thought they wanted a white
19 supervisor?
20      A    Well, Winifred was saying she was
21 discriminated because she was black, and
22 Donna was saying she was being discriminated
23 against because she was white, so what would

Page 55

1  you deduct from that?
2      Q   I get to ask the questions.
3      A   Well, that's how I came up with
4  that.
5      Q   Okay.  And you understand that
6  retaliation, it is distinct from race
7  discrimination, is that correct?  Do you
8  understand that?
9      A   I do.
10     Q   You understand that retaliation
11 involves someone making a complaint and
12 actions taken against them after they make a
13 complaint?
14     A   I do understand that.
15     Q   And you understood that
16 Ms. Blackledge was claiming that she was
17 being retaliated against?
18     A   I do understand that that's what
19 she was saying.
20     Q   You knew that at the time, that's
21 what she was claiming?
22     A   If you will note, this was not
23 sent to me, so I would not have known until

FREEDOM COURT REPORTING

Page 56

1    this came to me.  She did not address this

2    to me.  So it was no way for me to address

3    that with her.

4              (Whereupon Plaintiff's

5         Exhibit Number 38 was marked and

6         attached to the deposition.)

7    BY MR. WILSON:

8         Q    I'll go ahead and mark this as

9    Plaintiff's Exhibit 38, which was

10   Defendant's Exhibit 19, yesterday.  This is

11   a letter from Ms. Blackledge to you dated

12   March 27th, 2006, discussing

13   Ms. Blackledge's leave request?

14        A    Yes, it is.

15        Q    Did you draft that document?

16        A    I did.

17        Q    And you -- do you recall the

18   issue about Ms. Blackledge requesting leave?

19        A    I do.

20        Q    Do you recall that she was

21   requesting leave for some medical issues?

22        A    Yes, I do remember that issue.

23        Q    And did you not want her to take