FREEDOM COURT REPORTING

Page 36

1   going to fill it?" I don't remember those
2   conversations, but that's the nature of what
3   they would have been.
4        Q    And did you play any role in who
5   was selected for the CSS III position?
6        A    No. I was trying -- I believe I
7   was trying to get the job functions expanded
8   so that I could get psychological
9   evaluations done.
10       Q    Do you know Joan Owens?
11       A    I'm sorry?
12       Q    Do you know Joan Owens?
13       A    Yes, certainly.
14       Q    Did you have any discussions with
15  her about the CSS III position?
16       A    Not that I remember.
17       Q    Do you know Ms. Jerryln London?
18       A    Of course.
19       Q    Do you remember having any
20  discussions with her about the CSS III
21  position?
22       A    No, I don't. When?
23       Q    When the interviews were taking

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

**FREEDOM COURT REPORTING**

Page 37

1  place and about who should be selected for
2  that position.
3       A    No.
4       Q    We talked about Susan Stuardi.
5  Do you know Hugh Wicks?
6       A    Yes.
7       Q    Do you remember having any
8  conversations with him about who should fill
9  the CSS III position --
10      A    No.
11      Q    -- at this time?
12      A    Certainly not.
13      Q    Did you have any input in who
14 would be on the interview panel for that
15 position?
16      A    No.  I'm usually not asked.
17 Sometimes I'm asked to be on the panel, but
18 I'm not asked who should be on the panel.
19      Q    Do you know Mickey Groggel, who
20 was selected for that position?
21      A    I do.
22      Q    And you know her just through
23 your general job duties?

**FREEDOM COURT REPORTING**

Page 38

1  A    Actually, I had never met the
2  lady until after she moved on from that
3  position into the Quality Enhancement
4  position.
5  Q    Right.  She moved next to a
6  Planning and Quality Assurance II position
7  in approximately April of 2004, does that
8  sound right?
9  A    I don't know.
10  Q    Okay.  I'll show you this, which
11  has been marked as Plaintiff's Exhibit 24.
12  A letter from Susan Stuardi to you and
13  Mr. Ervin.  I'll ask if you've seen that
14  document before?
15  A    Yes, I have.
16  Q    Do you know why Ms. Groggel was
17  selected for the CSS III position in late
18  2003 but she did not move into that position
19  until March of 2004?
20  A    No.
21  Q    Do you have any idea why that
22  would happen?
23  A    I think we were -- I think we

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

FREEDOM COURT REPORTING

Page 39

1  were closing the facility at that time.
2      Q    What facility?
3      A    Brewer.
4      Q    Brewer?
5      A    And I don't remember this
6  specifically with regard to Groggel, over --
7  in all three cases there were -- we were
8  trying to -- we were trying to provide as
9  much support for the staff who would be
10 displaced by closing those facilities as we
11 could.  At the same time, we had to maintain
12 good service to the residents of those
13 facilities until the last one had left.  I
14 didn't know Mickey Groggel.  I had never met
15 her.  But she was -- she was a clinical
16 person in a fairly high position in the
17 Brewer facility, and I believe she was
18 probably essential to the operation of that
19 facility, and that might be why she couldn't
20 come and fill the position to which she had
21 been hired.
22     Q    Okay.  Do you know Kathi Allen?
23     A    No.  I know the name; I've never

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 40

1  met the lady.
2      Q    Do you remember responding in any
3  way to this letter from Ms. Stuardi?
4      A    I did not respond in writing
5  because I searched E-mails and files and I
6  did not. We may have had a conversation, I
7  don't know. The -- it didn't happen. So
8  I'm assuming that it was nixed. On the
9  other hand, it could be other reasons it
10 didn't happen.
11     Q    And by it not happening, you're
12 referring to what she talked about in the
13 letter?
14     A    Yes.
15     Q    And are you aware that Kathi
16 Allen left the department around this time
17 period?
18     A    I believe I have heard that she
19 went to work for another -- one of our
20 contractors or one of our programs.
21     Q    And we briefly touched on this,
22 but you're aware that in April, Ms. Groggel
23 was selected for Planning and Quality

FREEDOM COURT REPORTING

Page 41

1  Assurance II position?

2      A    Yes.

3      Q    Okay.  Which she was in this CSS

4  III position for a very short time and then

5  she moves to this PQA position, and from

6  everything I've looked at, I don't think the

7  CSS III position was filled after

8  Ms. Groggel left.  Do you know whether or

9  not it was?

10     A    I don't think it was.

11     Q    Do you know why it would not be

12 filled?

13     A    Other than Ms. Stuardi wasn't

14 allowed to fill it, I don't know.

15     Q    Because she was -- she worked

16 very hard for a year period to get the

17 position open?

18     A    Yeah.

19     Q    Ms. Groggel finally moves into it

20 in March of '04 and leaves in April of '04

21 and then no one else moves into it.  So the

22 position was only occupied by someone for

23 about a month?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

FREEDOM COURT REPORTING

Page 42

1  A  Right. And by the -- you know, I
2  don't recall what stopped us from filling
3  that position. But by the end of that
4  summer, we no longer had the position.
5  Q  By the end of the summer 2004?
6  A  Yes.
7  Q  You no longer had the CSS III
8  position?
9  A  We had to give up a position in
10 each regional office.
11 Q  Was that because of budget cuts?
12 A  I believe it was.
13 Q  So your job is to try to help
14 with the staffing plan and what positions
15 are available, not as much the people that
16 go into those positions?
17 A  No. I don't -- I don't usually
18 deal very much with the people that go into
19 the positions, because the Regional Director
20 needs to be able -- or the Regional
21 Community Service Director needs to be able
22 to hire who they want.
23 Q  She needs to make those decisions

1  herself?
2      A    And I usually try to back them
3  up.
4      Q    I mean just like from this
5  letter, it seems to me, looking at it, that
6  Ms. Stuardi is able to move people around as
7  long as there's a position open and she can
8  move this person here and maybe move this
9  person down here.  If there's a position
10 open, did she have that kind of authority?
11         MR. TARVER:  Object to the form.
12     A    I'm sorry?
13     Q    You can answer, if you follow
14 what my question.
15     A    She can move people around.  She
16 has to have -- she has to actually get
17 somebody to say yes.
18     Q    She has to get somebody like
19 Ms. Wilson to say yes?
20     A    Yes.
21     Q    If Ms. Wilson says she lets Susan
22 make those decisions, she just signs off on
23 them, that's okay, also?

1  actually meet Ms. Rosalis until considerably
2  later.
3      Q    Did you have any input into
4  Ms. Rosalis receiving that position?
5      A    No.
6      Q    Do you know if anyone was in that
7  position prior to Ms. Rosalis?
8      A    It was a new position.
9      Q    It was a new position at that
10 time?
11     A    Yes.  There was a new position
12 made for each regional office.  That
13 position did not report to the Regional
14 Community Service Director.  It was not
15 under my direct line.
16     Q    They worked in that office but
17 they reported to central office?
18     A    To central office, to a newly
19 developed office of Quality Enhancement.
20     Q    Are you aware that Ms. Blackledge
21 filed an EEOC charge in 2004?
22     A    I assume I am.  I was copied on I
23 think most of the documents that she sent.

FREEDOM COURT REPORTING

Page 56

1  time. And she said, "I just want to tell
2  you that I'm doing this and heads up." And
3  I said, "Good." That is -- that is the way
4  I do the evaluations, and it was something
5  of a shock to some of the Community Service
6  Directors when I came on the scene. And I
7  followed the rules, this is how you do
8  evaluations. They said, "Well, but..." I
9  said, "No, read it. That's how you do the
10 evaluations."
11      Q    This is Plaintiff's Exhibit 40
12 and might be something you were just talking
13 about, E-mails back and forth from between
14 you and Ms. London. Have you seen that
15 document before?
16      A    Yes. You asked me what other
17 conversations I had had with Jerryln London,
18 and I just told you all about them,
19 including this one.
20      Q    That's what we were just talking
21 about?
22      A    Yes.
23      Q    Do you know what she was talking

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

FREEDOM COURT REPORTING

Page 57

1  about where she's saying, "I did not
2  document that Winifred needed to improve in
3  her mid-winter appraisal"?
4      A    Yeah.  She's saying she didn't
5  document.
6      Q    Is that something she's supposed
7  to do?
8          MR. TARVER:  Object to the form.
9      A    What else does she say in there?
10     Q    "I understand from Henry Ervin
11 that I should have documented such before
12 reducing her score."
13     A    Well, Henry Ervin is the Director
14 of Personnel.  He has a much better grasp
15 for how you're supposed to do this than I
16 do.  But, yes, you're suppose to, as best
17 you can, if you're going to.  If somebody is
18 having problems in the middle of the year,
19 you're supposed to document that.
20     Q    And is this an example of what
21 you had just said about when you came in and
22 told the Community Services Director this is
23 the way things need to be done, or whatever

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

FREEDOM COURT REPORTING

Page 62

1  otherwise, we were out of compliance with
2  Medicaid.
3      Q    You said you received copies of
4  the letters Ms. Blackledge had sent where
5  she made allegations of harassment and
6  retaliation.  Did you ever have any
7  discussions with Ms. London or Ms. Butler
8  about changing the way they handled
9  Ms. Blackledge?
10     A    No.  And I've never spoken to
11 Ms. Butler about Ms. Blackledge or any other
12 employee.  I have talked with Jerryln about
13 what are the facts and what's happening.  I
14 find Ms. Jerryln London's judgment to be
15 pretty accurate.
16     Q    So you understood Ms. Blackledge
17 was making allegations of harassment and
18 retaliation and you discussed that with
19 Ms. London, is that correct?
20     A    No, I don't think we discussed
21 the allegations.  I think we talked about --
22 I mean, for instance, in the matter of the
23 15 minutes of overtime, I said, "What is

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

FREEDOM COURT REPORTING

Page 63

going on with that, it seems rather extreme." And so she told me, you know, "This is the situation, this is what Winifred did, this is what Kendra did, this is what I did." I said, "Okay." I could see it.

Q  So you trusted Ms. London's description of what happened?

A  Yes, I do.

Q  Rather than investigate, yourself, you just trusted what she said?

MR. TARVER:  Object to the form of the question.

A  Well, I did investigate, myself, to the point I talked to Jerryln about it.

Q  Did you do any other type of investigation?

A  Such as?

Q  Did you talk to anyone else?  Did you talk to Ms. Blackledge about it?

A  No.

Q  Any reason why you didn't talk to Ms. Blackledge?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

1    A    Ms. Blackledge is Jerryln
2  London's employee.  I observe the chain of
3  command when I can.
4    Q    But you would be over
5  Ms. Blackledge, is that correct, in the
6  chain of command?
7    A    Uh-huh.
8    Q    And if you wanted to talk to her,
9  you could?
10   A    If I wanted to, I could.  I don't
11 undercut my Community Service Directors.
12   Q    Like you said, you trusted what
13 Ms. London had to say about the situation
14 and left it at that?
15   A    Yeah.
16   Q    Have you had any training on any
17 type employment discrimination matters?
18   A    I think I had some years ago in
19 Missouri.
20   Q    Not since you've been with the
21 Alabama Department of Mental Health?
22   A    No.
23   Q    Have you received any documents