FREEDOM COURT REPORTING

Page 23

1    at conciliation are futile, basically,

2    stating that conciliation of this matter

3    will not work?

4           A    I guess it could be inferred,

5    yeah.

6           Q    Do you have a different --

7           A    No.

8           Q    Did you participate in the

9    investigation of Ms. Blackledge's EEOC

10   charge from 2004?

11          A    Did I participate in it?

12          Q    Yes.

13          A    From the standpoint of what now?

14   What do you mean?

15          Q    Did you do an investigation?

16          A    No.

17          Q    Interviews?

18          A    No.

19          Q    Anyone from your office do any

20   interviews, that you're aware of?

21          A    No.

22          Q    Did you have any discussions with

23   anyone about the EEOC charge, besides the --

1    well, anyone, first of all?

2        A    Just the legal division, people

3    in legal.

4        Q    You didn't have any conversations

5    with Ms. Susan Stuardi about the charge?

6        A    No.

7        Q    How about Ms. Jerryln London?

8        A    No.

9        Q    How about Fordyce Mitchell?

10       A    No.

11       Q    Ms. McIntosh-Wilson, did you have

12   any conversations with her?

13       A    No.

14       Q    And Ms. Blackledge has filed a

15   second charge of discrimination.  Are you

16   aware of that second charge of

17   discrimination?

18       A    Yes.

19       Q    And are you aware of that -- what

20   that charge alleges?

21       A    I believe this is the one

22   regarding performance appraisal?

23       Q    Performance appraisals, yes.  And

FREEDOM COURT REPORTING

1    it is or where we would find it?  We

2    provided some documents here, and I didn't

3    see one, but that does not mean there is not

4    one.  I couldn't find one.  Do you have

5    something here we could look through to find

6    it?

7          A     Other than the DMHR policy

8    manual?

9          Q     Yes.

10         A     No.

11         Q     I mean, do you want to look

12   through and see if we can find it?

13         A     We can.

14               (Whereupon Plaintiff's

15         Exhibit Number 84 was marked and

16         attached to the deposition.)

17   BY MR. WILSON

18         Q     Before we do that, this might

19   help.  This is Plaintiff's Exhibit 84, two

20   pages of documents.  And this is marked

21   number 60-77, policy statement:  "A hostile

22   work environment or on-the-job harassment

23   will not be tolerated."  I will show you

1    this document.

2           A    Okay.  What about this?

3           Q    Is that a policy that's in effect

4    today in the department?

5           A    Yes.

6           Q    Do you know if there's a separate

7    policy, other than that document, discussing

8    retaliation?

9           A    No.  I don't think there's

10   anything separate that I'm aware of.

11          Q    So it's your belief that policy

12   60-77 encompasses the retaliation policy of

13   the department?

14               MR. TARVIN:  Object to the form.

15          A    This is the one that I'm familiar

16   with.  I'm not familiar with another one.

17          Q    Okay.  I'm going to show you

18   again, there's nothing that I saw specific

19   that states retaliation is prohibited, is

20   that correct?

21          A    Nothing specific that states

22   retaliation, no, I don't see that.

23          Q    And as far as we know today,

FREEDOM COURT REPORTING

Page 28

1    there's no other policy that would encompass

2    retaliation?

3              MR. TARVIN:   Object to the form.

4         A    Not one that I can find today,

5    but I will continue to look through this and

6    see if there's something I missed.

7         Q    Okay.  If you want to take your

8    time or any --

9         A    I don't see anything else.

10        Q    Okay.  And whether or not we can

11   find it specifically written in the

12   policies, is it the policy of the department

13   that employees cannot be retaliated against

14   once they've taken some sort of protective

15   activity?

16        A    Absolutely.

17        Q    And that should -- employees or

18   anyone should not retaliate against another

19   employee, no matter how they feel about the

20   allegations an employee is making, is that

21   correct?

22        A    That's correct.

23        Q    If an employee alleges they're

FREEDOM COURT REPORTING

1      Q    Okay.  Ms. Kendra Butler, who has

2    been Ms. Blackledge's supervisor for some

3    time now, said she has not received any

4    training on any type of retaliation or

5    employment discrimination.  Does that

6    surprise you?

7              MR. TARVIN:  Object to the form.

8      A    I don't know Ms. Butler.  I don't

9    know, you know, what capacity she's been in,

10   other than supervising at Region III.  But

11   the Brewer Center would have been

12   responsible for any training that was done

13   there at that time.  So I can't speak for

14   that.

15     Q    Well, I mean as Director of HR,

16   of Human Resources -- I mean as Director of

17   Human Resources, do you think it's important

18   that supervisors are trained on employment

19   discrimination matters?

20     A    Absolutely.

21     Q    If supervisors are the ones

22   giving out discipline, they should know

23   what's right and what's wrong regarding

FREEDOM COURT REPORTING

1   you seen that document before?

2        A    Yes.

3        Q    And is this a policy to comply

4   with equal opportunity employment matters?

5        A    It's pretty much a policy

6   statement regarding equal employment

7   opportunity.

8        Q    Section 2 there, Standards, would

9   you just read that for me, sentence.

10       A    "The department will maintain and

11  implement some affirmative action plan."

12       Q    Is there some affirmative action

13  plan?

14       A    Yes.

15       Q    How long has that been in effect?

16       A    When I got here in 1980 it was in

17  effect.  We've revised it since then, of

18  course.

19       Q    Do you know why that affirmative

20  action plan was put in effect?

21       A    To ensure that individuals would

22  be employed and -- on an equal opportunity

23  basis, based on Title VII.

FREEDOM COURT REPORTING

Page 59

```
 1    don't remember right now?

 2         A     Yeah, I just don't remember right

 3    now.

 4         Q     Federal something or another?

 5         A     It's the same classification

 6    that's done by the Federal Government when

 7    they do GS ratings and that kind of thing.

 8         Q     Do you know if that scoring

 9    system was followed in regards to

10    Ms. Blackledge's desk audit?

11         A     I'm not real certain.

12         Q     If it was not performed, would

13    that be a violation of the policy?

14              MR. TARVIN:  Object to the form.

15         A     If it was not performed?

16         Q     If the scoring system was not

17    performed.

18              MR. TARVIN:  Same objection.

19         A     I wouldn't say it would be a

20    violation.  It would be an oversight on

21    someone's part.

22         Q     So it should be performed?

23         A     Yes.
```

FREEDOM COURT REPORTING

Page 64

1          Q     And what is a form 40?

2          A     That's a questionnaire that the

3     State of Alabama uses for each of its

4     positions, whether it's classified or merit

5     -- I mean whether it's classified or

6     unclassified.  It details the job

7     descriptions.

8          Q     Okay.  If you will, can you flip

9     through those documents and tell me if

10    there's a form 40 in there?

11         A     No, the form 40, itself, is not

12    in here.

13         Q     The scoring that we discussed

14    about that's supposed to be done during a

15    desk audit, would that be done on a form 40

16    or something else?

17         A     No, the form 40 would be

18    separate.

19         Q     Do you see anything in these

20    documents that indicate the proper scoring

21    was done for Ms. Blackledge's desk audit?

22              MR. TARVIN:  Object to the form.

23         A     The nonfactors are here but the

FREEDOM COURT REPORTING

1    scoring is not actually done.

2         Q    Okay.  And we're talking about

3    this Exhibit 4 still, correct?

4         A    Yes.

5         Q    So there's nine factors and

6    there's no scoring done, is that correct?

7         A    That's correct.

8         Q    So would you state this is an

9    improper audit?

10              MR. TARVIN:  Object to the form.

11        A    Improper, I wouldn't say improper

12   but maybe incomplete.

13        Q    Incomplete?  The lack of scoring

14   would indicate a incomplete audit -- let me

15   finish.  The lack of scoring would indicate

16   a incomplete audit, is that correct?

17        A    As far as I'm concerned.

18        Q    Okay.  Do you remember seeing

19   this document?

20        A    I don't remember.

21        Q    Do you remember anything about

22   Ms. Blackledge bringing to anyone's

23   attention that the desk audit was not

FREEDOM COURT REPORTING

1    the bottom, she appears to be complaining

2    the interviewer, Ms. Benson, did not request

3    a narrative or did not ask detailed

4    questions, or do you remember that being an

5    issue?

6        A    No.  I don't remember that as

7    being an issue.

8        Q    Do you remember her making a

9    complaint about the improper scoring?

10       A    Yes.

11       Q    And what's labeled here as

12   Exhibit 7, I believe goes from Bates stamp

13   3547 to 3554.  Do you recognize that

14   document?

15       A    Yeah, I recognize it.

16       Q    And what do you recognize it as?

17       A    Well, I saw it for the first time

18   when we were going over the interrogatories,

19   and I think this is part of the exhibits

20   that I saw.

21       Q    Would you agree that it appears

22   to be Ms. Blackledge drafting what she

23   considers to be a proper desk audit?

Page 71

```
 1          Q     Well, first of all, let me ask
 2     what does the recommendation mean?
 3          A     That means that she was -- the
 4     hearing officer recommended that guidelines
 5     be established for doing desk audits and
 6     that another desk audit be done for the CSS
 7     III or IV and that she may be given a desk
 8     audit for a Mental Health Specialist II, if
 9     the standards allow for Mental Health
10     Specialist II.
11          Q     Do you know if standard
12     guidelines and procedures were completed
13     after this?
14          A     Yes.
15          Q     They were?
16          A     Yes.
17          Q     And did -- where are those
18     guidelines located?  Where are they?  What
19     are they located in?
20          A     In fact, I don't believe we even
21     have them in our responses here, but I could
22     get that for you.
23          Q     Okay.
```

Page 79

1        Q    And did you do anything to

2    investigate those complaints?

3        A    Well, first of all, she had

4    already made a call to Joan Owens to

5    determine whether she had to sign her

6    performance appraisal, and I think Joan

7    responded that she did and that there was no

8    appeal for filing an appeal on one's

9    performance appraisal.  So, as a result, no,

10   I did not respond to that.

11       Q    And have you done anything to

12   assure employees do not retaliate against

13   Ms. Blackledge?

14       A    Have I done anything?

15       Q    Yes.

16            MR. TARVIN:  Same objection.  You

17            can answer.

18       A    The only thing, I've had a

19   conversation with Ms. Wilson to just make

20   sure that was understood at that regional

21   office, that that would not happen.  So

22   that's the only thing I've had a

23   conversation with her about.

Page 86

1       Q    Can you tell me those steps?

2       A    Well, without looking, I will do

3    my best with what I remember.  Verbal

4    warnings, written counseling, written

5    reprimand, suspensions, termination.

6       Q    Okay.  That's about right.  Do

7    you know if verbal discipline should be

8    documented?

9       A    A written warning is usually

10   documented but no points are deducted.

11      Q    Okay.  And I'm trying not to make

12   a lot more exhibits, but on Bates stamp

13   4641, page 38, says, "The supervisor should

14   make a note as documented evidence of the

15   conversation, including violation, the date

16   it occurred, the employee's name, what

17   action will follow, and employee's comments.

18   The note of the verbal reprimand should be

19   kept in supervisor's file, not in the

20   Personnel file."  Is that the policy as you

21   know it today?

22      A    Yes.

23      Q    Are you familiar with

1    preappraisals?

2         A    Yes.

3         Q    And mid-appraisals?

4         A    Yes.

5         Q    What are -- what is a

6    preappraisal?

7         A    Well, the preappraisal,

8    basically, is that document that outlines

9    those duties that will be performed and

10   agreed upon by the employee and the

11   supervisor for a particular classification.

12        Q    And when is that usually done?

13        A    At the appraisal period,

14   beginning of the new appraisal period, or

15   when a person first comes into employment.

16        Q    And what about a mid-appraisal?

17        A    A mid-appraisal is usually done

18   at the three-month interval, if it's a

19   six-month evaluation period or six-month

20   probationary period, it's usually done at

21   the third month.

22        Q    And supervisors having some

23   issues with the employee, is the supervisor

FREEDOM COURT REPORTING

1    supposed to develop some sort of plan for

2    that employee to improve over the course --

3    until the next appraisal?

4         A    An action plan, yes.

5         Q    Is that supposed to be

6    documented?

7         A    It should be documented on that

8    form that an action plan has been developed.

9         Q    Should be documented on the

10   mid-appraisal form?

11        A    Right.

12        Q    Okay.  And the supervisor should

13   let the employee know what that plan is and

14   how they can improve?

15        A    Yes, it should be written on that

16   form.

17        Q    Okay.  I don't think I've asked

18   you this, but do you play any role on

19   selecting who is on an interview panel when

20   a job comes open?

21        A    Do I play a role, personally?

22   No.

23        Q    Have you ever selected who would

Page 92

1       A     Right.

2       Q     And they're making the ultimate

3    decision, because they're signing off on it,

4    but they might not have any actual input

5    into the decision, is that true?

6       A     As it relates to filling a

7    position?

8       Q     Yes.  As it relates to the person

9    selected for the position?

10      A     Well, I'm quite sure the

11   supervisor will definitely be talking to the

12   Associate Commissioner, if that's the person

13   that supervises them, before a decision is

14   made.

15      Q     Okay.  So if Ms. Wilson had

16   testified that she did not play a role in

17   making a decision, she left it to the

18   authority of the supervisor, is there

19   anything wrong with that?

20      A     Nothing wrong with that, if

21   that's what she wants to do.  Yeah.

22      Q     She has the ability to do that?

23      A     Yes.

FREEDOM COURT REPORTING

1    employees?

2        A    Yes.

3        Q    And these are the following two

4    pages, page 8 and 9.  I believe this goes

5    with it, correct?

6        A    Yeah, that's correct.

7        Q    And I'm just going to attach this

8    as one exhibit, Exhibit 94, pages 3 through

9    9, Bates stamped 4808 through 4814.  When

10   employees are chosen, should the person

11   choosing just look to the interviews or they

12   should look at other stuff also, such as

13   employees' education and qualifications?

14       A    Yeah, everything.

15       Q    Everything together?

16       A    Yes.

17       Q    Do you know if any particular

18   weight is put on the interview compared to

19   other factors?

20       A    Not necessarily, no.  The

21   interview plays a major piece of it, but

22   there are other factors too to include.

23       Q    Plays a part but they should also

Page 97

1    consider employees' education?

2         A    Sure.

3         Q    Their work experience?

4         A    Directly related to the job

5    they're applying for, yeah.

6         Q    Anything else you can think of?

7         A    No.

8         Q    And on page 9 here, paragraph 3,

9    stating, "It also must be stressed that

10   interviewer supervisor who is rating the

11   applicant must make no attempt the

12   manipulate the system or otherwise allow

13   personal biases to influence the decision."

14        A    Yeah.

15        Q    So it would be against policy for

16   the interviewer and selector to try to

17   influence other panel members?

18        A    Yes.

19        Q    Do you think it's possible that

20   that could happen sometimes?

21             MR. TARVIN:  Object to the form,

22             I think.

23        A    We know anything is possible, but

Page 98

1    I just hope it didn't happen and doesn't.

2    But it's possible, yeah.

3         Q    And my understanding is that

4    through the interview, employees are given a

5    list of questions to ask the interviewees,

6    is that correct?

7         A    Yes.

8         Q    But, ultimately, it's up to the

9    interviewer's subjective opinion on the

10   employees who is the best candidate?

11              MR. TARVIN:  Object to the form.

12        A    You're going to have to repeat

13   that one again for me.

14        Q    Will you read it again?

15   (Whereupon, the question was read back.)

16              MR. TARVIN:  Same objection.

17        A    The panel makes the

18   recommendation to whatever the acquiring

19   manager is, whether that manager is on the

20   panel or not.  If it's a supervisor that

21   they need to make the recommendation to,

22   that you look at the top three in this

23   category or this is the number 1 person,

FREEDOM COURT REPORTING

Page 99

1    that recommendation is made by the panel.

2         Q    Okay.  But when the panel is

3    interviewing an applicant, they have to go

4    by their subjective opinion on the applicant

5    in the interview, correct?

6              MR. TARVIN:  Object to the form.

7         A    Well, if you want to say it's

8    subjective, whatever is in front of them as

9    it relates to information provided, whether

10   it's educational background or whether it's

11   how they came across, how they answered the

12   questions in the interview, yes, if you want

13   to say that's subjective.

14        Q    Right.  How they answered the

15   questions and all, that would be subjective?

16        A    Yeah, certainly.

17        Q    But they should also take into

18   account maybe other objective things, maybe

19   such as -- that you can weigh, such as

20   education, experience, and work experience?

21        A    Yes.

22        Q    All right.  I think I'm done.

23   Thank you for your time.