UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
(NORTHERN DIVISION)

| | |
|---|---|
| WINIFRED BLACKLEDGE )<br>  )<br>    Plaintiff, )<br>  )<br>v. )<br>  )<br>ALABAMA DEPARTMENT OF MENTAL )<br>    HEALTH AND MENTAL )<br>    RETARDATION, and JOHN HOUSTON)<br>    in his official capacity as Commissioner, )<br>  )<br>    Defendant. ) | Civil Action No.  2:06 CV 321-ID |

**DEFENDANT'S REPLY
TO RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

Comes now the Defendant, by and through its attorneys of record, Alabama Deputy Attorney General, Courtney Tarver, and Alabama Assistant Attorney General Rebecca Luck, and reply to plaintiff's response to Defendant's Motion for Summary Judgment as follows:

DMHMR is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge its initial responsibility, but may simply point out that there is an absence of evidence to support Ms. Blackledge's case. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116-7 (11th Cir. 1993), or may support its motion for summary judgment with affirmative evidence demonstrating that the Plaintiff will be unable to prove its case at trial. *Id.* at 1116.

Before evaluating the legal sufficiency of the Plaintiff's allegations, a reconciliation of Plaintiff's EEOC Charges with her three judicial complaints of discrimination and her judicial retaliation claims will clarify which, if any, claims are properly before this Court

Many of the allegations in the Plaintiff's Complaints, as amended, and argued in her Response to the Motion for Summary Judgment, were not timely claimed in any EEOC Charge, and should be dismissed. The Court can only hear claims for acts of discrimination contained in a timely EEOC Charge, or claims "like or related" to the claims in a Charge that were properly before the EEOC under Title VII. *Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1569 (11th Cir.1987).

When we compare Plaintiff's EEOC Charge of discrimination to her judicial complaint in this action, we find that the claims asserted in this case are much broader than the charges asserted in the EEOC Charges. We must review both the nature of the complaints made and whether any EEOC Charge was timely filed, thus preserving the issue for review by this court.

The Plaintiff's Complaint in this action alleges discrimination for three different incidents of failure to promote. The parties agree that there were three incidences when Ms. Blackledge was not the successful candidate for positions she applied for and was interviewed for, as follows:

    1) a Planning and Quality Assurance Specialist II position (**P&QA II 2002**) which was filled November 13, 2002 (this position was located in the Mobile-Daphne area, but supervised by the Quality Assurance Division in Montgomery); (See Wilson affidavit, Defendant's Exhibit "15" attached hereto.)

    2) a Community Services Specialist III position (**CSS III 2003**) which was filled December 10, 2003 (this position was located in the Mobile-Daphne area, and supervised by the Mental Retardation Division's Region III offices in the Mobile-Daphne area); (See Wilson affidavit, Defendant's Exhibit "15" attached hereto) and,

3) another Planning and Quality Assurance Specialist II position (**P&QA II 2004**) which was filled in April 17, 2004 (this position was also located in the Mobile-Daphne area, and supervised by the Quality Assurance Division in Montgomery) (See Wilson affidavit, Defendant's Exhibit "15" attached hereto.).

1. ALLEGATIONS OF DISCRIMINATION MUST BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES REGARDING THE P&QA II 2002 AND 2004 POSITIONS.

The face of the Plaintiff's EEOC Complaint of discrimination (and amendments thereto) addressed only one "failure to promote" claim. The only claim addressed in Plaintiff's EEOC Charge of discrimination was the alleged "failure to promote" concerning the Community Services Specialist III (CSS III 2003) position announced on October, 27, 2003, and filled by appointment of another candidate on December 10, 2003. However, Plaintiff's Complaint in the instant action before this Honorable Court includes two other claims for failure to appoint to Planning and Quality Assurance Specialist II (P&QA II) positions. Plaintiff did not dispute the selection of other candidates for those two P&QA II positions in any EEOC Charge, and therefore did not exhaust administrative remedies regarding either of the P&QA II positions she complains of in the instant action. Plaintiff did not meet Title VII's administrative prerequisites pursuant to 42 U.S.C. Section 2000e-5(e) because she did not file an EEOC Charge of discrimination for the allegations of failure to promote to the two P&QA II positions in 2002 and 2004. The allegations of failure to promote on several occasions did not constitute one continuing violation, but were discrete events, each requiring exhaustion of administrative remedies by filing appropriate EEOC Charges for each discrete event. This Honorable Court

addressed the issue of whether complaints of a series of "failure to promote" constituted a continuing violation, as follows:

> "… An employee cannot use one timely-filed EEOC charge as a bootstrap for lapsed claims arising out of other remote, discrete events. See *Carter v. West Publ'g Co.,* 225 F.3d 1258, 1263-65 (11th Cir.2000) (distinguishing between ongoing acts of discrimination and single discriminatory acts followed by neutral, nondiscriminatory consequences); *Lewis v. Board of Tr. of ASU,* 874 F.Supp. 1299, 1303 (M.D.Ala.1995)."

*Williams. v. Alabama Indus. Dev't Tr'g,* 146 F. Supp.2d 1214 (M.D.Ala.2001).

Other federal court Middle District of Alabama cases have also found that a series of claims for failure to promote do not constitute a continuing violation, but are discrete events requiring administrative prerequisites before suit can be maintained. Where no EEOC charge had been brought, the action was barred. *Lane v. Ogden*, 13 F.Supp.2d 1261, 1271 (M.D. Ala.1998); *Smith v. Alabama Department of Corrections*, 131 F.Supp.2d 1318, 1321 (M.D.Ala.2001).

The Plaintiff offered no proof that she filed EEOC Charges regarding the positions of P&QA II, and therefore, those issues are barred under the case law cited above, and should be dismissed.

In 2002 when the P&QA II position was announced, this position was newly created to perform a new function (Mitchel depo, 44:14-45:19, Defendant's Exhibit 27). Ms. Stuardi testified that no one in the Community Services, Region III office had experience with data collection and trend analysis, and it was just being introduced to them and that these were the skills DMHMR's Quality Assurance Division was targeting for the P&QA II position offered in 2002 (Stuardi depo, 169:1-6). Although Ms. Blackledge asserted, in a conclusory allegation, that the successful candidate for this position, Ms. Rosalis, had no quality enhancement experience, Ms. Rosalis' personnel file indicates otherwise. Rosalis' personnel file, attached hereto as Defendant's Exhibit " 16",  show Ms. Rosalis' background in quality enhancement and a

4

background in mental retardation work. Ms. Rosalis' letter dated September 24, 2002 asserts that she had "proven skills that relate to strategic planning and continuous quality improvements within the public and private sectors and mental retardation experience, attached as Exhibit " 16" hereto.

Ms. Groggel was the successful candidate for the P&QA II 2004 position. Again, although Ms. Blackledge alleges that Ms. Groggel had no relevant experience, the record shows otherwise. Ms. Groggel's personnel file indicates that she held a higher position in the series, a P&QA IV, from June 7, 1988 through January 10, 1990 with DMHMR at the Brewer Center campus. In this position, Ms. Groggel monitored Title XIX eligibility; developed and maintained a Quality Assurance program; oversaw the ACDD accreditation; and provided programming. The relevant pages of Ms. Groggel's personnel file are attached hereto as Defendant's Exhibit "17". Ms. Groggel's other superior qualifications are set forth in the discussion regarding the CSS III 2003 position.

2.  ALLEGATIONS OF FAILURE TO PROMOTE TO THE CSS III 2003 POSITION, SHOULD BE DISMISSED AS A SANCTION FOR PLAINTIFF'S FAILURE TO PRESENT DOCUMENTS TIMELY.

At no time before responding to the Motion for Summary Judgment, did the Plaintiff produce the document, Plaintiff's Exhibit "T", a letter purporting to be from Marilyn Benson to Winifred Blackledge purportedly dated December 15, 2003. This letter has been offered as Plaintiff's proof that she timely filed her EEOC, but Plaintiff has never produced the letter in this action and it is not a part of the official record (see affidavit of Eranell McIntosh-Wilson, attached as Exhibit "15")..

At Plaintiff's deposition on March 13, 2007, both the Plaintiff and her attorney asserted that they had no documents other than those produced by the DMHMR. Despite direct and aggressive inquiry during her deposition, the plaintiff did not produce several documents that she later produced. Even when the Plaintiff produced other documents late, she did not produce the letter marked as Plaintiff's Exhibit "T" until offering it in response to the motion for summary judgment. Plaintiff's Exhibit "T" should not be considered by the Court.

The Federal Rules of Civil Procedure, Rule 37(c)(1), instructs that where a party fails to disclose or fails to produce in discovery information without substantial justification, that party will not be permitted to use the evidence at trial, at a hearing or on a motion. The Advisory Committee Notes to the 1993 Amendments to this subsection indicate that the revision provides a self-executing sanction for failure to make a disclosure required by Rule 26(a) without a need for a motion. The comment further states that the automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, including for motions for summary judgment. Plaintiff offered Exhibit "T" to support her claims in this case. Such documents were required to be produced under Rule 26(a)(1)(B).

The Defendants have acted in good faith to discover any documents that the Plaintiff had in this case, Plaintiff would not produce them until the court ordered them to do so. By letter dated August 10, 2007, Plaintiff's counsel informed this office that he had not seen the letter until responding to the motion for summary judgment (a copy of Plaintiff's counsel's letter is attached hereto as Defendant's Exhibit "18"). However, this does not explain why the Plaintiff had not produced the document earlier. We offer the attached letter, Defendant's Exhibit "18", describing discussions with Plaintiff's counsel about Plaintiff's failure to produce documents. Also attached are copies of deposition pages wherein defense counsel inquired pointedly about

6

whether any other documents existed. (Exhibits 30--Attached Blackledge depo.,pp. 23, line 10 through 44, line 16; and Exhibit 31—Attached Stuardi depo., pp. 100, line 13 through p. 107, line 19), Plaintiff's responses, in their best light, are incomplete, if not evasive. Rule 37(c)(1) allows for the sanctions set out at (b)(2)(A)(B)and(C), as follows:

> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

*FRCP, Rule 37(b)(2)(B) and (C).*

The Report of the Parties, Rule 26 Planning Meeting, dated August 21, 2006 established agreement of the parties to exchange Rule 26(a)(1) Prediscovery Disclosures by September 25, 2006. The Plaintiff did not produce or identify any documents in its initial disclosure. The Defendant identified certain documents in its initial disclosures on September 26, 2006, and produced almost four thousand pages of documents to the Plaintiff's counsel on March 8, 2007. Later, other supplements to document discovery were produced by the Defendants.

Plaintiff's Exhibit "T" is pivotal in this case regarding the Plaintiff's claim for alleged failure to promote to the CSS III position. The Plaintiff did not produce Exhibit "T" until responding to the motion for summary judgment. The Defendant did not have Exhibit "T" for purposes of this litigation and could not find such a document in its files until receipt from Plaintiff herein. Exhibit "T" is the only evidence purporting to evidence that Ms. Blackledge received notification that she had not been selected to fill the CSS III position in December of

2003. The remaining evidence reveals that the CSS III position was awarded on December 10, 2003, (see Plaintiff's Exhibit "S"), and that Plaintiff filed her EEOC Charge more than 180 days after the award of the position to another, and too late to be properly before this court.

3.  DEFENDANT, JOHN HOUSTON SHOULD BE DISMISSED AS A DEFENDANT

The Plaintiff produced no argument and no evidence to support retaining Commissioner, John Houston, as a defendant in his official capacity in this action. The DMHMR's highest official is not a proper defendant and should be dismissed. *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 2312 (U.S. 1989).

4.  IF ANY CLAIM FOR DISCRIMINATION IS DEEMED PROPERLY BEFORE THE COURT, NONE ARE SUFFICIENT TO SURVIVE SUMMARY JUDGMENT

A.  The Plaintiff has failed to demonstrate discriminatory intent.

Ms. Stuardi testified that race was not a factor in the interviews she was a part of for the CSS III 2003 position. (Stuardi depo 159:17-160:7, Defendant's Exhibit "25"). The Plaintiff testified that the only reason she felt she was racially discriminated against with regard to the P&QA II 2002 position was because of the interview scores shown at Plaintiff's Exhibit "K". (Blackledge depo.,55: 14-17, Defendant's Exhibit "21") However, the interview scoring sheet shows that three black candidates scored higher than one white, of the total group of five candidates. This does not reasonably show racial preference.

Plaintiff failed to plead a prima facie case of failure to promote, because she did not

8

defeat the Defendant's legitimate non-discriminatory reasons for hiring other candidates, and did not provide proof to support any contention that the proffered reasons were pretextual. The Department's legitimate non-discriminatory reasons were set forth in the Motion for Summary Judgment brief.

The evidence Plaintiff offers of discrimination can be reduced to the following allegations:

Ms. Blackledge alleges she is more qualified than successful candidates. Ms. Blackledge offers her own deposition testimony to establish that she believes she was more qualified for all positions than the successful candidate, and argues that she had more experience than other candidates because the other candidates had not worked in the particular Community Services office where the position would be located, and where she worked.

This Honorable Court addressed whether a Plaintiff's claims that he was so qualified that he could establish pretext, on motion for summary judgment, in a case similar to the instant action in *Gremillion v. Walgreen Co., Inc.,* 2006 WL 1794745 (M.D. Ala. 2006) (Not Reported in F.Supp.2d, a copy is attached hereto as Exhibit "20".) Like the case before this court, *Gremillion*'s failure to promote case was also brought pursuant to Title VII and Section 1981. Gremillion alleged that 1) he had been working at the work site in question (a photo lab), and that 2) the successful applicant for the position had not previously worked at that work site; that 3) his working experience in the field of photo lab work was more recent than the successful applicant; that 4) he had no history of discipline while employed by the Defendant; and that 5) he was required to train the successful applicant. These offers of circumstantial evidence in an attempt to prove pretext are very similar to the allegations made by Ms. Blackledge in this case.

The *Gremillion* court reviewed case law regarding when disparity of qualifications would be successful to show pretext, as follows:

> " . . . a plaintiff only will be successful in establishing pretext if the "'disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" . . . Subsequent to *Ash* the Eleventh Circuit has "emphasize[d]" that the latter *Cooper* standard is the correct one for courts to employ. *Hubbard v. M&H Valve Co.*, No. 05-11969, 2006 WL 1410147 (11th Cir.2006); *see also Brooks*, 446 F.3d 1163 (applying *Cooper, supra*.)."

*Gremillion, supra*, page 8.

We submit that the Plaintiff has not shown pretext where the evidence shows that those persons who were charged with the responsibility of choosing the successful candidate for each position, believed that Ms. Blackledge was not the most qualified candidate.

Susan Stuardi was the Director of Community Services, Region III (Stuardi depo., 19:3-6, Defendant's Exhibit "25") and reported directly to DMHMR's offices in Montgomery including the time period from year 2000 through her retirement in the summer of 2004 (Stuardi depo, 21:17-23, Defendant's Exhibit "25"). Ms. Stuardi oversaw of all Region III services and personnel, including Ms. Blackledge. (Stuardi depo., 22:1-21, Defendant's Exhibit "25"), and reported directly to Fordyce Mitchel, (Stuardi depo, 19:13-20, Defendant's Exhibit "25"). At that time, Mr. Mitchel was supervised by Associate Commissioner for Mental Retardation, Eranell McIntosh Wilson (Stuardi depo 19:22-20:5, Defendant's Exhibit "25"). Mr. Mitchel testified that he believed Ms. Groggel (the successful candidate for the CSS III 2003 and the P&QA II 2004 positions) was a high ranking Brewer facility staff member who was probably

essential to the operation of that facility. (Mitchel depo 39: 13-21, Defendant's Exhibit "27").

Ms. Stuardi was working at the Brewer Center when Ms. Blackledge was first hired by DMHMR to work at the Brewer Center in 1987 (Stuardi depo 25:14-22, Defendant's Exhibit "25"). Ms. Stuardi testified that Ms. Blackledge was basically a good employee (Stuardi depo 25:23-26:3, Defendant's Exhibit "25").

Ms. Stuardi explained that opening and filling the CSS III position in 2003 entailed a budget review; submission of a request through the MR Division and the Personnel Department asking them to open the position; announcement by the Personnel Department (Stuardi depo, 59:2-6, Defendant's Exhibit '25"); establishment of a panel to interview applicants; and announcement of the successful candidate. (Stuardi depo, 34: 11-20, Defendant's Exhibit "25").

Ms. Stuardi stated that Ms. Blackledge met the qualifications noted on the job announcement for the CSS III 2003 position.(Stuardi depo 58:3-10, Defendant's Exhibit "25"). Ms. Stuardi had been Ms. Groggel's (the successful candidate) supervisor at a previous time (Stuardi depo 89:8-13), and has also signed performance appraisals for Ms. Blackledge (Stuardi depo 89:14-16, Defendant's Exhibit "25").

At the time of the CSS III 2003 interviews, DMHMR was downsizing and a lot of people faced unemployment and were looking for whatever jobs were available (Stuardi depo 66:7-18, Defendant's Exhibit '25") and Groggel was a department head over both residential and day program services at the Brewer Center. (Stuardi depo 79:11-22, Defendant's Exhibit "25").

When Ms. Groggel was selected to fill the CSS III position in 2003, she had to take a substantial pay cut. (Stuardi depo 80:9-16, Defendant's Exhibit "25"). Ms. Stuardi believes that Ms. Groggel was selected for the position because she had the exact skill set that DMHMR was

11

trying to move toward at the time, with background in education testing.  (Stuardi depo 96:7-16, Defendant's Exhibit "25").  Ms. Stuardi denied that subjective bias played any role in her decision to grade Ms. Groggel higher than Ms. Blackledge (Stuardi depo 100:4-8, Defendant's Exhibit "25").  Ms. Stuardi clarified that a candidate's experience with particular tasks or skill sets were looked at, but whether a candidate had worked in the Community Services Office was not a factor under consideration. (Stuardi depo 109:11-111:4, Defendant's Exhibit "25").  Ms. Stuardi said there were three people who met the specific criteria DMHMR was looking for who were ahead of Ms. Blackledge for the CSS III position.  (Stuardi depo 113:2-6, Defendant's Exhibit "25").  The key thing for that position at that time was dealing with the functional assessment tools, etc., as outlined on the job announcement.  DMHMR was looking for someone who could take over coordinating of the individual client assessment and training other people to use the client assessments.  Ms. Groggel had experience in testing.  (Stuardi depo 113:19-114:10, Defendant's Exhibit "25").  In contrast, Ms. Blackledge would have had to gain a lot more skills than what she had at the time that the job was announced. (Stuardi depo 113:12-17, Defendant's Exhibit "25").  The people who scored highest in the interview (including the successful candidate) had more assets to offer DMHMR at that time for that job; had skill sets that were needed in testing and assessment, and supervisory experience; had already moved actually beyond a CSS III position and most of them had to come back down to apply for that job.  (Stuardi depo 159:8-16, Defendant's Exhibit "25").

Ms. Blackledge argues that the Interview Panels were comprised of a greater percentage of caucasion than black members, and further argues that the final decision maker was Caucasian, implying that this denotes discriminatory intent.  Ms. Blackledge argues that black

candidates all scored lower than white candidates, but did not allege or offer proof that they were similarly situated.

Ms. Blackledge argues that Ms. Stuardi worked for a very long time to create and open the CSS III position in 2003, and that the CSS III was closed shortly after opening. However, Ms. Stuardi clarified that positions were not created or opened for an employee, but for a function, and that it would not be unusual for a position to be vacated and eliminated at the same time. DMHMR was in the middle of restaffing, rebudgeting, and closure of facilities. (Stuardi depo 129:2-131:17, Defendant's Exhibit "25").     Ms. Blackledge argues without proof that Ms. Allen was "offered" the position of CSS III 2003 Ms. Groggel obtained, and vacated. However, Ms. Blackledge did not file an EEOC Charge, nor did she make a claim for damages for failure to promote to this position, and it is not properly before the court. We dispute Ms. Blackledge's allegation that Kathi Allen was offered a job without the appropriate selection process, and note that her bald allegations are without any reasonable supporting documents or other evidence.

Even if Ms. Blackledge's allegations were all taken as true, they do not rise to the level of evidence of discriminatory intent or pretext. DMHMR has produced sufficient evidence to establish that the successful candidate had a considerable lead over Ms. Blackledge in qualifications and skill sets for the position that was being offered at the time.

Ms. Stuardi clarified that there were a few candidates with good testing skills with higher overall scores than Ms. Blackledge. The entire Department was condensing and people were losing jobs. People were transferred and every effort was being made to offer whatever few positions DMHMR had left to people who were about to lose their jobs. The DMHMR was making a very serious effort to use its positions and keep as many employees as possible without

13

having to fire people. Job saving was a big part of the whole process, to keep people from being unemployed. (Stuardi depo 142:10-143:11, Defendant's Exhibit "25").

      Mr. Fordyce Mitchel, Director of Mental Retardation Community Service programs since year 2002 (Mitchel depo, 8:23-9:11, Defendant's Exhibit "27"), testified that during the period of 2002-2004, DMHMR was trying to provide support for the staff who would be displaced by closing facilities while maintaining good service to the residents of the open facilities until the last resident was outplaced. (Mitchel depo 39:7-13, Defendant's Exhibit "27").

      Ms. Eranell McIntosh Wilson, Associate Commissioner for Mental Retardation (Wilson depo, 13:9-15, Defendant's Exhibit "26") who reports directly to the Commissioner of DMHMR in Montgomery testified that DMHMR closed three of the four developmental centers and mental illness facilities in 2003 and 2004, and that the Governor of the State of Alabama asked DMHMR's Commissioner and the DMHMR to make every opportunity available to people who would lose their jobs because of the closure of the facilities. The Governor even froze vacancies at various other agencies so that people who were losing jobs due to the closures could apply and if all things were equal and the candidates were qualified, those persons who would have lost their jobs due to closure should be given a preference. (Wilson depo., 86:11-88:23, Defendant's Exhibit "26").

      The Defendants attached a copy of the Commissioner, Kathy Sawyer's Consolidation Plan of August 2003 with the Governor's approval dated August 15, 2003, (Defendant's Exhibit "12") allowing for the massive closures and efforts to support placement of staff facing unemployment.

      Ms. Blackledge argues that the questions asked in the interview for the CSS III position were subjective, and implies that this shows discriminatory intent. Ms. Stuardi testified in her

14

deposition that she believed they tried to make the questions as objective as possible by having a set interview format and by making sure every applicant is asked the same things. (Stuardi depo 61:11-22, Defendant's Exhibit "25"). A copy of the questions asked during the interviews for the CSS III position are attached as Defendant's Exhibit "22". A review of these questions show that they are as objective as possible. Although Plaintiff's response refers to deposition testimony to support this allegation, a careful review of the testimony indicates that no witness alleged subjectivity, but merely acquiesced in the questioner's characterization.

      Ms. Blackledge argues that Ms. Stuardi's letter dated February 20, 2004 (after appointment of the CSS III successful candidate in December) indicates pre-selection. Ms. Stuardi's testimony establishes that the letter was written during the closure activities when persons facing unemployment were being assisted under the Consolidation Plan finding positions for which they might qualify (Stuardi depo., 142:9-146;8, Defendant's Exhibit '25"). Ms. Blackledge argues that the list of applicants with Ms. Stuardi's handwritten "NO" notes imply discriminatory intent. However, Ms. Stuardi described the non-discriminatory reasons for the words "NO" indicating that these individuals did not have education to support the testing she hoped to address with the new position. (Stuardi depo., 78:4-13, Defendant's Exhibit "25").

## No Indicia of Retaliation

      The Plaintiff offered no proof of adverse employment actions, and consequently no proof that an adverse employment action resulted in any injury or damages to the Plaintiff.

      Although Plaintiff argues that Wilson, Mitchel, London and Butler were aware of the EEOC Charge filed by the Plaintiff, this recitation of the proof is misleading. Ms. London and Ms. Butler's deposition testimony actually reveals that Ms. Butler only knew of a grievance that Ms. Blackledge had filed, but did not know what it was about. (Butler depo., 28:10-29:10,

Defendant's Exhibit "29");  and  Ms. London testified that she was uncertain when she became aware of the charge.  (London depo., 33:19-23, Defendant's Exhibit "28").  Mr. Mitchel testified that he had become aware of the EEOC charge by the time of his deposition, March 14, 2007, but did not know when he became aware of it.  (Mitchel depo., 45:20-46:6, Defendant's Exhibit "27").   Ms. Wilson testified that she didn't recall when she learned of the EEOC. (Wilson depo., 36:21-37:4, Defendant's Exhibit "26").  Plaintiff's representations of testimony are misleading, and imply that these individuals had knowledge of the EEOC charges at the time of alleged retaliatory acts.  However, no such proof has been provided.

    Ms. Blackledge argued in her response that she was required to work at a time when she was recovering from knee surgery, and alleged that she was forced to work during the Spring Conference.  However, Plaintiff's Exhibit "X", demonstrates that the Spring Conference registration in question occurred on Monday, April 17, 2006, and indicates that other activities would be covered on Tuesday, April 18, and Wednesday, April 19, 2006.  Exhibit "X" is a memorandum from Ms. London to Ms. Blackledge and specifically states, " . . . I need your assistance at the registration table for the Spring Conference.  Registration will be opened on Monday, 4/17/06. . ."    Ms. Blackledge worked Tuesday and Wednesday, but not on the date of registration, as requested.  (London depo, 59: 17-22, Defendant's Exhibit "28").  In rebuttal to the allegations of Ms. Blackledge's response to this motion for summary judgment, we attach Ms. Blackledge's Time Card and approved request for leave (attached as Defendant's Exhibit "23"  for the relevant date, April 17, 2007, to prove that she was granted time off after she produced a doctor's statement.  Her doctor's statement establishes that Ms. Blackledge was undergoing treatment in the form of "knee injections", (and not surgery as alleged in Ms. Blackledge's Response) on April 17, 2006.  (see Plaintiff's Depositions Exhibit "45", a copy of

16

which is attached hereto as Defendant's Exhibit "19").  Plaintiff's Deposition Exhibit "41" shows the difficulties that Ms. London had in obtaining the doctor's statement.  Ms. London notes that she told Ms. Blackledge that she could take the 18th and 19th off.  (a copy of Plaintiff's Deposition Exhibit "41" is attached hereto as Defendant's Exhibit "19").  Plaintiff's complaints that she was recovering from knee surgery and forced to work the Spring Conference are, if taken in their best light, misleading.  The dates of the complained of action occurred more than 180 days before the Plaintiff filed her EEOC action complaining of retaliation on January 9, 2007. (see Plaintiff's Exhibit "W").

Where an action is cured, there is no adverse employment action.  *W.R. Crittenden v. Int'l Paper Co., Wood Prods*. Div., 214 F. Supp.2d 1250 (M.D.Ala. 2002); *Shelby v. American Colloid, Co.*, 2005 WL 3804725, at page 5, (M.D.Ala.).  The Plaintiff's complaint that she was required to attend the Spring Conference, was cured, and she was granted leave, as set forth above.

Plaintiff's "Exceeds Standards" or "Meets Standards" performance evaluations do not constitute negative performance evaluations, and do not constitute adverse employment actions. *Malone v. K-Mart Cor.,* 51 F. Supp.2d 1287, 1308 (M.D.Ala. 1999).

Plaintiff argues in her Response that her December 21, 2005 (Plaintiff's Exhibit "BB") performance appraisal inappropriately assigned a lower score than she had previously obtained. However, here again, the Plaintiff received relief that same afternoon, and this will not constitute an adverse employment action under *Malone,* supra.

The Plaintiff's allegation that she was singled out because she was asked to keep her door open is too remote in time and was not addressed by an EEOC charge.  Plaintiff Exhibit "Y" is a memorandum dated March 21, 2006 and shows that Ms. Blackledge was asked to keep her door

open before March 21, 2006, and therefore more than 180 days before filing her Amended Complaint for retaliation on January 9, 2007. A supervisor's request that the employee keep her door open would not reasonably be considered significant enough to constitute an adverse employment action.

The Plaintiff also complained that she was forced to take 15 minutes leave time for the 15 minutes her two supervisors noted she left early from work on January 4, 2007. However, Plaintiff's Exhibit "PP" shows that her supervisor observed her leaving before the time noted on her Sign In/Out Sheet indicated. Ms. London's note regarding having also observed Ms. Blackledge leave early is attached hereto as Defendant's Exhibit "24".

The Plaintiff offered no proof in her response to the motion for summary judgment of any comparator of similarly situated employees who were treated better than the Plaintiff. Although she has previously referred to an employee that she believed was treated more favorably in her deposition testimony, Shirley Patterson, she did not prove that Ms. Patterson was similarly situated. Ms. Patterson is not an appropriate comparator because she is of the same race as Ms. Blackledge. (see Wilson affidavit, attached hereto).

The Plaintiff offered no proof in her response to the motion for summary judgment of any racial animus. Plaintiff offered her Exhibit "QQ" for that proposition, however, the reasonable interpretation of those pages indicates that black candidates for DMHMR positions were hired in numbers approximately equal to the percentage of black applicants.

The Defendant has offered legitimate non-discriminatory reasons for hiring others than Ms. Blackledge for the positions that she has questioned, and there is no evidence of any actions which constitutes retaliation

> " . . . Because the plaintiff bears the burden of establishing pretext [for discrimination], [s]he must present 'significantly probative' evidence on the

18

> issue to avoid summary judgment." *Young v. General foods Corp.,* 840 F.2d 825, 829 (11th Cir. 1988) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Id*. at 830.

Malone v. K-Mart corp., 51 F.Supp.2d 1287, 1310 (M.D.Ala. 1999).

Plaintiff offered nothing substantial in her arguments of pretext. "Therefore, this court cannot conclude that the reason articulated is so weak, implausible, inconsistent, incoherent, or contradictory so as to establish pretext." *Marshall v. Daleville City Board of Education,* 2006 WL 2056581, at page 7, (M.D.Ala.).

WHEREFORE, the Defendant prays this Honorable Court will dismiss all claims for discrimination and retaliation and dismiss this case in its entirety.

Respectfully submitted this, the 13th day of August, 2007.

    TROY KING
    ATTORNEY GENERAL

    /s/ Rebecca J. Luck
    Rebecca J. Luck (LUC011)
    Assistant Attorney General

    /s/ Courtney W. Tarver
    Courtney Tarver (TAR009)
    General Counsel, and
    Deputy Attorney General, for the
    Alabama Department of Mental Health
       and Mental Retardation
    Attorneys for the Defendant
    RSA Union Building, 100 N. Union St.
       Fifth floor
    P.O. Box 301410
    Montgomery, Alabama 36130-1410
       (334) 242-3038
       facsimile (334) 242-0924
       rebecca.luck@mh.alabama.gov
       courtney.tarver@mh.alabama.gov

## CERTIFICATE OF SERVICE

  I hereby certify that a copy of the foregoing DEFENDANT'S REPLY TO RESPONSE TO MOTION FOR SUMMARY JUDGMENT has been served by use of this court's electronic filing system, CM/ECF, which will provide service to the following on this the 13th day of August, 2007.

  Josh D. Wilson, Esq.
  WIGGINS, CHILDS, QUINN & PANTAZIS
  The Kress Building
  301 Nineteenth Street North
  Birmingham, AL   35203


                _/s/Courtney W. Tarver_____
                Courtney W. Tarver