# UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| **WINIFRED BLACKLEDGE,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **CIVIL CASE NO. 2:06-321-ID** |
| | ) |
| **ALABAMA DEPARTMENT OF** | ) |
| **MENTAL HEALTH AND** | ) |
| **MENTAL RETARDATION,** | ) |
| **Defendant.** | ) |

## AFFIDAVIT OF ERANELL McINTOSH-WILSON

**County of Montgomery**
**State of Alabama**

Before me, the undersigned authority, a notary public in and for the State of Alabama, personally appeared ERANELL McINTOSH-WILSON, who is known to me and who, being first duly sworn, deposes and states on oath as follows:

1. My name is Eranell McIntosh-Wilson. I am a resident of Elmore County, Alabama, and an adult competent to testify. I have been working with the Alabama Department of Mental Health and Mental Retardation since July 3, 2001. My current position is Special Advisor to the Commissioner of the Department of Mental Health/Mental Retardation. My education and professional experience are as follows:

Fisk University - Nashville, Tennessee B.A., June 1961
    Major: Psychology
    Minor: Elementary Education

Fisk University - Nashville, Tennessee M.A., June 1962
    Major: General Psychology



DEFENDANT'S EXHIBIT 15

Practicum:    Assessment and Therapy of individuals with cognitive disabilities
at Clover Bottom Developmental Center
Designed and set up an Educational Program for children with
special needs at Fisk University Special School

Chicago State University - Chicago, Illinois, 1962-1963
Projective Techniques -      six hours (Dr. Allan Rosendale)
Projective Techniques -      Full semester workshop (non-credit) in evaluating
individuals with cognitive disabilities

University of Illinois Chicago Circle - Chicago, Illinois, 1971-1972
Twelve credit hours toward Ph.D. in Psychology

Central Michigan University - Mt. Pleasant, Michigan, 1977-1978
Twelve credit hours towards Psy.D.

## WORK EXPERIENCE

Alabama Department of Mental Health and Mental Retardation,
April 18 – to present - Special Advisor to the Commissioner
July 1, 2001 to April 17, 2007 – Associate Commissioner, Division of Mental
Retardation Services

Illinois Department of Mental Health and Developmental Disabilities
September 16, 1995 to July 1, 2001 - Clinical Director, Shapiro Developmental
Center, Kankakee, Illinois
February 1994 to September 15, 1995 - Associate Director for State Operated
Developmental Centers, Division of Developmental Disabilities
July 15, 1991 to February 1994 - Associate Director, Division of Developmental
Disabilities

Oklahoma Department of Human Services
September 1, 1988 to May 15, 1991 - Division Administrator, Developmental
Disabilities Services Division

Alabama Department of Mental Health and Mental Retardation
May 7, 1984 to September 1, 1988 - Director, Mental Retardation Services
Region II and Partlow Developmental Center, Tuscaloosa, Alabama

United States Department of Health and Human Services May 1982 to 1991 - Consultant,
Administration on Developmental Disabilities, Washington, D.C.

Michigan Department of Mental Health
Plymouth Center for Human Development,   Northville Michigan
April 1, 1979 to May 6, 1984 - Director
August 21, 1978 to March 31, 1979 - Acting Director

May 21, 1978 to August 20, 1978 - Assistant Director

Mt. Pleasant Regional Center for Developmental Disabilities, Mt. Pleasant, Michigan June 15, 1977 to May 20, 1978 - Director of Programs

Joint Commission on Accreditation of Hospitals, May 1975 to May 1977 - Field Representative (Surveyor) Accreditation Council/Mental Retardation, Developmental Disabilities, Chicago, Illinois

University of Kansas Medical Center, November 15, 1972 to September 1, 1975 - Clinical Training Director, Children's Rehabilitation Unit- A University Affiliated Facility

Chicago State University, April 1968 to September 1972 – Instructor, Department of Psychology and Special Education

Illinois Department of Mental Health and Developmental Disabilities - Chicago
       Illinois State Pediatric Institute (aka Illinois Institute of Developmental Disabilities) Department of Psychology
       September 1, 1971 to December 1, 1972 - Assistant Director
       June 1, 1969 to September 1, 1971 - Acting Director
       June 1963 to June 1, 1969 - Staff Psychologist

Chicago Board of Education, September 1962 to February 1964 - School Psychologist, Bureau of Child Study

Fisk University, Nashville, Tennessee
       Summer, 1962 - Research Assistant, Department of Psychology
       September 1961 to June 1962 - Assistant Dorm Director

Cook County Department of Public Aid, Summer, 1961 - Case Worker - Damen Office, Chicago, Illinois

Greenleigh & Associates (New York), Summer, 1960 - Research Assistant - Study of Cook County Aid to Dependent Children Program, Chicago, Illinois

## PUBLICATIONS

McIntosh, Eranell I, & Warren, Sue Allen, Adaptive Behavior in the Retarded -- A Semi-longitudinal Study, **Training School Bulletin**, Vol. 66, No. 1, May 1969

Warren, Sue Allen & McIntosh, Eranell I., Reported Skills of Chosen Children, **Exceptional Children**, Vol. 37, September, 1970

Peterson, Rolf, & McIntosh, Eranell, Teaching Tricycle Riding, **Mental Retardation**, Vol. II, No. 5, October 1973

Jerry, McIntosh, Eranell I., & Weade, Barbara L., Ethic Background Measured Intelligence and Adaptive Behavior Scores, Mentally Retarded Children, **American Journal of Mental Deficiency**, Vol. 78, No. 1, 1973

McIntosh-Wilson, Eranell I., Closing a Facility, <u>Changing Patterns in Residential Services for Persons with Mental Retardation</u>, President's Committee on Mental Retardation, 1986

## PROFESSIONAL ASSOCIATIONS

National Association of State Directors of Developmental Disabilities Services, Inc.
Board of Directors 1989 to April 1994
Secretary/Treasurer 1991-1993
President-elect 1993-1994
Board of Directors 2006 - present

Fellow, Association on Intellectual and Developmental Disabilities, 1965 - Present
Editorial Consultant - **Mental Retardation**, 1972-1977
National Membership Committee Chair - 1975-1978 and 1979-1980
Regional VI Chairperson - 1982-1983
National Vice-President of Administration Division - 1981-1983
National Councilor - 1983-1985
Ethics Committee Member - 1986-1987
Board of Directors - 1988-1990
Nominating Committee - 1992 - 1995
Awards and Fellowship Committee - 2000 – 2003

Associate, American Psychology Association - 1968-1988

Member, Chicago Psychological Club - 1968-1975

Member, Association of Public Developmental Disabilities Administrators - 1978-1988
Chair - Legislative Committee - 1986 The Committee was responsible for preparing the Association's comments on the proposed Federal ICF/MR revised regulations.

Vice-President, Michigan Facility Directors' Association - 1979-1981

## APPOINTMENTS

Governor's State Occupational Council (Michigan), 1979-1984

Department of Mental Health (Michigan), Director's Task Force on Women's Issues - 1979-1984
Vice-Chair - 1980-1984

Governor's State Interagency Council for Early Childhood Intervention (Oklahoma), 1988-1991

Governor's Planning Council on Developmental Disabilities (Oklahoma), 1988-1991

Governor's Planning Council on Developmental Disabilities (Illinois), 1991-1994

**CERTIFICATIONS**

Qualified School Psychologist, Illinois - September 1963

Registered Psychologist, State of Illinois – 1966

2. I am familiar with Winifred Blackledge's case in the U.S. District Court for the Middle District of Alabama based on allegations of racial discrimination and retaliation.

3. As Associate Commissioner for the Division of Mental Retardation Services, Community Services, serving individuals with mental retardation, The Brewer Developmental Center and Region III Community Services where are under my administrative responsibility, and were so in the fall and winter of 2003.

4. The two P&QA II, 2002 and 2004 positions that Ms. Blackledge applied for were under the office of Quality Enhancement, different from Community Services within the Mental Retardation Division. Susan Stuardi, Director of Community Services for Region III, had no role in creation of, or responsibility in the selection of candidates for the P&QA positions.

5. During the Department's preparation of its response to the Plaintiff's EEOC Charge, I became aware that the Personnel position file was missing for the CSS III 2004 position which Ms. Blackledge complained of in her current action in this Court. The file has not been discovered, but I have been told that portions of the file were produced by the Plaintiff in this case. The letter notifying the Plaintiff that she was not a successful candidate was missing and never found by the Department.

6. The Governor of the State of Alabama approved the Department's Consolidation Plan scheduling several departmental facilities for closure, including the Brewer Center. That plan including the Governor's letter of approval is attached to Defendants' Motion for Summary Judgment as Defendants' Exhibit 12 (Document #26, pages 6-75 of 75). As a part of the closure process, hundreds of staff members were at risk to lose their jobs. The Department engaged a plan to assist at risk individuals in finding positions for which they were qualified. Under the plan, when an at risk staff member was equally qualified with other applicants, the at risk staff member would be given a preference for any open positions.

7. Ms. Blackledge was never at risk to lose her job during the closure process. Ms. Groggel, the successful candidate was at risk to lose her employment with the Department, and took substantial grade and pay cuts to remain employed with the Department.

I declare under penalty of perjury of the State of Alabama, that the foregoing statements are true and correct to the best of my knowledge, information and belief.

_Eranell McIntosh-Wilson_                    Dated: _August 13, 2007_

Eranell McIntosh-Wilson
Consultant to the Commissioner of
     The Alabama Department of Mental Health
     And Mental Retardation


Before me this day appeared Eranell McIntosh-Wilson, personally known to me, and affirmed the truth of the foregoing document, and affixed her signature thereto.

_Bernardine Thomas_                          Dated: _August 13, 2007_
Notary Public - Exp. 2/11/08

The Alabama Department of Mental Health and Mental Retardation
Office of Personnel
100 North Union Street, 4th Floor
Montgomery, Alabama  36130-1410

September 24, 2002

Dear Personnel Office,

Is there an opportunity within your organization for a proven organizational development
professional that knows how to realize outcomes through effective relationship
management, strategic planning, organizational assessment and creative thinking?  If so, I
may be the candidate you seek.  I read with interest your recent search announcement
titled, Planning and Quality Assurance Specialist III.

Consider the following as they relate to your needs:
- Greater than 4 years of professional experience working with persons with mental
  retardation in various community settings.
- Proven skills that relate to strategic planning and continuous quality improvements
  within the public and private sectors.
- An advanced educational foundation, which encompasses strategic planning,
  management, marketing, and quality enhancements.

Enclosed, you will find a completed State of Alabama employment application and a
resume.  I greatly appreciate your consideration and look forward to exploring the
opportunity in question.  Should you require additional information please do not hesitate
to contact me.  All of my points of contact are listed on my resume and application.
Again, thank you for your consideration, I am

Sincerely,

Daphne D Rosalis, MBA.


DEFENDANT'S
EXHIBIT
76

# Daphne D. Rosalis

200 Michigan Avenue
Mobile, Alabama 36604
(251) 432-8531
daphnerosalis@hotmail.com

## Professional Profile:

Mid-level management and marketing executive with greater than 5 years of experiences in the private and public sector, combining strong analytical skills and business acumen to positively contribute to the bottom line of organizations and corporate systems.  Key strengths include:

| | |
|---|---|
| Program Management | Staff Development and Corporate Training |
| Continuous Quality Improvement | Account Management |
| Relationship Management | Strategic Planning |
| Account Management | Operational Management |

## Education:

**MBA**, Troy State University, 2000        **BS**, Florida State University, 1996

## Employment History:

### Regional Quality Enhancement Specialist, 11/2002- Present
Alabama Department of Mental Health and Mental Retardation
Mobile, Alabama

Appointed during the final year of Governor Seigleman's administration, by the State Director of Quality Enhancement, to provide vision and leadership that would foster systemic change and advancements within the Southwest Region of Alabama's mental health service system. Assisted in the design and implementation all quality enhancement programs for this $326 million dollar division of state government. Provide ongoing leadership within an assigned regional community service system and state operated developmental center, which serve greater than 2000 consumers annually. Additionally, responsible for managing consumer, community and political relations programs for the Region, while providing ongoing executive counsel to the State Director and other regional appointees.

- Provided staff development training and consultation services throughout the Region with focus on quality enhancement, certification requirements, and "best practices".

- Managed the National Core Indicator Project Consumer Satisfaction Survey, while exceeding participation requirements.

- Represented the Office of Quality Enhancement as an active participant on various task forces with focus on consumer satisfaction, reorganizations, facility closures, outplacement planning and system improvements.

- Served as a speaker at state and regional conference offering workshops and training opportunities with focus on consumer satisfaction, system improvements, incident management and strategic planning, while consistently receiving superior evaluations.

- Effectively managed special events and conferences for the Division of Mental Retardation throughout the State of Alabama.

## Marketing Manager, 2/2000- 9/2002
Imagine Perfection LLC/Synergy LLC
Asheville, North Carolina

Independent contractor primarily responsible for the development and management of marketing campaigns for this regional wireless and computer retailer, which served as an authorized agent for Sprint PCS and Cingular Wireless with 8 retail stores. Effectively developed campaigns that included: direct mail, print, television and radio, which constantly increased sales. In addition, provided operational management while serving as Manager for various retail outlets during periods of transition and expansion. Actively involved in strategic planning and corporate relationship management. This "start-up company" was sold to a private owner in late 2002 and continues to be the premier Cingular agent of North Carolina.

- Sales increased by 45%, through an effective marketing campaign within 60 days.

- Effectively managed human resources activities- hiring, training and supervising.

- Conducted market research that determined store locations and merchandising plan.

## National Campaign Manager, 9/2001-4/2002
Monster Moving. Com
New York, New York

Effectively managed national advertising campaigns for this e-commerce based corporation. Responsible for compiling and analyzing market segment and account status reports for clients. Direct relationship management activities and review of client satisfaction and conflict resolution were central functions of this position.

- Managed national accounts to include: Marriott, AOL-Time Warner, Well's Fargo, and Direct TV.

- Assisted in the development and implementation of a screening processed used to increase effectiveness of monitoring status of client accounts.

- Effectively addressed conflict resolution and consumer satisfaction, which resulted in an increase in client retention.

**Marketing Manager**, 2/2000-2/2001
Porter & Associates, Inc.
Atlanta, Georgia

Successfully researched, developed and marketed new product lines. Responsible for the development of RFPs, newsletters and white-papers. Planned and executed corporate presence at industry events.

- ▫ Effectively increased corporate exposure by 40% through online affiliation, industry events, direct marketing and cross-marketing new product lines.

- ▫ Increased revenue by 20% by generating and retaining key clients to include: EDS, Ernst & Young, McKesson, HBOC and PricewaterhouseCoopers, Inc.

---

**Human Services Experience:**

**Case Manager**, 4/1998-10/1999, Skyland Trail, Atlanta, Georgia
Provided case management services to adults with and mental illness. Planned and implemented treatment plans for consumers. Coordinated community outings. Developed recreational and social programs. Created and implemented new medication procedures for staff and consumers in accordance to JCAHO Standards.

**Job Coach**, 3/1998-08/1999, People Making Progress, Atlanta, Georgia
Provided daily support and recreational supervision for adult consumers with mental retardation. Assessed consumer's Adult Daily Life Skills ability. Daily monitored medication, nutrition, and health. Provided vocational training and assessment in a work environment.

**Mental Health Technician II**, 11/1996-5/197, Rivendell Hospital, Panama City, Florida
Provided direct care to consumers with mental illness and substance abuse. Assisted in implementation of treatment plans. Monitored behavior and encouraged positive socialization and group activities. Implemented admissions process to include: EKG report, intake card, vital signs, safety check, and hospital orientation. Conducted groups and provided daily progress notes.

---

**Software Skills:** Microsoft Suite, Adobe Suites, Micro Media, ACT, Goldmine, Double Click and various other tools.

**Certified Web Developer**, New York Career Institute, 2002

*Excellent Reference Available*

STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

### ALBERT P. BREWER DEVELOPMENTAL CENTER

POST OFFICE BOX 8467
MOBILE, ALABAMA 36689-0467

PHONE (205) 633-0400



March 31, 1988

*Pos. #*
*22156*

LARRY L. LATHAM, Ph.D.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

LINDSAY W. PUCKETT
DIRECTOR

GUY HUNT
GOVERNOR

J. W. (BILL) McFARLAND
COMMISSIONER

Ms. Mildred Thornton Groggel
173 North Mendenhall
Memphis, Tennessee 38117

Dear Ms. Groggel:

This will confirm your appointment as Planning & Quality Assurance Spec. IV at the Albert P. Brewer Developmental Center, Mobile, Alabama, effective Tuesday , June 7, 1988 , at Pay Range 78 , Step 12 , $ 1397.00 bi-weekly, or $ 36,322.00 annually. You have been assigned to the Administration (Director) Department.

During the first three (3) days of your employment, you will attend an In-Service Training Program from 8:00 A.M. until 4:30 P.M. each day. If for some reason you are unable to report to Personnel at the time and date designated, or are no longer interested in employment at the Center, please let us know by telephone, or letter. Following are conditions of employment for this facility:

PROBATIONARY PERIOD: All new employees, Exempt and Merit, must serve a six (6) month Probationary Period. During this period, you may be terminated without a right to appeal should you experience unsatisfactory job performance, or other disciplinary problems. An extension may be granted for a six (6) month period, normally in three (3) month increments, not to exceed twelve (12) months. Former employees hired from a Re-employment Register must serve a three (3) month probationary period, which can be extended for one (1) three (3) month period. The same stipulations related to poor job performance/disciplinary actions apply.

OFFICIAL TRANSCRIPT: If applicable, it will be necessary that we receive an original copy of your transcript from the college or university from which you received your degree within ninety days from the effective date of your appointment. This transcript must be mailed directly to the Personnel Office from the college or university concerned.

EMPLOYMENT ELIGIBILITY VERIFICATION: The Immigration Reform and Control Act of 1986 requires that new employees provide certain information, including date of birth and country of origin, and to attest to employment eligibility. In addition, the law requires proof of certain documents establishing identity and work authorization, such as a drivers license, social security card, etc. In this regard, completing a form, "Employment Eligibility Verification", will be a part of your employment paperwork.

LICENSE REQUIREMENTS: Department policy provides that only those individuals who meet the educational requirements of a position and who possess a current and valid license, certification, or registration by applicable statute, job requirement or regulatory standards may be employed. Failure of an employee hired prior to certification to obtain certification in their classification

DEFENDANT'S EXHIBIT 11

Page 2
Ms. Mildred Thornton Groggel
March 31, 1988

within a reasonable period of time, normally six to seven months, or who fail
the test for certification, will be subject to termination.  The acquisition or
maintenance of licensure, certification, or registration shall be required as a
condition of employment, and it is the responsibility of each employee to maintain
a current and valid license, certification, or registration, if applicable.

SPECIAL INSTRUCTIONS:  Please report to the Personnel Office at 8:00 A.M. on the
date specified below.  Be sure to bring your Social Security Card, as we are
required to make a copy to forward with your paperwork.  All employees must register
their car(s) with the Security Office, which necessitates that you bring your
driver's license and tag receipt.  You will have approximately ten (10) days from
the date of your employment to take care of this matter.

We are looking forward to having you join us on  Tuesday  ,  June 7, 1988          .

                                        Sincerely,

                                        John R. Green
                                        John R. Green
                                        Personnel Officer

JRG:np

cc:  Director
     Administrative Coordinator II
     Department Head
    ·Position File
     Personnel File

LAW OFFICES

# WIGGINS, CHILDS, QUINN & PANTAZIS

### A LIMITED LIABILITY COMPANY

ROBERT L. WIGGINS, JR.
ROBERT F. CHILDS, JR.
C. MICHAEL QUINN
DENNIS G. PANTAZIS
TERRILL W. SANDERS
RICHARD J. EBBINGHOUSE
ANN K. WIGGINS
SAMUEL FISHER
ANN C. ROBERTSON
JOSEPH H. CALVIN, III
DEBORAH A. MATTISON
TIMOTHY B. FLEMING*
JON C. GOLDFARB
GREGORY O. WIGGINS
ROCCO CALAMUSA, JR.
BRIAN M. CLARK
RUSSELL W. ADAMS
CRAIG L. LOWELL
EDWARD McF. JOHNSON

LOUIS SILBERMAN 1889-1976

WILBUR G. SILBERMAN 1919-2003

THE KRESS BUILDING
THREE HUNDRED ONE - NINETEENTH STREET NORTH
BIRMINGHAM, ALABAMA 35203
205-314-0500
205-254-1500 (FAX)

*LORI B. KISCH
*ERIC BACHMAN
HERMAN N. JOHNSON, JR.
TEMPLE D. TRUEBLOOD
H. WALLACE BLIZZARD
KEVIN W. JENT
JENNIFER WIGGINS SMITH
SUSAN DONAHUE
JOSHUA D. WILSON
*KEIR BICKERSTAFFE
TONI BRAXTON
*JULIENE JAMES
ETHAN R. DETTLING
JAMES V. DOYLE, JR.
RACHEL LEE McGINLEY
MELISSA N. TAPP

CANDIS A. McGOWAN
OF COUNSEL
*Not Licensed in Alabama

August 10, 2007

E-mail: jdw@wcqp.com
Direct Dial: (205) 314-0566
Direct Fax: (205) 314-0766

Rebecca J. Luck/Assistant Attorney General
State of Alabama Department of Mental Health and Mental Retardation
RSA Union Building
100 N. Union Street
P.O. Box 301410
Montgomery, Alabama 36130-1410

> **Re:**  ***Winifred Blackledge v. Alabama Department of Mental Health &***
> ***Mental Retardation and Commissioner John Houston***
> ***Civil Action No.: 2:06CV321***

Dear Rebecca:

I am writing in response to your letters dated August 6 and August 8, 2007.

Regarding Exhibit T, this document was not in my possession until a few days prior to filing the Response to Defendants' Motion for Summary Judgment. This document was not made relevant until Defendants raised a timeliness argument in the Motion for Summary Judgment. Furthermore, such document should have been included in your response to my requests for production as it was created by your client, the Alabama Department of Mental Health and Retardation, and therefore was already in your possession. Finally, you did not send any interrogatories or request for production and this document was not responsive to any proper request in Ms. Blackledge's subpoena duces tecum.



LAW OFFICES

# WIGGINS, CHILDS, QUINN & PANTAZIS

### A LIMITED LIABILITY COMPANY

Page 2

It is my position that you do not have grounds to file a motion to strike. The document was served on you within a few days after it was in my possession. If you intend to file a Motion to Strike I will have to consider my options as well if I am forced to have to spend time responding to such a motion that is without merit.

Regarding Ms. Blackledge's deposition, I will allow you to question Ms. Blackledge on documents that were not previously produced and those which were not already in your possession at the time of her first deposition. If the documents were already in your possession at that time, you could have inquired about those documents during this first deposition. However, I will not object to your questions regarding the CSS III scoring sheets (Exh. UU), Ms. Blackledge's confidential medical records or Exhibit T.

Very truly yours,

Joshua D. Wilson

JDW/mw

Mar. 13. 2006 11:04AM    NURSE STATION CD    No. 0537   P. 1/1

**THE ORTHOPAEDIC GROUP, P.C.**

6144 Airport Blvd. • P. O. Box 86144 • Mobile, AL 36689-6144
(251) 476-5050 • (800) 342-3141 • www.theorthogroup.com

**CLINIC LOCATIONS:**

6144 Airport Boulevard • Mobile, AL
1728 Springhill Avenue, Suite 100 • Mobile, AL
1711 North McGregor Street • Foley, AL
Baldwin County Hospital • U.S. Highway 31 South • Montgomery, AL
809 Hwy. Strip • Latonia, MS

Bobby P. Taylor, IV, M.D.
Eugene C. Dowd, IV, M.D.
Walton I. Pope, III, M.D.
Robert B. McGinley, M.D.
Guy L. Rutledge, III, M.D.
Huey A. Lucroy, Jr., M.D.
Micha A. Wallace, Jr., M.D.

James L. Wise, III, M.D.
Stephen D. Corr, M.D.
J. F. McGowin, III, M.D.
J. Morris, Crumly, M.D.
Thomas M. Burton, III, M.D.
Tony K. Volkan, M.D.

Buddy P. Poitevin, III, M.D.
Walton I. Pope, IV, M.D.
L. Dean Moon, II, M.D.
Jeffery M. Conrad, M.D.
Chris T. Nichols, M.D.

NAME: _Wanford Blacklock_

Pt scheduled for

knee injections on

4/11/06 to alleviate

knee pain

DATE: _3/13/06_

TDO-78206

- 48 -

DEFENDANT'S
EXHIBIT
11

Westlaw.

Not Reported in F.Supp.2d                                                Page 1

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

Gremillion v. Walgreen Co., Inc.
M.D.Ala.,2006.
Only the Westlaw citation is currently available.
United States District Court,M.D.
Alabama,Northern Division.
Jason GREMILLION, Plaintiff,
v.
WALGREEN CO., INC., Defendant.
Civil Action No. 2:05cv484-ID (WO).

June 28, 2006.

Jay Lewis, Law Offices of Jay Lewis, LLC,
Montgomery, AL, for Plaintiff.
Alysonne Odessa Hatfield, John Richard Carrigan,
Ogletree, Deakins, Nash, Smoak & Stewart,
Birmingham, AL, for Defendant.

*MEMORANDUM OPINION AND ORDER*
IRA DeMENT, District Judge.

### I. INTRODUCTION

*1 Before the court is a motion for summary
judgment filed by Defendant Walgreen Co., Inc. ("
Walgreen"), on March 15, 2006. (Doc. No. 15.) A
brief and an evidentiary submission accompany the
motion. (Doc. Nos.16-17). Plaintiff Jason
Gremillion ("Gremillion") submitted a response in
opposition on March 30, 2006 (Doc. No. 19), to
which Walgreen filed a reply on April 6, 2006.
(Doc. No. 20.) In this lawsuit, Gremillion, an
African-American male, sues his employer, alleging
discriminatory failure to promote on the basis of
race, and brings his claim pursuant to Title VII of
the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-
2000e-17 ("Title VII"), and 42 U.S.C. § 1981 (" §
1981").

After careful consideration of the arguments of
counsel, the relevant law and the record as a whole,
the court finds that Walgreen's motion for summary

judgment is due to be granted.

### II. JURISDICTION AND VENUE

The court properly exercises subject matter
jurisdiction over this action, pursuant to 28 U.S.C. §
1331 (federal question jurisdiction) and 28 U.S.C. §
1343 (civil rights jurisdiction). The parties do not
contest personal jurisdiction or venue, and the court
finds adequate allegations of both.

### III. STANDARD OF REVIEW

A court considering a motion for summary
judgment must construe the evidence and make
factual inferences in the light most favorable to the
nonmoving party. *See Celotex Corp. v. Catrett,* 477
U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.,*
398 U.S. 144, 157 (1970). Summary judgment is
entered only if it is shown "that there is no genuine
issue as to any material fact and that the moving
party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c). At this juncture, the court does
not "weigh the evidence and determine the truth of
the matter," but solely "determine[s] whether there
is a genuine issue for trial." *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 249 (1986) (citations
omitted). This determination involves applying
substantive law to the substantive facts that have
been developed. A dispute about a material fact is
genuine if a reasonable jury could return a verdict
for the nonmoving party, based on the applicable
law in relation to the evidence developed. *See id.* at
248; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th
Cir.1989).

The moving party bears the initial burden of
establishing the absence of a genuine issue of
material fact. *See Celotex,* 477 U .S. at 323. "[T]he
burden on the moving party may be discharged by '
showing'-that is, pointing out to the district
court-that there is an absence of evidence to support

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

the nonmoving party's case." *Id.* at 325. The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *See id.* at 587.

## IV. STATEMENT OF FACTS

**\*2** Viewed in the light most favorable to Gremillion, the following facts constitute the facts material to resolution of the instant motion for summary judgment.

In May 2003, Gremillion began work as a part-time service clerk at a Walgreen store located on the South Boulevard in Montgomery, Alabama ("South Boulevard store"). In addition to working at Walgreen, Gremillion at the time was pursuing a full-time course of study at Alabama State University, with an anticipated graduation date in the summer of 2006. In the fall of 2003, at his request, Gremillion moved into the photo department at the Southern Boulevard store. In the photo department, Gremillion primarily performed one-hour photo duties using a Kodak Gretag photo developing machine. During Gremillion's employment at the South Boulevard store, Gremillion was supervised by Store Manager James Freeman ("Freeman").

In June 2004, Gremillion told Freeman, a Caucasian male, of his interest in becoming the head photo specialist at a new Walgreen store on Perry Hill Road in Montgomery which at the time was under construction ("Perry Hill store"). Freeman directed him to speak to JoAnn Jones ("Jones"), who served temporarily as the manager responsible for filling job vacancies at the Perry Hill store. At Freeman's suggestion, Gremillion approached Jones about his interest in filling the head photo specialist position at the Perry Hill store. He told her that he "would be more than happy to fill the position of head photo tech at the Perry Hill store and that [he] had already requested a transfer" to that store.

(Gremillion Dep. at 28.) Gremillion also informed Jones that he would be able to work full-time, if selected as the head photo specialist, because he would be able to schedule all of his college classes after 5:30 p.m. According to Gremillion, Jones further inquired about his class schedule and told him that she would "get back with" him.[FN1] *(Id.)*

> FN1. At this juncture, the parties present divergent facts. Jones says that she does not recall that Gremillion informed her that he wanted to be promoted to the head photo specialist position, but only that he desired a transfer to the Perry Hill store in the photo department. For present purposes, the court accepts Gremillion's version of the facts as true.

Jones approved Gremillion's transfer to the new store, but placed him in the position of photo specialist, not head photo specialist. The Perry Hill store opened in July 2004, and Gremillion continued his part-time work at this store.

Thereafter, Jones selected Renee Hand ("Hand"), a Caucasian female, to fill the full-time head photo specialist position at the new Perry Hill store. During construction of that store, a marquee on the premises publicized that interested individuals should submit an application for employment on Walgreen's website. Hand submitted an application on-line for employment at the new store. It is undisputed that Gremillion did not.

Gremillion filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 22, 2004, contending that in July 2004 he was denied a promotion to the position of head photo specialist at the Perry Hill store. At the end of October 2004, Gremillion left his employment with Walgreen and started working full-time at another business. In or about December 2004, the head photo specialist position at the Perry Hill store became open, and Gremillion applied. He was selected for the position by the then-current Store Manager Leland Wallace. On the date Gremillion filed his response to the instant motion for summary judgment, Gremillion still was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

employed in the position of head photo specialist at the Perry Hill store.

**\*3** After the EEOC issued Gremillion a right-to-sue letter, he filed this lawsuit on May 19, 2005, alleging racial discrimination in the denial of the promotion to head photo specialist, in violation of Title VII and § 1981. (Am.Compl.(Doc. No. 13).) Walgreen has moved for summary judgment.

## V. DISCUSSION

### A. *Abandoned Claims*

Walgreen's first ground for summary judgment is premised on the theory of abandonment. Walgreen asserts that Gremillion has abandoned his allegation of a "pattern and practice" of racial discrimination. (Walgreen Reply at 1 n. 1 (Doc. No. 20).) The court agrees.

Although Gremillion alleges in his Amended Complaint that Walgreen has "exhibited a pattern of racial discrimination" (Am. Compl. ¶ 23 (Doc. No. 13)), Gremillion confines his response to the pending motion for summary judgment to a discussion of his claim that the denial of a promotion to the position of head photo specialist in July 2004 constitutes unlawful race discrimination. In opposing summary judgment, Gremillion cannot rest on his pleadings, *see Celotex,* 477 U.S. at 324 (citing Fed.R.Civ.P. 56(e)), and "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995). Accordingly, the court finds that Gremillion has preserved for review only his claim that in July 2004 he was denied a promotion to the position of head photo specialist at the Perry Hill store.

### B. *Failure to Promote*

### *1. Title VII Jurisdictional Requirements*

Walgreen has not challenged Gremillion's allegations in the Amended Complaint that Gremillion fulfilled the jurisdictional requirements for filing a Title VII lawsuit as to his claim for race discrimination in the denial of the July 2004 promotion to head photo specialist at the Perry Hill store. (Am. Compl. ¶ 1 (Doc. No. 13)); *Forehand v. Florida State Hosp. at Chattahoochee,* 89 F .3d 1562, 1567 (11th Cir.1996) ("Before instituting a Title VII action in federal district court, a private plaintiff must file an EEOC complaint against the discriminating party and receive statutory notice from the EEOC of his or her right to sue the respondent named in the charge."). The court, therefore, finds that, for purposes of ruling on the instant summary judgment motion, these Title VII prerequisites have been satisfied.

### *2. The Merits*

Gremillion brings his failure-to-promote claim pursuant to Title VII and § 1981, seeking to prove that Gremillion intentionally discriminated against him on the basis of his race. Because Gremillion relies on circumstantial evidence to prove his claim, the allocation of proof shifts in accordance with the three-step procedure established in *McDonnell Douglas Corp. v. Green,* 411 U .S. 792 (1972).[FN1] In the first *McDonnell Douglas* phase, the plaintiff must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated against him or her in taking the alleged adverse employment action. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993).

> FN1. The Title VII circumstantial evidence approach to proving employment discrimination also applies to claims brought pursuant to § 1981; thus, the analysis is the same under both statutes. *See Shields v. Fort James Corp.,* 305 F.3d 1280, 1282 (11th Cir.2002) ("[A]s we have repeatedly held, both of these statutes [i.e., § 1981 and Title VII] have the same requirements of proof and use the same analytical framework.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*4** Next, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason. *Id.* at 509. The employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment. ' " *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 509). Finally, to avoid summary judgment, the plaintiff must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997); *see also Reeves,* 530 U.S. at 143. "The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory." *Morris v. Emory Clinic, Inc.,* 402 F.3d 1076, 1081 (11th Cir.2005) (per curiam).

As to the prima facie elements applicable to Gremillion's failure-to-promote claim, Walgreen appropriately cites *Summerlin v.. M & H Valve Co.,* No. 05-11030, 2006 WL 93131 (11th Cir.2006). To satisfy the prima facie elements, a plaintiff must demonstrate that (1) he "is a member of a protected minority; (2) he was qualified and applied for the promotion; and (3) he was rejected despite these qualifications." *Id.* (citing *Walker v. Mortham,* 158 F.3d 1177, 1185-87 (11th Cir.1998)).

Walgreen does not dispute that "Gremillion is a member of a protected class, that he was arguably minimally qualified for the head photo specialist position in the summer of 2004," and that Hand was selected for the position, rather than Gremillion. (Walgreen Reply at 2 (Doc. No. 20).) Walgreen, however, argues that Gremillion cannot establish a prima facie case of discrimination in promotion because "he neither applied for that job, nor does he establish any legal basis to excuse him from the application requirement." *(Id.)* In response, Gremillion does not dispute that he did not complete a formal application for the open position of head photo specialist at the Perry Hill store. (Gremillion Resp. at 8 (Doc. No. 19).) He asserts, however, that he was not required to do so because "

[Walgreen] did not conduct a proper selection process by posting the position" and that, therefore, it is sufficient that he expressed his interest in being promoted to the head photo specialist position to Jones in or about June 2004. *(Id.)* Gremillion relies on *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126 (11th Cir.1984). (*See id.)* Walgreen does not directly address whether Gremillion's evidence that he orally told Jones that he wanted to be the head photo specialist suffices to establish the "applied for" element of the prima facie case; instead, Walgreen merely says that it cannot be deemed to have "discriminate[d]" against Gremillion by selecting an individual who made an on-line application in favor of an individual who did not. (Walgreen Br. at 10 (Doc. No. 16).) For the reasons to follow, the court agrees with Gremillion that he has satisfied the "applied for" prong, but the court reaches its conclusion for different reasons than those advocated by Gremillion.

**\*5** In *Carmichael,* involving a Title VII failure-to-promote claim, the Eleventh Circuit carved out an exception to the "applied for" element of the prima facie case. 738 F.2d at 1132-34 . It held that, when a company employs an informal method of advertising a vacancy, such as by "word of mouth," which is ineffective in conveying notice to the plaintiff of the job opening, the plaintiff may establish a prima facie case, thereby raising a presumption of discrimination, without demonstrating that he or she applied for an available promotion.[FN2] *See id.* at 1132-34. Instead, the plaintiff merely has to demonstrate that the employer "had some reason or duty to consider him [or her] for the post." *Id.* at 1133; *see also Vessels v. Atlanta Indep. School Sys.,* 408 F.3d 763, 768 (11th Cir.2005) ("[W]here an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second [prima facie] prong that he applied for the position-only that the employer had some reason to consider him for the post."). In *Carmichael,* a "reason" arose from the fact that the plaintiff had expressed a general interest in obtaining a promotion within the company. 738 F.2d at 1134. Additionally, the defendant's "subjective promotion procedures imposed upon the defendant a duty to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

consider for any open position all employees who might reasonably be interested in the position." *Id.*

> FN2. The *Carmichael* court explained that subjective informal processes "can lead to racial discrimination, both because important information may be available only to whites and because such procedures place no check on individual biases.... For this reason we have held that '[t]he failure to establish fixed or reasonably objective standards and procedures for hiring is a discriminatory practice.' " 738 F.2d at 1133; *see also Roberts v. Gadsden Mem. Hosp.,* 835 F.2d 793, 798 (11th Cir.1988) (observing that in *Carmichael* "[t]he promotion process was completely informal and provided no checks against racial bias"). In *Carmichael,* the employees, who "overwhelmingly" were Caucasian, generally learned of job openings by "word of mouth" while eating lunch together, but the plaintiff "was unlikely to have much access to the information grapevine," because his Caucasian coworkers made him feel unwelcome to join them during lunch. 738 F.2d at 1133 n. 2

In this case, the court finds that Gremillion cannot rely on the *Carmicheal* exception. Admittedly, the evidence is scant as to Walgreen's policies governing the process by which employees apply for promotions and the methods used by Walgreen to announce vacancies internally. The parties have not submitted or alluded to any written policies.[FN3] There is, though, evidence that, during construction of the Perry Hill store, a marquee on the premises publicized that interested individuals should submit an application for employment on Walgreen's website. The court finds that this method of publicizing the vacancies is neither informal nor subjective. Unlike the subjective notification method in *Carmichael,* which placed considerable discretion in the employer as to whom to communicate the notice, *see id.* at 1133, the website and the marquee were not selective as to their targeted audiences; rather, the marquee was visible

to all who passed by, and the website was accessible by the public. The means employed by Walgreen to solicit applications for vacant positions at the Perry Hill store simply are not comparable to the " informal, secretive selection process" criticized in *Carmichael. Roberts,* 835 F.2d at 793 (citing *Carmichael,* 738 F.2d at 1133). Gremillion has presented no evidence indicating that this procedure utilized by Walgreen had the effect of excluding African-Americans from learning of the job vacancies at the new store. *See Carmicheal,* 738 F.2d at 1133 ("We have recognized that such subjective procedures can lead to racial discrimination, both because important information may be available only to whites and because such procedures place no check on individual biases.").

> FN3. The court is aware that Gremillion has complained that the openings were not "posted" in a prominent place in his store, but he has not submitted any evidence that Walgreen had a policy requiring posting in this manner. (Gremillion Dep. at 55.)

*6 Additionally, in this case, Gremillion undisputedly knew of the job opening at the Perry Hill store; thus, *Carmicheal's* concern as to the unfairness associated with an employer's informal method of notification where the plaintiff "did not know about [the job opening]" is not present in this case. *See* 738 F.2d at 1133.

Based on the foregoing, the court finds that the facts of this case do not fit within the exception articulated in *Carmichael.* Nonetheless, for a different reason, the court finds that the fact that Gremillion did not make a formal application does not preclude him from establishing a prima facie case given the particular facts presented which the court has viewed in the light most favorable to Gremillion.

Having learned of the job opening at the Perry Hill store for a head photo specialist, Gremillion specifically informed the decisionmaker, i.e., Jones, that he wanted that job. Although Walgreen complains that Gremillion did not submit a formal on-line application, there is no evidence in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 6

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

record that Walgreen deemed a formal on-line application a prerequisite to consideration for an open position, but there is some evidence to the contrary. Namely, Gremillion testified that, after he told Jones that he wanted to be considered for the head photo specialist position at the Perry Hill store, Jones told him that she would "get back to" him and did not ask him to submit a formal application on-line. Jones was the final decisionmaker on the hiring matter, and the court finds that Gremillion's testimony as to Jones' response, if believed by the jury, is evidence from which a jury reasonably could conclude that Gremillion's oral interest was an acceptable method of application in the mind of the decisionmaker and, therefore, sufficient pursuant to Walgreen's personnel practices for him to be considered for the position.[FN4] Similarly, a jury plausibly could conclude that Jones' statement that she would "get back to" him caused Gremillion to believe that Jones was considering him for the position and that further or formal application was unnecessary. *See Lloyd v. WABC-TV,* 879 F.Supp. 394, 401 (S.D.N.Y.1995). Accordingly, the court finds that Gremillion has raised a factual dispute for trial as to whether he "applied for" the position when he told Jones, the decisionmaker, that he was interested in the position of head photo specialist at the Perry Hill store.[FN5]

> FN4. The court notes also that Freeman, Gremillion's supervisor, made no mention of a requirement that Gremillion submit a formal application on-line for the job opening at the Perry Hill store, when Gremillion mentioned the prospect to him. (Gremillion Dep. at 25.)

> FN5. The court notes that the facts are distinguishable from those which the court discussed in its opinion entered this same date in *Wilson v. Walgreen,* Civ. No. 2:05cv465-ID (M.D. Ala. June 27, 2006). In Wilson, the court found that the plaintiff's general statement expressing a desire to "make more money," without referencing the specific promotional position at issue, was insufficient to satisfy

the "applied for" requirement of the prima facie case. *See id.,* slip. op. at 15 (relying on *Smith v. J. Smith Lanier & Co.,* 352 F.3d 1342 (11th Cir.2003) (per curiam)).

The court recognizes that the prima facie paradigm, discussed above, must be adapted to fit the facts of this case. The Supreme Court, however, has repeatedly cautioned that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.' " *Swierkiewicz v. Sorema, N. A.,* 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)); *see also McDonnell Douglas,* 411 U.S. at 802 n. 13 ("[T]he specification ... of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). The ultimate prima facie question merely requires a plaintiff to "show[ ] actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Furnco Const. Corp.,* 438 U.S. at 575-76 (internal citations omitted). Based on the overriding inquiry put forth by the prima facie elements, the court finds that Gremillion has raised a presumption of discrimination.

*7 Proceeding to the second and third stages of the *McDonnell Douglas* analysis, Walgreen has the burden of justifying its decision by presenting a legitimate, nondiscriminatory reason for its failure to promote Gremillion to the position of head photo specialist. Walgreen focuses on the qualifications of Hand as compared to Gremillion. Walgreen asserts that it hired Hand, and not Gremillion, because at the time of hire (1) Hand had experience working on Fuji film developing machines, while Gremillion did not; (2) Hand had prior supervisory experience working in a photo lab, unlike Gremillion; (3) Hand had a total of twenty-one months of photo lab experience, as compared to Gremillion's year of experience; (4) Hand was available for full-time work and Jones "did not believe" that, as "a full-time college student," Gremillion "could effectively perform the full-time duties" of the head photo specialist position; and (5) Hand had a "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

friendly, outgoing demeanor." (Jones Decl. ¶¶ 4, 7 (Ex. to Doc. No. 17)); (Walgreen Reply at 6 (Doc. No. 20).) The court finds that Walgreen has articulated with adequate specificity and evidentiary support legitimate, nondiscriminatory reasons for hiring Hand for the head photo specialist position " which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr.,* 509 U.S. at 509 (emphasis in original). The burden, thus, shifts back to Gremillion to demonstrate that the reason offered by Walgreen is not the real reason, but rather a pretext for discrimination. Gremillion may accomplish his burden by pointing to " ' weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation." *Brooks v. County Comm'n of Jefferson County, Ala.,* 446 F.3d 1160, 1163 (11th Cir.2006) (quoting *Jackson v. Ala. State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir.2005)). A reason, however, "is not pretext for discrimination ' unless it is shown both that the reason was false, and that discrimination was the real reason.' " *Id.* (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 515).

Gremillion attempts to show pretext in several ways. Gremillion alleges that he possessed " superior qualifications" for the position because (1) he had worked for Walgreen in a photo shop for a year immediately preceding his application for the job of head photo specialist, while Hand was not previously a Walgreen employee; (2) he had never received any disciplinary action or counseling regarding his job performance at Walgreen; (3) Hand's photo lab experience was "stale" in that Hand had not worked in a photo lab for the six months preceding Hand's hire at the Perry Hill store and her supervisory job in a K-Mart photo lab concluded almost two years prior to her hire date with Walgreen; and (4) Gremillion had to train Hand on the use of cash registers, Pitch Care Plus (a system Walgreen uses to receive orders), and overall store maintenance. (Gremillion Resp. at 9-11 (Doc. No. 19).) Gremillion also asserts that Walgreen's reliance on Hand's knowledge of the Fuji system as being a superior qualification has no basis in fact because, although he worked with Gretag photo lab equipment at Walgreen's South Boulevard store, "the difference in the photo lab

equipment brands is not significant." (Gremillion Aff. at 1 (Ex. to Doc. No. 19).) Gremillion attests that "[t]he same principle is involved in running both machines" and that his "skill, knowledge and ability to run the Gretag equipment allowed [him] to run the Fuji equipment." *(Id.)*

**\*8** "[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext." *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 126 S.Ct. 1195, 1197 (2006) (per curiam). As to the appropriate test, the Supreme Court in Ash rejected as " unhelpful and imprecise" the Eleventh Circuit's formulation in *Cooper v. Southern Co.,* 390 F.3d 695, 732 (11th Cir.2004), that pretext requires a showing that the disparity in qualifications are " 'so apparent as virtually to jump off the page and slap you in the face.' " *Id.* Although declining to pronounce a precise standard, stating that it was " not the occasion" to do so, the Court cited favorably other language in *Cooper,* namely *Cooper's* phraseology that a plaintiff only will be successful in establishing pretext if the " 'disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.' " *See id.* (quoting *Cooper,* 390 F.3d at 732). Subsequent to Ash, the Eleventh Circuit has " emphasize[d]" that the latter *Cooper* standard is the correct one for courts to employ. *Hubbard v. M & H Valve Co.,* No. 05-11969, 2006 WL 1410147 (11th Cir.2006); *see also Brooks,* 446 F.3d at 1163 (applying *Cooper, supra).*

Here, Gremillion asserts that he possessed superior qualifications because Hand's supervisory experience was "stale," and because he had more seniority as a Walgreen employee, had an unblemished work record, and had to teach Hand how to perform certain aspects of the job. The court, however, finds that Gremillion's subjective belief that these attributes rendered him more qualified, in and of itself, is insufficient to avoid summary judgment, even if the court were to agree with Gremillion. *See Brooks,* 446 F.3d at 1163-64 (" [O]ur inquiry at the third stage of the McDonnell Douglas analysis of a promotion discrimination claim is not concerned with [plaintiff's] belief that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

she was more qualified or whether we could conclude that she was better qualified than [the individual promoted].''); *Sanchez v. Henderson,* 188 F.3d 740, 746 (7th Cir.1999) (pretext analysis " seeks to uncover the true intent of the defendant, not the belief of the plaintiff''). Gremillion has not submitted any evidence that the criteria which he has chosen to assess himself as superior to Hand were qualifications which Walgreen deemed dispositive or was required to consider. For instance, there is no evidence in the record that tenure with the company was a factor which Walgreen used to fill open positions. *See Dudley v. Wal-Mart Stores,* 931 F.Supp. 773, 790 (M.D.Ala.1996).

The question is whether Gremillion's qualifications are so favorable that the only reasonable conclusion which can be reached is that Gremillion was more qualified than Hand. *See Cooper,* 390 F.3d at 732. Contrary to Gremillion's argument, however, the court finds that a reasonable person could conclude that Hand was better qualified for a managerial position in the photo department than Gremillion, given that Hand actually had supervisory experience in a photo lab and had been employed longer in the relevant field than Gremillion, who undisputedly had never worked for Walgreen in a supervisory capacity and had less overall photo lab experience. Previous managerial experience and more experience in the photo industry certainly qualify as factors that might motivate a reasonable employer to select one individual over another. In other words, the court finds that an employer would be at liberty to consider Hand's supervisory experience and length of employment in the photo developing business than Gremillion's seniority with the company. *See Pennington v. City of Huntsville,* 261 F.3d 1262, 1267 (11th Cir.2001) ("a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason," as long as " the reason is one that might motivate a reasonable employer''); *see also Farrokhi v. Laura Ashley, Inc.,* 82 F.Supp.2d 1248, 1252 (D.N.M.1999) ( "Merely because Plaintiff might evaluate his experience more favorably is irrelevant. An employer retains the prerogative to evaluate experience and prefer more and comparable experience to less, absent a

showing that the process is a sham.'').

**\*9** Moreover, Gremillion has failed to rebut Jones' opinion that, given Gremillion's full-time course work as a student, she did not believe that he could devote the necessary time and attention to the full-time position of head photo specialist. Although this reason is subjective, the Eleventh Circuit has held that an employer may take into account subjective factors which are legitimate and non-discriminatory so long as the employer "sets out a 'clear and reasonably specific factual basis upon which it based its subjective opinion.' " *Roper v. Foley,* No. 05-15149, Slip Copy, 2006 WL 1004377, *7 (11th Cir. April 18, 2006) (quoting *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.2000) (en banc)). Jones was specific in her articulation; she knew that Gremillion worked part-time in his position as photo specialist, that he also was a full-time student and that the position he sought was a full-time one. Accordingly, the court finds that Gremillion has not demonstrated that this specific reason for not promoting him to the full-time supervisory position is not the real reason or is false. *See Brooks,* 446 F.3d at 1289.

Finally, even accepting as true that the technical differences between Gretag and Fuji photo equipment were minimal to non-existent, as asserted by Gremillion in his affidavit, the court finds that Gremillion's evidence, at best, challenges the wisdom of Jones' appraisal, not the honesty of her assessment. *See Woodard v.. Fanboy, L.L.C.,* 298 F.3d 1261, 1265 (11th Cir.2002) (holding that plaintiff cannot show pretext by presenting evidence that defendant "was mistaken about the facts upon which he based his alleged non-discriminatory decision. Instead, a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which he allegedly based his non-discriminatory decision.''); *Combs,* 106 F.3d at 1543 ("a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer''). Gremillion has not presented any evidence that, even if Jones was mistaken in her understanding of how the Fuji and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

Gretag equipment operated, she acted with dishonest intent in concluding that prior experience with the exact machinery in place at the Perry Hill store was desirable.

It is clear that Gremillion must do more than demonstrate that he was better qualified than Hand. *See Roper,* 2006 WL 1004377, *6 (citing *Wilson v. B/E Aerospace,* Inc., 376 F.3d 1079, 1090 (11th Cir.2004)). The court " 'must not judge which employee was more qualified, but determine whether any disparity is so great that a reasonable fact-finder could infer that [the employer] did not believe' that the comparator was better qualified." *Id.* (quoting *Wilson,* 376 F.2d at 1090). This case simply is not one in which the court can conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Hand over Gremillion for the job in question. *See Cooper,* 390 F.3d at 732.

**\*10** Based on the foregoing analysis, the court finds that Gremillion's failure to present evidence that Walgreen's neutral reason for not promoting Gremilliion was a pretext negates any finding of purposeful race discrimination. Summary judgment, therefore, is due to be entered in favor of Walgreen on this claim.

### VI. ORDER

Accordingly, for the foregoing reasons, it is CONSIDERED and ORDERED that Walgreen's motion for summary judgment be and the same is hereby GRANTED.

A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

M.D.Ala.,2006.
Gremillion v. Walgreen Co., Inc.
Not Reported in F.Supp.2d, 2006 WL 1794745 (M.D.Ala.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Date of Printing: AUG 13,2007

## KEYCITE

Gremillion v. Walgreen Co., Inc., 2006 WL 1794745 (M.D.Ala., Jun 28, 2006) (NO. CIVA2:05CV484-ID(WO))

### History
=>  1  **Gremillion v. Walgreen Co., Inc.,** 2006 WL 1794745 (M.D.Ala. Jun 28, 2006) (NO. CIVA2:05CV484-ID(WO))

### Court Documents
### Trial Court Documents (U.S.A.)

**M.D.Ala. Trial Pleadings**
2  Jason GREMILLION, Plaintiff, v. WALGREEN CO, INC., Defendant., 2005 WL 1539836 (Trial Pleading) (M.D.Ala. May 23, 2005) **Complaint** (NO. 205CV484-D)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

**M.D.Ala. Trial Motions, Memoranda and Affidavits**
3  Jason GREMILLION, Plaintiff, v. WALGREEN CO., INC., Defendant., 2006 WL 1201331 (Trial Motion, Memorandum and Affidavit) (M.D.Ala. Mar. 15, 2006) **Defendant's Brief in Support of Its Motion for Summary Judgment** (NO. 205-CV-00484-D)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)
4  Jason GREMILLION, Plaintiff, v. WALGREEN CO., INC., Defendant., 2006 WL 1201332 (Trial Motion, Memorandum and Affidavit) (M.D.Ala. Mar. 30, 2006) **Plaintiff's Response to the Defendant's Motion for Summary Judgment** (NO. 205-CV-484-ID)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)
5  Jason GREMILLION, Plaintiff, v. WALGREEN CO., INC., Defendant., 2006 WL 1488316 (Trial Motion, Memorandum and Affidavit) (M.D.Ala. Apr. 6, 2006) **Defendant's Reply in Support of its Motion for Summary Judgment** (NO. 205-CV-00484-IDM)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

### Dockets (U.S.A.)

**M.D.Ala.**
6  GREMILLION v. WALGREEN CO., INC., NO. 2:05cv00484 (Docket) (M.D.Ala. May 23, 2005)

© Copyright 2007 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


WINIFRED BLACKLEDGE,                )
                                    )
        Plaintiff                   )
                                    )  CIVIL ACTION
VS.                                 )  NO.
                                    )  2:06CV321-
                                    )  ID
                                    )
ALABAMA DEPARTMENT OF MENTAL        )
HEALTH & MENTAL RETARDATION &       )
COMMISSIONER JOHN HOUSTON, in       )
his Official as Commissioner of     )
the Alabama Department of           )
Mental Health & Mental              )
Retardation                         )
                                    )
                                    )
        Defendants.                 )


    The deposition of **WINIFRED BLACKLEDGE**, taken

pursuant to notice at the Mobile Law Library

Conference Room, Mobile Government Plaza, 205

Government Street, Mobile, Alabama, beginning at

11:03 a.m., on March 13, 2007.

# ORIGINAL


**BEFORE:**  **Rachel S. Landreneau, CCR, LA, MS**


---

BAY AREA REPORTING
MOBILE, AL (251) 473-1016


DEFENDANT'S
EXHIBIT
21

1    Q.    Who scored the highest in the interviews?

2    A.    Daphne Rosalis.

3    Q.    Who scored second highest in the

4    interviews?

5    A.    Yolanda Thomas.

6    Q.    And you see that there were several

7    interviewers who made those determinations?

8    A.    Correct.

9    Q.    Do you believe that any one of those

10   people racially discriminated against you?

11   A.    Yes, I do.

12   Q.    Which ones?

13   A.    All of them.

14   Q.    Other than your scores on the interview,

15   do you have any reason to believe that any of

16   these people discriminated against you racially?

17   A.    That's a no.

18   Q.    In your complaint you've alleged that

19   there was not one but several times that you

20   applied for a position that you did not get, and

21   you've alleged that that was racial

22   discrimination?

23   A.    Correct.

24   Q.    What was the second time that you applied

25   for a position that you did not get?

ROM :REGION_III_COMMUNITY_SERVICES    FAX NO. :2514435553

# COMMUNITY SERVICE SPECIALIST III

## INTERVIEW QUESTIONS

1. Describe your experience in assessing individual's adaptive and Behavioral functioning using the ICAP and functional assessment tools.

2. Describe your experience in training staff in the use of assessment Tools.

3. Describe your experience in training staff in the implementation of skill acquisition and behavior plans.

4. What is your background with regard to the use of person centered planning techniques.

5. This job will require travel over a 10 county area to provide technical assistance and monitor service delivery. This requires 10 to 12 hour days. How will you adjust your schedule.

6. Describe your written and oral communication skills and your experience in giving presentations.

7. How would you go about providing transition support to individuals to facilitate adjustment to new living environments?

8. Discuss options for day programs and how to assist providers in offering more individualized and creative activities.

9. You will not be able to do any independent consulting work with contractors of DMH/MR while employed in Community Services. Do you have any arrangements which could be construed as a conflict of interest?

10. You will be on 24-hour call on a rotating basis. How will that impact your schedule.



DEFENDANT'S
EXHIBIT
tabbies
22

**Page 2**
**CSS III**

11. Please look at the Essential Job Functions. Do you feel you can complete the Essential Functions.

12. Do you have an objection to the Department of Mental Health contacting your last three (3) supervisors?

13. What is the minimum salary you would accept?

14. If offered the position, how soon could you report to work?

15. Do you have any questions you would like to ask?

**PAYROLL/SEC. NO.:** 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

**JOB CODE:** M2000

**EMPLOYEE NAME:** BLACKLEDGE  WINIFRED

**HOME PAYROLL ACCOUNT CODE:** 0001-313-8209-6000

**PERIOD ENDING:** 04/30/2006

| DAY & DATE | TIME IN | TIME OUT | HOURS WORKED | UANNL | USICK | UCOMP | LEAVE USED UHLDY | ULWOP | UCORT | UMLTY | UPLDY | REG HOURS | SOT | OTIME | AHLDY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SU 0416 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| MO 0417 | 8:00 | sick |  |  |  |  |  |  |  |  |  | 8 |  |  |  |
| TU 0418 | 7:00 AM | 3:30 PM | 8 |  |  |  |  |  |  |  |  | 8 |  |  |  |
| WE 0419 | 7:00 AM | 3:30 PM | 8 |  | 8 |  |  |  |  |  |  | 8 |  |  |  |
| TH 0420 | 7:00 AM | 3:30 PM | 8 |  |  |  |  |  |  |  |  | 8 |  |  |  |
| FR 0421 | 7:00 AM | 3:30 PM | 8 |  |  |  |  |  |  |  |  | 8 |  |  |  |
| SA 0422 |  | 0441 |  |  |  |  |  |  |  |  |  | 40 |  |  |  |
| TOTAL S TOTAL |  |  | 32 |  |  |  |  |  |  |  |  |  |  |  |  |
| SU 0423 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| MO 0424 | HOLIDAY |  |  |  |  |  |  |  |  |  |  | 8 |  |  |  |
| TU 0425 | 7:00 AM | 3:30 PM | 8 |  |  |  |  |  |  |  |  | 8 |  |  |  |
| WE 0426 | 7:00 AM | 3:30 PM | 8 |  |  |  |  |  |  |  |  | 8 |  |  |  |
| TH 0427 | 7:00 AM | 3:30 PM | 8 |  |  |  |  |  |  |  |  | 8 |  |  |  |
| FR 0428 | TOTAL | | |  |  |  |  |  |  |  |  | 40 |  |  |  |
| SA 0429 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| SU 0430 |  |  |  |  |  |  |  |  |  |  |  | 80 |  |  |  |
| SUB TOTAL |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| GRAND TOTAL |  |  | 64 | 8 |  |  |  |  |  |  |  |  |  |  |  |

**SIGNATURE:** Winifred Blackledge

**EMPLOYEE APPROVAL**

**SUPERVISOR APPROVAL**

THE INFORMATION ON THIS FORM IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

tabbies®

DEFENDANT'S EXHIBIT
23

FORM P6
Revised 7/2000

**STATE OF ALABAMA**
**DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION**

Original: Timekeeper
Yellow: Supervisor
Pink: Employee

**DEPT/UNIT** _____    CHECK ONE:  ☐ **LEAVE REQUEST**         ☐ **LEAVE EARNED**

| SOCIAL SECURITY NUMBER | NAME (First, Middle, Last) |
|---|---|
| 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 | Winifred Blackledge |

|   | LEAVE STARTS | | | | | | LEAVE ENDS | | | | | | TOTAL HOURS | MIN | APPROVAL/ DISAPPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | Month | Day | Year | Hour | A.M. | P.M. | Month | Day | Year | Hour | A.M. | P.M. |   |   |   |
| 1 | 4 | 17 | 06 |   | 7.00 |   |   |   |   |   |   | 330 | 8 |   |   |
| 2 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 3 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 4 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 5 |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |

| CHECK TYPE LEAVE REQUESTED | | CHECK TYPE LEAVE EARNED |
|---|---|---|
| ☐ ANNUAL | ☐ L.W.O.P. | ☐ HOLIDAY EARNED |
| ☐ COMPENSATORY | ☐ PERSONAL LEAVE DAY | ☐ COMP EARNED |
| ☐ COURT | ☐ MILITARY | ☐ NON-REGULAR HOURS EARNED |
| ☐ FMLA | ☑ SICK | |
| ☐ HOLIDAY | | |

_Winifred Blackledge_  5/9/06
Employee                Date

_Jerris B. Linda_  5/9/06
Supervisor               Date

Explanation/Comments/Purpose: _____

On January 4, 2007, I observed Winifred Blackledge backing out of her parking space at 3:15 PM. I was returning from a late lunch. I was on a liquid diet on 1/4/07 for a colonoscopy scheduled for 1/5/07. I specifically did not have lunch with my co-workers to prevent agony and temptation to eat. I went to the bank and upon my return I observed Ms. Blackledge leaving for the day.

I later learned that Ms. Blackledge signed out at 3:30 PM.

*Jerryln R. London*        1/10/07
Jerryln R. London



DEFENDANT'S
EXHIBIT
24