FREEDOM COURT REPORTING

Page 19

1   stayed in Community based services until I

2   retired.

3        Q    Okay.  And the last position you

4   held when you retired was?

5        A    Was the Director of Region III

6   Community Services.

7        Q    And explain to me the area that

8   Region III encompasses?

9        A    Ten counties in southwest

10  Alabama.

11       Q    And where was your office

12  located, your main office?

13       A    The last office when I retired

14  was located over at the Poundstone facility

15  in Daphne where I believe the office is

16  still located.

17       Q    And who was your immediate

18  supervisor?

19       A    Fordyce Mitchell.

20       Q    And he is in Montgomery, correct?

21       A    Correct.

22       Q    And who would be above

23  Mr. Mitchell?

DEFENDANT'S
EXHIBIT
25

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

## FREEDOM COURT REPORTING

Page 21

1        when you just say Region III,

2        because her last job, Community

3        Services was split out, and no

4        longer under -- used to have a

5        Regional Director that was in

6        charge of Facility Director and

7        Community Services Director.  And

8        the present configuration when she

9        retired, Community Services is

10       now, as she's testified, directly

11       lined up with Montgomery and the

12       Facility Director reports straight

13       to -- it was a Director of

14       Facility Services basically who

15       reports to the Commissioner II.

16       That's all.

17            Q    I'm just basically trying to get

18  an idea of when -- the main time period that

19  I'm talking about is probably 2000 on.  Were

20  you acting in some sort of Director role

21  from 2000 on?

22            A    Yes.  Of Community Services and

23  reporting to Montgomery.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

## FREEDOM COURT REPORTING

Page 22

1        Q      Okay.  Okay.  And can you briefly

2    or as detailed as you need, give me a

3    description of your job duties as a

4    Director?

5        A      Okay.  It had to do with

6    budgeting, oversight of the Community based

7    services that operated within that area,

8    oversight of the Direct Client Services that

9    were handled out of the regional office, the

10   personnel of the Regional Community Service

11   office, and a lot of Development and

12   Community Relations that had to go with that

13   office.

14       Q      In that position, did you have --

15   at times Ms. Jerryln London, who is sitting

16   here with us?

17       A      Correct.

18       Q      How about Kendra Butler?

19       A      Yes.

20       Q      And Ms. Winifred Blackledge,

21   who's also sitting here?

22       A      Yes.

23       Q      Let me ask you if you've had

## FREEDOM COURT REPORTING

Page 24

1    Q    Do you know if those written
2    policies were given to all employees?
3    A    I believe that information was
4    made available to everybody, but I couldn't
5    remember specifically when and in what
6    format.
7    Q    I guess one thing I'm trying to
8    ask is did you, say, go to training and then
9    you were responsible for taking that
10   training and giving it to other employees
11   that are under you?
12   A    I honestly don't remember that.
13   It seemed to me that -- that there were
14   written information and policies and
15   procedures that were given to every
16   employee.
17   Q    But you did not go --
18   A    I don't remember conducting a
19   training session.
20   Q    Okay.  With employees that were
21   under you?
22   A    I don't remember that.
23   Q    Okay.  Are you aware of anyone

## FREEDOM COURT REPORTING

1    else that would conduct such training to

2    other employees that would be below you?

3          A    Well, it seemed to me that there

4    were like general classes that were held at

5    different sites where everybody was invited.

6          Q    Invited or required to attend, I

7    mean is that a difference?  Is that --

8          A    I couldn't answer you honestly

9    about that.  I just recall people being --

10   signing off on things that they had been

11   through training --

12         Q    Okay.

13         A    -- or provided information.

14         Q    Let me ask you if you remember

15   when you first met Ms. Blackledge?

16         A    I can't remember our first

17   meeting, other than it was a long time ago.

18         Q    I believe she had started

19   sometime around 1987?

20              MS. BLACKLEDGE:  Correct.

21         Q    You were employed?

22         A    I would have been there.

23         Q    Okay.  Would you over the time

## FREEDOM COURT REPORTING

Page 26

1   you had supervised Ms. Blackledge, would you

2   generally say she was a good employee?

3        A    I say basically a good employee.

4        Q    Would you say she was productive?

5        A    You'd have to be much more

6   specific about a particular task or

7   function.

8        Q    Okay.  And I will.  I will get

9   more specific.  Did you ever have any

10  general problems with her work?

11       A    I'm sorry to be slow in

12  answering.  I'm just trying hard to think of

13  specifics, and I don't -- I don't have

14  specifics that come to mind.

15            (Whereupon Plaintiff's

16       Exhibit Number 2 was marked and

17       attached to the deposition.)

18  BY MR. WILSON

19       Q    Okay.  I'm going to mark this as

20  Plaintiff's Exhibit 2 and ask if you've seen

21  this document before.  Have you seen that

22  before?

23       A    Yes, I believe so.

## FREEDOM COURT REPORTING

Page 34

1    Q    And do you recall a specific CSS

2    III position coming open sometime in 2003?

3    A    I know we had an opening during

4    that time.

5    Q    And did you play a role in

6    getting that position opened?

7    A    Yes.

8    Q    And do you recall when that --

9    when you -- explain to me what your role was

10   in opening a CSS III position in 2003?

11   A    As best I can recall, it would

12   have entailed a budget review, a submission

13   of a request through the division of MR and

14   the Personnel Department. They would have

15   actually created the opening and done the

16   announcing. And then there would have been

17   a panel established to review anybody who

18   had applied for the job, and then an

19   announcement of whoever was selected for

20   that position.

21          (Whereupon Plaintiff's

22          Exhibit Number 5 was marked and

23          attached to the deposition.)

## FREEDOM COURT REPORTING

Page 58

1    A    She would have had a degree in a

2   related human service field.

3    Q    So did she meet the

4   qualifications as listed on the document

5   there?

6    A    She would have had a degree that

7   fit within this qualification, yes.

8    Q    So is the answer she met the

9   qualifications as listed on the document?

10    A    Yes.

11    Q    She would have been employed with

12   Region III for approximately 16 years, at

13   the time, correct?

14    A    Yes.

15    Q    Let me just talk about in general

16   when a position comes open, is there always

17   an interview process?

18    A    Yes, to my knowledge.  I can't

19   think of any time we wouldn't interview

20   people.

21    Q    Okay.  And is the process

22   generally there's a panel that's formed to

23   interview the applicants?

## FREEDOM COURT REPORTING

Page 59

1          A     Correct.

2          Q     How is that panel -- how do we

3    decide who is on that panel?

4          A     I guess the Personnel Department

5    would try to have some kind of

6    representational group.

7          Q     Were you ever part of the

8    discussions about who would be on a certain

9    panel?

10         A     I don't recall that.

11         Q     But you've been on a panel,

12   correct?

13         A     Yes.

14         Q     And how would you be notified if

15   you were on a panel?

16         A     You would get some kind of

17   official notification from the Personnel

18   Department that you've been selected, when

19   the interviews would transpire, and where to

20   report, whether it was Mobile, Montgomery,

21   or wherever.

22         Q     And what percentage, in general,

23   does the actual interview -- what weight do

FREEDOM COURT REPORTING

Page 61

1   What else can you think of that would play a

2   role, or would you say those are the three

3   most important things?

4           MS. TARVER:  Object to the form.

5       A   Those are the three that come to

6   mind.

7       Q   Would you say those are the three

8   most important things?

9           MS. TARVER:  Object to the form.

10      A   I guess so.  That's a yes.

11      Q   And in your opinion, is the

12  interview process a subjective process?

13          MS. TARVER:  Object to the form.

14      A   I think they try to make it as

15  objective as possible by having a set

16  interview format and by making sure every

17  applicant is asked the same things.  In

18  other words, you can't go off in some

19  different direction with a different

20  applicant.  Every single person has to be

21  able to respond to the same questions and so

22  on.

23      Q   But your view of the applicant

## FREEDOM COURT REPORTING

Page 66

1   James Packard, Yolanda Thomas, Donna

2   Buckley, Edwin Aikens, Rebecca Aydelette,

3   and Tina Nettles.

4           MS. TARVER:  Object to the form.

5       Q    Does that coincide with your

6   recollection?

7       A    That sounds about right.  There

8   were a lot of people who wanted that job.

9       Q    Why is that?  Do you know?

10      A    Well, can we talk about

11  downsizing?  We can only say that as the

12  department was downsizing, there were a lot

13  of people facing unemployment.  So there

14  were a lot of people looking for whatever

15  jobs were available.

16      Q    The department was downsizing at

17  the time?

18      A    Yes.

19      Q    And what is your recollection

20  about where these interviews were held?

21      A    Montgomery, I think.

22      Q    And how long do the interviews

23  usually last?

## FREEDOM COURT REPORTING

1    Q    And care to guess?

2         MS. TARVER:  Object to the form.

3    A    I don't know.

4    Q    Okay.  Now, you've marked "no"

5  next to four people's names.  Why did you do

6  that?

7    A    I guess I would tie that together

8  with the top statement about where the

9  degree came, what kind of degree they had.

10  And it would appear to me that's saying

11  these people don't have a degree in

12  psychology or special education.  That's

13  what it looks like to me.

14    Q    To your knowledge, James Packer

15  did not have that degree?

16    A    As best I recall now.  That would

17  have been the rational at the time.

18    Q    Now, Ms. Blackledge did have a

19  masters, correct?

20    A    But not in psychology or special

21  education.

22    Q    But she had one in a similar

23  field that would qualify for this, correct?

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

## FREEDOM COURT REPORTING

Page 79

1      A      Only in the most general sense.

2    In other words, if what you're after is

3    somebody whose background is in testing,

4    assessment, and so on, what your reference

5    is to find somebody with a background in

6    psychology or special education.

7      Q      And the four people's names

8    marked out with no next to them, they're all

9    black employees, correct?

10     A      Yeah, they are.

11     Q      The person selected for this

12   position was Mickey Groggel, correct?

13     A      Yes.

14     Q      And Mickey was a white employee

15   that came from the Brewer Center, correct?

16     A      Correct.

17     Q      Do you know what her job title at

18   the Brewer Center was, at that time?

19     A      I can't remember what their

20   classifications were.  She was a department

21   head over both residential and day program

22   services.

23

## FREEDOM COURT REPORTING

1            (Whereupon Plaintiff's

2      Exhibit Number 13 was marked and

3      attached to the deposition.)

4       Q     I'll mark this Exhibit 13 Bates

5   stamp 0446, dated 12/10/2003.  Have you seen

6   this document before?

7       A     Yes.

8       Q     Can you tell me what that is?

9       A     Basically, this is the letter to

10   Mr. Ervin at the Personnel Department

11   stating the outcome of the selection process

12   was that Mickey Groggel was selected for the

13   job and indicating that her start time was

14   being negotiated with the Brewer Center and

15   that she was going to have to take a

16   substantial pay cut to accept the position.

17       Q     Do you know what that pay cut

18   was?

19       A     I don't know in amount, but I

20   know that it was certainly a much lower

21   classification than she had been in before.

22       Q     And do you have any idea what

23   that CSS III position paid?

## FREEDOM COURT REPORTING

1      A      I was aware of that.  I had

2  knowledge of what -- that going on.

3      Q      That kind of goes against what

4  you just said, correct?

5      A      I really thought everybody was

6  applying for a job just because they were

7  about to lose whatever they had.

8      Q      Did you ever do any performance

9  appraisals on Mickey Groggel, that you're

10  aware of?

11      A      It's possible, because at one

12  point when I was Facility Director, I was

13  her supervisor.

14      Q      And do you remember doing some on

15  Winifred Blackledge, also?

16      A      Yes.

17      Q      Performance appraisals, are they

18  done twice a year, is that right?

19      A      Formal -- a formal appraisal is

20  done once a year.  There's an interim

21  process that is somewhat different than a

22  formal appraisal that goes on mid-year, or

23  did at that time.

## FREEDOM COURT REPORTING

1  other.

2      Q    Could have, you just don't

3  remember?

4      A    Could have, don't remember.

5  Could have discussed any of the people on

6  that list.

7      Q    Who do you think the best person

8  was for that position?

9      A    Well, since Mickey was selected,

10  I guess I would think it was her.  I think

11  she had the -- she had the exact skill set

12  that we were trying to move the department

13  toward at that time, with background in

14  education testing.  But I think I said in

15  the memo even that there were some really,

16  really good people in that interview pool.

17      Q    At that time period, who worked

18  more closely with Winifred, you or

19  Ms. London?

20      A    I guess we both did.  It was a

21  very small office.  Everybody, you know,

22  worked with everybody else.  We were all

23  very -- in very close proximity to each

## FREEDOM COURT REPORTING

1    the highest and the four black candidates

2    the lowest, correct?

3        A    Correct.

4        Q    Is it possible that any

5    subjective bias played a role in your

6    decision?

7            MS. TARVER:  Object to the form.

8        A    No.

9        Q    Do you find it odd that you

10   graded the four black employees the lowest

11   compared to the white employees?

12       A    No, not when you know everybody.

13       Q    Do you want a break or anything?

14       A    No.

15           (Whereupon Plaintiff's

16       Exhibit Number 16 was marked and

17       attached to the deposition.)

18   BY MR. WILSON

19       Q    I'll take one here shortly.  I'm

20   going to enter as Plaintiff's Exhibit 16.

21   This is a stack of looks like about 30

22   pages.

23           MS. TARVER:  All this is one

# FREEDOM COURT REPORTING

Page 109

1  account the other things you discussed

2  earlier, such as education and experience?

3          MS. TARVER:  Object to the form.

4      A    Correct.  Yes.  This is just a

5  tally sheet from the interviews.

6      Q    But you said those things,

7  education, experience, should play a factor

8  also in the final decision to hire someone,

9  correct?

10     A    Yes.  Sure.

11     Q    Do you know if Ms. Groggel had

12  experience in the Community Services

13  Department?

14     A    That would not have been a

15  factor.  The experience that would have been

16  a factor would have been experience with the

17  tasks, the skill sets that were being looked

18  for in an employee, whether somebody came

19  from inside or outside or where they came

20  from, if they had certain skill sets that

21  were being considered.

22     Q    Even though the first category is

23  knowledge of Department of Mental Health,

## FREEDOM COURT REPORTING

1    CSS III position?

2        A    For the CSS III position that was

3    announced at that time, I thought there were

4    probably three people ahead of her in terms

5    of people who met the specific criteria we

6    were looking for at that particular job.

7        Q    And who were those three?

8        A    That would have been Ms. Groggel

9    Ms. Allen and Ms. Chappell. And there was

10   one that was also very close. And the

11   differences between them are not great.

12       Q    Do you think -- so if you're

13   saying they're not great, you think

14   Ms. Blackledge could have done the job?

15       A    I think Ms. Blackledge would have

16   had to gain a lot more skills than what she

17   had at the time that the job was announced.

18       Q    Such as?

19       A    Such as the testing skills. I

20   think the key thing for that position at

21   that time was dealing with the functional

22   assessment tools and all of that sort of

23   thing that were outlined in the job

# FREEDOM COURT REPORTING

Page 114

1    announcement.  What they were really after

2    at that time was somebody who could take

3    over coordinating of the individual client

4    assessments and training other people to use

5    client assessments.

6        Q    And do you know if Mickey Groggel

7    had experience in testing?

8        A    Yes.

9        Q    She did?

10       A    Yes.

11       Q    But to be clear, you thought she

12   was a candidate who was qualified to do the

13   job, although, not the highest candidate, in

14   your opinion?

15       A    I think she could have learned to

16   do the job.

17       Q    Let me jump back to 2002 now.  Do

18   you remember a Planning Quality Assurance

19   position opening in 2002?

20       A    I'm sorry, I can't give you a

21   good answer on that.

22       Q    Would it refresh your memory if I

23   told you there was one that was open that

## FREEDOM COURT REPORTING

Page 142

1          MS. TARVER:  She's told you but

2      go ahead.

3          THE WITNESS:  First of all,

4      you're making an assumption that

5      Kathi Allen declined the position,

6      which she, to my knowledge, she

7      did not.

8  BY MR. WILSON

9      Q    We don't know.

10     A    We don't know what happened

11  there.  We know that what we were looking

12  for in that situation was a person with good

13  testing skills, and there were a few of

14  those candidates that had good testing

15  skills on the list.  So we know that's why

16  they probably ended up with higher overall

17  scores because they had specific skill.

18     We also know what was going on at the

19  time, and at that particular time, what you

20  had happening was an entire operation

21  condensing, people losing jobs, people being

22  transferred, etcetera, and every effort was

23  being made to offer whatever few positions

## FREEDOM COURT REPORTING

Page 143

1  we had left to people who were about to lose

2  their jobs.  And I believe that that -- that

3  the department was making a very serious

4  effort to use its positions and keep as many

5  employees as possible without having to fire

6  people.  So they could have taken that

7  position and put it somewhere else to save

8  somebody else's job.  I don't know what they

9  did, but I know that job saving was a big

10  part of this whole process, to keep people

11  from being unemployed.

12      Q     And let me jump to the second

13  paragraph.  Do you remember what you're

14  talking about changing classifications for

15  Daphne Rosalis?

16      A     No.  Except that all of these

17  things were occurring at the same time.  You

18  had massive movement of people from regional

19  offices to central offices, closing down

20  facilities, etcetera.  So what we had was

21  several hundred more employees than we had

22  positions, and people were making a lot of

23  moves, at that time.

## FREEDOM COURT REPORTING

Page 144

1    Q    So you don't recall the specific

2    classification you wanted to move Daphne to?

3    A    I wouldn't have moved Daphne.

4    Daphne would have been moved by somebody

5    else.  And if that was an opportunity for

6    employment, you know, we were talking about

7    general moving and saving jobs and people

8    moving around, that's all I can tell you.

9    Q    Do you know what happened to

10    Daphne Rosalis, if she's still employed

11    there?

12    A    I don't know if she's still

13    employed or not.

14    Q    You don't know when she left

15    either?

16    A    No.  But I know she moved to

17    central office in some capacity.  Whether

18    she's still there or not, I don't know.

19    Q    And then Mickey Groggel, you're

20    talking about changing her classification to

21    QE, what is QE?

22    A    Quality -- it was Quality

23    Assurance.  I don't know.  They kept

# FREEDOM COURT REPORTING

Page 145

1  renaming things.  So I don't remember.

2      Q    And why did you want to change

3  her classification to QE?

4      A    It wouldn't have been me making

5  that change.  This is basically stating if

6  all these people are moving, you know, what

7  can we do to help this person who is about

8  to lose their job.

9      Q    Why did you make that suggestion

10  in the letter?  I know you might not be able

11  to change her classification.

12      A    Right.

13      Q    Why did you make the suggestion

14  to change her to QE?

15      A    No, I would not make that

16  suggestion.  What I'm saying, if these

17  things are occurring, if this is going to

18  happen and this is going to happen, you

19  know, what can we do to save this one

20  person's job.  That's basically all this

21  memo is about.

22      Q    So did you think Mickey Groggel

23  was being changed to QE?

## FREEDOM COURT REPORTING

Page 146

1      A     Yes.

2      Q     Do you remember why you thought

3   that?

4      A     I don't know if it had been

5   announced already or just exactly what had

6   happened.  Basically, I'm saying, if these

7   things are going to fall into place, what

8   can we do.

9            MR. WILSON:  Should be about

10           done.  Let me get a quick break,

11           like real quick, and I will wrap

12           up.

13           MS. TARVER:  Okay.

14      (Whereupon, a short break was taken.)

15   BY MR. WILSON

16      Q     I'm trying to wrap up here.

17   Thank you for your time and your patience.

18   Let me jump back to something we were

19   talking about a while ago.  Do you recall

20   anything about Kathi Allen leaving for The

21   Learning Tree, to take a job outside the

22   department at that time?

23      A     I heard that's where she went

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

## FREEDOM COURT REPORTING

Page 159

1   position that's been in question here, do

2   you believe that the people that you rated

3   higher have had more or less of those extras

4   that you're referring to than

5   Ms. Blackledge?

6       A    Well, I did because --

7       Q    You did what?

8       A    I did believe that they had more

9   assets to offer the department at that time

10   for that job.  They had skill sets we wanted

11   in testing and assessment, some of them -- I

12   think they all had supervisory experience

13   and so on.  These are people who had already

14   moved actually beyond a CSS III position and

15   most of them were having to come back down

16   to apply for that job.

17       Q    So when Mr. Wilson phrases his

18   questions with identifying the race of the

19   individuals that were rated higher, as

20   compared to Ms. Blackledge's race, that was

21   not a consideration for you in how you

22   graded any of these individuals?

23       MR. WILSON:  Object to the form.

## FREEDOM COURT REPORTING

Page 160

1      A    No, that wasn't a factor at all.

2      Q    Well, he's objected, let me

3  rephrase it.  Was race a factor in how you

4  graded people in the interviews for the CSS

5  III that you've been asked questions about

6  here today?

7      A    No.

8           MS. TARVER:  Okay.  One last

9           thing, Josh.  I have got, as I

10          have discussed with you off the

11          record, we have what some of the

12          other deponents that are coming up

13          later have provided us in response

14          to the later retaliation charges

15          that have been added to this case,

16          that we had received from them in

17          the process of preparing our

18          response to EEOC to those charges,

19          and I have just had them presented

20          to and literally going through

21          them to be able to update our

22          production to you and what would

23          be responsive generally in this

## FREEDOM COURT REPORTING

Page 169

1    there probably wasn't anybody in our office

2    who had really looked through these kinds of

3    systems.  You know, doing data collection

4    and trend analysis, and so on, was something

5    really just at that point being introduced

6    to us.

7         Q    Okay.  That's all I have.

8              MS. TARVER:  Okay.

9              DEPOSITION CONCLUDED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3                SOUTHERN DIVISION

4

5      CIVIL ACTION NUMBER   CV-2:06CV321-ID

6    WINIFRED BLACKLEDGE,

7          Plaintiff(s),              COPY

8    v.

9    ALABAMA DEPARTMENT OF MENTAL HEALTH

10    & RETARDATION; COMMISSIONER JOHN

11    HOUSTON in his Official capacity as

12    Commissioner of Alabama Department

13    of Mental Health & Mental

14    Retardation,

15

16          Defendant(s).

17

18         DEPOSITION TESTIMONY OF:

19          ERANELL McINTOSH-WILSON

20    Commissioner:

21    Renny D. McNaughton

22    March 15, 2007

23    Mobile, Alabama

DEFENDANT'S
EXHIBIT
26

# FREEDOM COURT REPORTING

Page 13

1    A    Yeah, somewhere '96, '97.

2    Q    Okay.  How long --

3    A    And then I stayed there until

4  June 2001.

5    Q    Then where did you go June 2001?

6    A    State Department of Mental Health

7  and Retardation in Alabama as the State

8  Director.

9    Q    And what is your current title?

10   A    Associate Commissioner for the

11 Department of Mental Health and Mental

12 Retardation.

13   Q    Is that a different position than

14 what you said you had when you came in 2001?

15   A    No.

16   Q    Same position?

17   A    Yes.

18   Q    So it's a State Director

19 position?

20   A    That's correct.

21   Q    And who is your immediate

22 supervisor?

23   A    Commissioner Houston.

# FREEDOM COURT REPORTING

Page 36

1  Ms. Blackledge's complaints about her

2  performance appraisal?

3       A    Don't remember that I did.

4       Q    You don't recall talking to Mr.

5  Ervin or anyone --

6       A    He didn't ask me a question.

7       Q    This is another one, Plaintiff's

8  57, also copied to you.

9       A    The subject matter I do remember,

10 but the subject matter appears to be the

11 same for the two.

12      Q    Okay.  Also discussing the

13 performance appraisal?

14      A    Yes.  As I said, whether I

15 received both of them, the subject matter is

16 in both.  Okay.

17      Q    And does the same thing apply,

18 you would send those to your secretary just

19 to file?

20      A    Correct.

21      Q    Okay.  Were you aware also that

22 Ms. Blackledge had filed an EEOC complaint?

23      A    I think the legal office did make

# FREEDOM COURT REPORTING

1    me aware of that.

2        Q    Do you remember when you were

3    made aware of that?

4        A    No.

5        Q    Let's see if we can get some type

6    of idea.  If it was filed in maybe April of

7    2004, do you know if they notified you

8    sometime soon after that, or was it more

9    recently?

10       A    I don't remember.

11       Q    You can't give me an estimate?

12   Was it within the last six months?

13       A    No, I don't remember.

14       Q    Okay.  And what did the legal

15   department -- well, sorry.  Were you also

16   made aware that she had filed a lawsuit

17   against the department?

18       A    Yes.

19       Q    Do you remember when you were

20   made aware of that?

21       A    No.

22       Q    I'm going to jump back in to what

23   we were talking about earlier, about job

## FREEDOM COURT REPORTING

Page 86

1      A    Yes, I heard this name.  You

2  asked me if knew her.

3      Q    I know.

4      A    I didn't know she was white until

5  they told me this week.

6      Q    Okay.  Do you know anything about

7  her employment with the department ending in

8  February of '04?

9      A    Yes.

10     Q    What do you know about that?

11     A    The department closed three of

12  the developmental centers in '03, '04, and

13  as a part of the closure, the Governor asked

14  the Commissioner and, therefore, asked us to

15  make every opportunity available to people

16  who would lose their jobs because of the

17  closure of the facilities.  We had three

18  developmental centers and two MI facilities

19  closing during -- between October '03 and

20  February -- and March 1st '04.  And we did,

21  we made every possibility.  The Governor

22  even froze vacancies at various other

23  agencies so that people who were losing

**FREEDOM COURT REPORTING**

Page 87

1   their jobs would have an opportunity to have

2   a job when the closures were over.

3        Q    And I don't want to -- let's try

4   to listen carefully and answer carefully

5   about these little series of questions here,

6   and I'm going to try to ask them the best I

7   can.  I know I probably don't always ask the

8   best questions.  Earlier we had talked about

9   how it would be against the rules for

10  someone to select somebody for a position

11  and then go through the interview position

12  and hire them, is that correct?  Do you

13  remember talking about that?

14       A    If it were possible to preselect

15  with the panel, as I indicated, that's the

16  check and balance system.

17       Q    Okay.  Is that something -- was

18  that the department tried to do for people

19  that were working at the center -- a center

20  that was closing down, though, to try to

21  find them positions?

22       A    What we did was made available

23  the opportunity for them to apply.  We

# FREEDOM COURT REPORTING

Page 88

1   didn't just say, "Here is a position,"

2   especially those at the executive level or

3   -- in fact, all of them, all except the

4   direct care staff, we did say, "Here is a

5   position you can go into." But we had

6   people actually interview for those

7   positions. If you look at here --

8       Q    You're referring to Plaintiff's

9   Exhibit 11?

10      A    Yes, eleven. Groggel, Allen,

11  Packer. I don't know who that is. Ezell,

12  Shappell all were losing their jobs. We

13  didn't give it to anyone; they applied for

14  it.

15      Q    So they just had the opportunity

16  to apply?

17      A    To apply for, yes, and were told.

18      Q    Go ahead. And were what?

19      A    And we were told to give, if all

20  being equal, to those people who were

21  getting the -- getting -- losing their jobs.

22  If they qualified and all being equal, they

23  should be given preference, that's correct.

## FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5      CIVIL ACTION NUMBER   CV-2:06CV321-ID

6   WINIFRED BLACKLEDGE,

7         Plaintiff(s),              COPY

8   v.

9   ALABAMA DEPARTMENT OF MENTAL HEALTH

10  & RETARDATION; COMMISSIONER JOHN

11  HOUSTON in his Official capacity as

12  Commissioner of Alabama Department

13  of Mental Health & Mental

14  Retardation,

15

16         Defendant(s).

17

18         DEPOSITION TESTIMONY OF:

19             FORDYCE MITCHEL

20  Commissioner:

21  Renny D. McNaughton

22  March 15, 2007

23  Mobile, Alabama

**DEFENDANT'S EXHIBIT 27**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

**FREEDOM COURT REPORTING**

Page 8

1    Q    And are you married, Mr. Mitchel?

2    A    Yes, I am.

3    Q    A what is your wife's name?

4    A    Jane Mitchel.

5    Q    And how long have you been

6    married?

7    A    Twenty-five years.

8    Q    Do you have children?

9    A    One.

10    Q    What is your child's name?

11    A    Aaron.

12    Q    Aaron.  Is that a boy or girl?

13    A    It's A-A-R-O-N.  It's a boy.

14    Q    How old is Aaron?

15    A    I think he's 23.

16    Q    Does he live in the Montgomery

17    area?

18    A    No.

19    Q    Where does he live?

20    A    Pennsylvania.

21    Q    What is your current position

22    with the department?

23    A    I'm the Director of Mental

# FREEDOM COURT REPORTING

Page 9

1  Retardation Community Service programs.

2          Q     So are you over all the Community

3  Service departments in the department?

4          A     No, in the division of Mental

5  Retardation.  The community programs are my

6  responsibility.

7          Q     Okay.  How long have you been in

8  that position?

9          A     Six years and two months.

10         Q     So, approximately, the beginning

11  of 2002, is that when you started?

12         A     Yes, sir.

13         Q     What was your position before

14  that?  Were you with the department.

15         A     I was with the Department of

16  Mental Health in the State of Missouri for

17  25 years.

18         Q     What is your education level?

19         A     Masters degree.

20         Q     In what?

21         A     Social work.

22         Q     From where?

23         A     University of Missouri.

FREEDOM COURT REPORTING

Page 39

were closing the facility at that time.

Q    What facility?

A    Brewer.

Q    Brewer?

A    And I don't remember this
specifically with regard to Groggel, over --
in all three cases there were -- we were
trying to -- we were trying to provide as
much support for the staff who would be
displaced by closing those facilities as we
could.  At the same time, we had to maintain
good service to the residents of those
facilities until the last one had left.  I
didn't know Mickey Groggel.  I had never met
her.  But she was -- she was a clinical
person in a fairly high position in the
Brewer facility, and I believe she was
probably essential to the operation of that
facility, and that might be why she couldn't
come and fill the position to which she had
been hired.

Q    Okay.  Do you know Kathi Allen?

A    No.  I know the name; I've never

FREEDOM COURT REPORTING

Page 44

1    A    Well, she's got to get my

2  approval, too.  I don't remember saying,

3  "No, you can't do this."  But the fact that

4  she didn't do it sounds to me like, you

5  know, either I said no or Joy said there

6  wasn't the money or Ms. Wilson said no.  I

7  cannot imagine Susan Stuardi leaving a

8  position open when she could fill it.

9    Q    But she had that ability to move

10  people around those positions, as long as

11  she got approval from your office?

12         MR. TARVER:  Object to the form.

13    A    Right.

14    Q    Were you also aware that Ms. --

15  that there was a Planning and Quality

16  Assurance II position opened back in 2002?

17    A    Yes.

18    Q    In this Region III?

19    A    We had one in each region.

20    Q    Okay.  Do you remember Daphne

21  Rosalis receiving a PQA position in 2002?

22    A    If you say that's when it

23  happened, I'll agree with you.  I didn't

## FREEDOM COURT REPORTING

Page 45

1   actually meet Ms. Rosalis until considerably

2   later.

3        Q    Did you have any input into

4   Ms. Rosalis receiving that position?

5        A    No.

6        Q    Do you know if anyone was in that

7   position prior to Ms. Rosalis?

8        A    It was a new position.

9        Q    It was a new position at that

10  time?

11       A    Yes.  There was a new position

12  made for each regional office.  That

13  position did not report to the Regional

14  Community Service Director.  It was not

15  under my direct line.

16       Q    They worked in that office but

17  they reported to central office?

18       A    To central office, to a newly

19  developed office of Quality Enhancement.

20       Q    Are you aware that Ms. Blackledge

21  filed an EEOC charge in 2004?

22       A    I assume I am.  I was copied on I

23  think most of the documents that she sent.

## FREEDOM COURT REPORTING

Page 46

1      Q      Okay.  Do you know -- are you

2   talking about more recent incidents?  I'm

3   trying to talk about a EEOC charge that was

4   filed by Ms. Blackledge in 2004 regarding

5   discrimination in promotions.

6      A      I don't recall it, specifically.

7      Q      Did you play any role in

8   investigating any EEOC claims Ms. Blackledge

9   made?

10      A      I don't believe so.

11      Q      Do you recall having

12   conversations not -- I'm not trying to ask

13   what you discussed, but any conversations

14   with the legal department about

15   Ms. Blackledge?

16      A      No.

17          (Whereupon Plaintiff's

18      Exhibit Number 98 was marked and

19      attached to the deposition.)

20   BY MR. WILSON

21      Q      I will mark this as Plaintiff's

22   Exhibit 98.  This is a document signed by

23   Ms. Rebecca Luck, who is here with us today

# FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3               SOUTHERN DIVISION

4                                           COPY

5       CIVIL ACTION NUMBER   CV-2:06CV321-ID

6  WINIFRED BLACKLEDGE,

7          Plaintiff(s),

8  v.

9  ALABAMA DEPARTMENT OF MENTAL HEALTH

10 & RETARDATION; COMMISSIONER JOHN

11 HOUSTON in his Official capacity as

12 Commissioner of Alabama Department

13 of Mental Health & Mental

14 Retardation,

15

16          Defendant(s).

17

18          DEPOSITION TESTIMONY OF:

19              JERRYLN LONDON

20 Commissioner:

21 Renny D. McNaughton

22 March 14, 2007

23 Mobile, Alabama

DEFENDANT'S
EXHIBIT
28

**FREEDOM COURT REPORTING**

Page 33

1   exactly.  It was either one of the two:  BC

2   Farnum or Jeff Williams.

3        Q    And is she employed with the

4   department?

5        A    Yes.

6        Q    What is her position now?

7        A    PQA II.  I guess it's II.  Don't

8   quote me on that.

9        Q    Is she still in Region III?

10       A    Yes.  She is in Region III, and

11  her supervisor is still in Montgomery.

12       Q    Who is her supervisor now?

13       A    Jeff Williams.

14       Q    So you don't have a opportunity

15  to work with her?

16       A    We do work together on a lot of

17  things, but I don't supervisor her.

18       Q    Okay.  Were you aware that

19  Winifred filed an EEOC charge against the

20  department in, I think, April 2004?

21       A    I don't know when I was aware,

22  but, yes, I'm aware that she filed a EEOC

23  charge.

# FREEDOM COURT REPORTING

Page 59

1    A    I don't remember if she told me

2  that, number one, but if she did, Donna may

3  have been assigned to do something, or I may

4  have needed them both to do it.  But without

5  the assignment list in front of me, I would

6  only be guessing.

7    Q    Have you ever let other people

8  out of the spring conference?

9    A    I had already approved for

10 Shirley Patterson to go.  That was probably

11 the first time that we had done.

12    Q    You can't think of anyone else

13 that --

14    A    I hadn't been in charge before.

15 That was '04, '05.  That might have been the

16 second one, but not the first that I recall.

17    Q    And did Ms. Blackledge end up

18 working that spring conference?

19    A    She did come in and work that

20 Tuesday, Wednesday.  But the registration

21 table, it's the first day is usually --

22 really when I needed her.

23    Q    Have you ever disciplined

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5    CIVIL ACTION NUMBER   CV-2:06CV321-ID

6    WINIFRED BLACKLEDGE,

7         Plaintiff(s),

8    v.

9    ALABAMA DEPARTMENT OF MENTAL HEALTH

10   & RETARDATION; COMMISSIONER JOHN

11   HOUSTON in his Official capacity as

12   Commissioner of Alabama Department

13   of Mental Health & Mental

14   Retardation,

15

16        Defendant(s).

17

18        DEPOSITION TESTIMONY OF:

19             KENDRA BUTLER

20   Commissioner:

21   Renny D. McNaughton

22   March 14, 2007

23   Mobile, Alabama

DEFENDANT'S
EXHIBIT
29
tabbies

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 28

1    Plaintiff's Exhibit 55.  It was Defendant's

2    Exhibit 28.  This is a letter from

3    Ms. Blackledge to Mr. Henry Ervin.  I think

4    she also attached Exhibit 54 with that.

5    Have you ever seen Exhibit 55 before?

6          A     I do not recall seeing this.

7          Q     You don't think you've seen that

8    document?

9          A     I don't believe so, no.

10         Q     Were you aware at that time that

11   Ms. Blackledge was making allegations of

12   retaliation and harassment?

13         A     No, not that I recall.

14         Q     Were you aware that

15   Ms. Blackledge had filed an EEOC charge?

16                    MR. TARVER:  Object to the

17                    form.

18                    MR. WILSON:  Do you want me

19                    to rephrase it?

20                    MR. TARVER:  Uh-huh.

21                    MR. WILSON:  What's wrong

22                    with it?

23                    MR. TARVER:  She's got two

**FREEDOM COURT REPORTING**

Page 29

1      different charges.

2    BY MR. WILSON:

3        Q    Were you aware Ms. Blackledge had

4    filed an EEOC charge in 2004?

5        A    I didn't know it was an EEOC

6    charge.

7        Q    What did you know?

8        A    I knew that there was a grievance

9    filed, and that was the extent of what I

10   knew.

11       Q    And did you know what it

12   involved?

13       A    No.

14       Q    Did you know it involved anything

15   about race discrimination?

16       A    No.

17       Q    And how were you made aware of

18   that, that there was a grievance filed?

19       A    Which grievance?

20       Q    Well, which one --

21       A    I mean, I didn't know about --

22       Q    You knew she made some form of

23   complaint?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**