Page 93

1  just takes whatever is on the other page and
2  tallies it and puts it into a summary form
3  and gives you a general overview.
4      Q   Could it affect -- I mean could
5  it affect an employee's pay?
6      A   Not that I'm aware of.  Not --
7  any classification where somebody is meeting
8  or exceeding the standard is not going to
9  affect pay.  I don't know what it would do
10 with this does not meet standards area.
11     Q   Could it affect an employees's
12 potential for promotion?
13     A   That would depend on the weight
14 somebody put on it, you know, when they were
15 looking at it.
16     Q   So it could play a factor?
17     A   It could.
18     Q   I mean, if you were going to look
19 at a employee's record for promotion, would
20 you go back and look at the performance
21 appraisal?
22     A   Not necessarily.  In terms of
23 going back and pulling a whole list of

Page 94

1  somebody's ratings, not necessarily.
2      Q   So, I mean, it sounds to me like
3  you're trying to say they're not very
4  important?
5      A   No.  What I'm saying is if you're
6  looking at a promotion or if you're looking
7  at a job that's different than whatever that
8  person has done before, you might be looking
9  at a different skill set than what an older
10 evaluation might tell you.
11     Now, if you know that employee, you're
12 going to know whether they're coming to work
13 on time and whether they're, you know,
14 complying with rules and regulations and
15 that sort of things.  If it's somebody
16 you've never met before, you know, then that
17 kind of information might -- you might not
18 know that already.
19     Q   So performance appraisals are
20 important to employees, correct?
21     A   I would think so, yeah.
22     Q   Let me -- I'm going to jump back
23 talking about this CSS III position again.

Page 95

1  We know it was sometime in late 2003 Mickey
2  Groggel was selected for this position.  The
3  date we have here is December 10th, 2003.
4  Did you have any discussions with anyone
5  about Mickey Groggel being a good person for
6  this position?
7      A   With that group of people, Mickey
8  included, and all the people that were
9  applying, most of those people were really
10 very well known already.  Their work history
11 was well known, what their job assignments
12 were well known.  So going back and finding
13 out information probably wasn't part of that
14 process.  It was probably based on whatever
15 we had in front of us and whatever our
16 knowledge was of those people.
17     Q   Okay.  Let me go back to the
18 question.  Do you remember discussing Mickey
19 Groggel for this position with anyone?
20     A   I don't remember it.
21     Q   Don't remember one way or the
22 other?
23     A   Don't remember one way or the

Page 96

1  other.
2      Q   Could have, you just don't
3  remember?
4      A   Could have, don't remember.
5  Could have discussed any of the people on
6  that list.
7      Q   Who do you think the best person
8  was for that position?
9      A   Well, since Mickey was selected,
10 I guess I would think it was her.  I think
11 she had the -- she had the exact skill set
12 that we were trying to move the department
13 toward at that time, with background in
14 education testing.  But I think I said in
15 the memo even that there were some really,
16 really good people in that interview pool.
17     Q   At that time period, who worked
18 more closely with Winifred, you or
19 Ms. London?
20     A   I guess we both did.  It was a
21 very small office.  Everybody, you know,
22 worked with everybody else.  We were all
23 very -- in very close proximity to each

24 (Pages 93 to 96)

FREEDOM COURT REPORTING

Page 97

1  other.
2      Q   On this Plaintiff's Exhibit 11,
3  you didn't grade Mickey the highest, did
4  you?
5      A   No, I didn't.
6      Q   You graded Chris Allen?
7      A   Kathi Allen.
8      Q   Kathi Allen the highest with a
9  23, correct?
10     A   Uh-huh.
11     Q   Next you graded Celestine
12 Chappell with a 22, correct?
13     A   Correct.
14     Q   And then Mickey Groggel with a
15 21, correct?
16     A   Correct.
17     Q   And all three of those are white
18 employees we've established. You graded
19 Ms. Blackledge with a 17, who would be next;
20 Ms. Williams with a 12; Mr. Packer with a 8;
21 and Ms. Ezell with a 16.
22     A   Uh-huh.
23     Q   Jerryln London graded

Page 98

1  Ms. Blackledge with a 30, which I don't know
2  if that's the highest you can get but it
3  appears to be very high. Ms. London graded
4  Ms. Groggel with an 18. So she clearly felt
5  that Ms. Blackledge was better suited for
6  that position from what it looks like on
7  this paper, correct?
8          MS. TARVER: Object to the form.
9      Q   Sorry, what was your answer?
10         MS. TARVER: Same objection.
11     Q   We got your objection.
12     A   The numbers would suggest that.
13     Q   And the numbers apparently played
14 some factor in this, correct?
15     A   Yes. And we never determined
16 exactly what these numbers were, whether it
17 was just the interview or whether it was the
18 over all package.
19     Q   But we knowed it played some
20 factor?
21     A   That's a factor somewhere in all
22 this.
23     Q   And because the numbers vary so

Page 99

1  much, it's clearly the panel's subjective
2  thoughts on what the grades were, correct?
3          MS. TARVER: Object to the form.
4      A   I can't answer whether or not
5  it's their subjective thoughts or how
6  objective the criteria were at that time.
7      Q   But for you to grade
8  Ms. Blackledge with a 17 and for Ms. London
9  to grade her with a 30 --
10     A   We, obviously, had a difference
11 of view.
12     Q   A difference of opinion?
13     A   Okay.
14     Q   Different view. Your subjective
15 belief was that one candidate was better
16 than the other, correct?
17         MS. TARVER: Object to the form.
18     A   Okay.
19     Q   You can answer. Is that yes?
20     A   Yes.
21     Q   We have seven candidates on this
22 list: Three white candidates and four black
23 candidates. You graded the three candidates

Page 100

1  the highest and the four black candidates
2  the lowest, correct?
3      A   Correct.
4      Q   Is it possible that any
5  subjective bias played a role in your
6  decision?
7          MS. TARVER: Object to the form.
8      A   No.
9      Q   Do you find it odd that you
10 graded the four black employees the lowest
11 compared to the white employees?
12     A   No, not when you know everybody.
13     Q   Do you want a break or anything?
14     A   No.
15         (Whereupon Plaintiff's
16     Exhibit Number 16 was marked and
17     attached to the deposition.)
18 BY MR. WILSON
19     Q   I'll take one here shortly. I'm
20 going to enter as Plaintiff's Exhibit 16.
21 This is a stack of looks like about 30
22 pages.
23         MS. TARVER: All this is one

25 (Pages 97 to 100)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

FREEDOM COURT REPORTING

Page 101

1    exhibit?
2        MR. WILSON: Yeah.
3        MS. TARVER: Sixteen?
4        MR. WILSON: Yeah.
5    BY MR. WILSON
6        Q   Let me ask if you recognize these
7    documents. If you can, tell me what they
8    appear to be.
9        A   Okay. They look like rating
10   sheets.
11       Q   Looks like rating sheets for the
12   CSS III position?
13       A   That's what it looks like.
14       Q   And is this what you were
15   referring to earlier about something you
16   would fill out during the interview
17   selection process?
18       A   Uh-huh.
19       Q   Yes?
20       A   Yes.
21       Q   And does this kind of refresh
22   your memory about how you get this score
23   here on Plaintiff's Exhibit 11?

Page 102

1        A   Yes.
2        Q   So if we match up -- if you will
3    flip to --
4            MS. TARVER: Hang on a minute.
5        For the record, these records that
6        make up Plaintiff's Exhibit 16
7        that Ms. Stuardi has just been
8        provided are not records that came
9        from the Department of Mental
10       Health, and, in fact, have been
11       the subject of some concern
12       because the official record of
13       this particular interview was
14       lost. And that is why the earlier
15       reference to Plaintiff's
16       Exhibit -- I'm looking for 11,
17       Josh.
18           MR. WILSON: I'm sorry.
19           MS. TARVER: Plaintiff's Exhibit
20       11 that has been presented to
21       Ms. Stuardi, she did not recognize
22       seeing it, which I represent is a
23       handwritten chart by John Owens

Page 103

1        from Personnel of the results of
2        the interview process is why
3        Ms. Stuardi didn't know about what
4        this was and hadn't seen it. This
5        is significant because a large
6        part of why I believe the EEOC
7        made a finding in this case is the
8        fact that we could not produce the
9        official record of the interview
10       process.
11           MR. WILSON: Let me object to
12       that statement about your opinion
13       about why the EEOC found cause.
14           MS. TARVER: Fine.
15           MR. WILSON: I don't believe that
16       should be asserted right here.
17           MS. TARVER: That's fine. That's
18       my opinion and you're certainly
19       subject to your objection. But,
20       for the record, the Department of
21       Mental Health in its production to
22       the EEOC did not have these
23       records available and, therefore,

Page 104

1        was unable to give the complete
2        picture that we're normally able
3        to give in a case like this. So
4        the department will be propounding
5        discovery related to where these
6        documents came from and these
7        documents had not been yet
8        produced to the department as a
9        part of our request for
10       documentation from Ms. Blackledge.
11           MR. WILSON: Okay. And I will
12       just say that these documents were
13       asked for in our discovery
14       requests. Whether or not they
15       were provided Friday when I got
16       all the documents, I'm not sure.
17       I know they were asked for, and
18       whether or not there's in any in
19       there or not, I'm not sure. I
20       thought there were some in there,
21       but they were asked for by the
22       plaintiffs. And one reason why
23       they were not given yet is because

26 (Pages 101 to 104)

Page 105

1  they were asked for and we would
2  naturally assume that they would
3  be in the possession of the
4  department.
5       MS. TARVER: Well, one of the
6  things that was provided in the
7  production was the department's
8  response to the EEOC, which was
9  supplemented, I believe, on more
10 than one occasion, and a large
11 part of that record demonstrates
12 that we did not have the documents
13 that are being referred to in
14 Plaintiff's 16. So with that, can
15 we take a break and copy these so
16 we can have a copy for our records
17 before you start going down this
18 road?
19      MR. WILSON: Sure.
20 (Whereupon, a short break was taken.)
21      MR. WILSON: Were we finished
22 with our conversation?
23      MS. TARVER: Let me say at this

Page 106

1  point I am not objecting to
2  Plaintiff's Exhibit 16. I just
3  want it clear for the record that
4  prior to this proceeding, the
5  department from the time the
6  interview was completed and the
7  records handed off to the Brewer
8  Personnel Department, which we
9  will get at in further
10 depositions, until now, we have
11 not had in our possession the
12 documents that Ms. Stuardi has
13 been presented and it has been a
14 concern of ours related to the
15 charges from the EEOC in this
16 case.
17      MR. WILSON: And, for the record,
18 those were documents we had
19 requested. I'm unaware -- I was
20 unaware of whether or not they
21 were in the production you gave
22 us. However -- sorry, lost my
23 train of thought. But they were

Page 107

1  in the documents we requested and
2  whether or not the department had
3  possession of them or not, I'm
4  unaware of. So --
5       MS. TARVER: Okay. I will just
6  note that they are not Bates
7  stamped in accord with over 4,000
8  pages of documents we presented to
9  you.
10      MR. WILSON: Okay.
11      MS. TARVER: We have supplemented
12 the record and we have attempted
13 to identify in some way the record
14 since we provided you those over
15 4,000 pages of documents, and we
16 will continue to identify things
17 that are not Bates stamped in a
18 way we all can identify what was
19 given and what wasn't.
20 BY MR. WILSON
21      Q  Ms. Stuardi, back to this -- the
22 documents that were handed and identified,
23 let's look at, for example, the second page

Page 108

1  of those documents. And this is dated
2  December 5th, 2003.
3       A  Uh-huh.
4       Q  And interviewer name is your
5  name. Is this your handwriting?
6       A  Yes.
7       Q  Okay. And if we look back on
8  Plaintiff's Exhibit 11, the score listed on
9  that handwritten note, Plaintiff's Exhibit
10 11, is 21?
11      A  Right.
12      Q  And the score total here at the
13 bottom of Plaintiff's Exhibit 16, page 2, is
14 also 21, correct?
15      A  Correct.
16      Q  And so does it make sense that --
17 can we tell now that the scores listed on
18 that handwritten note were based solely on
19 the interview process?
20      MS. TARVER: Object to the form,
21 but you can answer.
22      A  That's what it appears, yes.
23      Q  So those scores did not take into