**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **WINIFRED BLACKLEDGE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 2:06cv321-ID** |
| **v.** | ) | |
| | ) | |
| **ALABAMA DEP'T OF MENTAL** | ) | |
| **HEALTH & MENTAL RETARDATION,** | ) | |
| **et al.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

In this lawsuit, Plaintiff Winifred Blackledge ("Blackledge"), an African-American female, sues the Alabama Department of Mental Health & Mental Retardation and John Houston, in his official capacity as DMH/MR's commissioner (collectively, "Defendants").  Blackledge alleges that she was denied three promotions and retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and 42 U.S.C. §§ 1981 and 1983.

Before the court is Defendants' motion for summary judgment.  (Doc. No. 26.)  A brief and an evidentiary submission accompany the motion.  (Doc. Nos. 26-27.)  Blackledge submitted a response in opposition and an evidentiary submission to which Defendants filed a reply.  (Doc. Nos. 33-35.)  After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Defendants' motion for summary judgment is due to be granted in part and denied in part.

## II. JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III. STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting

evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.


## IV.  FACTS[1]

### A.  Defendants

_____The Alabama Department of Mental Health & Mental Retardation ("DMH/MR") is a state agency which provides mental illness, mental retardation and substance abuse services throughout Alabama.  Its commissioner is John Houston ("Houston").

DMH/MR presently operates seven residential treatment facilities for individuals with mental illness.  These facilities fall under DMH/MR's Division of Mental Illness. DMH/MR's Division of Mental Retardation comprises five regional community services offices and one residential treatment facility for individuals with mental retardation. (Defs. Ex. 10 at 1-2 (Doc. No. 26).)  The community services offices, which include the Region III Community Services Office where Blackledge works, are charged with

---

[1] The facts are presented in the light most favorable to Blackledge.

coordinating, developing and monitoring services and with finding placement in the community for individuals with mental retardation.  (Id.)

### B.  Blackledge's Educational and Employment Background

Blackledge obtained a Bachelor of Arts degree in History Education from Clark College (now Clark College Atlanta University) in 1980 and a Master of Social Work from Florida State University in 1984.  (Pl. Dep. at 12-13 (Ex. A to Doc. No. 34).)  She also is a Master Licensed Degree Social Worker.  (Id. at 13.)

Blackledge became employed with DMH/MR in March 1987.  (Id. at 15-16.)  She was hired as a Habilitation Team Leader Trainee at the Albert P. Brewer Developmental Center ("Brewer Center"), which now is defunct, but at the time was a residential facility for individuals with mental retardation.[2]  The Brewer Center, which was located in Mobile, Alabama, was under the Division of Mental Retardation.

On March 26, 1988, Blackledge received a promotion to the classification of Mental Health Social Worker II.  She remains in this position today.  (Id. at 16-17.)  In 1988 or 1989, Blackledge transferred to DMH/MR's Region III Community Services Office in Daphne, Alabama, where she still works.  (Id. at 18.)

As a Mental Health Social Worker II, Blackledge's duties include providing technical assistance in the surrounding areas and monitoring community homes.  As a

---

[2] As part of a department-wide reorganization, discussed below, the Brewer Center closed effective March 1, 2004.  (Defs. Ex. 10 at 2 (Doc. No. 26).)

monitoring coordinator, she provides consultation training in order to facilitate compliance with minimum standards applicable to DMH/MR.  (Id. at 42.)

One of Blackledge's past supervisors, Susan Stuardi ("Stuardi"), described Blackledge as a "basically good employee" who worked without performance or disciplinary problems and who "was very good at specific assignments that she was given."  (Stuardi Dep. at 25-26, 117-18 (Pl. Ex. B).)  Blackledge's work performance "exceed[ed] standards" on performance appraisals rated by Stuardi.  (Stuardi Dep. at 19, 147-49); (See, e.g., Pl. Performance Evaluations (Exs. CCC, DDD, EEE, FFF, GGG to Doc. No. 34).)

It is undisputed that Blackledge applied for the following three positions, but was not selected:  (1) a Planning and Quality Assurance Specialist II position ("PQA II"), which was filled in November 2002; (2) a Community Services Specialist III position ("CSS III"), which was filled in December 2003; and (3) another PQA II position, which was filled in April 2004.  In this lawsuit, Blackledge complains that she was denied these three promotions because of her race.

## C.  2002 PQA II Position

In 2002, Blackledge applied for a PQA II position in response to a job announcement.  (Pl. Dep. at 47-48.)  Daphne Rosalis ("Rosalis"), a Caucasian employee, however, was selected for the position.  (Defs. Resp. to Pl. Interrog. No. 5 (Pl. Ex. L to Doc. No. 34)); (Pl. Ex. J to Doc. No. 34).)

The court need not elaborate further on the factual circumstances surrounding Blackledge's non-selection.  As discussed later in this opinion, Defendants argue only that Blackledge failed to exhaust her administrative remedies under Title VII, an argument which Blackledge essentially concedes.  Blackledge, however, brings a parallel claim under 42 U.S.C. § 1981, as enforced by 42 U.S.C. § 1983, and Defendants do not move for summary judgment on the merits of this claim.

### D.  2003-04 CSS III Position

#### 1.  *The State of Affairs at DMH/MR*

Prior to the selection for the CSS III position at issue, DMH/MR was in the midst of a statewide review of its staffing positions and levels.  In February 2003, the DMH/MR created the Special Personnel Task Force to conduct staffing reviews, establish uniform standards for staffing positions, and develop recommendations and guidelines for adjustments in staffing, to include methods to fill vacancies and reduce staff overages.[3] (Special Personnel Task Force Report to Commissioner (Defs. Ex. 11 to Doc. No. 26)); (see also Ervin Dep. at 74 (Defs. Ex. 13 to Doc. No. 26)); (Mitchel Dep. at 8-9, 39 (Defs.

---

[3] The report specifically provides that methods to fill identified vacancies and reduce staff overages must comply with State Personnel rules and DMH/MR policies. (Special Personnel Task Force Report to Commissioner at 3-4 (Defs. Ex. 11 to Doc. No. 26).)

Ex. 27 to Doc. No. 35).)  In conjunction with the establishment of this task force,

DMH/MR underwent a major reorganization, which was directed and approved by the

governor of the state of Alabama.  The reorganization resulted in the closing and

consolidating of several DMH/MR facilities.  (Consolidation Plan, August 2003 (Defs.

Ex. 12 to Doc. No. 26)); (Wilson Dep. at 86-88 (Defs. Ex. 26 to Doc. No. 35).)

Eranell McIntosh-Wilson ("Wilson"), who at the time was the associate

commissioner for the Division of Mental Retardation, testified that DMH/MR closed

three of its four developmental centers and mental illness facilities between October 2003

and March 2004.  Wilson also said that the governor asked Houston to make every

opportunity available to employees who would lose their jobs because of the closure of

the facilities.  (Wilson Dep. at 86-88 (Defs. Ex. 26 to Doc. No. 35).)  Consequently,

DMH/MR gave those employees facing job losses "the opportunity to apply" for open

positions.  (Id. at 87.)  Wilson stated that, if "all things were equal," those employees who

otherwise would lose their jobs due to closure were to be given preference for the

position.  (Id. at 88.)

Particular to the CSS III position, Stuardi testified that "[t]here were a lot of people

who wanted that job" because many employees were "facing unemployment" as a

consequence of the department downsizing.  (Stuardi Dep. at 66 (Defs. Ex. 25 to Doc.

No. 35.)  Stuardi explained that, during the general time frame of the CSS III

announcement and closing,

> an entire operation [was] condensing, people losing jobs, people being
> transferred, etc., and every effort was being made to offer whatever few

7

positions we had left to people who were about to lose their jobs. And I believe that . . . the department was making a very serious effort to use its positions and keep as many employees as possible without having to fire people. . . . [J]ob saving was a big part of this whole process, to keep people from being unemployed.

(Id. at 143.)

## 2. The Selection Process

On October 28, 2003, Blackledge applied for the CSS III position in response to an announcement.[4] (Pl. Ex. R.) The announcement set out the qualifications, kind of work, required knowledge, skills and abilities and method of selection. It provided, in pertinent part, as follows:

QUALIFICATIONS: Masters degree in psychology, special education or related human service field. Progressively responsible administrative experience in the field of mental retardation. Licensure/certification as required by discipline and valid drivers license.

KIND OF WORK: This is highly responsible professional work requiring clinical skills and extensive experience in working with community mental retardation programs. The employee in this position coordinates assessment activities and provides training to providers in the use of functional assessment, ICAPS and other assessment tools. Technical assistance is given to community providers in skill acquisition behavioral training and person centered planning. This person provides technical assistance to service providers to facilitate compliance with standards, rules and regulations. The employee assists with the outplacement, diversion and waiting list individuals. This person travels throughout the 10 counties of southwest Alabama. Serves as professional on 24 hour call.

---

[4] The CSS III position opened on October 27, 2003, with an application deadline of November 10, 2003. (Pl. Ex. O).

REQUIRED KNOWLEDGE, SKILLS AND ABILITIES: Ability to plan, organize and prioritize work with independence. Ability to communicate effectively in writing and orally and to conduct individual and group training. Possess computer skills in word processing and data base programs.

METHOD OF SELECTION: Applicants will be rated on the basis of an evaluation of their training, experience and education and should provide adequate work history identifying experiences related to the duties and minimum qualifications as above mentioned. All relevant information is subject to verification . . . .

(CSS III position announcement (Pl. Ex. O to Doc. No. 34).) It is undisputed that

Blackledge, who had a Master of Social Work, had a master's degree in a "related human

service field," as set out above. (Stuardi Dep. at 57-58 (Pl. Ex. B to Doc. No. 34).)

Twelve individuals applied for the position. Of the twelve applicants, six are

Caucasian, and six are African American. (Pl. Ex. H to Doc. No. 34.) Four applicants

were eliminated because they did not have a master's degree, a minimum educational

requirement for the position. Eight applicants were chosen for interviews. Seven

interviewed. Those seven were (1) Celestine Chappell, Caucasian; (2) James Packer,

African American; (3) Kathi Allen, Caucasian; (4) Blackledge; (5) Melissa Ezell, African

American; (6) Mildred "Mickey" Groggel, Caucasian; and (7) Sheritta Williams, African

American. (Id.); (Defs. Ex. 8 at 3 (Doc. No. 26).)

The record includes Exhibit H, which is reproduced below. Blackledge submits

this typewritten exhibit, which also contains Stuardi's handwritten notations, and relies on

it as proof of discriminatory intent, as discussed later in this opinion.[5] At the top of the

document, Stuardi wrote--"Only consider masters in Psychology or Special Ed." (Pl. Ex.

---

[5] Not all of the handwritten notations on Exhibit H are Stuardi's. Stuardi says that she is not the author of the notations which read--"no masters/no substitution allowed" and "8 candidates for interview." (Stuardi Dep. at 77 (Pl. Ex. B to Doc. No. 34).)

H (Ex. to Doc. No. 34).)  Stuardi also wrote the word "no" in the left-hand margin next to

the names of Packer, Blackledge, Ezell and Williams, all of whom are African American.

(Stuardi Dep. at 77-79.)  When asked why she wrote "no," Stuardi responded:

> I guess I would tie that together with the top statement about where the
> degree came, what kind of degree they had.  And it would appear to me
> that's saying these people don't have a degree in psychology or special
> education.  That's what it looks like to me.

(Id. at 78.)  This is Exhibit H:

The interview panel comprised four individuals:  (1) Joan Owens ("Owens"), Caucasian; (2) Jerryln London ("London"), African American; (3) Stuardi, Caucasian; and (4) Hugh Wicks ("Wicks"), Caucasian.  (Stuardi Dep. at 64-65 (Pl. Ex. B to Doc. No. 34)); (Pl. Ex. U); (London Dep. at 30 (Pl. Ex. C to Doc. No. 34).)  Stuardi indicated that the candidates interviewed were graded based upon their "experience, education, and the interview."  (Stuardi Dep. at 60-61 (Pl. Ex. B to Doc. No. 34).)

Each interview panel member assigned the interviewees a numerical score, and Groggel received a higher (and, thus, a better) overall combined score than Blackledge.  The interviewers rated Groggel as follows:  26 (Owens); 28 (Wicks); 21 (Stuardi); and 18 (London), for a combined score of 93.  The interviewers rated Blackledge as follows:  18 (Owens); 19 (Wicks); 17 (Stuardi); and 30 (London), for a combined score of 84.  (Id.) (Defs. Ex. 4 (handwritten score sheet) (Doc. No. 26).)

Stuardi made the ultimate hiring decision and chose Groggel.  (Defs. Ex. 8 at 2 (Doc. No. 26)); (Wilson Dep. at 70, 79, 80 (Pl. Ex. E to Doc. No. 34)); (Mitchel Dep. at 36, 42-43 (Pl. Ex. F to Doc. No. 34).)  Groggel had been employed by DMH/MR since approximately 1988.  (See Defs. Ex. 17 (Doc. No. 35).)  At the time she was selected for the CSS III position, Groggel was the department head over both residential and day program services at the Brewer Center.  (Stuardi Dep. at 79 (Ex. B to Doc. No. 34).)  Mitchel, who at the time was the director of Mental Retardation Community Services programs, described Groggel as occupying "a fairly high position in the Brewer facility" and said that she was "essential to the operation of that facility."  (Mitchel Dep. at 39 (Ex. F to Doc. No. 34)); (Mitchel Dep. at 8-9 (Defs. Ex. 26 to Doc. No. 35).)  Mitchel also

recalled that, during the time frame when Groggel was selected for the CSS III position,

DMH/MR was closing the Brewer Center.  (Id. at 38-39.)

Stuardi testified that Groggel was selected for the position because Groggel "had

the exact skill set that we were trying to move the department toward at that time, with

background in education testing."  (Stuardi Dep. at 96 (Defs. Ex. 25 to Doc. No. 35));

(see also Defs. Mem. of Law at 10 (Doc. No. 27)); (Stuardi Dep. at 109-10, 114 (Defs.

Ex. 14 to Doc. No. 26).)  Stuardi testified that experience in a community services office

(such as the one where Blackledge worked) was not a factor:  "The experience that would

have been a factor would have been experience with the tasks, the skill sets that were

being looked for in an employee, whether [the applicant] came from inside or outside [of

the department] . . . [and] if [the applicant] had certain skill sets that were being

considered."  (Stuardi Dep. at 109 (Defs. Ex. 14 to Doc. No. 26).)  Stuardi believed that

Blackledge could have "learned to do the job," but that Blackledge would have had "to

gain a lot more skills than what she had at the time that the job was announced."  (Id.

at 113-14.)  Stuardi also believed that three other Caucasian applicants, in addition to

Groggel, ranked ahead of Blackledge "in terms of people who met the specific criteria we

were looking for at that particular job."  (Id. at 99-100, 113); (Pl. Ex. U.)

In a memorandum from Stuardi to an individual in the Personnel Department,

Stuardi states that Groggel was taking a "substantial pay cut" by moving into the CSS III

position which was a "lower classification" than the position which Groggel was

vacating.  (Defs. Ex. 5 (Doc. No. 26)); (Stuardi Dep. at 80, 159 (Defs. Ex. 25 to Doc. No.

35).)  Because of the reduction in pay Groggel was facing, Stuardi "encouraged [Groggel]

to continue pursuing other higher paying openings for which she may qualify." (Defs. Ex. 5.)  By letter dated December 15, 2003, Blackledge was informed that she was not awarded the position.[6] (Pl. Ex. T (Doc. No. 34).)

## E.  PQA II Position (2004)

On April 2, 2004, a PQA II position opened.  (Defs. Resp. to Pl. Interrog. No. 14 (Pl. Ex. L).)  Blackledge applied.  The only other applicant was Groggel.  (Id., No. 16.) Groggel was awarded the job (see Stuardi Dep. at 88-89) and placed in the position on April 17, 2004.  (Defs. Resp. to Pl. Interrog. No. 18 (Pl. Ex. L).)

Concerning the circumstances surrounding the opening and filling of the PQA II position, Blackledge points to a memorandum, dated February 20, 2004, from Stuardi to Mitchel, Stuardi's supervisor.  The memorandum provides:

> As I understand it, Kathi's [Allen] employment with DMH/MR will end on 2/27/04 unless we are able to offer her a position.  We would like to move her into the CSS III position that is likely to be vacated by Mickey Groggel.
>
> If there is not time before the 27th to change classifications for Daphne Rosalis (to central office) and Mickey Groggel (to QE), can we extend Kathi's employment as an HTC III for the next few weeks until all of this can be resolved?  RCS III does currently have the funds to pick up her salary until these reclassifications are complete.
>
> Please let me know as quickly as possible.  Thank you.

(Pl. Ex. M.)  Ultimately, Allen did not move into the CSS III position because she left the employ of DMH/MR.  (Mitchell Dep. at 40-41 (Pl. Ex. F).)  Groggel, however, was

---

[6] The admissibility of Blackledge's Exhibit T is contested and is discussed later in this opinion.

appointed to the PQA II position, and the CSS III position was closed.  (Id. at 38-39,

40-42 (Pl. Ex. F)); (Stuardi Dep. at 142.)  When asked why the CSS III position was

closed, after being occupied by Groggel for approximately one month, Mitchel stated that

each regional office had to "give up a position" because of budget cuts.  (Mitchel Dep.

at 42 (Pl. Ex. F).)


    F.  Blackledge's EEOC Charges, Federal Complaint and Allegations of Retaliation

       On June 8, 2004, Blackledge signed a charge of racial discrimination which was

stamped "received" by the Equal Employment Opportunity Commission ("EEOC") on

June 9, 2004.  (Defs. Ex. 1 (Doc. No. 26).)  In her charge, Blackledge complains that,

although she had eighteen years experience in one of DMH/MR's community services

offices, she was not selected for the CSS III position for which she applied in October

2003.  (Id.)  Rather, she contends that the position "was given to a white female [Groggel]

with no experience in the Community Service Department."  (Defs. Ex. 1.)  The EEOC

found "reason to believe" that discrimination had occurred and issued Blackledge a right-

to-sue letter.  (Pl. Exs. W, SS, TT (Doc. No. 46)); (Compl. ¶ 2.)

       On April 10, 2006, Blackledge commenced this civil action, alleging race

discrimination arising from her non-selection for three positions (the PQA II positions in

2002 and 2004 and the CSS III position in 2003), in violation of Title VII and

§ 1981/§ 1983.  (Compl. ¶¶ 35-47.)

       On January 8, 2007, Blackledge filed a second EEOC charge, alleging that she had

been subjected to retaliation as a result of filing her original EEOC charge and her federal

civil lawsuit.  (Pl. Ex. W.)  In her January 8 EEOC charge, Blackledge says that she

received "a false and adverse performance appraisal" and states, without any elaboration,

that she was the victim of "numerous" other incidents of retaliation.  (Id.)

On February 7, 2007, the court permitted Blackledge to amend her complaint to

add a retaliation count.  In her amended complaint, Blackledge repeats that "she was

given a completely false and adverse performance appraisal," that "her salary is directly

related to performance appraisals," and that she suffered other unspecified retaliatory acts

on "numerous occasions."  (Am. Compl. ¶¶ 34, 51 (Doc. No. 18).)  As relief, Blackledge

requests a permanent injunction enjoining Defendants "from continuing to violate Title

VII and . . . § 1981" and a declaratory judgment "that the employment policies, practices,

procedures, conditions and customs of the defendant are violative of the rights of

[Blackledge] as secured by Title VII . . . and § 1981."  (Id. at 9.)  Blackledge also

requests an order requiring Defendants "to make [her] whole by awarding her the

position[s], pay and benefits she would have occupied in the absence of race

discrimination, back-pay (plus interest), compensatory damages and/or nominal damages,

declaratory and injunctive relief, equitable relief and benefits."  (Id. at 10.)

## V.  DISCUSSION

### A.  Title VII and 42 U.S.C. §§ 1981/1983:  Elements of Proof, Immunity and Proper Defendants

*1.  Elements of Proof*

Blackledge brings her failure-to-promote claims under Title VII and § 1981/§1983.[7]  Blackledge's Title VII and § 1981/§1983 failure-to-promote claims have the same elements of proof and analytical framework.  The Eleventh Circuit has explained, "Where . . . a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.  A plaintiff asserting either claim must prove intentional discrimination."  Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985) (emphasis added).  Unless there is direct evidence of discrimination, the court applies the familiar McDonnell Douglas burden-shifting framework to ascertain whether intentional discrimination can be inferred from circumstantial evidence.  See id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

---

[7] The court notes that "§ 1983 contains the sole cause of action against state actors for violations of § 1981."  Butts v. County of Volusia, 222 F.3d 891, 892 (11th Cir. 2000); Godoy v. Habersham County 211 Fed. Appx. 850, 852  (11th Cir. Dec. 12, 2006).  Blackledge, thus, cannot sue directly under § 1981.  Blackledge, however, can sue under § 1983 for a violation of § 1981, and the court finds that Blackledge's complaint, as amended, fairly can be read as alleging such a claim.

Blackledge also brings retaliation claims under Title VII and § 1981/§ 1983.[8]  In

<u>Adams</u>, the Eleventh Circuit noted that "'whether the elements of Title VII and § 1981

retaliation claims are the same is an open question in this Circuit.'"  2007 WL 1720430,

*4 n.6 (quoting <u>Bass v. Bd. of County Comm'rs, Orange County, Fla.</u>, 256 F.3d 1095,

1120 n.10 (11th Cir. 2001)).  As in <u>Adams</u>, however, because the parties have not raised

this "open question," the court assumes without deciding that the elements of a Title VII

retaliation claim also apply to a § 1981/§ 1983 retaliation claim.  See <u>id.</u>


### 2. Eleventh Amendment Immunity:  § 1981/§ 1983

Defendants contend, and the court agrees, that DMH/MR is entitled to summary

judgment on Blackledge's § 1981/§ 1983 causes of action based on the Eleventh

Amendment.  (Defs. Mem. at Law at 14 (Doc. No. 27).)  The Eleventh Amendment bars

suits directly against a state or its agencies, regardless of the nature of relief sought.

<u>Papasan v. Allain</u>, 478 U.S. 265, 276 (1986); <u>Pennhurst State School & Hosp. v.</u>

<u>Halderman</u>, 465 U.S. 89, 100-01 (1984).

---

[8] Blackledge bases her § 1983 retaliation claims on alleged violations of § 1981 "which itself prohibits an employer from retaliating against its employee as a response to the employee's complaint of race-based discrimination."  <u>Adams v. Cobb County School District</u>, No. 06-15103, 2007 WL 1720430, *4 n.6 (11th Cir. June 15, 2007).  Title VII's anti-retaliation provision, codified at 42 U.S.C. § 2000e-3, "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . in' a Title VII 'investigation, proceeding, or hearing.'"  <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, ___ U.S. ___, ___ 126 S.Ct 2405, 2416 (2006) (quoting 42 U.S.C. § 2000e-3).

Defendants also argue that the Eleventh Amendment precludes Blackledge's § 1981/§ 1983 suit against Houston in his official capacity for damages, but admits that any claims for prospective equitable relief survive.  (Defs. Mem. at Law at 14 (Doc. No. 27)); (see also Pl. Mem. of Law at 19-20 (Doc. No. 33).)  The court agrees that Blackledge is not entitled to the full panoply of relief which she requests in her amended complaint.

The Eleventh Amendment is a bar to Blackledge's claims for monetary damages (or their equivalent) against Houston in his official capacity.  See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (holding that actions for money damages against a state official in his or her official capacity are essentially suits against the state and, thus, barred by the Eleventh Amendment).  An exception to Eleventh Amendment immunity (first delineated in *Ex parte* Young, 209 U.S. 123 (1908)), however, applies in suits against a state official seeking prospective equitable relief to end continuing violations of law.  See Edelman v. Jordan, 415 U.S. 651, 663-64 (1974); see also Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 146 (1993) (noting that, although prospective relief is available against state officials, it is not available against state agencies).  The only official-capacity claims which may be pursued consistent with the Eleventh Amendment are ones for prospective injunctive or declaratory relief.

Here, Blackledge seeks an injunction prohibiting Houston in his official capacity from continuing violations of § 1981, as enforced through § 1983 (Am. Compl. at 9 (Doc. No. 21)) and that claim for relief survives based upon the foregoing authority.

18

Additionally, to the extent that Blackledge's § 1983 prayer for declaratory relief does not relate solely to purported past violations of law by Houston in his official capacity, that relief is available to Blackledge in this lawsuit.  See Cobb v. Marshall, 481 F. Supp.2d 1248, 1258 (M.D. Ala. 2007) (discussing Eleventh Amendment immunity and foreclosing plaintiff's attempt to use Ex parte Young to "'adjudicate the legality of past conduct'" in the form of declaratory relief) (citation omitted)).  Defendants' motion for summary judgment premised on Houston's entitlement to Eleventh Amendment immunity is due to be granted.

### 3.  Title VII Official-Capacity Claims against Houston

Blackledge sues DMH/MR and Houston in his official capacity under Title VII, but Defendants contend that Blackledge's official-capacity Title VII claims against Houston are redundant because DMH/MR is named separately as a defendant.  (Defs. Mem. of Law at 5-6 (Doc. No. 27).)  The court agrees.

State agencies can be sued directly for violations of Title VII, and, thus, DMH/MR, as Blackledge's employer, is a proper defendant under Title VII.  See Allen v. Alabama State Bd. of Educ., 816 F.2d 575, 577 (11th Cir. 1987) (state defendants do not have Eleventh Amendment protection under Title VII).  Where, as here, the employer is a party to a Title VII suit, Title VII claims against a state official in his or her official capacity are redundant.  See Willis v. Georgia Dept. of Natural Resources, Civil Action No. 5:05-CV-420, 2007 WL 2908458, *7 (M.D. Ga. Sept. 29, 2007); see also Blalock v.

<u>Dale County Bd. of Educ.</u>, 33 F. Supp.2d 995, 998 (M.D. Ala. 1998) (dismissing plaintiff's Title VII claim against supervisor in his official capacity as redundant of plaintiff's Title VII claim against the board of education).  Accordingly, the court finds that summary judgment is due to be entered in Defendants' favor on Blackledge's Title VII official-capacity claims against Houston.


B.  <u>Failure to Promote:  Three Claims</u>

Title VII "makes it an 'unlawful employment practice' for an employer to fail or refuse to promote any individual because of her race[.]"  <u>King v. Kirkland's Stores, Inc.</u>, No. 2:04cv1055-MEF, 2006 WL 2239208, *7 (M.D. Ala. Aug. 4, 2006) (citations omitted).  Title VII contains an administrative exhaustion requirement; 42 U.S.C. § 1983 does not.  <u>Templeton v. Bessemer Water Serv.</u>, 154 Fed. Appx. 759, 760 n.1 (11th Cir. Nov. 14, 2005).  Defendants contend that, as to all three of Blackledge's failure-to-promote claims, Blackledge failed to exhaust her administrative remedies in a timely manner (or at all).  Defendants also challenge the merits of Blackledge's claim alleging that she was not promoted to the CSS III position on the basis of her race.

*1. The PQA II Positions*

a.  Title VII Administrative Requirements

Defendants contend that Blackledge did not administratively exhaust her Title VII race discrimination claims alleging denials of promotions in 2002 and 2004 to the PQA II positions.  (Defs. Mem. of Law at 6 (Doc. No. 27).)  Blackledge fails to rebut this argument.

A plaintiff who wishes to pursue a Title VII discrimination claim first must exhaust her administrative remedies.  Exhaustion requires that an employee timely seek review by the EEOC on a claim that an employment decision was motivated by race.  Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  In her EEOC charge, Blackledge complains only of the failure of Defendants to promote her to the CSS III position in December 2003.  (Defs. Ex. 1 (Doc. No. 26).)  The denial-of-promotion claims to the two PQA II positions were not the subject of her EEOC charge.  (Id.)  By her silence, Blackledge makes this concession and fails to overcome her summary judgment burden.  See Fed. R. Civ. P. 56.

Because Blackledge did not file an EEOC charge alleging that she had been discriminated against based upon her race when she was not selected for the two PQA II positions, the court finds that Blackledge is precluded from seeking Title VII judicial review of these two claims.  Defendants' motion for summary judgment, therefore, is due to be granted in Defendants' favor on this issue.

b.  Statute of Limitations:  42 U.S.C. §§ 1981, 1983

While conceding that under Title VII she did not administratively exhaust her denial-of-promotion claims regarding the two PQA II positions, Blackledge asserts that her claims are timely under § 1981's four-year statute of limitations.  (Pl. Mem. of Law at 20 (Doc. No. 33).)  Blackledge is correct that § 1981 race discrimination claims are governed by a four-year statute of limitations.  See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004); 28 U.S.C. § 1658.  There, however, is a flaw in Blackledge's argument.

A § 1981 claim brought against a state actor pursuant to § 1983 is subject to the statute of limitations governing § 1983 claims.  See Marshall v. Daleville, Civil Action No. 1:05cv386-WHA, 2006 WL 2056581, *2 (M.D. Ala. July 24, 2006).  42 U.S.C. § 1983 contains a two-year statute of limitations.  See id.  Blackledge's claims, thus, are governed by a two-year statute of limitations.

The court, however, need not address the timeliness of Blackledge's § 1983 claims under the applicable statute of limitations.  The statute of limitations is an affirmative defense, which is waived if not raised.  See Day v. Liberty Nat'l Life Ins. Co., 122 F.3d 1012, 1015 (11th Cir. 1997); Fed. R. Civ. P. 8(c).  Defendants have not raised the statute of limitations as a defense at any point during these proceedings.  The statute of limitations as a bar to Blackledge's § 1983 claims is not at issue.

c.  Merits

As pointed out by Blackledge, in their summary judgment brief, Defendants do not address the § 1981/§ 1983 merits of Blackledge's two claims alleging denials of promotions in 2002 and 2004 to the PQA II positions.  (Pl. Mem. of Law at 24-25 (Doc. No. 33).)  The only ground for summary judgment urged by Defendants is, as addressed above, that under Title VII Blackledge failed to administratively exhaust these two claims before the EEOC.  In their reply brief, Defendants continue to argue exhaustion, and, for the first time, challenge the merits of the § 1981/§ 1983 failure-to-promote claims by asserting that Blackledge failed to rebut Defendants' legitimate, nondiscriminatory reasons for hiring other applicants.  (Defs. Reply at 9 (Doc. No. 35).)  The court agrees with Blackledge that Defendants' argument comes too late in a reply brief.

"When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B-a ground the movant might have presented but did not." Malhotra v. Cotter & Co., 885 F.2d 1305, 1310 (7th Cir. 1989), superseded by statute on other grounds as stated in Rush v. McDonald's Corp., 966 F.2d 1104 (7th Cir. 1992). Here, ground A was a Title VII exhaustion argument.  Defendants presented ground A in their opening brief filed in support of their motion for summary judgment, and Blackledge addressed that argument in her responsive brief.  Defendants' ground B, which asserts that there are nondiscriminatory reasons for not selecting Blackledge for the PQA II positions, could have been raised by Defendants in their opening summary judgment brief, but was not.  Blackledge was not required to anticipate and address

23

ground B in her response.  See id.; see also Fisher v. Ciba Specialty Chemicals Corp.,

Civil Action No. 03-0566-WS-B, 2007 WL 2995525, *9 (S.D. Ala. Oct. 11, 2007) ("it is

improper to raise new arguments in a reply brief or to recast a motion as something else

in the movant's final briefing opportunity, after it is too late for the nonmovant to

respond").

Put another way, the court finds that, at this juncture of the litigation, Defendants

have not sustained their burden of production under McDonnell Douglas' three-step,

burden-shifting procedure which applies to Blackledge's failure-to-promote claims.  See

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).  Under the second step,

Defendants, not Blackledge, bears the burden of producing a nondiscriminatory reason

for the adverse actions.[9]  See Tex. Dep't of Cmty. Affairs v. Burdine ("Burdine"), 450

U.S. 248, 255 (1981) ("the defendant must clearly set forth, through the introduction of

admissible evidence, the reasons for the plaintiff's rejection").  Defendants, however, did

not articulate any nondiscriminatory reason to explain why Blackledge was passed over

for the promotions.  Because Defendants failed to sustain their burden of production, the

burden did not shift back to Blackledge to show pretext.

For the foregoing reasons, Blackledge's § 1981/§ 1983 claims predicated on

Defendants' failure to promote Blackledge to the two PQA II positions proceed to trial.

Defendants' motion for summary judgment in this regard is due to be denied.

---

[9] Because Defendants did not challenge any element of Blackledge's prima facie
case in their opening summary judgment brief, Defendants are deemed to have conceded
those elements for present purposes.

## 2. The CSS III Position

The merits of Blackledge's race discrimination claim challenging Defendants' failure to promote Blackledge to the CSS III position are in issue.  Before addressing the merits, the court examines Defendants' argument that Blackledge did not timely file her EEOC charge.  Subsumed within the timeliness issue is a discovery dispute.

### a.  Title VII Administrative Requirements

Defendants contend that Blackledge did not file her June 2004 charge with the EEOC within 180 days of the denial of her promotion to the CSS III position, as is required in Alabama.  (Defs. Mem. of Law at 6-9 (Doc. No. 27)); see Price v. M & H Valve Co., 177 Fed. Appx. 1, *9 (11th Cir. April 7, 2006) (holding that in Alabama, a non-deferral state, an EEOC charge must be filed within 180 days of the last discriminatory act); Tipp v. AmSouth Bank, 76 F. Supp.2d 1315, 1327 (S.D. Ala. 1998) (discussing the Title VII condition precedent of timely exhaustion of a claim before the EEOC).  Defendants, thus, assert that Blackledge did not satisfy all Title VII conditions precedent to suit and that, therefore, it is entitled to summary judgment on Blackledge's Title VII race discrimination challenging her non-selection for the CSS III position.  See Brewer v. Alabama, 111 F. Supp.2d 1197, 1204 (M.D. Ala. 2000) (failure to file an EEOC charge within the 180-day window precludes judicial review of a Title VII claim).

Blackledge agrees with Defendants' calculation of the 180-day filing window insofar as she does not dispute that the charge is timely only if she received notice of her

rejection on or after December 11, 2003.  (Pl. Mem. of Law at 22 (Doc. No. 33)); <u>Nelson v. United States Steel Corp.</u>, 709 F.2d 675, 677 (11th Cir. 1983) ("The 180 day time period begins to run only when the complainant first learns or should have learned of the alleged discrimination.").  Blackledge, however, alleges that she timely filed her EEOC charge because she first learned that she did not receive the promotion on or after December 15, 2003.  (<u>Id.</u>)  As evidentiary support, Blackledge submits Exhibit T, which is a letter on DMH/MR letterhead from Personnel Specialist Marilyn B. Benson to Blackledge, dated December 15, 2003.  The letter notifies Blackledge that she was not selected for the CSS III position.  (Pl. Ex. T to Doc. No. 34).)

Defendants do not dispute that the letter proves the fact for which Blackledge offers it, <i>i.e.</i>, that Blackledge timely filed her EEOC charge within the 180-day window. Defendants, however, heavily contest the letter's admissibility in these proceedings. Defendants stress that Exhibit T is the only proof that Blackledge satisfied the Title VII condition precedent which requires the timely filing of an EEOC charge prior to the commencement of a lawsuit.  (Defs. Reply at 7 (Doc. No. 35).)

Because Blackledge did not disclose this "pivotal" letter until she filed her opposition to Defendants' motion for summary judgment, Defendants urge the court to exclude the letter, pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure. (<u>See</u> Defs. Reply at 5-8 (Doc. No. 35).)  Defendants argue that Rule 26(a)(1)(B) required Blackledge to disclose the letter, that Blackledge did not produce the letter even after Defendants inquired whether she possessed any other documents relevant to her case, and

that the letter is not part of DMH/MR's "official record."  (Id. at 6-7); Fed. R. Civ. P.

26(a)(1)(B).  In response, Blackledge argues, among other things, that Exhibit T does not

fall under Rule 26(a)(1)(B) because Blackledge had no intention of using this document

to support her Title VII claim until Defendants raised failure to exhaust in their motion

for summary judgment, but that, in any event, any discovery violation is harmless because

Defendants should have been in possession of the letter.  (Pl. Mot. Strike (Doc. No. 36).)

Rule 37(c)(1) provides, in pertinent part, that a party who "without substantial

justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not,

unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or

on a motion any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1).

Whether to exert the power of exclusion, however, rests within the discretion of the

district court.  Cooper v. Southern Co., 390 F.3d 695, 728 (11th Cir. 2004); Prieto v.

Malgor, 361 F.3d 1313, 1318 (11th Cir. 2004).

Defendants argue that Blackledge has not submitted substantial justification for

her failure to disclose Exhibit T as part of her initial Rule 26(a)(1) disclosures.  (See

Defs. Reply at 7 (Doc. No. 35)); see Fed. R. Civ. P. 26(a)(1)(B) (requiring a party to

disclose, without awaiting a request, " a copy of . . . all documents . . . that are in the

possession, custody, or control of the party and that the disclosing party may use to

support its claims").  The court has considered the parties' competing arguments on this

issue, but concludes that it need not decide whether substantial justification exists on this

record because, assuming a violation, the violation was harmless.

Concerning Rule 37(c)(1), this court has stated, "A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced."  Stallworth v. E-Z Serve Convenience Stores, 199 F.R.D. 366, 369 (M.D. Ala. 2001) (DeMent, J).  Other relevant considerations include whether the concealing party acted in bad faith, whether the party seeking exclusion of undisclosed evidence suffered prejudice, and whether the prejudice, if any, can be cured.[10]  The court turns to consideration of these factors.

First, Defendants argue that because they raised as a defense in their answer the failure of Blackledge to satisfy the conditions precedent to a Title VII suit, Blackledge cannot claim in good conscience that she was unaware of her duty to disclose Exhibit T as proof of timely exhaustion.  (Doc. No. 37 at 7.)  The court has read the cited paragraphs of Defendants' answer and amended answer.  For purposes of resolving the harmlessness inquiry and whether Blackledge could have made an honest mistake, the court questions whether Defendants denied "'specifically and with particularity'" that

---

[10] See Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3rd Cir. 1995) (holding defendant's failure to provide names of two trial witnesses was harmless when there was "no reason to believe defendant acted in bad faith" and plaintiff knew witnesses' names and scope of testimony well before trial); Hirpa v. IHC Hospitals, Inc., 149 F. Supp.2d 1289, 1294 (D. Utah 2001) (finding that a failure to disclose is "harmless when there is no prejudice to the party entitled to the disclosure") (internal quotations omitted), aff'd, 50 Fed. Appx. 928 (10th Cir. 2002); Ross v. Corporation of Mercer Univ., ___ F. Supp.2d ___, 2007 WL 988768, *14 (M.D. Ga. March 30, 2007) (considering prejudice in excluding evidence pursuant to Fed. R. Civ. P. 37(c)(1)); In re Frank Santora Equip. Corp., 256 B.R. 354, 368 (Bkrtcy. E.D.N.Y. 2000) (setting forth that whether the prejudice can be remedied is a relevant factor under the Fed. R. Civ. P. 37(c) harmlessness inquiry).

Blackledge did not fulfill all conditions precedent to suit *as to the CSS III position* (as opposed to the other positions at issue which Blackledge concedes were not administratively exhausted) so as to bring the exhaustion issue as to the CSS III position to the forefront at the inception of this litigation. The denial is general and does not state to which claim the denial applies, and the court finds that the specificity of the denial is relevant to the state-of-mind issue at hand. See <u>Jackson v. Seaboard Coast Line R.R. Co.</u>, 678 F.2d 992, 1010 (11th Cir. 1982) (holding that a plaintiff's burden of demonstrating that the conditions precedent have been satisfied does not arise unless the defendant "'specifically and with particularity'" denies that the preconditions have been fulfilled); <u>see also</u> <u>Wright, Miller & Marcus</u>, Federal Practice and Procedure: Civil 2d § 2053 at 263 (2007 pocket part) (observing that while the 2000 amendments to Rule 26 removed the particularity provision in disclosure, "more specific pleadings may be attractive to parties anxious to promote disclosure. *It may happen that owing to lack of specifics in pleadings, a party does not apprehend initially that it will use certain witnesses or documents.*") (italics added).

The court, though, does not view Defendants' answer in isolation, but in the context of the proceedings as a whole. The EEOC, when it investigated the claim, found that Blackledge timely filed her EEOC charge challenging her non-selection for the CSS III position. (<u>See</u> Pl. Ex. SS.) No assertion has been made that the timeliness of the charge was at issue during the EEOC's investigation so as to alert Blackledge of a potential litigation issue. Defendants also have not pointed to any evidence that, prior to

filing their summary judgment motion, they raised timeliness as an issue, for example, during a deposition or in a document request specifically pertaining to administrative exhaustion.  (See, e.g., Doc. No. 37 at 4.)  Finally, even though Defendants contend that the letter is missing from DMH/MR's official record, as discussed below, and even if that fact was known by Blackledge, it would not be unreasonable for an employee to assume that an employer otherwise was privy to information about when it notified an employee that it was denying her a promotion.

Considering all of the facts together and in context, the court finds that a reasonable person in Blackledge's position honestly could have concluded (mistaken or not) that, until raised in Defendants' summary judgment motion, the timeliness of Blackledge's EEOC charge concerning the CSS III position was not at issue and, thus, that Exhibit T was not a document which would be "use[d] to support [Blackledge's] claim[.]"  Fed. R. Civ. P. 26(a)(1)(B).  The court's finding that Blackledge's mistake was honest also is supported by the fact that, once Defendants directly and clearly raised the timeliness issue in their summary judgment motion, Blackledge disclosed the letter.  See Fed. R. Civ. P. 26(e) (discussing the duty of a party to supplement disclosures if he or she "learns that in some material respect the information disclosed is incomplete or inaccurate").

Second, the statement by Defendants that they did not have knowledge of Exhibit T because "it is not a part of [DMH/MR's] official record," although accurate, is somewhat misleading.  (Defs. Reply at 5 (Doc. No. 35).)  According to Defendants'

evidence, the reason the letter is not in the official record is because the letter is lost.

(See Wilson Aff. at ¶ 5 (Ex. to Doc. No. 35) (attesting that the "[p]ersonnel position file

was missing for the CSS III 2004 position" and "[t]he letter notifying [Blackledge] that

she was not a successful candidate [Exhibit T] was missing and never found by the

Department") (brackets added).  Apart from Blackledge's failure to disclose, but for the

fact that they lost the letter, Defendants would have been (and should have been) aware

of Exhibit T.  Under these circumstances, the court finds that Defendants' lack of

knowledge does not weigh in favor of the harsh sanction of exclusion.

Third, the court finds that Blackledge's alleged untimely disclosure could have

been cured by permitting Defendants an extension of the discovery deadline to discern

the authenticity of the letter, if its authenticity truly is in issue.  The court questions,

though, whether Defendants' one-word reference to Exhibit T as a "purported" letter is a

serious challenge to the authenticity of the letter, rather than puffery.  In any event,

Defendants avert discussion of whether alternative relief or lesser sanctions would suffice

and seek the most severe remedy as a sanction.  See, e.g., Fed. R. Civ. P. 37(c)(1)

(authorizing court to "impose other appropriate sanctions" in lieu of exclusion of

evidence).

Fourth, the court concludes that the record does not support a finding that

Blackledge's omission resulted from bad faith or willfulness.  As explained above, there is

evidence to support Blackledge's assertion that she "had no plans to use" Exhibit T to

support her Title VII claim (and, thus, did not need to disclose it under Rule 26(a)(1)).

(Pl. Mot. Strike at 2 (Doc. No. 36).)  The court also cannot think of any reason, and none has been offered by Defendants, why it would be advantageous to Blackledge to conceal this letter from Defendants.  The absence of any self-serving or sinister motive to conceal also supports a finding that Blackledge's failure to disclose was not intentional.

Balancing the foregoing factors, the court finds that Blackledge's failure to disclose Exhibit T does not warrant its preclusion from evidence in opposition to summary judgment.  The court finds that, assuming error, the error was harmless and that, on these facts, the harmless exception avoids an unduly harsh penalty.  See Fed. R. Civ. P. 37 advisory committee's note.  At the same time, the court finds that Defendants did not act in bad faith in invoking Rule 37(c)(1) and that their argument was not frivolous. The court, thus, declines Blackledge's invitation "to strike" Defendants' "argument for sanctions" and to sanction Defendants for requiring her to respond to such a "frivolous" argument.[11]  (Doc. No. 36 at 2.)

The court, therefore, considers Exhibit T.  As stated, Defendants concede that Exhibit T is evidence which demonstrates that Blackledge filed her EEOC charge within 180 days of when she first learned of the adverse action.  Accordingly, the court finds that Blackledge has demonstrated that her race discrimination claim, seeking relief for the denial of a promotion to the CSS III position, was timely filed and that Blackledge may seek judicial relief on this Title VII claim.

---

[11] By separate order, the court denies Blackledge's motion to strike and motion for sanctions.

32

b.  The Merits

Having found that Blackledge timely filed her EEOC charge, challenging her non-selection for the CSS III position, the court turns to the merits.  Because Blackledge's evidence is circumstantial, rather than direct, the allocation of proof shifts in accordance with the three-step procedure established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).[12]  In the first McDonnell Douglas phase, the employee must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated against her in taking the alleged adverse employment action.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).

Next, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason.  Id. at 509.  The employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 509).  Finally, to avoid summary judgment, the plaintiff must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997); see also Reeves, 530 U.S. at 143.  "The result of this

---

[12] Blackledge's assertion of direct evidence is discussed below.

33

three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory."  Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam).


### i.  Prima Facie Case

Defendants, as well as Blackledge, cite Walker v. Mortham, 158 F.3d 1177 (11th Cir. 1998), as establishing the elements of a prima facie case of discrimination in a failure to promote case.  (Defs. Mem. of Law at 8 (Doc. No. 27)); (Pl. Mem. of Law at 23 (Doc. No. 33).)  Defendants, however, bypass a discussion of the prima facie elements and proceed directly to the second step of McDonnell Douglas.  (Defs. Mem. of Law at 9 (Doc. No. 27).)  Because Blackledge's prima facie case stands unrebutted, the court finds for present purposes that those elements are satisfied.  The court's review, thus, is confined to whether Defendants have articulated a legitimate, nondiscriminatory reason for their employment decision and, if so, whether Blackledge has produced sufficient evidence to raise a genuine issue of material fact on the question of pretext.


### ii.  Legitimate, Nondiscriminatory Reasons

In Burdine, supra, a unanimous Supreme Court described the employer's burden of production as follows:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To accomplish this, the defendant must clearly set forth, through the

34

> introduction of admissible evidence, the reasons for the plaintiff's rejection.
> The explanation provided must be legally sufficient to justify a judgment
> for the defendant. . . .  Placing this burden of production on the defendant
> thus serves simultaneously to meet the plaintiff's prima facie case by
> presenting a legitimate reason for the action and to frame the factual issue
> with sufficient clarity so that the plaintiff will have a full and fair
> opportunity to demonstrate pretext.  The sufficiency of the defendant's
> evidence should be evaluated by the extent to which it fulfills these
> functions.

450 U.S. at 255-56 (internal citations and footnote omitted); Alexander v. Fulton County,

Ga., 207 F.3d 1303, 1336 (11th Cir. 2000) (employer "must provide a specific legitimate

non-discriminatory reason" for its action) (citing Burdine, 450 U.S. at 254-55).  While the

employer's burden is not a heavy one, see Perryman v. Johnson Prods. Co., 698 F.2d

1138, 1142 (11th Cir. 1983), Burdine establishes that the employer must articulate the

reasons with adequate specificity so that the employee will know what she needs to rebut.

     Moreover, a reason is not unlawful merely because it is subjective.  "A subjective

reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant

articulates a clear and reasonably specific factual basis upon which it based its subjective

opinion."[13]  Chapman, 229 F.3d at 1034.

     In their summary judgment brief, Defendants provide a "list of [four] reasons" for

denying Blackledge a promotion to the CSS III position.  (Defs. Mem. of Law at 9-10

(Doc. No. 27).)  Those four "reasons," quoted verbatim from Defendants' brief, are as

follows:

---

[13] The court notes that Blackledge incorrectly states that the court must examine an
employer's subjective reason with heightened scrutiny.  (Pl. Mem. of Law at 29-31 (Doc.
No. 33)); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004).

35

1.  The Department's Special Personnel Task Force Report Established on February 6, 2003, noted herein as Exhibit 11 demonstrates that the DMH/MR was in the process of reviewing its entire staffing positions and levels, prior to the selection for the CSS III position at issue in this case.  *See also* Exhibit 13 (Ervin deposition at page 74, lines 1-21).

2.  Further, a massive DMH/MR project, directed by Governor Riley, of closing and consolidation three mental illness facilities (closing two nursing homes and consolidating one hospital with another) and three mental retardation residential developmental centers was conducted that drastically impacted on hiring and promotions within DMH/MR from March/April 2003 until February/March.  *See* Exhibit 12.  The closures inspired the administration to create a Task Force with the mission of doing everything within reason to assist those employees of the closing facilities who would be losing their jobs, in finding other employment.  Susan Stuardi, head of the Community Services office where Blackledge works prior to the incumbent head (Jerryln London)[,] testified that the employees who were facing unemployment, were given special consideration when they applied and were considered equally qualified as another candidate.

3.  The testimony of Susan Stuardi in her deposition, established that Mickey Groggel was the better candidate because she had experience in educational testing and that was the skill set that was needed for the new CSS III position.  Exhibit 14 (Stuardi deposition, pages 109, line 6 through p. 114, line 10).

4.  Mickey Groggel also scored higher on the interview by four panelists.  Exhibit 4; Exhibits 7-9; Exhibit 14.

(Id.)

The court is not persuaded that reasons 1 and 2 are, in fact, reasons which explain Blackledge's rejection.  A "reason" is defined as "the basis or motive for an action, decision or conviction" or "[a] declaration made to explain or justify an action, decision, or conviction."  American Heritage Dictionary (2nd College ed. 1982).  The statements in 1 and 2 bring to the forefront that DMH/MR was undergoing a massive reorganization which impacted jobs, but do not explain why Stuardi, the undisputed decisionmaker (see

e.g., Defs. Ex. 8 at 2 (Doc. No. 26)), did not choose Blackledge for the CSS III position. The court has studied the excerpts from Stuardi's deposition which incidentally were untimely submitted by Defendants with their reply brief.[14]  See Fisher, 2007 WL 2995525, *9 ("it is improper to raise new arguments in a reply brief or to recast a motion as something else in the movant's final briefing opportunity, after it is too late for the nonmovant to respond").  The untimeliness of the submission, however, is inconsequential because in that testimony Stuardi does not mention Groggel or Blackledge, does not state whether Groggel or Blackledge was at risk to lose her job, and does not indicate whether, if Groggel's job was in jeopardy and Blackledge's was not, she (Stuardi) gave preference to Groggel for that reason.

Defendants attempt to clarify the ambiguity regarding Groggel's job status via an affidavit from Wilson, who states that "Groggel . . . was at risk to lose her employment with the Department."  (Wilson Aff. ¶ 7 (Defs. Ex. to Doc. No. 35).)  The alleged clarification is made by Wilson, not Stuardi, and there is no evidence that Wilson participated in the decision to hire Groggel.  More important, though, the affidavit still does not clarify whether Stuardi gave Groggel preference over Blackledge for the CSS III position because of Groggel's at-risk status.  (See, e.g., id. ¶ 6.)

---

[14] For instance, Stuardi states that "[t]here were a lot of people who wanted" the CSS III job because many employees were "facing unemployment" as a consequence of the department downsizing, (Stuardi Dep. at 66 (Defs. Ex. 25 to Doc. No. 35)), and that she believed that the "department was making a very serious effort to use its positions and keep as many employees as possible without having to fire people."  (Id. at 143.)

In sum, the court finds that, in paragraphs 1 and 2 above, Defendants do not "clearly set forth" any reason why Stuardi chose Groggel over Blackledge.  <u>Burdine</u>, 450 U.S. at 255.  Because the statements in those two paragraphs do not present a justification for Groggel's decision to reject Blackledge, there is nothing for Blackledge to rebut.  <u>See id.</u> at 256.

Turning to Defendants' third proffered reason, Blackledge has not challenged this reason as insufficient to sustain Defendants' intermediary burden of production.  The burden, thus, shifts to Blackledge to show pretext, which is discussed in the next subsection.

The court, thus, proceeds to Defendants' fourth reason by which Defendants contend that DMH/MR chose Groggel because her combined score assigned by the interview panel was higher than Blackledge's.  (Defs. Mem. of Law at 10 (Doc. No. 27)); (Defs. Exs. 4, 7-9, 14 (Doc. No. 26).)  Blackledge argues that the numerical score for each applicant was computed based upon subjective criteria and that there is "a material question of fact as to the legitimacy of the articulated reason" that Groggel was selected because she ranked higher than Blackledge on the interview panel.[15]  (Pl. Mem. of Law at 29-31 (Doc. No. 33)).

On two levels, the court is inclined to agree with Blackledge that Defendants have not met their burden of providing a legitimate, nondiscriminatory reason by reliance on

---

[15] The court notes that, although Blackledge discusses the alleged subjective nature of the interview process in the pretext section of her brief, Blackledge directly attacks the sufficiency of Defendants' asserted legitimate, nondiscriminatory reason and Defendants' ability to meet their burden.  (<u>See</u> Pl. Mem. of Law at 29-31.)

the numerical scores. On the first (and threshold) level, the court questions whether

Defendants' level of proof is sufficient. (Defs. Mem. of Law at 10 (Doc. No. 27).) As

evidentiary support for their recited reason that Groggel "scored higher on the interview

by four panelists," Defendants cite "Exhibit 4," "Exhibits 7-10," and "Exhibit 14," but

without reference to the relevant page or line within these exhibits (in violation of the

court's scheduling order), and without any discussion. (Id. (citing Exs. 4, 7-10, 14

to Doc. No. 26).)

 Notwithstanding the absence of discussion by Defendants, the court has examined

the exhibits upon which they rely. Exhibit 4 is a one-page handwritten document which

contains only the numerical score each interviewer assigned to each applicant. Exhibit 7

includes a statement that "the panel members individually ranked the person

interviewed," that "the scores were totaled," and that "the applicants [were] ranked by

numerical score." Exhibit 8, which is DMH/MR's response to the EEOC's "request for

additional information," does not provide any clues as to how the panel members scored

the applicants. In that document, DMH/MR states that an "applicant assessment form"

was "used to score each person interviewed" for the CSS III position, but that it was

"unable to find the [a]pplicant [a]ssessment [f]orms that were actually completed by the

interview panel members." (Defs. Ex. 8 to Doc. No. 26).) Exhibit 10 comprises 68 pages

and is Defendants' position statement to the EEOC concerning Blackledge's charge

alleging retaliation. Defendants have not explained how Exhibit 10 is relevant to

Blackledge's claim that she was not selected for the CSS III position. Exhibit 14 is

Stuardi's deposition testimony. Therein, Stuardi, who was on the interview panel and

made the final decision, merely says that the scores were assigned based upon the interviewees' "experience, education, and the interview."  (Stuardi Dep. at 60-61.)

Without any evidence of what process the panel members used to rate and rank the applicants, the court has no way of ascertaining whether the process used was reasonable or legitimate (or, for the matter, subjective).  An explanation as to how the applicants' scores were decided is particularly crucial in this case because one of the interviewers (Stuardi) is the very individual whom Blackledge says discriminated against her.  As to the sufficiency of Defendants' evidence, the court questions whether the evidence is specific enough to provide Blackledge a "full and fair opportunity to demonstrate pretext" and to sustain Defendants' burden of establishing a nondiscriminatory reason for Blackledge's non-selection.  Burdine, 450 U.S. at 256.

With that said, however, the court recognizes that Blackledge has supplied some evidence to fill in the gaps and finds that her evidence reveals a subjective component to the interview process.  Namely, as evidence of the subjective but unexplained process, Blackledge has submitted some, but not all, of the assessment forms used by the interviewers to rate the applicants.[16]  (CSS III Position Applicant Assessment Forms (Pl. Ex. UU).)  The forms require the grader to rate the applicant in ten categories, by checking a box denoting either "inadequate" (0 points), "adequate" (1 point), "good" (2 points) or "outstanding" (3 points).  Having reviewed the forms, the court finds that many of the ten categories require subjective evaluation.  The subjective nature of the

---

[16] The court notes that it finds it quizzical that Blackledge was able to find some of the assessment forms, but Defendants were not.

process is amplified by the fact that the graders could assign ratings to the subjective

criteria without having to provide any explanation.  On Groggel's assessment form, for

example, Stuardi checked "outstanding" in the categories of "ability to communicate

effectively and express ideas in a clear and concise manner" and "ability to work with

contractors and independent consultants," but the applicant assessment form is silent as to

why Stuardi thinks Groggel rated "outstanding" in these categories, and Defendants have

not cited any other explanatory evidence.  See, e.g., Chapman, 229 F.3d at 1034

(providing that a subjective reason requires explanation and citing as sufficient an

assertion by an employer trying to fill "a job requiring continuing interaction with the

public" that the employer "'did not like [applicant's] appearance because his hair was

uncombed and he had dandruff all over his shoulders'").

     Based upon the foregoing discussion, Defendants' reason predicated on its reliance

on Groggel's numerical score arguably is legally insufficient to sustain Defendants'

burden and shift the burden back to Blackledge to prove pretext.  The court, however,

need not decide the issue.  Assuming *arguendo* that Defendants have presented sufficient

evidence, the court finds that the lack of explanation as to how scores were assigned to

the applicants during the interviews, when considered with the other evidence discussed

below, creates a jury issue as to whether Defendants' reliance on the scores is a pretext

for discrimination.  The foregoing discussion, thus, applies equally to the third and fourth

reasons outlined by Defendants on page 10 of their summary judgment brief and quoted

above.  (See Defs. Mem. of Law at 10 (Doc. No. 27).)

### iii.  Pretext

"To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." <u>Vessels v. Atlanta Indep. School Sys.</u>, 408 F.3d 763, 771 (11th Cir. 2005).  The pretext inquiry focuses on whether the employee has presented "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence." <u>Combs</u>, 106 F.3d at 1538 (citation and internal quotation marks omitted).

For the reasons to follow, the court is persuaded that this is a case which cannot be decided as a matter of law and that the issue of whether Defendants' proffered reasons are nondiscriminatory or pretextual is for the jury.  The court finds that it is helpful to divide its discussion of Blackledge's pretext evidence into two categories:  (1) the pretext evidence which is insufficient to move Blackledge's case beyond summary judgment; and (2) the pretext evidence which creates a jury issue.

(a)  Insufficient Pretext Evidence

Blackledge argues that she has presented statistical evidence which proves pretext.[17]  (See Pl. Mem. of Law at 33 n.22 (Doc. No. 33).)  In individual disparate treatment cases, Blackledge is correct that "statistics may be relevant to establish that an employer's articulated reason for an employment action is pretextual."  Burney v. Rheem Mfg. Co., Inc., 196 F.R.D. 659, 667 (M.D. Ala. 2000) (citing McDonnell Douglas, 411 U.S. at 804-05).  Here, however, Blackledge's statistics consist merely of a list of raw percentages of "blacks appointed" and "whites appointed" at DMH/MR from January 2002 to June 2006.  (Pl. Mem. of Law at 33 & n.22 (Doc. No. 33).)  Although the percentages show some discrepancies in appointments between Caucasian and African-American workers, there is no way to discern whether the discrepancies are the result of legitimate or racially-discriminatory variables because there are no measurable variables provided.  See Wilson, 376 F.3d at 1089 ("Statistics without any analytical foundation are virtually meaningless") (citations omitted); Barnes v. GenCorp, Inc., 896 F.2d 1457, 1466 (6th Cir. 1990) (statistical data must "eliminate the most common nondiscriminatory explanations for the disparity").  Because the statistics are devoid of any analytical value, this evidence has no probative value on the issue of pretext.

---

[17] The court notes that Blackledge also argues that the alleged statistical evidence supports a disparate impact claim.  (Pl. Mem. of Law at 32 (Doc. No. 33).)  Blackledge's complaint, however, does not allege disparate impact as a theory of liability, and the court will not permit Blackledge to amend her complaint by inserting a new claim in a brief. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Blackledge also relies on evidence of qualifications.  Defendants, however, argue that there is no evidence that the disparities in qualifications between Blackledge and Groggel are of such a weight and significance that no reasonable person in the exercise of impartial judgment could have chosen Groggel over Blackledge for the CSS III position. (Defs. Mem. of Law at 10-11 (Doc. No. 27) (citing Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006), as their principal authority).)  Defendants, thus, contend that the issue of relative qualifications does not suggest pretext.

Blackledge counters that she has multiple bases for proving pretext, qualifications being only one, and that, in this scenario, the disparities in qualifications need not be as great as when the employee seeks to prove pretext solely based upon qualifications.  (Pl. Mem. of Law at 27 (Doc. No. 33) (citing Vessels, 408 F.3d at 772).)  In any event, Blackledge asserts that she has presented "substantial evidence" that she was "more qualified" than Groggel.[18]  (Pl. Mem. of Law at 27 (Doc. No. 33).)   (Id.)  Blackledge says that her qualifications are superior to Groggel's because she [Blackledge] had more seniority with DMH/MR, had no documented performance problems which would have prevented her from performing the CSS III job duties, and had additional beneficial experience because she worked in a community services office.  (Id. at 28.)  The court, however, is not persuaded that Blackledge's arguments concerning qualifications establish pretext.

_____

[18] Blackledge concedes that she and Groggel both earned master's degrees in fields which satisfied the minimum qualifications of the job.  In this regard, the court notes that Defendants have not disputed that Blackledge met the requirements set out in the "Qualifications" section of the announcement for the CSS III position.  (Defs. Reply at 11 (Doc. No. 35)); (Stuardi Dep. at 58 (Defs. Ex. 25).)

First, the record reveals that both Groggel and Blackledge are veteran employees of DMH/MR. They have been employed with the department since 1987 and 1988, respectively. The court finds that the factor of seniority is neutral.

Second, as to Blackledge's assertion that she had no documented performance problems, Defendants do not argue that Blackledge was rejected because of past performance problems or that she was incapable of performing the duties required of the CSS III position.[19] (See, e.g., Stuardi Dep. at 58, 113-14.) Rather, Defendants contend that Groggel was more qualified than Blackledge. By her assertion, Blackledge does not address relative qualifications, but only her own qualifications. When, however, an employer relies on relative qualifications as the reason for its decision, the employee cannot demonstrate the falsehood of that reason *solely* by presenting evidence of her own qualifications. Gbenoba v. Montgomery County Dept. of Health and Human Services, 209 F. Supp.2d 572, 577-78 (D. Md. 2002), aff'd, 57 Fed. Appx. 572 (4th Cir. 2003).

Third, Blackledge contends that she stands apart from Groggel in that she had sixteen to seventeen years experience in DMH/MR's community services division, while Groggel had no experience in that specific division. (Pl. Mem. of Law at 27-28 (Doc. No. 33)); (Blackledge Dep. at 55-56 (Ex. A to Doc. No. 34).) Although the position for

---

[19] In fact, for summary judgment purposes, Defendants conceded that Blackledge met the minimum qualifications for the CSS III position when they failed to challenge Blackledge's prima facie case. See Walker, 158 F.3d at 1183 n.10 (providing that an element of the prima facie case which a plaintiff must show on a failure-to-promote claim is that "she was qualified for the position" for which she applied); Price, 177 Fed. Appx. at *12 (holding that the "qualified" prong of the prima facie case requires only that plaintiff show that she "satisfied the employer's objective qualifications").

which Blackledge applied is titled, "*Community Service* Specialist III," the job posting does not list experience in a community services office as a required skill or qualification.

Moreover, Defendants have presented evidence in the form of Stuardi's deposition testimony that "whether a candidate had worked in the Community Services Office was not a factor under consideration." (Stuardi Dep. at 109-11 (Defs. Ex. 14 to Doc. No. 26).) Stuardi's assertion does not contradict the job posting. The job posting focuses on various types of experience in the "field" of mental retardation, but does not specify that the applicant's experience in the area of mental retardation must have been garnered within the confines of DMH/MR's community services offices.[20] Blackledge has not presented evidence that Stuardi's determination that experience in a community services office was not a key job qualification is unbelievable or inconsistent; the court, thus, declines, as it must, to second-guess that determination. Combs, 106 F.3d at 1543 (holding that "federal courts do not sit to second-guess the business judgment of employers"). In short, the court finds that Blackledge has failed to raise a genuine issue of material fact as to the veracity of Defendants' reasons by her argument that she is more qualified than Groggel.

The fact, however, that Blackledge's evidence on qualifications is insufficient to establish pretext does not mean that the pretext inquiry is over. There is more than one way to establish pretext. Proof of superior qualifications is one method, see Ash, 546

---

[20] The court notes that, prior to her selection for the CSS III position, Groggel worked at the now-defunct Brewer Center. The Brewer Center, like the community services office where Blackledge works, is under DMH/MR's Division of Mental Retardation. Both Blackledge and Groggel, thus, worked in the Division of Mental Retardation.

U.S. at 457-58, "[b]ut an equally valid way to prove pretext is to provide evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its reasoning-albeit one based on a real difference in qualifications-manufactured after the fact." Dennis v. Columbia Colleton Medical Ctr., Inc., 290 F.3d 639, 648 n.4 (4th Cir. 2002).  Concerning this "equally valid" alternative method, the Dennis court explained,

> Indeed, this is often the only way a plaintiff can reasonably be expected to show pretext.  Employers are free within certain bounds to choose the criteria by which they may legitimately assess employees.  In comparing any two employees, it is often the case that each is superior on at least a few of the possible criteria that could be used in assessing their qualifications.  Given these facts, it is not farfetched to suppose that discriminatory employers might be likely to choose to emphasize at trial those characteristics on which their chosen candidates were superior in order to construct pretextual explanations that are as plausible as possible. If plaintiffs were required to show they were superior on the criteria chosen at trial by their employers, rather than being free to show that the criteria were not the ones actually used, the McDonnell Douglas frame-work would become a shield for employers rather than a tool to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.  See Burdine, 450 U.S. at 255, 101 S.Ct. 1089.

Id.  Against the backdrop of Dennis, the court proceeds to a discussion of Blackledge's other evidence which the court finds is sufficient to raise a genuine issue of material fact as to the truth of Defendants' asserted reasons for Blackledge's non-selection.

(b)  Sufficient Evidence of Pretext

The court turns to Exhibit H, which Blackledge contends is potent evidence of pretext.  (Pl. Ex. H to Doc. No. 34).)  On Exhibit H, which the court reproduced earlier in

this opinion, Stuardi, who undisputedly was the decisionmaker, wrote "no" next to the four African-American applicants who had been selected for an interview.  Blackledge argues that, because the word "no" is written next to all of the names of the African-American interviewees, but is not written next to any of the names of the Caucasian applicants, "no" constitutes direct evidence that DMH/MR "wanted a white employee for the CSS III position."  (See Pl. Mem. of Law at 31 (Doc. No. 33).)

Direct evidence is hard to find.  Direct evidence is that which, if believed, proves the existence of discriminatory motive "without inference or presumption."  Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998).  An oft-cited example of direct evidence is the management memorandum examined in Earley v. Champion International Corp., 907 F.2d 1077, 1081-82 (11th Cir. 1990), an age discrimination case.  The memorandum read, "Fire Earley-he is too old."  Id.

Exhibit H does not meet the stringent direct evidence standard.  One has to infer that the reason Stuardi wrote "no" next to the names of the four African-American applicants is because she was disqualifying them from consideration for the CSS III position because of their race.  Exhibit H says, "No," but it does not say explicitly, "Don't Hire Blackledge, Parker, Ezell, Williams-they are African-American."  The probative value of the evidence, however, is not diminished based upon the circumstantial label.  As explained below, the court finds that there are at least three reasonable inferences which can be drawn from Exhibit H in Blackledge's favor and that these reasonable inferences create a genuine issue of fact for trial.

First, based on the facts which follow, the court finds that the inference Blackledge draws is justified, *i.e.*, that Stuardi wrote "no" next to the names of the four African-American interviewees because she did not want to hire Blackledge or the other three African-American interviewees for the CSS III position because of their race. The evidence shows as follows: (1) Stuardi admits she handwrote the words "no" on the typewritten Exhibit H which lists the applicants for the CSS III position; (2) Stuardi was the decisionmaker who selected Groggel and rejected Blackledge; (3) each of the individuals by whose name Stuardi wrote "no" is African American; (4) Stuardi did not write "no" next to any of the names of the Caucasian interviewees; and (5) Stuardi (who was Blackledge's supervisor) knew Blackledge's race and the race of the other three African-American applicants. (See Stuardi Dep. at 76, 78-79); (Defs. Ex. 8 at 2 (Doc. No. 26).) In addition to these facts, Stuardi had difficulty vocalizing the reason she wrote "no" next to the names of the four African-American applicants. She "guess[ed]," stating that "it looks like" or "appear[s]" that she wrote "no" because the four African-American applicants did not have a master's degree "in psychology or special education."[21] (Stuardi Dep. at 78.) The court finds that a reasonable jury could conclude that Stuardi's testimony is an exercise in guesswork and insufficient to negate the discriminatory inference argued by Blackledge.

---

[21] The court notes that Packer's, Ezell's and Williams' job applications -- which presumably would indicate the field in which these applicants had earned a master's degree -- are not part of the summary judgment record. According to DMH/MR's position statement to the EEOC, DMH/MR cannot find the application packages. (See Defs Ex. 8 at 2 (Doc. No. 26).)

Second, accepting Stuardi's explanation at face value, however, also is problematic for Defendants.  If Stuardi wrote "no" to conform with the handwritten remark at the top of Exhibit H which states, "Only consider masters in Psychology or Special Ed," then the evidence reasonably supports a conclusion that Stuardi rejected applicants who had not earned a master's degree in psychology or special education.  The posted job announcement, however, provides that an applicant satisfies the qualifications if he or she has earned a master's degree in "psychology, special education or *related human service field*."  (CSS III position announcement (Pl Ex. O to Doc. No. 34) (emphasis added).) Stuardi admits that Blackledge had a master's degree in the field of social work and that her degree qualified as one in a "related human service field."  (Stuardi Dep. at 57-58 (Pl. Ex. B to Doc. No. 34).)  Yet, viewing the evidence in the light most favorable to Blackledge, a reasonable inference can be drawn from Stuardi's testimony that Stuardi altered the posted job qualifications by striking "or related human service field," thereby limiting the type of qualifying master's degrees and disqualifying Blackledge and the three other African-American applicants.[22]  (Stuardi Dep. at 78.)  Evidence that a policy (here, a job posting) was not adhered to in order to give a candidate an advantage is

---

[22] To the extent that Defendants argue a different inference, *i.e.*, that Stuardi wrote "no" by the names of the African-American applicants solely because they had not earned a master's degree in psychology or special education, not because she had excluded them from consideration for the position on that basis, the court finds that those different and competing inferences are for the jury to weigh and consider.

probative of pretext.[23]  See Vessels, 408 F.3d at 772; see also Weinstock v. Columbia

Univ., 224 F.3d 33, 45 (2d Cir. 2000) (noting that procedural irregularities may "'raise a

question as to the good faith of the process where the departure may reasonably affect the

decision'").

Third, Stuardi's explanation also could be interpreted as different from or

inconsistent with the reasons offered as justification in this litigation.  Citing Stuardi's

deposition testimony, Defendants state in their summary judgment brief that Stuardi

selected Groggel because Groggel had a background in "education testing," while

Blackledge did not, and because Groggel had a higher numerical score than Blackledge.

(Defs. Mem. of Law at 10 (Doc. No. 27)); (Stuardi Dep. at 109-10 (Defs. Ex. 14 to Doc.

No. 26)); (Stuardi Dep. at 96 (Defs. Ex. 25 to Doc. No. 35).)  Arguably, these two

reasons differ from an assertion that the field in which Blackledge obtained her master's

degree disqualified her from consideration.  Shifting or inconsistent explanations by the

decisionmaker also can constitute evidence of pretext.  See Bechtel Constr. Co. v. Sec'y

of Labor, 50 F.3d 926, 935 (11th Cir. 1995); Tidwell v. Carter Products, 135 F.3d 1422,

1427 (11th Cir.1998).

---

[23] On the subject of deviations from the posted job announcement, the court has a question about whether a "background in education testing," the skill which won Groggel the job, is enumerated in the CSS III job posting.  (Stuardi Dep. at 96 (Defs. Ex. 25).) The job posting does not expressly list "education testing" as a required skill, and Defendants have not pointed to any correlative provision in the job posting.  If "education testing" falls under the heading of one of the expressly recited skills, which is uncertain based upon the present record, Defendants have not explained why the other numerous skills listed were ignored or less critical than "education testing," nor have Defendants informed the court what "education testing" entails.  On the evidentiary record, "education testing" is an enigma.

Turning to other offerings of pretext evidence, Blackledge argues that Exhibit M, a memorandum dated February 20, 2004, from Stuardi to Mitchel, is proof that Stuardi preselected Groggel for both the CSS III position and the PQA II position in 2004 (for which Blackledge also applied) and that Exhibit M creates a "material question of fact as to the real reason the CSS III position was awarded to a white employee."[24]  (Pl. Mem. of Law at 29 (Doc. No. 33).)  Blackledge also contends that the evidence of preselection offers additional support for her position that Stuardi marked "no" next to the names of all the African-American applicants (on Exhibit H) so as to exclude them from consideration because of their race.  (See Pl. Mem. of Law at 29 n.20 (Doc. No. 33).)

Preselection can serve as "relevant evidence of the employer's motivation." Goostree v. State of Tennessee, 796 F.2d 854, 861 (6th Cir. 1986).  The motivation is key because preselection based on a reason not prohibited by the federal anti-discrimination statutes is not probative of pretext.  In Jaramillo v. Colorado Judicial Department, a Title VII sex discrimination case, the evidence at best proved that the application process was an exercise in futility because the employer intended all along to promote the male candidate "to prevent him from leaving the department."  427 F.3d 1303, 1314 (10th Cir. 2005).  The Tenth Circuit explained, "This might be inconsiderate or unfair, but it does not support the inference that the [] employment decision was motivated by sex-based

---

[24] The memorandum recites that Stuardi wanted to move Kathi Allen (a Caucasian employee who interviewed for the CSS III position along with Blackledge) into the CSS III position occupied by Groggel because otherwise Allen's employment with DMH/MR would end on February 27, 2004.  At the same time, Stuardi requested that Groggel receive the PQA II position, a job which had not yet been announced.  (Pl. Ex. M to Doc. No. 34).)

discrimination." Id.  Moreover, as explained by the Fourth Circuit, preselection alone is

insufficient to demonstrate pretext because preselection "work[s] to the detriment of all

applicants for the job, black and white alike." Anderson v. Westinghouse Savannah River

Co., 406 F.3d 248, 271 (4th Cir. 2005).  On the other hand, while preselection alone may

not be indicative of discrimination, id., it can support a finding of pretext in conjunction

with other evidence.  See Ham v. Washington Suburban Sanitary Com'n, 158 Fed. Appx.

457, 470 (4th Cir. 2005); see also Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1174

(10th Cir. 1998) (noting that the court considers the totality of the plaintiff's circum-

stantial evidence of pretext).

    The court finds that the preselection argument cuts both ways.  On one hand, as in

Jaramillo, supra, Exhibit M suggests a nondiscriminatory reason for Allen's reassignment

to the PQA II position, i.e., that Allen otherwise would lose her job.  Also, Blackledge's

argument that Stuardi knew prior to the interview process for the CSS III position that she

would place Groggel in the CSS III position as a stepping stone to the PQA II position, a

higher classification, also means that Groggel intended to eliminate all applicants, some

of whom are African American, but others of whom are Caucasian.

    On the other hand, the court cannot rule out that Blackledge's evidence of

preselection provides some probative value on the issue of pretext when it is coupled with

the inferences derived from Exhibit H, the subjective nature of some of the selection

factors and the arguable failures of Defendants to adhere to DMH/MR's job criteria in the

posted announcement.  Notably, preselection, if it occurred, arguably would constitute a

violation of DMH/MR's hiring rules.  (See CSS III position announcement (Pl. Ex. O to

Doc. No. 34 (providing that "[a]pplicants will be rated on the basis of their training, experience and education")); (see also *supra*, footnote 3). Such violations, as already mentioned herein, are relevant to the overall consideration of whether the proffered reasons are a pretext. See Vessels, 408 F.3d at 772.

In sum, the court finds that Blackledge has presented sufficient evidence to create a genuine issue of material fact regarding whether Defendants acted with discriminatory intent in rejecting Blackledge for the CSS III position. Accordingly, Defendants are not entitled to summary judgment on Blackledge's failure-to-promote claim regarding the CSS III position.

## C. Retaliation

Blackledge also brings retaliation claims pursuant to Title VII and § 1981/§ 1983. To establish a prima facie case of retaliation, a plaintiff must show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse employment action and (3) that the adverse employment action was causally related to the protected activity. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).

Defendants assert that Blackledge cannot demonstrate that the complained-of actions, considered individually or collectively, are sufficiently severe to constitute an

adverse employment action. (Defs. Mem. of Law at 11-13).) For the reasons to follow, the court agrees.[25]

In Burlington Northern and Santa Fe Railway Co. v. White ("Burlington Northern"), the Supreme Court defined what constitutes an adverse employment action in the Title VII retaliation context. ___ U.S. ___, ___ 126 S.Ct 2405 (2006). Significantly, it clarified that the standard for evaluating a materially adverse employment action is less burdensome in the Title VII retaliation context than in the anti-discrimination context: Title VII's "anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment" or to "so-called 'ultimate employment decisions.'"[26] Burlington Northern, 126 S.Ct. at 2412-13, 2414. To demonstrate a retaliatory adverse employment action, "a plaintiff must show

---

[25] In their opening summary judgment brief, Defendants focus on whether Blackledge demonstrated an adverse employment action. (Defs. Mem. of Law at 11-14 (Doc. No. 27).) The court notes, though, that, in a fragmented sentence on page 14 of their brief, Defendants assert that "reasons why a prima facie case of demonstration do not lie and DMH/MR's legitimate non-discriminatory reasons for any further actions claimed are also addressed in Exhibit 10, including Exhibit 10-2." (Id. at 14.) Exhibits 10 and 10-2 comprise 144 pages. It is not the court's function to weed through these numerous pages in search of evidence to support Defendants' motion, see Freeman v. City of Riverdale, No. 1:06-cv-2230-WSD-LTW, 2007 WL 1129004, *6 (N.D. Ga. April 16, 2007), or to craft for Defendants legitimate nondiscriminatory reasons for their actions. See Burdine, 450 U.S. at 255 (employer's "explanation of its legitimate reasons must be clear and reasonably specific").

[26] As recognized by the Eleventh Circuit in an unpublished opinion, Burlington Northern rejected this circuit's standard requiring a Title VII plaintiff who alleged retaliation to "show that she suffered an action affecting the terms and conditions of her employment" Arnold v. Tuskegee Univ., 212 Fed. Appx. 803, 810 n.4 (11th Cir. Dec. 19, 2006). In their summary judgment brief, Defendants cite Burlington Northern, but also rely on pre-Burlington Northern opinions. Those opinions are no longer binding or persuasive to the extent that they conflict with Burlington Northern.

that a reasonable employee would have found the challenged action materially adverse,"
which means that the action "might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." Id. at 2415 (internal quotations omitted).

The Supreme Court imposed a requirement of materiality "to separate significant
from trivial harms." Id. "An employee's decision to report discriminatory behavior
cannot immunize that employee from those petty slights or minor annoyances that often
take place at work and that all employees experience." Id. At the same time, the Court
also stressed that "any given act of retaliation will often depend upon the particular
circumstances. Context matters." Id. For instance, "[a] schedule change in an
employee's work schedule may make little difference to many workers, but may matter
enormously to a young mother with school age children." Id. The Supreme Court
enunciated, "By focusing on the materiality of the challenged action and the perspective
of a reasonable person in the plaintiff's position, we believe this standard will screen out
trivial conduct while effectively capturing those acts that are likely to dissuade employees
from complaining or assisting in complaints about discrimination." Id. at 2416.

The court's initial task is to ascertain the precise retaliatory acts of which
Blackledge complains. In her EEOC charge filed on January 8, 2007, Blackledge alludes
to "numerous" incidents of retaliation, but recites as the sole example a "recent[] . . . false
and adverse performance appraisal," asserting that the appraisal directly affects her
salary. (Pl. Ex. W (Doc. No. 34).) In her amended complaint, filed on February 7, 2007,
in which Blackledge adds a retaliation count, she repeats that "she was given a
completely false and adverse performance appraisal," that "her salary is directly related to

performance appraisals," and that she suffered other unspecified retaliatory acts on "numerous occasions."  (Am. Compl. ¶¶ 34, 51.)

Neither in her EEOC charge nor in her amended complaint does Blackledge set forth the date of the alleged unfavorable performance appraisal or provide any hint about the substance of the other so-called "numerous" incidents.  The court, however, has discerned that the performance appraisal to which Blackledge refers is the one dated January 4, 2007, which is an evaluation of Blackledge's performance for the calendar year 2006.  (See Pl. Performance Appraisal, dated Jan. 4, 2007 (Pl. Ex. NN) (Doc. No. 34).)

Ascertaining what acts encompass the other alleged "numerous," but unspecified, incidents has not been easy.  In her brief opposing summary judgment, Blackledge complains of a second alleged "lowered performance evaluation" in December 2005.  (Pl. Mem. of Law at 14-15, 36-37 (Doc. No. 33).)  Blackledge also argues that she was subjected to "increased job scrutiny" and "singled out," asserting that she was scolded for working with her door "ajar," was unjustifiably required to take fifteen minutes leave on one occasion, was "forced to work the Spring Conference," and once was required to use flex time, rather than compensatory time.  (Id. at 13-16, 36.)  In support of these contentions, Blackledge relies on, among other evidence, "Exhibit III," which is a letter dated March 21, 2006, from Blackledge to Wilson, DMH/MR's then associate commissioner, in which Blackledge complains of retaliation.  (See id. at 36.)  These court's findings as to whether these alleged retaliatory acts are adverse employment actions are set out below.

*1.  Negative Performance Evaluations*

Blackledge complains that, as a result of filing an EEOC charge and this lawsuit, Blackledge received two negative performance appraisals, one from London and one from Kendra Butler ("Butler").[27]  (See Pl. Mem. of Law at 14-15 (Doc. No. 33)); (Pl. Annual Performance Appraisal, dated Dec. 21, 2005 (Pl. Ex. DD)); (Pl. Annual Performance Appraisal, dated Jan. 4, 2007 (Pl. Ex. NN).)  The alleged negative performance appraisal rated by Butler was for the 2006 calendar year.  The other one, which was rated by London, was for the 2005 calendar year, but as discussed herein, was a *proposed,* not a final, performance appraisal score.  The court discusses these two appraisals in reverse chronological order.

_____

[27] After Stuardi retired on August 1, 2004, London, an African-American female, became Blackledge's direct supervisor.  (See Defs. Ex. 10 (Doc. No. 26).)  On March 27, 2006, London assigned supervision of Blackledge and two other employees to Butler, a Caucasian female.  (See id.)

58

a.  2006 Performance Appraisal

Blackledge alleges that she received a negative, retaliatory annual performance

appraisal, dated January 4, 2007.[28]  In that appraisal, Blackledge received a score of 25.7

which placed her performance in the upper range of the "meets standards" category.[29]

(Blackledge Performance Appraisal, dated Jan. 4, 2007 (Pl. Ex. NN)); (Butler Dep. at 18

(Pl. Ex. D).)  Blackledge says that the score is negative, unjustified and adversely impacts

her salary and promotional opportunities and that a reasonable person would consider the

appraisal a materially adverse action.  (Pl. Mem. of Law at 13-14, 37 (Doc. No. 33).)  For

the reasons to follow, the court disagrees with Blackledge that she has demonstrated an

adverse employment action.

_____

[28] The court notes that, in her brief opposing summary judgment, Blackledge refers
to her performance mid-appraisal, dated July 26, 2006 (which she calls a "pre-appraisal").
(Pl. Mem. of Law at 15 (Doc. No. 33) (citing Pl. Mid-appraisal (Ex. II) (Doc. No. 34).)
The performance mid-appraisal precedes the annual performance appraisal and generally
occurs at the six-month mark.  Its purpose is to facilitate a discussion between the
employee and supervisor concerning the employee's strengths and weaknesses.  Only the
performance appraisal can affect whether an employee, who is eligible for an annual
raise, receives an increase and in what amount.  (See Defs. Ex. 10 at 3 (Doc. No. 26).)
Blackledge does not make any specific complaint about the mid-appraisal, and the
exhibits which she cites refer not to her mid-appraisal, but to her final annual
performance appraisal, dated January 4, 2007.  (Pl. Mem. of Law at 12 (Doc. No. 27).)
The court, thus, has not considered the mid-appraisal separately as an alleged retaliatory
act.

[29] Evaluations are scored based upon a point system.  A score between 26.7 and
36.6 denotes that the employee's performance "exceeds standards," while a score between
16.7 and 26.6 earns an employee a "meets standards" performance rating.  (See, e.g., Pl.
Performance Appraisal, dated Dec. 21, 2005 (Ex. BB to Doc. No. 34)); (see also Defs.
Ex. 10 at 4 (Doc. No. 26).)

The parties have not cited any authority discussing Burlington Northern in the context of an alleged retaliatory performance evaluation. The court, however, finds persuasive a decision from a district court in a neighboring circuit. In Hilt v. Nicholson, a Title VII retaliation case, the district court examined whether under Burlington Northern a lowered evaluation score was an adverse employment action. See No. 3:05-0371, 2007 WL 1577701 (M.D. Tenn. May 31, 2007). The evaluation at issue in Hilt lowered the plaintiff's ratings in two performance categories, one from "high satisfactory" to "satisfactory" and the other from "satisfactory" to "low satisfactory." Id. at *7. The court emphasized that even the lowest rating "remained at a level of at least 'satisfactory'" and that, "although the plaintiff dispute[d] the basis for the lowered evaluation scores, he fail[ed] to show that the scores had any effect whatsoever beyond bruising his ego." Id. The court also reasoned that, because "the plaintiff's scores were on the decline six months prior to his complaint of discrimination," the fact that the plaintiff's scores continued to decline after the plaintiff engaged in protected activity distinguished the case from Halfacre v. Home Depot, U.S.A., 221 Fed. Appx. 424 (6th Cir. April 3, 2007), where there was a "sudden, dramatic drop in very close temporal proximity to the complaint of discrimination." Id. On those facts, the court found that the "lowered performance evaluation scores simply d[id] not rise to the level of an adverse employment action." Id.

The court finds that Hilt supports a finding in this case that Blackledge's reduced performance appraisal score is not a post-Burlington Northern adverse employment action

protected by Title VII's anti-retaliation provision.  As explained below, the court

concludes that the performance appraisal score still satisfied DMH/MR's job expectations

and did not cause any harm to Blackledge other than hurt feelings.[30]

Blackledge's "meets standard" rating is not negative in and of itself.  "Meets

standards" is defined as follows:  "The employee's overall performance was in a fully

competent manner, as he/she was hired to do, and the expected results were met.  The

employee correctly performed the job in a timely manner with only necessary

supervision."  (See Defs. Ex. 10 at 4 (Doc. No. 26).)  Based on this definition, Butler,

who rated Blackledge, determined that Blackledge was performing her job satisfactorily.

Although Butler's "meets standards" rating of Blackledge's performance is one category

lower than the "exceeds standards" rating ascribed to Blackledge's performance by

London the previous year, the court finds that, unlike in Halfacre, the change in

_____

[30] The court notes that the facts of this case are distinguishable from Hilt in that
Blackledge's performance scores were in the "exceeds standards" category prior to
Blackledge's EEO activity.  The court finds, though, that this is a distinction without a
difference.  Just as "the strong inference in Halfacre that the lowered performance
evaluation scores were a direct result of the plaintiff's engaging in protected activity" was
not present in Hilt, it is not present here, albeit for different reasons.  See Hilt, 2007 WL
1577701, *8.  First, Blackledge's downgraded evaluation, dated January 4, 2007, was not
issued on the heels of the protected activities which Blackledge engaged in when she filed
her EEOC charge in June 2004, and, when she filed this lawsuit in April 2006.  Second,
Blackledge's performance appraisal score did not change immediately after she filed her
EEOC charge in June 2004.  Specifically, on her 2005 performance appraisal (discussed
in the next subsection), the first appraisal Blackledge received after she filed her June
2004 EEOC charge, London gave Blackledge a rating of "exceeds standards" consistent
with the ratings Blackledge received on past performance appraisals.  (See Pl.
Performance Appraisal, dated Dec. 21, 2005 (Ex. BB).)

Blackledge's ratings was not drastic, Halfacre, 221 Fed. Appx. at 432, and was not considerably lower than the performance appraisal scores Blackledge received prior to engaging in protected activity.  Cf. James v. Metropolitan Gov't of Nashville, No. 04-5874, 2007 WL 1786792, *4 (6th Cir. June 20, 2007) ("Markedly worse performance evaluations that significantly impact an employee's wages or professional advancement are also materially adverse."); Cooper v. City of Philadelphia, Civ. Act. No. 06-576, 2007 WL 1825399, *2, *5 (E.D. Pa. June 21, 2007) (performance evaluation was materially adverse in Title VII retaliation context where plaintiff received "unacceptable" ratings in several categories and overall rating of "improvement needed"; evaluation "was significantly poorer" than her previous two performance evaluations in which she was rated overall as "superior").

Blackledge, however, argues that she has demonstrated harm because her professional advancement and salary have been hindered by the "meets standards" evaluation.  The court, though, finds that these arguments are not supported by the record.

First, relying on London's testimony, Blackledge argues that a lowered performance evaluation affects her promotional opportunities.  (Pl. Mem. of Law at 14 (Doc. No. 33)); (London Dep. at 50, 56 (Ex. to Doc. No. 34).)  This was not London's testimony.  Although Blackledge's counsel inquired as to whether a "lowered" evaluation score could negatively impact promotions or layoffs (London Dep. at 50), London did not answer both parts of the two-part question.  She limited her answer to whether a lowered evaluation affected layoffs and her testimony in that regard was speculative.  London

stated that she had "never been involved in layoffs," but had "heard" that an evaluation score is one factor, among others, used to compute an employee's retention score. (London Dep. at 50-51.)

Second, Blackledge states, without explanation, that an unfavorable performance appraisal has a negative impact on her salary. (Pl. Ex. W (Doc. No. 34)); (Am. Compl. ¶ 51)); (Pl. Mem. of Law at 13 (Doc. No. 33).) Defendants, however, submitted evidence that Blackledge "was at the top of her pay classification and would not be eligible for merit increases based on evaluations" and, that, therefore, an "exceeds standards" or "meets standards" evaluation would not compromise her salary as a Mental Health Social Worker II. (Defs. Mem. of Law at 12 (Doc. No. 27) (citing record excerpts).) In her brief opposing summary judgment, Blackledge does not directly address Defendants' contention or refute Defendants' evidence. On this record, Blackledge has failed to demonstrate that her 2006 performance appraisal actually impacted her promotion potential or wages.

Based on the foregoing, the court finds that Blackledge's 2006 performance appraisal is not a markedly worse performance appraisal and that Blackledge has not shown that the performance appraisal significantly impacted her professional advancement or salary. The 2006 performance appraisal does not meet the standard in Burlington Northern and, thus, is not a materially adverse action.

b.  2005 Performance Appraisal

Blackledge argues that, "without any cause," London "attempt[ed] to lower [her]

appraisal score" to 28.6 on her annual performance evaluation for the 2005 calendar

year.[31]  (Pl. Ex. III at 3 (Doc. No. 34)); (Compare Pl. Ex. DD with Pl. Ex. BB (Doc. No.

34)); (Pl. Mem. of Law at 14 (Doc. No. 33).)  The same day on which London informed

Blackledge of her intent to give Blackledge a performance score of 28.6, however,

Blackledge challenged London's decision, and London decided against lowering her

score.  (Pl. Mem. of Law at 14 (Doc. No. 33).)  In the end, Blackledge attained a score of

35.7 on her official performance appraisal for the 2005 calendar year.  (Pl. Mem. of Law

at 14 (Doc. No. 33)); (Pl. Performance Appraisal (Ex. BB to Doc. No. 34).)  Both the

proposed rating of 28.6 and the actual rating of 35.7 fall within the "exceeds standards"

category, see, supra, footnote 29.  Blackledge does not complain about her final score of

35.7, but rather contends that London's initial attempt to rate her performance 7.7 points

lower than Blackledge's performance score in 2004 was unjustified, retaliatory and in

response to her protected EEO activity.[32]  (Pl. Ex. III at 3 (Doc. No. 34).)

---

[31] In December 2005, London informed Blackledge of her intent to rate
Blackledge's performance for the 2005 year with a score which would have been 7.7
points lower than Blackledge's performance score for the 2004 year.  (See Pl. Mem. of
Law at 14 (Doc. No. 33)); (Compare Pl. Ex. CC, which is Blackledge's 2004 performance
appraisal, with Pl. Ex. DD, which reflects London's *proposed* performance score for
Blackledge for 2005).)  Both scores -- the actual one for 2004 and the proposed one for
2005 -- placed Blackledge's performance in the "exceeds standards" category.  (Id.)

[32] This alleged retaliatory act predates the filing of Blackledge's federal complaint
in April 2006, but postdates the filing of her EEOC charge in June 2004.

Defendants argue, in the first instance, that the *proposed* performance score (the one in Exhibit DD) is not negative because both the proposed lower score and Blackledge's score the preceding year placed Blackledge's performance in the "exceeds standards" category. (Defs. Reply at 17 (Doc. No. 35).)  The authority and the court's discussion in the preceding section support Defendants' position, and the court need not repeat that analysis here.

Additionally, as also argued by Defendants, more to the point is the fact that the act which Blackledge feared, *i.e.*, a performance score which was 7.7 points lower than her previous year's score, did not materialize.  At best, the adversity about which Blackledge complains is an unsuccessful attempt by London to rate Blackledge's performance within the lower range of the "exceeds standards" category.  There is no evidence that Exhibit DD (the document which reflects the proposed score) is part of Blackledge's personnel file, that DMH/MR used the proposed lower score to Blackledge's disadvantage concerning any term of her employment, or that the lower score caused Blackledge any other cognizable harm.  (See, e.g., Defs. Ex. 10 at 6 (Doc. No. 26).)

The only alleged harm which Blackledge musters is a statement that she suffered "stress" and hurt feelings.  (See Pl. Mem. of Law at 15, 37 (Doc. No. 33) (citing Pl. Dep. at 184).)  Her testimony, however, is nonspecific, and her subjective response is not dispositive because Burlington Northern requires the court to examine the material adversity of an action from the viewpoint of an *objectively* reasonable person.  Accordingly, the court finds that the rejected score did not cause Blackledge any "injury or harm."  Burlington Northern, 126 S.Ct. at 2414.

Under the reasonable person inquiry and having considered the totality of the circumstances, the court finds that Blackledge has not demonstrated an act which is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."[33]  Burlington Northern, 126 S.Ct. at 2409. Accordingly, the court finds that Defendants' motion for summary judgment is due to be granted on Blackledge's retaliation claim predicated on the proposed, but rejected, performance score in 2005.

### 2.  Other Acts

For two reasons, one which is substantive and one which is procedural, Defendants assert that they are entitled to summary judgment on Blackledge's retaliation claims predicated on other alleged "numerous" retaliatory acts.  (Am. Compl. ¶¶ 34, 51.) The gist of Defendants' first argument is that the other "numerous" retaliatory acts alleged by Blackledge are too trivial to constitute the adverse employment action required to state a claim for retaliation.  The court agrees.

The other acts about which Blackledge complains are as follows:  (1) the requirement that Blackledge obtain a doctor's note in order to be excused from attendance at the annual Spring Conference in April 2006 (Pl. Exs. X, Y to Doc. No. 34); (2) an

---

[33] It also is noteworthy that there is no evidence that there is anything inherently wrong with a performance appraisal score which differs from a prior one; in an appraisal, an employee is rated based upon his or her annual performance which commonsense counsels can change from year to year.  Although Blackledge argues that a performance appraisal must, at the very least, remain the same each year unless an employee has received a "prior counseling," she points to no competent evidence on this point.

averment that in or before March 2006 London "singled out" Blackledge for working with

her door "ajar" and not open (Pl. Ex. Y (Doc. No. 34)); (Pl. Dep. at 138-39 (Ex. A

to Doc. No. 34)); (3) an incident on January 12, 2007, when Blackledge says that Butler

falsely accused her of leaving work fifteen minutes early and required her to subtract

fifteen minutes from her leave time (Pl. Dep. at 176); and (4) "one incident" when Butler

prohibited Blackledge from using compensatory time for overtime hours on an

assignment and required her to use flex time.[34]  (Pl. Dep. at 53, 54, 181-83.)

Having considered the evidence in the light most favorable to Blackledge and the

context in which these four actions occurred, the court finds that these acts do not rise to

the level of an adverse employment action under the Burlington Northern standard.

Concerning the first incident, Blackledge was required to justify her leave by obtaining a

doctor's excuse, but she was not denied leave.  Once she procured the doctor's note,

Blackledge's leave was approved.  (See Defs. Exs. 18, 23.)  The court finds that the

additional burden placed on Blackledge to secure approval for her medical leave is a

---

[34] The court notes that it rejects Defendants' unsupported argument that one or more of these instances occurred more than 180 days prior to the date Blackledge filed her second EEOC charge alleging retaliation and that, thus, Blackledge did not timely exhaust her administrative remedies.  (Defs. Reply at 17-18 (Doc. No. 35).)  Here, each of the four incidents allegedly occurred after Blackledge filed her original charge of discrimination on June 8, 2004.  They are deemed timely exhausted.  See Houston v. Army Fleet Serv., L.L.C., ___ F. Supp.2d ___, 2007 WL 1747142, *7 (M.D. Ala. 2007) ("After the initial EEOC charge is filed, it can be said that the retaliation claim grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation") (citing Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988)).

"minor annoyance[]" which would not deter a reasonable employee from opposing workplace discrimination. Burlington Northern, 126 S.Ct at 2415. Similarly, the court categorizes the other three incidents as not reaching the threshold of materiality required to be protected by the anti-retaliation provision of Title VII. See id. at 2416.

The court also has considered Blackledge's analogy to Wideman, *supra*, which permits the court to view acts collectively to ascertain whether an adverse employment action has occurred. (See Pl. Mem. of Law at 34-35 (Doc. No. 33)); Wideman, 141 F.3d at 1456. The court, however, finds that, even under the more relaxed Burlington Northern definition of adverse employment action, the cumulative effect of all the actions about which Blackledge complains falls short of the level of materiality required. In context, the actions would not dissuade a reasonable employee from invoking the protections of Title VII.

As stated, Defendants also suggest a second ground in support of their motion for summary judgment on Blackledge's claims predicated on other "numerous" retaliatory acts. Defendants argue that Blackledge failed to identify any facts in her amended complaint concerning the nature of the alleged other "numerous" retaliatory acts. (Defs. Mem. of Law at 14 (Doc. No. 27) (citing Fed. R. Civ. P. 8(a).)

Defendants' argument finds support in a recent Supreme Court decision, and the court adopts Defendants' contention as an alternative basis for granting summary judgment on Blackledge's retaliation claims which allegedly are part and parcel of the so-called other "numerous" incidents. (Am. Compl. ¶¶ 34, 51); cf. Bell Atlantic Corp. v.

68

Twombly, ___ U.S. ___, 127 S.Ct. 1955, 1959 (2007) ("While a complaint attacked by a

Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels

and conclusions, and a formulaic recitation of a cause of action's elements will not do.")

(internal citation omitted); see also Jenkins v. County of Hennepin, Minn., Civ. No.

06-3625 (RHK/AJB), 2007 WL 2287840, *2 (D. Minn. Aug. 3, 2007) (plaintiff "cannot

simply allege, in conclusory fashion, that the State Defendants sought to retaliate against

him, in the hope of later uncovering some unknown-and un-alleged-facts to support that

conclusory assertion.") (citing Twombly, 127 S.Ct. at 1974).  For the foregoing reasons,

the court finds that Defendants are entitled to summary judgment on Blackledge's

retaliation claims brought pursuant to Title VII and § 1981/§ 1983.


### 3.  Summary

In sum, Blackledge has not offered evidence sufficient to demonstrate that she

suffered an adverse employment action within the meaning of Burlington Northern.

Blackledge, therefore, fails to establish a prima facie case of retaliation.  Defendants'

motion for summary judgment on Blackledge's retaliation claims brought pursuant to

§ 1981/§ 1983 and Title VII is due to be granted.

## VI. CONCLUSION

Blackledge brings retaliation and three failure-to-promote claims against DMH/MR and Houston in his official capacity pursuant to 42 U.S.C. §§ 1981, 1983 and Title VII. In this memorandum opinion and order, the court reaches the following findings on the issues raised in Defendants' motion for summary judgment: (1) the Eleventh Amendment bars Blackledge's § 1981/§ 1983 action against DMH/MR; (2) the Eleventh Amendment precludes Blackledge's § 1981/§ 1983 official-capacity action against Houston for monetary damages, but does not preclude Blackledge's § 1981/§ 1983 official-capacity action against Houston for prospective equitable relief; (3) Blackledge's Title VII claims against Houston in his official capacity are redundant of the Title VII claims against DMH/MR; (4) Blackledge failed to seek review by the EEOC on her Title VII failure-to-promote claims alleging that she twice was denied a promotion to a PQA II position, thus, precluding judicial review of these claims, but these two failure-to-promote claims proceed to trial under § 1981/§ 1983 against Houston in his official capacity for prospective equitable relief; (5) concerning Blackledge's Title VII race discrimination claim against DMH/MR for failure to promote to the CSS III position, Blackledge's failure to disclose Exhibit T as part of her Rule 26(a)(1)(B) disclosures does not warrant Exhibit T's exclusion under Rule 37(c)(1); Blackledge timely filed her EEOC charge; and Blackledge raises a genuine issue of material fact for trial on the issue of discrimination; (6) Blackledge's § 1981/§ 1983 race discrimination claim against DMH/MR alleging failure to promote to the CSS III position also proceeds to trial against

70

Houston in his official capacity for prospective equitable relief; and (7) Blackledge fails to make out a prima facie case on her retaliation claims.

### VII. ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendants' motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part.

DONE this 25th day of October, 2007.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE